James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

[Additional Attorneys on Signature Page]

*Attorney for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLENN SAGER and THOMAS HARRIES, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>KEY SAFETY SYSTEMS, INC., GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS LLC, GENERAL MOTORS LLC, and FCA US LLC,<br><br>Defendants. | Case No.: _____<br><br>CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................. 1

II.    PARTIES ......................................................................................... 6

       A.    Plaintiffs ............................................................................. 6

       B.    Defendants .......................................................................... 6

III.   JURISDICTION AND VENUE ...................................................... 8

IV.    SUBSTANTIVE ALLEGATIONS ................................................. 9

       A.    Definitions .......................................................................... 9

       B.    Joyson Airbags Have A Common Uniform Defect ................. 11

       C.    Defendants Knew The Airbags Were Defective. .................... 14

             1.    Defendants were aware of the Defect and engaged in a slow and
                   ineffective recall. ..................................................... 15

             2.    Defendants knew or should have known about the publicly reported
                   airbag failures in the Class Vehicles. ......................... 18

             3.    Defendants' knew of the inflator defect from prior recalls and
                   litigation. ................................................................ 26

       D.    Despite Their Knowledge, Defendants Concealed The Inflator Defect And
             Continued To Sell Class Vehicles with the Defective Airbags As "Safe"
             And "Reliable." ................................................................. 27

             1.    Labels and window stickers on the Class Vehicles stated that they
                   were equipped with working airbags and seatbelts and failed to
                   disclose the Inflator Defect. ..................................... 28

             2.    General Motors and FCA marketed the Class Vehicles as safe and
                   reliable but failed to mention the Inflator Defect. ......... 33

V.     CLASS ACTION ALLEGATIONS ................................................ 49

       A.    The Class Definition ........................................................... 50

       B.    Numerosity: Federal Rule of Civil Procedure 23(a)(1) ......... 51

       C.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2)
             and 23(b)(3) ...................................................................... 52

       D.    Typicality: Federal Rule of Civil Procedure 23(a)(3) ............ 53

       E.    Adequacy: Federal Rule of Civil Procedure 23(a)(4) ............ 54

F.  Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2) ................................................................ 54

G.  Superiority: Federal Rule of Civil Procedure 23(b)(3) ............................ 54

VI.  ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED ............. 55

VII.  NATIONWIDE CLASS CLAIMS ..................................................................... 57

NATIONWIDE COUNT I: ................................................................................. 57
Violation of the Magnuson-Moss Warranty Act .......................................... 57

NATIONWIDE COUNT II: ............................................................................... 62
Fraud by Concealment ................................................................................ 62

NATIONWIDE COUNT III: .............................................................................. 65
Unjust Enrichment ...................................................................................... 65

VIII.  STATE SPECIFIC CLAIMS ............................................................................. 67

NEW JERSEY COUNT I: .................................................................................. 67
Violation of the New Jersey Consumer Fraud Act ("NJCFA") N.J. Stat. Ann. § 56:8-2 et seq ..................................................................................... 67

NEW JERSEY COUNT II: ................................................................................. 70
Breach of Express Warranty ........................................................................ 70

NEW JERSEY COUNT III: ................................................................................ 75
Breach of Implied Warranty of Merchantability  N.J. Stat. Ann. §§ 12A:2-314, 12A:2A-103, and 12A:2A-212 ........................................................... 75

MISSOURI COUNT I: ....................................................................................... 78
Violation of the Missouri Merchandising Practices Act ............................... 78

MISSOURI COUNT II: ...................................................................................... 85
Breach of the Implied Warranty of Merchantability ..................................... 85

IX.  PRAYER FOR RELIEF ..................................................................................... 86

X.  DEMAND FOR JURY TRIAL ........................................................................... 87

Plaintiffs Glenn Sager and Thomas Harries, individually and on behalf of all others similarly situated allege the following against General Motors Company, General Motors Holdings LLC, General Motors LLC (collectively "General Motors"), FCA US LLC ("FCA" with General Motors, the "Truck Manufacturers"), and Key Safety Systems, Inc. d/b/a Joyson Safety Systems ("Joyson") (collectively "Defendants") based upon personal knowledge as to allegations specifically pertaining to Plaintiffs and, as to all other matters, upon the investigation of counsel.[1]

## I.   <u>INTRODUCTION</u>

1.     This action concerns defective airbags manufactured by Key Safety Systems, Inc. d/b/a Joyson Safety Systems (previously defined as "Joyson"), the successor-in-interest to Takata Corporation ("Takata"), which contain airbag inflators that were contaminated by moisture during Joyson's manufacturing process, but were nevertheless equipped in trucks that Defendants FCA and General Motors manufactured, sold, or leased. The Truck Manufacturers misrepresented the Class Vehicles (defined below) as safe and deceptively concealed the fact that inflators in these vehicles are prone to explode, even without airbag deployment, and

---

[1]  Counsel's investigation includes an analysis of publicly available information, including Defendants' Technical Service Bulletins, National Highway Traffic Safety Administration documents and consumer complaints. Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

may maim or kill drivers and passengers.

2.      An airbag is a critical safety feature of any motor vehicle. Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield. An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact. In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.

3.      All Joyson airbags at issue in this litigation share a common, uniform Defect: corrosion inside the inflator vessel of the airbags, caused by moisture introduced into the vessel during Joyson's manufacturing process ("Inflator Defect" or "Defect"). It is known that airbags containing the Inflator Defect are located in the roof-rails of certain trucks manufactured by General Motors and the side-curtains of certain trucks manufactured by FCA. However, the Inflator Defect may also be present in other airbags manufactured and distributed by Joyson.

4.      Because of the common, uniform Inflator Defect, Joyson airbags fail to perform as they should. Instead of protecting vehicle occupants from bodily injury during accidents, the defective Joyson airbags may spontaneously explode, and may injure drivers and passengers. As of August 2021, Joyson airbags have been involved in three recalls because of the Inflator Defect.

5.      Defendants either knew or should have known of the Inflator Defect

in light of their respective histories with Takata, a Japanese automotive parts company. In 2013, a series of deaths and injuries associated with defective Takata airbag inflators manufactured by their Mexican subsidiary, led Takata to initially recall 3.6 million cars equipped with such airbags. Further fatalities caused by the airbags led the National Highway Traffic Safety Administration ("NHTSA") to order an ongoing, U.S.-wide recall of tens of millions of cars, the largest automotive recall in U.S. history (the "Takata Recalls").

6.      On June 25, 2017, Takata filed for Chapter 11 bankruptcy in the United States and filed for bankruptcy protection in Japan, owing more in compensation than was possible for its survival. On April 11, 2018, the bankrupt assets of Takata were acquired by Key Safety Systems, Inc., which then renamed itself to Joyson Safety Systems. Joyson now owns Takata's supplier factories and on information and belief is the successor-in-interest to its core books, records, and personnel.

7.      The Truck Manufacturers are aware of the Takata Recalls and are still facing ongoing litigation for, among other things, concealment and suppression of facts related to the Takata Recalls. The Truck Manufacturers are also aware that Joyson is Takata's successor-in-interest. The Truck Manufacturers therefore knew or should have known that airbags manufactured by Joyson contain similar defects in design or manufacturing to those triggering the Takata Recalls.

8.     The Inflator Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury. Moreover, the Defective Airbags (defined below) are manufactured in Mexico, which is the *same location* where the defective Takata airbags were manufactured. The Truck Manufacturers are putting profits ahead of safety by continuing to equip vehicles with Joyson airbags, even though they knew or should have known those airbags were defective. Despite the shocking record of airbag failures, injuries, and deaths caused by Joyson's predecessor, Takata, the Truck Manufacturers failed to adequately test the Defective Airbags, to fully investigate the problem, and have been slow to issue recalls. Only relatively recently—on the heels of General Motors' second recall—has the Defect with Joyson airbags come to light. Defendants have delayed repairing the Inflator Defect, and continue to misrepresent and/or conceal material facts regarding their safety.

9.     As a result of this misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages. Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than

they would have had the Inflator Defect been disclosed. Plaintiffs and the Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as it avoids incurring the costs associated with recalls and installing replacement parts.

10.     Plaintiffs and the Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and paying for childcare. Also, as a direct result of misconduct by the Truck Manufacturers, each Plaintiff and Class member has out-of-pocket economic damage by virtue of having incurred the expense of taking the time to bring vehicles in for repair.

11.     Plaintiffs and the Classes also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of the Class Vehicles. Defendants' false representations and omissions concerning the safety and reliability of those vehicles and their concealment of the known safety defects plaguing those vehicles caused Plaintiffs and Class members to purchase, lease, or retain their vehicles with diminished value.

II. **PARTIES**

A. **Plaintiffs**

12.     Plaintiff Sager resides in Atco, New Jersey. Plaintiff Sager owns a 2016 Chevrolet Silverado, which was purchased used on or around April 1, 2020, from Mall Chevrolet in Cherry Hill, New Jersey. The value of Plaintiff Sager's 2016 Chevrolet Silverado has diminished as a result of the Inflator Defect. Plaintiff Sager purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Sager would not have purchased his 2016 Chevrolet Silverado or would not have paid as much for it had Defendants disclosed the Inflator Defect.

13.     Plaintiff Harries resides in Saint Peters, Missouri. Plaintiff Harries owns a 2015 GMC Sierra, which was purchased used on or around August 1, 2021, from CarMax in Saint Peters, Missouri. The value of Plaintiff Harries' 2015 GMC Sierra has diminished as a result of the Inflator Defect. Plaintiff Harries purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Harries would not have purchased his 2015 GMC Sierra or would not have paid as much for it had Defendants disclosed the Inflator Defect.

B. **Defendants**

14.     Key Safety Systems, Inc. d/b/a Joyson Safety Systems ("Joyson"), is incorporated in Delaware with its principal place of business located at 2025 Harmon Road, Auburn Hills, MI 48326. Joyson is owned jointly by Joyson Group (China)

and PAG Capital (Hong Kong), and the company is the result of Key Safety Systems, Inc. purchasing troubled Japanese airbag company Takata Corporation.

15.     General Motors LLC ("General Motors LLC") is organized in Delaware and maintains its executive offices at 300 Renaissance Center, Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings LLC.

16.     General Motors Holdings LLC ("General Motors Holdings") is organized in Delaware and maintains its principal executive offices in Detroit, Michigan. The sole member of General Motors LLC is General Motors Company.

17.     General Motors Company ("General Motors Parent") is a Delaware corporation with its principal executive offices in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. General Motors Parent's only asset is its 100% ownership interest in General Motors Holdings. General Motors Parent is also responsible for making reports to NHTSA related to vehicle safety and deciding on vehicle recalls.

18.     FCA US LLC ("FCA"), formerly known as Chrysler Group LLC, is a Delaware limited liability company with its principal place of business located at 1000 Chrysler Drive, Auburn hills, Michigan, and FCA is a citizen of the States of Delaware and Michigan. The sole owner of FCA is Stellantis N.V., a Dutch-domiciled, multinational automotive manufacturing corporation, formed in 2021.

## III.    **JURISDICTION AND VENUE**

19.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Classes are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' Magnusson-Moss claims arise under federal law. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

21.     This Court has personal jurisdiction over General Motors under 18 U.S.C. § 1965(d) because it is found, has agents, or transacts business in this District. General Motors maintains 87 primary suppliers in New Jersey (direct and indirect) with a purchase order current within the last 365 days, 79 active dealers in New Jersey and delivered 58,177 vehicles in New Jersey just in 2020 alone.[2] Further, General Motors is committing a tortious act in this state, and causing injury to property in this state arising out of General Motors acts and omissions outside this state.

---

[2] General Motors in New Jersey, GENERAL MOTORS, https://www.gm.com/our-company/us/nj.html (last accessed Aug. 16, 2021)

22.     This Court has personal jurisdiction over FCA and Joyson under 18 U.S.C. § 1965(d) because: FCA and Joyson conducts substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of FCA and Joyson operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of FCA's and Joyson's acts and omissions outside this state; and at or about the time of such injuries FCA and Joyson was engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by FCA and Joyson anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District. Defendants caused harm to Plaintiff Sager, as well as hundreds of members of the Classes residing in New Jersey. Venue is also proper under 18 U.S.C. § 1965.

## IV.     **SUBSTANTIVE ALLEGATIONS**

### A.     **Definitions**

24.     Plaintiffs bring this action on behalf of themselves, and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs

seek redress individually, and on behalf of those similarly situated, for economic losses stemming from Defendants' manufacture, sale or lease, and false representations or omissions concerning the Inflator Defect in the Class Vehicles, including, but not limited to, diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties and injunctive relief/equitable relief.

25.     "Class Vehicles" refers to all vehicles in the United States that (a) were equipped with Defective Airbags (defined below) as original equipment and (b) were manufactured, distributed, sold, or leased by Defendants.

26.     "Defective Airbags" refers to all airbag modules manufactured by Joyson, including (a) all airbags containing the Inflator Defect; (b) all airbags subject to the recall identified in paragraph 28 below; and (c) all airbags manufactured by Joyson subject to any subsequent expansion of pre-existing recalls, new recalls, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to spontaneously deploy or rupture.

27.     All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, all Defective Airbags have an unreasonably dangerous tendency to explode, even without air-bag deployment, and maim or kill drivers and passengers.

28.     The following tables identify, to the best of Plaintiffs' understanding and without the benefit of discovery, the General Motors and FCA vehicles equipped

with the Defective Airbags, along with their respective recall status:

| Recall | Make | Model | Model Years |
|---|---|---|---|
| 20V-736; 21V-504 | GMC | Sierra 1500 | 2015-2016 |
| 20V-736; 21V-504 | GMC | Sierra 2500/3500 | 2015 |
| 20V-736; 21V-504 | Chevrolet | Silverado 1500 | 2015-2016 |
| 20V-736; 21V-504 | Chevrolet | Silverado 2500/3500 | 2015-2016 |
| 21V-632 | Dodge | Ram 1500 | 2015-2019 |
| 21V-632 | Dodge | Ram 2500 | 2015-2020 |
| 21V-632 | Dodge | Ram 3500 | 2015-2020 |
| 21V-632 | Dodge | Ram Classic | 2019-2020 |

**B.      Joyson Airbags Have A Common Uniform Defect**

29.      Airbags are designed to take advantage of the physics of a crash. In the case of a head-on collision, a car usually completes its impact progression in a few instants. For example, when traveling at 40 miles per hour, a car will decelerate at a rate of 3,997 meters per second, taking just 4.5 milliseconds to stop completely, the blink of an eye. Following Newton's second law, the bodies of the occupants will continue to move until an outside force, such as the steering wheel, dashboard or windshield bring the occupants to a stop. In this way, an airbag does not only soften the blow in a collision; it also lowers the impact by stretching the collision out over a longer period of time and spreading the impact over a larger area of the body. For this reason, airbags inflate and then quickly deflate—to gradually bring the occupants' momentum from full speed to zero.

30.     In general, there are five main parts of an airbag system: crash sensors; a control module; a heating element; an explosive charge; and the airbag itself.

31.     The airbag control module initiates airbag deployment by input from crash sensors located throughout the vehicle. Crash sensors are electronic devices designed to tell when an impact has occured. The sensors respond to several different sets of stimuli, such as sudden stopping or increased pressure as pieces of the car move due to the force of the collision. Different sensors measure wheel speed, seat occupant status, brake pressure, impact, and more. The airbag control module measures these vehicle status indicators during operation.

32.     Once the airbag control module detects a crash, it then sends an electrical current through the heating element of the system, to rapidly heat up inflator—or wake-up—the inflator.

33.     The inflator then ignites a charge, often solid pellets of sodium azide (NaN3), which explodes. The explosion produces nitrogen gas (N2~) that fills a deflated nylon airbag, at about 200 miles per hour. The whole reaction takes a mere 1/25 of a second.

12



34. The airbag itself has tiny holes that begin releasing the gas the moment it is filled. Airbags are designed to be deflating by the time it makes contact with the occupant, in order to absorb the impact, rather than resulting in whiplash that could kill or maim the occupant. For this reason, the Inflator Defect is tremendously dangerous to occupants, fatally so. If an airbag deploys in the event of no collision, occupants are assaulted with an airbag inflating at 200 mph in 1/25th of a second and may bombarded with shrapnel.

35. In the case of prior Takata Recall, the inflator—the metal cartridge packed with propellant wafers—ignited with too much force, sometimes with little to no stimuli. When the airbag ruptures, it sends metal shards flying through the bag in the same direction as it is inflating—in other words directly at the occupants' head and neck.

36. Here, the Defective Airbags were manufactured by Joyson—Takata's successor-in-interest—at Joyson's Mexican facilities. Joyson appears to still have issues from its acquisition of Takata – its airbag inflators were

contaminated with moisture during the manufacturing process. Indeed, just two months ago Joyson announced the discovery of falsified seat belt testing data from the Takata era. The Inflator Defect poses a tremendous public safety risk in the event of an unexpected deployment—which is a serious, unjustified, and dangerous safety defect.

**C.    Defendants Knew The Airbags Were Defective.**

37.    Defendants knew or had reason to know of the Inflator Defect and the risks it entails well before General Motors and FCA issued their recalls, from consumer complaints, internal investigations, and communications from their networks of dealerships. Defendants have continued to acquire knowledge of the Defect and General Motors delayed nearly nine months before issuing a secondary recall. Defendants have continued to conceal this problem and the pattern of accidents, injuries, and deaths that have resulted from it. Defendants have failed to share this information with the consumers who paid for and drive their Class Vehicles every day.

38.    It is perhaps unsurprising that Defendants have unreasonably and unsafely delayed disclosure of the Inflator Defect following its history endangering the public. As is now public knowledge, millions of General Motors and FCA vehicles contained the dangerous and defective Takata airbag inflators that can explode with too much force and spray metal shrapnel into vehicle passenger

14

compartments. While the dangers of these Takata airbags were widely known for years, General Motors and FCA lobbied regulators to delay recalls for their affected vehicles to avoid a resulting hit to their profits. The Truck Manufacturers reported that recalling their vehicles with Takata inflators costed hundreds of millions of dollars.

39.    Consumers brought a putative class action seeking redress. *See In re Takata Airbag Product Liability Litigation*, Case No. 14-cv-240009, Dkt. 2750, (S.D. Fl.). While other vehicle manufacturers had earlier and voluntarily recalled their vehicles with Takata airbags, it was only years later, with that consumer litigation pending, that the Truck Manufacturers issued belated recalls. And importantly, did so *only after* regulators from NHTSA denied General Motors' petition for inconsequentiality, in which it attempted to argue that a recall was unnecessary.[3] Here, as in Takata, Defendants knew or should have known that the Defective Airbags were dangerous.

### 1.    Defendants were aware of the Defect and engaged in a slow and ineffective recall.

65.    On June 2, 2020, General Motors' Technical Assistance Center

---

[3] *General Motors will recall 7 million vehicles for air bag issue worldwide,* REUTERS (November 23, 2020), https://www.reuters.com/article/us-gm- recall/gm-will-recall-7-million-vehicles-for-air-bag-issue-worldwide- idUSKBN2831TH (last visited August 16, 2021).

received a report from a General Motors dealer regarding an unwanted/uncommanded deployment of a roof-rail airbag in a 2015 model year Chevrolet Silverado. An inspection was conducted on June 22, 2020, and based on the photos obtained in that inspection, the issue was submitted to General Motors' safety program on June 25, 2020. On June 26, 2020, General Motors opened a formal product investigation.

66.     Joyson received the inflator from the field on July 17, 2020, and began engineering analyses on the returned part, including metallurgical and scanning electron microscopy analyses. Joyson found evidence of corrosion and material embrittlement at the inflator end cap.

67.     Joyson observed similar corrosion and embrittlement in a roof-rail airbag inflator returned from the field from a prior incident in 2019.

68.     On October 20, 2020, Joyson informed General Motors that it identified a production period during which moist air might have been introduced into the inflator manufacturing process. This supplier production window aligns with the manufacturing dates of inflators from both field cap-separation incidents. On November 18, 2020, General Motors' Safety and Field Action Decision Authority decided to conduct a safety recall on roof-rail airbag inflators produced during this production window.

69.     On November 25, 2020, the first recall was issued, less than 10,000

vehicles were recalled.[4]

70.     On January 15, 2021, according to NHTSA ID 11416553, at least one consumer indicated that they attempted to have their Class Vehicle repaired but that the parts were not yet available and the infrastructure for repair was not in place. Accordingly, over two months after issuing the recall, General Motors was not in a position to repair the Class Vehicles.

71.     In mid-June 2021, roof-rail airbags in three separate 2015 model year Silverado vehicles—one in Florida and two in Texas—ruptured while the vehicles were unoccupied and not in use within a few weeks' time. In all three inflators, the steel inflator-body sidewall split open, suddenly releasing the gas stored inside the chamber.

72.     General Motors became aware of these three incidents on June 15, June 21, and June 22nd. On June 24, 2021, General Motors' Safety and Field Action Decision Authority decided to conduct a safety recall.

73.     On July 1, 2021, General Motors issued their second recall, increasing the number of Class Vehicles' affected from under 10,000 vehicles to over 400,000 vehicles.[5]

---

[4]     *See* Part 575 Safety Recall Report, NHTSA (Feb. 24, 2021) https://static.nhtsa.gov/odi/rcl/2020/RCLRPT-20V736-6601.PDF.
[5]     *See* Part 575 Safety Recall Report, NHTSA (July 1, 2021) https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V504-9818.PDF.

74.     On August 15, 2021, FCA also issued a recall for 212,373 Ram pick-ups in the United States, and another 49,334 in Canada and Mexico. Nearly two years after Joyson became aware of the Defect in 2019, only recently have Defendants begun to issue recalls. Accordingly, Defendants knew or should have known that the Joyson airbags installed in millions of Class Vehicles were defective and potentially deadly.

### 2.     Defendants knew or should have known about the publicly reported airbag failures in the Class Vehicles.

79.     Defendants were also on notice of the Inflator Defect and its attendant safety risks from consumer complaints. These complaints are publicly available online through NHTSA's website.

80.     On information and belief, vehicle manufacturers such as General Motors and FCA monitor these public databases for complaints about their vehicles, in particular in light of their statutory obligations to report known safety defects in their vehicles to NHTSA and consumers. Moreover, in many of these reports, it is expressly clear that General Motors and FCA were directly informed of, and even investigated, the accidents in question. While the Truck Manufacturers had access to the full body of these complaints in the public database, they failed to act until much later.

Vehicle:              2015 Chevrolet Silverado 1500
NHTSA ID Number:      11428106

18

Incident Date:             July 9, 2021
Consumer Location:    DAYTONA BEACH, FL
VIN:                      1GCVKPEC5FZ****

**_Side rail airbag deployed knock me out and total my vehicle._**[6]

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Vehicle:                 2015 Chevrolet Silverado 1500
NHTSA ID Number:    11395621
Incident Date:             February 6, 2021
Consumer Location:    ALBUQUERQUE, NM
VIN:                      3GCUKREC9FG****

I WAS DRIVING AT A SPEED OF 40 MPH ON A DIRT ROAD WHEN **_I HIT A LITTLE BUMP AN DRIVER AN PASSENGER CURTAIN AIR BAGS DEPLOY FOR NO REASON AT ALL, CAUSING MYSELF AN WIFE TO RUN OFF THE ROAD INTO AN EMBANKMENT. MY WIFE IS OK I SUFFER A LACERATION TO MY NOSE AN A SPRANG ANKLE._** THIS HAD HAPPEN WILL DELIVERING FOOD AN WATER TO GRANDPARENTS ON THE RESERVATION, THEY HAVE NO RUNNING WATER. THERE WAS NO POLICE REPORT FILED DUE TO COVID 19 AN UNAVAILABLE POLICE ON RESERVATION.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Vehicle:                 2015 Chevrolet Silverado 1500
NHTSA ID Number:    11416553
Incident Date:             January 15, 2021
Consumer Location:    BLOOMINGDALE, NJ
VIN:                      1GCVKREC7FZ****

THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 20V736000 (AIR BAGS) HOWEVER, THE PART TO DO THE RECALL REPAIR WAS NOT YET AVAILABLE. THE CONTACT STATED THAT THE

---

[6] All emphasis added. Complaints available at: https://www.nhtsa.gov/vehicle/.

MANUFACTURER HAD EXCEEDED A REASONABLE AMOUNT OF TIME FOR THE RECALL REPAIR. HAWTHORNE CHEVROLET (1180 GOFFLE RD, HAWTHORNE, NJ 07506) AND THE MANUFACTURER WERE MADE AWARE OF THE ISSUE. THE MANUFACTURER INSTRUCTED THE DEALER TO PROVIDE THE CONTACT WITH A LOANER VEHICLE SINCE THE REMEDY WAS NOT YET AVAILABLE. THE CONTACT HAD NOT EXPERIENCED A FAILURE. THE VEHICLE WAS NOT YET REPAIRED. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Vehicle:                 2015 Chevrolet Silverado 1500
NHTSA ID Number:         11390204
Incident Date:           January 27, 2021
Consumer Location:       AURORA, MO
VIN:                     1GC1KVEG1FF****

*TL\* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 2500. THE CONTACT STATED THAT WHILE THE HUSBAND WAS DRIVING APPROXIMATELY 35 MPH BOTH THE FRONT AND REAR DRIVER AND PASSENGER SIDE CURTAIN AIR BAGS ERRONEOUSLY DEPLOYED CAUSING THE DRIVER TO LOST CONTROL OF THE STEERING AND CRASH INTO A DITCH. DURING THE INCIDENT THE DRIVER SUSTAINED A NECK INJURY.* NO POLICE REPORT WAS TAKEN. THE CAUSE OF THE FAILURE WAS NOT DETERMINED. THE LOCAL DEALER RELIABLE CHEVROLET LOCATED AT 3655 S CAMPBELL AVE, SPRINGFIELD, MO 65807 WAS NOTIFIED OF THE FAILURE. THE MANUFACTURER WAS NOT YET CONTACTED. THE FAILURE MILEAGE WAS 268,000.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Vehicle:                 2015 Chevrolet Silverado 1500
NHTSA ID Number:         11169960
Incident Date:           December 20, 2018
Consumer Location:       BAYTOWN, TX
VIN:                     3GCUKREC6FG****

DRIVING DOWN SINGLE LANE ROAD I BEGAN TO STOP FOR RED LIGHT, AS I BEGAN TO DEPRESS BRAKE PEDAL BUT IT WAS STIFF AND HAD SIGNIFICANT EFFECT SLOWING MY TRUCK. I DROVE OF RIGHT SIDE OF ROAD INTO WET GRASS TOO AVOID COLLISION OF SUV STOPED IN FRONT OF ME. THERE WAS NO LOSS OF CONTROL OR DAMAGE DONE TO EXTERIOR OF TRUCK OR MYSELF . ***AS I'M ALMOST COMPLETELY STOPED THE SIDE CURTAIN AIR BAGS DEPLOY FOR NO APPARENT REASON CAUSING SEVER DAMAGE IT THE INTERIOR PANELS, HEADLINER AND BOTH FRONT SEAT BELTS*** THAT HAVE THAT CONTAIN SMALL CHARGE PERMINTLY LOCK AND NOW ARE UN USABLE.I WAS ONLY PERSON IN TRUCK BUT THE PASSENGER FRONT SEAT BELT IS RETRACTED AND LOCKED GUITAR STRING TIGHT.

▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪

| | |
|---|---|
| Vehicle: | 2015 Chevrolet Silverado 1500 |
| NHTSA ID Number: | 10936390 |
| Incident Date: | November 11, 2016 |
| Consumer Location: | GUTHRIE, OK |
| VIN: | N/A |

***THE SIDE CURTAIN AIRBAGS DEPLOYED WHILE I WAS DRIVING ON A PAVED ROADWAY. I DID NOT HIT ANYTHING PRIOR TO INCIDENT.*** GM STATES THAT THEY WILL NOT TAKE RESPONSIBILITY FOR THE TRUCK. I WAS THANKFULLY NOT INJURED AND NO ONE ELSE WAS INJURED. THERE IS NO PHYSICAL DAMAGE TO THE TRUCK AT ALL. GM HAS ABSOLUTELY NO CONCERN FOR THE PUBLIC SAFETY. THE RECALL ON THE AIRBAGS HAD BEEN "FIXED" BY BOB HOWARD DEALERSHIP IN OKLAHOMA CITY THE MONTH BEFORE THE AIRBAGS DEPLOYED. THE SEATBELT RECALL WAS ALSO FIXED THE MONTH BEFORE AS WELL. *TR

▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪

| | |
|---|---|
| Vehicle: | 2015 Chevrolet Silverado 1500 |
| NHTSA ID Number: | 10908311 |
| Incident Date: | August 20, 2016 |
| Consumer Location: | CRAIG, CO |
| VIN: | 3GCUKPEC9FG**** |

***WHILE ON A DIRT ROAD DRIVING AT A SLOW SPEED, THE SIDE CURTAIN AIRBAGS DEPLOYED.*** THE VEHICLE DID NOT HIT ANYTHING AND NO OTHER DAMAGE OCCURRED. GM SENT A 3RD PARTY TO EVALUATE THE VEHICLE AND DECLARED THE WARRANTY VOID SINCE WE HAD INSTALLED A 4" LIFT KIT. THERE IS CURRENTLY A RECALL FOR TAKATA AIRBAGS ON THIS PARTICULAR TRUCK BUT GM SAYS THIS IS UNRELATED. THIS VEHICLE WAS PURCHASED NEW IN MARCH OF 2016 AND HAD 5089 MILES WHEN THIS INCIDENT OCCURRED. HOW CAN GM DENY THIS CLAIM. SHOULDN'T THEY HAVE TO PROVE THAT THE LIFT KIT CAUSED THE DEPLOYMENT IF THAT IS THEIR REASON FOR DENIAL? NO WHERE IN THE WARRANTY INFORMATION DOES IT STATE INSTALLING A LIFT KIT CAN CAUSE THE SIDE AIR BAGS TO DEPLOY. NO WHERE ON THE INFORMATION PROVIDED FROM THE LIFT KIT MANUFACTURER DOES IT STATE YOUR WARRANTY COULD BE VOID IF YOU INSTALL THE KIT. THIS ISN'T RIGHT. ANY HELP YOU CAN PROVIDE WOULD BE GREATLY APPRECIATED.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

| | |
|---|---|
| Vehicle: | 2015 Chevrolet Silverado 1500 |
| NHTSA ID Number: | 10748531 |
| Incident Date: | June 22, 2015 |
| Consumer Location: | PHILIPSBURG, PA |
| VIN: | 1GCVKREC8FZ**** |

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO. ***THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 14 MPH ON A GRAVEL ROAD, BOTH THE DRIVER AND PASSENGER SIDE AIR BAGS DEPLOYED. THE CONTACT AND THE PASSENGER SUSTAINED INJURIES.***

22

***THE CONTACT REQUIRED MEDICAL ATTENTION.*** THE VEHICLE WAS TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE FAILURE WAS CAUSED BY THE ROUGH ROAD AND THAT THE VEHICLE FUNCTIONED AS DESIGNED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 9,300.

● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ●

Vehicle:              2016 Dodge Ram 1500
NHTSA ID Number:      11396137
Incident Date:        September 3, 2020
Consumer Location:    HINESVILLE, GA
VIN:                  1C6RR6GGXGS****

***SIDE CURTAIN AND DRIVER SEAT AIRBAG DEPLOYED WHILE DRIVING ABOUT 10 MPH AFTER PULLING OUT OF THE GAS STATION. THERE WAS NO COLLISION.*** I REPORTED THE SITUATION TO RAM AND THEY TOLD ME SORRY ABOUT YOUR LUCK, WERE NOT TAKING CARE OF IT.

● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ●

Vehicle:              2015 Dodge Ram 2500
NHTSA ID Number:      11174495
Incident Date:        February 1, 2019
Consumer Location:    WARRENTON, MO
VIN:                  3C6TR5DT8FG****

TL* THE CONTACT OWNS A 2015 RAM 2500. WHILE DRIVING DOWN A GRAVEL DRIVEWAY, ***THE FRONT SIDE AIR BAGS DEPLOYED WITHOUT WARNING OR AN IMPACT. THERE WERE NO INJURIES.*** AN UNKNOWN DEALER WAS CONTACTED. THE MANUFACTURER WAS CONTACTED AND STATED THAT THE VEHICLE WAS NOT INCLUDED IN A TAKATA AIR BAG RECALL. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS UNKNOWN.

● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ●

Vehicle:                        2017 Dodge Ram 2500
NHTSA ID Number:       11407815
Incident Date:             April 8, 2021
Consumer Location:     ORANGE, CA
VIN:                          3C6UR5FL1HG****

***DRIVING DOWN HIGHWAY AND BOTH SIDE IMPACT AIRBAGS DEPLOYED FROM SEATS AND THE CEILING COVERING ALL SIDE WINDOWS FOR NO APPARENT REASON AT ALL.***

81.      The above consumer complaints represent a sampling of complaints filed with the NHTSA. Defendants monitored and saw the above quoted consumer complaints for three reasons:

    a.  First, pursuant to the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), 49 U.S.C. § 30118, manufacturers are required to monitor reports submitted to NHTSA and report information regarding internal customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects.

    b.  Second, car manufacturers like Defendants know that NHTSA is a repository for complaints, and as such can provide an early warning mechanism for responding to design or manufacturing defects that pose a safety hazard. Hence, as courts have found, it

is entirely reasonable to assume that car manufacturers closely monitor and analyze complaints made to NHTSA—particularly when they entail a safety hazard.

c.  Third, online reputation management (commonly called "ORM" for short), is now a standard business practice among most major companies and entails monitoring consumer forums, social media and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[7]  The growth of the internet and social media, along with the advent of reputation management companies, has led to ORM becoming an integral part of many companies' marketing efforts. Defendants regularly monitored NHTSA in connection with its ORM activities because candid

---

[7] Moryt Milo, *Great Businesses Lean Forward, Respond Fast*, SILICON VALLEY BUSINESS JOURNAL (September 5, 2013), http://www.bizjournals.com/sanjose/print-edition/2013/05/17/great-businesses-lean-forward-respond.html.

comments from Defendants owners provide valuable data regarding quality control issues and customer satisfaction. Defendants therefore would have learned about the numerous complaints filed with NHTSA.

82.    Defendants, who concealed their knowledge of the nature and extent of the Inflator Defect from the public while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety. Moreover, General Motors and FCA have violated their affirmative duty, imposed under the TREAD Act, to promptly advise customers about known defects.

### 3.    Defendants' knew of the inflator defect from prior recalls and litigation.

83.    Defendants knew or should have known of the Inflator Defect based off prior recalls and litigation.

84.    As explained above, the original Takata defect triggered the largest recall in American history, and it continues to grow. There, FCA recalled 2003-2010 Dodge Ram vehicles equipped with, upon information and belief, the same or similar defective inflators. FCA, working with Joyson, identified affected products, but, for the sake of its own profits, failed to include the Class Vehicles in its recalls.  FCA to this day has still failed to disclose the Inflator Defect to Plaintiffs or the Classes.

85.    Like FCA, General Motors also previously recalled 2007-2014 truck

and SUV vehicles equipped with, upon information and belief, the same or similar defective inflators. General Motors, working with Joyson, identified affected products, but, for the sake of its own profits, failed to initially recall these vehicles. However, as alleged in more detail herein, General Motors finally publicly admitted the existence of the Inflator Defect in the Class Vehicles.

**D.** **Despite Their Knowledge, Defendants Concealed The Inflator Defect And Continued To Sell Class Vehicles with the Defective Airbags As "Safe" And "Reliable."**

86. For Plaintiffs and many consumers, safety is one of the most important factors when buying or leasing a vehicle, and especially for trucks and family-oriented SUVs composing the Class Vehicles. General Motors and FCA capitalized on this fact in advertising and other consumer-facing representations about the Class Vehicles and touted the safety of the Class Vehicles in national marketing campaigns.

87. In advertisements and promotional materials, General Motors and FCA maintained that the Class Vehicles were safe and reliable, and did not correct representations about the Class Vehicles' safety and reliability made in the past. Instead, General Motors and FCA have repeatedly touted the Class Vehicles' passenger safety systems and assured consumers they could rely on their airbags. These representations are false and misleading because of what they fail to say; General Motors and FCA uniformly failed to disclose that the Defective Airbags are

prone to explode, even without air-bag deployment, and maim or kill drivers and passengers.

88.     Plaintiffs, directly or indirectly, were exposed to these advertisements and promotional materials before purchasing or leasing their Class Vehicles. If General Motors and FCA had instead chosen to disclose the truth about the Inflator Defect—including at dealerships, on their websites, in brochures, press releases or in other promotional materials—Plaintiffs and Class members would have seen those disclosures and been capable of making an informed purchasing decision. The misleading statements about Class Vehicles' safety in FCA and General Motors' advertisements and promotional materials, as well as omissions of truth about the Inflator Defect, influenced Plaintiffs and Class members' decisions to purchase or lease Class Vehicles.

### 1.     Labels and window stickers on the Class Vehicles stated that they were equipped with working airbags and seatbelts and failed to disclose the Inflator Defect.

109.     To distribute their vehicles in the United States, the Truck Manufacturers had to "certify to the distributor or dealer at delivery that the vehicle or equipment complies with applicable motor vehicle safety standards prescribed" by NHTSA under Chapter 301 of Title 49 of the U.S. Code. Accordingly, General Motors and FCA "may not issue the certificate if, in exercising reasonable care," they have "reason to know the certificate is false or misleading in a material respect."

49 U.S.C. § 30115; *see also* 49 U.S.C. § 30112.

110.    Further, since "[c]ertification of a vehicle must be shown by a label permanently fixed to the vehicle," all Class Vehicles have a permanent label certifying compliance with the safety regulations prescribed by NHTSA. Since all the Class Vehicles are passenger vehicles, the permanent label must state: "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." 49 C.F.R. § 567.4(g)(5).

111.    These labels were false and misleading because they failed to warn consumers about the risk that the inflators in the Class Vehicles are prone to explode, even without air-bag deployment, and instead indicated that the passenger safety system would function properly. *See* 49 C.F.R. § 571.208 (S4.1.5.4, S4.1.5.5) (Federal motor vehicle safety standards requiring Occupant Restraint Systems with airbags and seatbelts). Vehicle manufacturers have a duty to disclose known safety defects to the public and to NHTSA. When a vehicle manufacturer learns of a safety defect, federal law requires it to disclose the Defect to NHTSA and to the owners, purchasers, and dealers of the vehicle. 49 U.S.C. § 30118(c).

112.    Indeed, General Motors acknowledges these obligations in its public SEC filings. In its Form 10-K for fiscal year 2019, General Motors Parent states: "If we or NHTSA determine that either a vehicle or vehicle equipment does not comply

with a safety standard or if a vehicle Defect creates an unreasonable safety risk, the manufacturer [must] notify owners and provide a remedy."[8] Likewise, a prior publicly-traded parent of FCA, Fiat Chrysler Automobiles N.V., stated in an SEC filing that "Under U.S. federal law, all vehicles sold in the U.S. must comply with Federal Motor Vehicle Safety Standards ("FMVSS") promulgated by NHTSA, and must be certified by their manufacturer as being in compliance with all such standards at the time of the first purchase of the vehicle. In addition, if a vehicle contains a defect that is related to motor vehicle safety or does not comply with an applicable FMVSS, the manufacturer must notify NHTSA and vehicle owners and provide a remedy at no cost."[9]

113.    The interiors of the Class Vehicles also contain prominent labels that alert the driver and passengers to the vehicle's airbag system. For example, steering wheels and passenger dashboards typically have labels identifying the airbag and safety restraint system.

114.    General Motors and FCA was also specifically required to include in their vehicles warning labels that alerted consumers of the need to perform airbag maintenance. For example, S4.5.1 of 49 C.F.R. § 571.208 states:

> Air bag maintenance or replacement information. If the vehicle manufacturer recommends periodic maintenance or replacement of an

---

[8] General Motors, Co., Annual Report (Form 10-K) (Feb. 5, 2020).
[9] Fiat Chrysler Automobiles N.V., Annual Report (Form 20-F) (Feb. 20, 2018).

inflatable restraint system, as that term is defined in S4.1.5.1(b) of this standard, installed in a vehicle, that vehicle shall be labeled with the recommended schedule for maintenance or replacement. The schedule shall be specified by month and year, or in terms of vehicle mileage, or by intervals measured from the date appearing on the vehicle certification label provided pursuant to 49 CFR Part 567. The label shall be permanently affixed to the vehicle within the passenger compartment and lettered in English in block capital and numerals not less than three thirty-seconds of an inch high. This label may be combined with the label required by S4.5.1(b) of this standard to appear on the sun visor.

115.    Plaintiffs are unaware of any label in any Class Vehicle that alerted consumers to the Inflator Defect or the need to perform maintenance to prevent airbag deployment.

116.    General Motors and FCA also distributed the Class Vehicles with so-called "Monroney" labels (also known as "window stickers") that described the equipment and safety features of the vehicles, including airbags. Dealers sell Class Vehicles to consumers with these labels visible. An image of a Monroney label for the 2015 Chevrolet Silverado 1500 is included below as an example. In the center of the image, it features a "Five Star" frontal crash rating for drivers. Under "Safety & Security" features, it touts the airbag system.[10]

---

[10]    Monroney labels for many of the Class Vehicles are available at: https://monroneylabels.com.



117.    As shown in these examples, Monroney labels uniformly assured consumers that the Class Vehicles had working airbags. This information would have suggested to any reasonable consumer that the passenger safety system did not suffer from a Defect and would perform its intended function.

118.    Had General Motors and FCA disclosed the defective nature of airbags on the Monroney labels or other labels or marketing for the Class Vehicles, Plaintiffs and Class members would have seen that disclosure and been capable of making an informed decision when purchasing their Class Vehicle.

## 2. General Motors and FCA marketed the Class Vehicles as safe and reliable but failed to mention the Inflator Defect.

125. General Motors and FCA's advertisements for the Class Vehicles left out a vital part of the story like their other consumer-facing representations. By uniformly omitting any information about the Inflator Defect, General Motors and FCA misled consumers into believing that their airbags would function properly in a crash, despite its knowledge to the contrary.

126. Brochures and press releases for the Class Vehicles and Defendants' vehicles use similar language to send a misleading message of safety. Illustrative examples are described below.

a. In the brochure for the 2015 GMC Sierra 1500, General Motors specifically touted the safety features of the Class Vehicle including its airbags.[11]

---

[11] 2015 GMC Sierra 1500, Auto-Brochures https://www.autobrochures.com/makes/GMC/Sierra/GMC_US%20Sierra_2015.pdf (last accessed Aug. 20, 2021)



b. In the sales brochure for the 2016 GMC Sierra 1500, General Motors advertised the capability of the Class Vehicle's "safety alert system" and airbags.[12]

---

[12] 2016 GMC Sierra 1500, Auto-Brochures https://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20Sierra_2016.pdf (last accessed Aug. 20, 2021).



c. In the sales brochure for the 2015 GMC Sierra HD, General Motors stated "[t]he new Sierra HD raises the bar for pickup truck safety."[13]

---

[13]   2015   GMC   Sierra   HD,   Auto-Brochures   https://www.auto brochures.com/makes/GMC/Sierra/GMC_US%20SierraHD_2015-1.pdf   (last accessed Aug. 20, 2021).



d. In the sales brochure for the 2016 GMC Sierra HD, General Motors touted the Class Vehicle's ability to protect occupants of the vehicle through its various safety technologies.[14]

---

[14] 2016 GMC Sierra HD, Auto-Brochures https://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20Sierra_2016.pdf?bcs-agent-scanner=1c332355-502b-3442-b9a3-1e615b037b4a (last accessed Aug. 20, 2021).



e. In the sales brochure for 2016 Chevrolet Silverado 1500, General Motors touted the Class Vehicle as "surrounded by safety". General Motors stated the Class Vehicle has features "that help protect you from the unexpected", including the vehicle's "six airbags and a 360-degree sensor system."[15]

---

[15] 2016 Chevrolet Silverado 1500, Auto-Brochures https://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20Sierra_2016.pdf?bcs-agent-scanner=1c332355-502b-3442-b9a3-1e615b037b4a (last accessed Aug. 20, 2021).

# SURROUNDED BY SAFETY.

The available Enhanced Driver Alert Package has features that help protect you from the unexpected, including the Safety Alert Driver Seat, Lane Keep Assist, Forward Collision Alert, front and rear park assist and IntelliBeam™ headlamps.



**SAFETY ALERT DRIVER SEAT.**
The available Safety Alert Driver Seat uses directional vibration pulses from the seat cushion instead of audible crash avoidance alerts to help indicate the direction of potential collision threats. The patented warning approach is tied into other onboard crash avoidance systems.



**LANE KEEP ASSIST.** At speeds above 60 km/h (37 mph), this available camera-based system monitors road lines and will gently turn the steering wheel if the vehicle begins changing lanes without the use of a turn signal. New for 2016.



**FORWARD COLLISION ALERT.**
This available feature continually monitors how close your Silverado is to the vehicle in front of you. If the system determines that a front-end collision with a detected vehicle is imminent, it alerts the driver to a potential crash.



**REAR VISION CAMERA.**
When the Silverado transmission is in Reverse, the available rear vision camera with dynamic guiding lines allows the driver to view objects directly behind the vehicle via the available screen in the centre stack. So it's easier to back up, park or hook up a trailer.



**INTELLIBEAM HEADLAMPS.**
When oncoming headlamps are sensed or when tail lamps are detected in front of you, available IntelliBeam headlamps intuitively adjust between low and high beams.



**FRONT AND REAR PARK ASSIST.** Ideal when pulling into a parking spot at low speeds, this available system senses stationary objects and alerts you if an object is too close. If equipped, the rear vision camera automatically displays a live image of the area behind the vehicle on the available Chevrolet MyLink screen after you shift into Reverse.



**SIX AIRBAGS.** Silverado 1500 includes six airbags' and a 360-degree sensor system, including single-stage frontal airbags. There are also available head-curtain side-impact airbags with rollover protection and seat-mounted side-impact airbags.

**AVAILABLE ONSTAR®
AUTOMATIC CRASH
RESPONSE.²** In a crash, built-in sensors can alert a specially trained OnStar Advisor, who is connected into your Silverado to see if you need help — even if you can't ask for it. Advisors can use GPS technology to pinpoint your location and request emergency help.

**SAFETY STARTS WITH YOU.**
Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic, surroundings and road conditions at all times. Read the Silverado Owner's Manual for more important safety information.

    f.   In the sales brochure for the 2015 Chevrolet Silverado HD, General Motors stated "[a]t Chevrolet, we believe safety is as important to truck buyers as it is to car buyers. That is why the new Silverado HD sets the benchmark for pickup truck safety."[16]

---

[16] 2015 Chevrolet Silverado HD, Auto-Brochures https://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2015.pdf (last accessed Aug. 20, 2021).



At Chevrolet, we believe safety is as important to truck buyers as it is to car buyers. That is why the new Silverado HD sets a benchmark for pickup truck safety. Silverado offers the Driver Alert Package. The package includes Forward Collision Alert (FCA) to warn you when you're rapidly approaching another vehicle and a collision is imminent, Lane Departure Warning (LDW) to alert you if you wander from your lane without using your turn signal, the Safety Alert Driver Seat that uses vibrations in the seat cushions to signal the direction of a potential hazard and Front and Rear Park Assist to help ease you into or out of tight spaces. Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic,

surroundings and road conditions at all times. Read the vehicle Owner's Manual for more important safety information.

**SAFETY ALERT DRIVER SEAT** The available Safety Alert Driver Seat helps warn the driver of potential traffic danger using directional vibration pulses from the seat cushion. The patented warning approach is tied into other on-board crash avoidance systems.

**A / LANE DEPARTURE WARNING** This available technology alerts the driver when Silverado HD drifts over a lane line without signaling while traveling at least 35 mph.

**B / FORWARD COLLISION ALERT** To help prevent frontal crashes, this available technology alerts drivers when they are

closing in too quickly on a vehicle ahead. The warning gives the driver critical additional time to react and potentially avoid a crash.

**ABS BRAKES** Four-wheel, four-channel, antilock disc brakes (ABS) help provide straight, more controlled stops by preventing wheel lock-up in most road conditions.

**REAR VISION CAMERA** When Silverado HD's transmission is in reverse, the available Rear Vision Camera with dynamic grid lines allows the driver to view objects directly behind the vehicle via the available 8" diagonal screen in the center stack. So it's easier to back up, park or hook up a trailer.

**SIX AVAILABLE AIR BAGS** Silverado HD offers up to six air bags¹ and a 360-degree sensor system, including single-stage frontal air bags, head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags.

**ONSTAR** The safety and security of OnStar¹ is available on Silverado HD. In the event of a crash, a vehicle sensor can automatically send an alert to a specially trained OnStar Advisor who can be immediately connected into your vehicle. Even if you can't respond, OnStar can send whatever help you need, based on GPS coordinates, crash data and a prediction of injury severity.

g. Similarly, in the sales brochure for the 2016 Chevrolet Silverado HD, General Motors touted the capability of the Class Vehicle's safety systems.[17]

---

[17] 2016 Chevrolet Silverado HD, Auto-Brochures https://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2016.pdf (last accessed Aug. 20, 2021).

# SURROUNDED BY SAFETY.



With the available Driver Alert Package, you get features that help protect you from the unexpected, including the Safety Alert Driver Seat, Lane Departure Warning, Forward Collision Alert, and Front and Rear Park Assist.

**SAFETY ALERT DRIVER SEAT.** The available Safety Alert Driver Seat uses directional vibration pulses from the seat cushion instead of audible crash avoidance alerts to help indicate the direction of potential threats. The patented warning approach is tied into other onboard crash avoidance systems.



**FORWARD COLLISION ALERT.** This available feature continually monitors how close your vehicle is to the vehicle in front of you. If the system determines that a front-end collision with a detected vehicle is imminent, it alerts the driver to a potential crash.



**LANE DEPARTURE WARNING.** If you unintentionally change lanes (without a turn signal), this available camera-based system sends an alert. The camera, mounted near the inside rearview mirror, reads traffic lane markings when identifiable and provides audible and visual alerts.

**REAR VISION CAMERA.** When the Silverado HD transmission is in Reverse, the available rear vision camera with dynamic guiding lines allows the driver to view objects directly behind the vehicle via the screen in the center stack. So it's easier to back up, park or hook up a trailer.





**FRONT AND REAR PARK ASSIST.** Ideal when pulling into a parking spot at low speeds, this available system senses stationary objects and alerts you if an object is too close. The available rear vision camera automatically displays a live image of the area behind the vehicle on the screen in the center stack after you shift into Reverse.

**ABS BRAKES.** Four-wheel, four-channel, antilock disc brakes (ABS) help provide straight, more controlled stops by preventing wheel lockup in most road conditions.



**AIR BAGS.** Standard on 2500HD are six air bags, including frontal air bags, head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags, 3500HD has frontal air bags' standard, and available are head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags.

**AVAILABLE ONSTAR® AUTOMATIC CRASH RESPONSE.** In a crash, built-in sensors can alert a specially trained OnStar Advisor, who can be connected into your Silverado HD to see if you need help — even if you can't ask for it. Advisors can use GPS technology to pinpoint your location and request emergency help. OnStar Guidance Plan³ is standard for the first six months (available on WT⁴).

**SAFETY STARTS WITH YOU.** Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic, surroundings and road conditions at all times. Read the Silverado HD Owner's Manual for more important safety information.

127.    FCA also touted the capabilities of their Class Vehicles in terms of performance, safety and reliability. As shown below:

    a.  In the sales brochure for the 2015 Ram 1500, FCA touted the 2015 Ram 1500 as "Dependable [and] Sensible." FCA further stated, "When you deliver all the refinements of a Ram, comparisons to the wannabe competitors are welcome. The 2015 Ram 1500 stands up to all of them—and frequently stands above."[18]

---

[18]    2015    Dodge    Ram    1500,    Dealer    eProcess
https://cdn.dealereprocess.org/cdn/brochures/ram/2015-1500.pdf?bcs-agent-





**RAM 1500. THE PICKUP THAT BRINGS IT ALL TOGETHER.** These are the combinations that define leadership: one of the most extensive powertrain lineups in the industry, standing out with exceptional fuel efficiency, jaw-dropping towing and payload numbers for invaluable work capability—and priceless peace of mind for those demanding recreational needs. Nimble agility and responsive comfort for highways, off-roads and even at-rest loading. Class-exclusive[3]* suspensions. State-of-the-art technology. And people-centric interiors that give you seating, storage, communications and telematics at impressive levels of convenience and practicality. The 2015 Ram 1500 delivers a sleek aerodynamic exterior, legendary components and quality so good, it's backed by a 5-Year/100,000-Mile Powertrain Limited Warranty,[3] one of the best in the business. When you deliver all the refinements of a Ram, comparisons to the wannabe competitors are welcome. The 2015 Ram 1500 stands up to all of them—and frequently stands above. For a bigger picture that includes specs, videos, blogs and owner input, click over and bookmark **RAMTRUCKS.COM**

    b. In the sales brochure for the 2016 Ram 1500, FCA states "Ram 1500 Does It All."[19]

    c. In the sales brochure of the 2017 Ram 1500, FCA touted the safety features of the Class Vehicle stating that "Ram technology starts with safety and security."[20]

---

scanner=03ba9dbd-d25c-764c-baff-98a2439c0943  (last accessed Aug. 20, 2021).
[19]   2016   Dodge   Ram   1500,   Auto-Brochures   https://www.auto-brochures.com/makes/ram/Ram_US%201500_2016.pdf?bcs-agent-scanner=14b821b3-9357-314c-8640-a207633d54c1 (last accessed Aug. 20, 2021).
[20]   2017   Dodge   Ram   1500,   Auto-Brochures   https://www.auto-brochures.com/makes/ram/Ram_US%201500_2017.pdf?bcs-agent-scanner=d0687ab2-dbbb-2845-92dc-d6a505af78bf (last accessed Aug. 20, 2021).



d. In the sales brochure of the 2018 Ram 1500, touted the safety and security of the Class Vehicle, "Ram surrounds you with protection including advanced multistage front airbags, supplemental front side-mounted airbags, and side-curtain airbags." Further, FCA stated "Ram safety and security. Its all about you."[21]

---

[21]   2018   Dodge   Ram   1500,   Auto-Brochures   https://www.auto-



e. In the sales brochure of the 2019 Ram 1500, FCA states "THE ALL-NEW 2019 RAM 1500: UNCOMPROMISING DURABILITY, CAPABILITY, LUXURY, SAFETY, TECHNOLOGY AND EFFICIENCY."[22]

---

brochures.com/makes/ram/Ram_US%201500_2018.pdf?bcs-agent-scanner=9a8104de-c6ac-eb45-8cf7-2e1c9fb5055c (last accessed Aug. 20, 2021).

[22] 2019 Dodge Ram 1500, Auto-Brochures https://www.auto-brochures.com/makes/ram/Ram_US%201500_2019.pdf?bcs-agent-scanner=428fce91-e821-2b40-a0fe-550d3f1e3755 (last accessed Aug. 20, 2021).



THE ALL-NEW
2019 RAM 1500:
UNCOMPROMISING
DURABILITY,
CAPABILITY, LUXURY,
SAFETY, TECHNOLOGY
AND EFFICIENCY.
PERIOD.

RAM

  f. In the sales brochure of the 2019 Ram 1500 Classic, FCA states

the Ram 1500 Classic "is engineered for all-around strength—

and that includes jaw-dropping procedures to help ensure safety

and stability. To achieve it, our engineers employed testing

protocols that involved some of the most brutal conditions

imaginable."[23]

---

[23] 2019 Dodge Ram Classic, Auto-Brochures https://www.auto-



g.  Similarly, in the sales brochure of the 2020 Ram 1500 Classis, FCA touted the same capabilities of the Class Vehicle. FCA stated the Ram 1500 Classic "is engineered for all-around strength—and that includes jaw-dropping procedures to help ensure safety and stability. To achieve it, our engineers employed testing protocols that involved some of the most brutal conditions imaginable."[24]

---

brochures.com/makes/ram/Ram_US%201500_2019-cl.pdf (last accessed Aug. 20, 2021).

[24] 2020 Dodge Ram 1500, Auto-Brochures https://www.auto-brochures.com/makes/ram/Ram_US%201500_2020-cl.pdf (last accessed Aug. 20, 2021).



128.    Further, online and video advertisements further paint a misleading representation of safety, for example:

   a.   In a 2020 video advertisement, General Motors highlighted the engineering teams that work on family vehicles, a voiceover stated: "The Chevy family of SUVs: we don't just take safety seriously, we take it personally."[25]

---

[25] Sam Mceachern, *New Chevrolet Ad Shines Spotlight On Brand's Vehicle Safety: Video*, GM AUTHORITY (Aug. 22, 2020) http://gmauthority.com/blog/2020/08/new-chevrolet-ad-shines-spotlight-on-brands-vehicle-safety-video/.

b. In print advertisements, Chevrolet touted that its Silverado 1500 is the first ever pickup truck to receive a perfect 5 star rating for overall vehicle score safety.

c. For 2018, Chevrolet marketed the safety features of its vehicles on chevrolet.com by stating: "the safety of drivers and passengers is of high priority. That's why we offer a comprehensive and innovative approach to safety aimed at helping you make your drive safer before, during and after a collision. It's this "prevent, protect, respond" philosophy that drives Chevrolet in its efforts to deliver outstanding vehicle safety."[26]

d. For 2019, Chevrolet marketed the safety features of its vehicles on chevrolet.com by stating: "Nothing is more important than feeling confident and secure when you're on the road. That's why your safety and well-being are at the core of everything we do. And with a wide range of available features and technologies, our vehicles are constantly working to help you drive as safely as possible."[27]

---

[26] Chevrolet Safety (Mar. 12, 2018), http://www.chevrolet.com/safety [https://web.archive.org/web/20180312123148/http://www.chevrolet.com/safety].
[27] Chevrolet Safety (Aug. 12, 2019), http://www.chevrolet.com/safety [https://web.archive.org/web/20190812225714mp_/https://www.chevrolet.com/saf

e.  Likewise, for the 2018 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "We design our trucks to last and to help keep you safe and secure. That's why every Ram 1500 is equipped with some of the most advanced safety and security technology available, including dynamic crumple zones, side-impact door beams and an advanced airbag system."[28]

f.  For the 2019 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "Your peace of mind is our top of mind. That's why the All-New 2019 Ram 1500 has been fully redesigned with a high-strength steel frame and more than 100 standard and available safety and security features."[29]

g.  For the 2020 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "The 2020 Ram 1500 is designed for safety and security from the group up. So whether you're

---

ety].

[28]  Dodge Trucks (May 7, 2017), http://www.ramtrucks.com/ram-1500.html [https://web.archive.org/web/20170507194019/http://www.ramtrucks.com/ram-1500.html].

[29]  Dodge Trucks (April 1, 2018), https://www.ramtrucks.com/2019/ram-1500.html [https://web.archive.org/web/20180401023715mp_/https://www.ramtrucks.com/2019/ram-1500.html].

hauling big loads or transporting precious cargo, you can do it all with confidence."[30]

129.    The above represents a sampling of Defendants' advertisements.

130.    Based on information and belief, every single advertisement for a Class Vehicle omitted *any* mention that the vehicles' airbags and seatbelts could fail due to the Inflator Defect. General Motors and FCA's deceptive actions harmed Plaintiffs and the Classes. As a result of General Motors and FCA's unfair, deceptive, and/or fraudulent business practices and failure to disclose that the Class Vehicles carried a dangerous safety Defect, owners and lessees of the Class Vehicles have lost money and/or property.

## V.    CLASS ACTION ALLEGATIONS

131.    This case is about Defendants' legal responsibility for their knowledge, conduct, and products. The proposed Class members' claims all derive directly from a single course of conduct by Defendants. The objective facts are the same for all Class members. Within each Claim for Relief asserted by the respective proposed Classes, the same legal standards govern. Additionally, many states share the same legal standards and elements of proof, facilitating multistate or nationwide

---

[30]    Dodge Trucks (July 26, 2020), https://www.ramtrucks.com/ram-1500/safety-security.html [https://web.archive.org/web/20200726125527/https://www.ramtrucks.com/ram-1500/safety-security.html].

classes for some or all claims.

132.    Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated, as members of the proposed Classes under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

A.    **The Class Definition**

133.    "Class Vehicles" refers to all vehicles in the United States that (a) were equipped with Defective Airbags (defined below) as original equipment and (b) were manufactured, distributed, sold, or leased by Defendants.

134.    "Defective Airbags" refers to all airbag modules manufactured by Joyson, including (a) all airbags containing the Inflator Defect; (b) all airbags subject to the recall identified in paragraph 28 above; and (c) all airbags manufactured by Joyson subject to any subsequent expansion of pre-existing recalls, new recalls, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to spontaneously deploy or rupture.

135.    The proposed Nationwide Class includes all persons and entities that

purchased or leased a Class Vehicle in the United States, including its territories. Plaintiffs also propose separate Classes: State Classes for New Jersey and Missouri, each of which includes all persons and entities that purchased or leased a Class Vehicle in that state.

136.    Excluded from the Classes are:

a.    Defendants' officers, directors and employees and participants; Defendants' affiliates and affiliates' officers, directors, and employees; Defendants' distributors and distributors' officers, directors, and employees; and

b.    Judicial officers and their immediate family members and associated court staff assigned to this case.

137.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, reduced, divided into additional subclasses under Rule 23(c)(5), or otherwise modified.

**B.    <u>Numerosity: Federal Rule of Civil Procedure 23(a)(1)</u>**

138.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are millions of Class Vehicles and Class members nationwide. The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice

dissemination methods.

### C.   **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

139.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These include, without limitation, the following:

a.     Whether the Defect exists in the Class Vehicles;

b.     Whether Defendants knew, or should have known, about the Defect, and, if so, how long they have or should have known about it;

c.     Whether Defendants had a duty to disclose the Defect in the Class Vehicles and the associated safety risks to consumers including Plaintiffs and Class members;

d.     Whether Defendants' representations and certifications concerning vehicle safety were deceptive, false, and/or misleading given the Defect and the risk that the Defective Airbags will deploy without a collision and maim or kill drivers and passengers;

e.     Whether Defendants fraudulently concealed the Defect;

f.     Whether Defendants misrepresented that the Class Vehicles were safe;

g.     Whether Defendants engaged in unfair, deceptive, unlawful

and/or fraudulent acts or practices, in trade or commerce, by failing to disclose the Defect and/or that the Class Vehicles were designed, manufactured, and sold with Defective airbags components;

       h.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used in violation of the implied warranty of merchantability;

       i.      Whether Defendants' unfair and deceptive acts, misrepresentations, and failure to disclose and/or concealment of the Defect caused Plaintiffs and Class members to overpay for their Class Vehicles; and

       j.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

### D. Typicality: Federal Rule of Civil Procedure 23(a)(3)

140.    Plaintiffs' claims are typical of the Class members' claims whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class member purchased or leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based on the same legal theories as the claims of the other Class members.

### E.   Adequacy: Federal Rule of Civil Procedure 23(a)(4)

141.   Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automobile defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### F.   Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

142.   Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, for the Class as a whole.

### G.   Superiority: Federal Rule of Civil Procedure 23(b)(3)

143.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the

burden and expense that would be required to litigate their claims individually against Defendants such that it would be impracticable for members of the Classes to individually seek redress for Defendants' wrongful conduct.

144.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

145.    Defendants have known of the Inflator Defect since at least 2020, when Defendants respectively learned of the Defect following General Motors' first recall, and then continued to use and/or manufacture the Defective Airbags after that. They obtained further knowledge of the dangers of the Inflator Defect from consumer complaints and internal investigations, which provided additional and confirmatory notice of the continued risks of the Inflator Defect.

146.    Despite this knowledge, Defendants did not disclose the seriousness of the issue and, in fact, concealed the prevalence of the problem. In so doing, Defendants have failed to warn consumers, or initiate timely recalls, as Defendants are obligated to do.

147. Defendants had a duty to disclose the Inflator Defect to consumers and NHTSA. Contrary to this duty, Defendants concealed the defect by continuing to distribute, sell, and/or lease the Class Vehicles to Plaintiffs and the Class members; to advertise the safety of the Class Vehicles; and to fail to notify regulators or the Plaintiffs and the Class members about the truth about the Class Vehicles.

148. Because of the highly technical nature of the Inflator Defect, Plaintiffs and Class members could not independently discover it using reasonable diligence. Before the retention of counsel and without third-party experts, Plaintiffs and Class members lack the necessary expertise repair the Inflator and understand its defective nature.

149. Accordingly: (1) Defendants' fraudulent concealment tolls the statute of limitations; (2) Defendants are estopped from relying on the statute of limitations; and (3) the statute of limitations is tolled by the discovery rule.

150. The nature of notice to the proposed Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by the best notice practicable under the circumstance including, inter alia, email, publication in major newspapers and/or on the internet.

## CAUSES OF ACTION

### VII.   NATIONWIDE CLASS CLAIMS

### NATIONWIDE COUNT I:
### Violation of the Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301)

151.    Plaintiffs re-allege and incorporate by reference all paragraphs as though full set forth herein.

152.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301, by virtue of 28 U.S.C. § 1332 (a)-(d).

153.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C.  § 2301(1).

154.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C.  § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

155.    Each Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 15 U.S.C.  § 2301(4)-(5).

156.    15 U.S.C.  § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

157.    Defendants provided Plaintiffs and the other Class members with an

57

implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

158.    Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect. Defendants have admitted that the Class Vehicles are defective in issuing their recalls, but the recalls are woefully insufficient to address the Inflator Defect.

159.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

160.    Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants on the one hand, and Plaintiffs and the other Class members, on the other.

161.    Any limitations on the warranties are substantively unconscionable.

Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendants failed to disclose the Inflator Defect to Plaintiffs and the other Class members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

162.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either Defendants or their agents (dealerships) to establish privity of contract.

163.    Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the Inflator Defect.

164.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

165.    Furthermore, affording Defendants an opportunity to cure their breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

166.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their defective Vehicles by retaining them.

167.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class

members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

168.    Plaintiffs also request, as a form of equitable monetary relief, repayment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

169.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## NATIONWIDE COUNT II:
### Fraud by Concealment
### (Common Law)

170.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

171.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, as there are no true conflicts among various states' laws of fraudulent concealment. Defendants are liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977). In the alternative, Plaintiffs bring this claim on behalf of the State Classes.

172.     Defendants intentionally and knowingly concealed and suppressed material facts from regulators and consumers regarding the Inflator Defect that causes the airbags to spontaneously deploy.

173.     A reasonable consumer would not have expected that the Class Vehicles contain inflators are prone to explode, even without air-bag deployment, and maim or kill drivers and passengers. Defendants knew that reasonable consumers expect that their vehicle has working airbags, and would rely on those facts in deciding whether to purchase, lease, or retain a new or used motor vehicle. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

174.     Defendants ensured that Plaintiffs and the Class did not discover this information through actively concealing it and misrepresenting the Class Vehicles' safety systems without disclosing the truth. Defendants intended for Plaintiffs and the Class to rely on their omissions—which they did by purchasing and leasing the Class Vehicles at the prices they paid.

175.     Defendants had a duty to disclose the Inflator Defect because:

a.     Defendants had exclusive and/or far superior knowledge and access to the facts about this hidden and complex safety Defect. Defendants also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.     Defendants knew the Inflator Defect (and its safety risks) was a material fact that would affect Plaintiffs' or Class members' decisions to buy or lease Class Vehicles;

c.     Defendants are subject to statutory duties to disclose known safety Defects to consumers and NHTSA; and

d.     Defendants made incomplete representations about the safety and reliability of the Class Vehicles and their passenger safety systems, while purposefully withholding material facts about a known safety defect. In uniform advertising and materials

provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs and the Class that the Class Vehicles contained the dangerous Inflator Defect. Because they volunteered to provide information about the Class Vehicles that they offered for sale to Plaintiffs and the Class, Defendants had the duty to disclose the whole truth. They did not.

176.    To this day, Defendants have not made full and adequate disclosure, continue to defraud Plaintiffs and the Class, and continue to conceal material information regarding the Inflator Defect. The omitted and concealed facts were material because a reasonable person would find them important in purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class.

177.    Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect profits, and to avoid recalls that would hurt the brand's image and cost money. They did so at the expense of Plaintiffs and the Class. Had they been aware of the Inflator Defect in the Class Vehicles, and Defendants' callous disregard for safety, Plaintiffs and the Class either would not have paid as much as they did for their Class Vehicles, or they would not have purchased or leased them.

178.     Accordingly, Defendants are liable to Plaintiffs and the Class for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

179.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of Plaintiffs' and the Class' rights and well-being; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**NATIONWIDE COUNT III:**
**Unjust Enrichment**
**(Common Law)**

180.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

181.     Plaintiffs assert this Unjust Enrichment count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

182.     Because of their conduct, Defendants caused damages to Plaintiffs and Class members.

183.      Plaintiffs and Class members conferred a benefit on the Defendants by overpaying for Class Vehicles at prices that were artificially inflated by Defendants' concealment of the Inflator Defect and misrepresentations regarding the Class Vehicles' safety.

184.    As a result of Defendants' fraud and deception, Plaintiffs and Class members were not aware of the facts concerning the Class Vehicles and did not benefit from the Defendants' misconduct.

185.    Defendants knowingly benefitted from their unjust conduct. They sold and leased Class Vehicles equipped with an Inflator Defect for more than what the vehicles were worth, at the expense of Plaintiffs and Class members.

186.    Defendants readily accepted and retained these benefits from Plaintiffs and Class members.

187.    It is inequitable and unconscionable for Defendants to retain these benefits because they misrepresented that the Class Vehicles were safe, and intentionally concealed, suppressed, and failed to disclose the Inflator Defect to consumers. Plaintiffs and Class members would not have purchased or leased the Class Vehicles or paid less for them had Defendants not concealed the Inflator Defect.

188.    Plaintiffs and Class members do not have an adequate remedy at law.

189.    Equity cannot in good conscience permit the Defendants to retain the benefits that they derived from Plaintiffs and Class members through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of the Defendants' unjust enrichment is necessary.

## VIII.  **STATE SPECIFIC CLAIMS**

**NEW JERSEY COUNT I:**
**Violation of the New Jersey Consumer Fraud Act ("NJCFA")**
**N.J. Stat. Ann. § 56:8-2 et seq.**

190.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

191.    Plaintiff Glenn Sager (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the New Jersey State Class against all Defendants.

192.    The NJCFA prohibits:

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

N.J. STAT. ANN. § 56:8-2.

193.    Plaintiff and members of the New Jersey State Class are consumers who purchased or leased Class Vehicles for personal, family, or household use.

194.    In violation of the NJCFA, Defendants employed unconscionable commercial practices, deception, fraud, false pretense and/or false promise by providing Class Vehicles that contain the Inflator Defect and present an undisclosed

safety risk to drivers and occupants of the Class Vehicles. Further, Defendants misrepresented the standard, quality or grade of the Class Vehicles which were sold or leased with the latent Defect and failed to disclose the Inflator Defect and corresponding safety risk in violation of the NJCFA.

195.    Defendants' misrepresentations and fraudulent omissions were material to Plaintiff and members of the New Jersey State Class. When Plaintiff and members of the New Jersey State Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Defective Airbags would not pose an unavoidable safety risk. Had Defendants disclosed that the Defective Airbags was prone to an unavoidable safety risk, Plaintiff and members of the New Jersey State Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

196.    Further, had Defendants disclosed that about the Defective Airbags in the Class Vehicles, Plaintiff and members of the New Jersey State Class would have demanded repair or replacement during the warranty periods at no cost to Plaintiffs and members of the Classes—as provided for in Defendants' warranties.

197.    Defendants knowingly concealed, suppressed and/or omitted the existence of the Inflator Defect and safety risk in the Class Vehicles at the time of sale or lease and at all relevant times thereafter.

198.    Defendants unconscionably marketed the Class Vehicles to

uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent Defect and corresponding safety risk.

199.    Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff and members of the New Jersey State Class because Defendants possessed superior and exclusive knowledge regarding the Defect and the risks associated with the Defective Airbags' failure. Rather than disclose the Defect, Defendants intentionally concealed the Defect with the intent to mislead Plaintiff and members of the New Jersey State Class in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Defective Airbags to Plaintiff and members of the New Jersey State Class.

200.    Had Plaintiff and members of the New Jersey State Class known about the Inflator Defect at the time of purchase, including the safety hazard posed by the Defect, they would not have bought the Class Vehicles or would have paid much less for them.

201.    As a direct and proximate result of Defendants' wrongful conduct in violation of the NJCFA, Plaintiff and members of the New Jersey State Class have suffered and continue to suffer harm by the threat of the unexpected failure of the Defective Airbags and/or actual damages in the amount of the cost to replace the Defective Airbags, and damages to be determined at trial. Plaintiff and members of the New Jersey State Class have also suffered the ascertainable loss of the

diminished value of their vehicles.

202.    As a result of Defendants' fraudulent and/or deceptive conduct, misrepresentations and/or knowing omissions, Plaintiff and members of the New Jersey State Class are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial.  *See* N.J. STAT. ANN. § 56:8-19. Plaintiff and members of the New Jersey State Class also seek an order enjoining Defendants' unlawful, fraudulent and/or deceptive practices, and any other just and proper declaratory or equitable relief available under the NJCFA.  *See* N.J. STAT. ANN. § 56:8-19.

**NEW JERSEY COUNT II:**
**Breach of Express Warranty**
**N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-210**

203.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

204.    Plaintiff Glenn Sager (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the New Jersey State Class against all Defendants.

205.    Defendants are and were at all relevant times "merchants" under N.J. STAT. ANN. § 12A:2-104(1), and "sellers" and "lessors" of motor vehicles and/or automotive parts under § 12A:2-103(1)(d) and § 12A:2A-103(1)(p).

206.    The Class Vehicles are and were at all relevant times "goods" within

the meaning of N.J. STAT. ANN. §§ 12A:2-105(1) and 2A-103(1)(h).

207.    Defendants provided Plaintiff and members of the New Jersey State Class with one or more express warranties.

208.    Defendants marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that Defendants would stand behind the quality of their products and promptly repair any Defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiff and members of the New Jersey State Class.

209.    Under the warranties provided to Plaintiff and members of the New Jersey State Class, Defendants promised to repair or replace covered components arising out of Defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time.  As alleged herein, Defendants breached these warranties.

210.    Defendants breached the express warranty promising to repair and correct a manufacturing Defect or Defect in materials or workmanship of any parts it supplied.

211.    On information and belief, Defendants have not suitably repaired or replaced the Defective Airbags for Plaintiff and members of the New Jersey State Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

212.     Defendants further breached their express warranties by selling Class Vehicles that were Defective with respect to materials, workmanship, design and manufacture.

213.     Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing Defects which cause a failure to deploy the airbags as warranted.

214.     Plaintiff and members of the New Jersey State Class have had sufficient direct dealings with Defendants or their agents, their authorized dealerships, to establish privity of contract between Defendants, on the one hand, and Plaintiff and members of the New Jersey State Class, on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other members of the Classes are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

215.     Defendants were provided notice of the Inflator Defect by their engineers, numerous consumer complaints made to their authorized dealers

nationwide, complaints to NHTSA and through their own testing. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because Defendants have known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defective Airbags within a reasonable time.

216.   Any attempt by Defendants to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold or leased a Defective product without informing consumers about the Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the New Jersey State Class. Among other things, Plaintiff and members of the New Jersey State Class did not determine these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and members of the Classes, and Defendants knew or should have known that the Class Vehicles were Defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

217.   Further, the limited warranty promising to repair and/or correct a manufacturing Defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and members of the New Jersey State Class whole because, on information and belief, Defendants have failed and/or have refused to

73

adequately provide the promised remedies within a reasonable time.

218.   Defendants knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff and members of the New Jersey State Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

219.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiff and members of the New Jersey State Class purchased or leased their Class Vehicles.

220.   Plaintiff and members of the New Jersey State Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Defendants. Despite the existence of the warranties, Defendants failed to inform Plaintiff and members of the New Jersey State Class that the Class Vehicles contained the Inflator Defect during the warranty periods.

221.   Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

222.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and members of the New Jersey State Class have been damaged in an amount to be determined at trial.

223.    Finally, because of Defendants' breach of express warranty as set forth herein, Plaintiff and members of the New Jersey State Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and members of the New Jersey State Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**NEW JERSEY COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.J. Stat. Ann. §§ 12A:2-314, 12A:2A-103, and 12A:2A-212**

224.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

225.    Plaintiff Glenn Sager (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the New Jersey State Class against all Defendants.

226.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles and/or automotive parts under N.J. STAT. ANN.§ 12A:2-104(1), and "sellers" and "lessors" of motor vehicles and/or automotive parts under § 12A:2-103(1)(d) and § 12A:2A-103(1)(p).

227.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. STAT. ANN. §§ 12A:2-105(1) and 2A-103(1)(h).

228.    Plaintiff Glenn Sager and members of the New Jersey State Class

purchased or leased the Class Vehicles from Defendants by and through Defendants' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Defendants were the manufacturers, distributors, warrantors and/or sellers of Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

229. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. STAT. ANN. §§ 12A:2-314 and 2A-212.

230. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent Defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Defendants breached their implied warranty of merchantability.

231. Plaintiff and members of the New Jersey State Class have had sufficient direct dealings with Defendants or their agents, their authorized dealerships, to establish privity of contract between Defendants, on the one hand, and Plaintiff and members of the New Jersey State Class, on the other hand.

76

Nonetheless, privity is not required here because Plaintiff and each of the other members of the Classes are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

232.     Defendants were provided notice of the Inflator Defect by their engineers, numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Defendants have known of and concealed the Inflator Defect and, on information and belief, have refused to repair or replace the Defective Airbags within a reasonable time.

233.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and members of the New Jersey State Class have been damaged in an amount to be proven at trial.

234.     Any attempt by Defendants to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they

knowingly sold or leased a Defective product without informing consumers about the Defect.  The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the New Jersey State Class.  Among other things, Plaintiff and members of the New Jersey State Class did not determine these time limitations, the terms of which unreasonably favored Defendants.   A gross disparity in bargaining power existed between Defendants and members of the New Jersey State Class, and Defendants knew or should have known that the Class Vehicles were Defective at the time of sale or lease and that the Inflator Defect posed a safety risk

### MISSOURI COUNT I:
### Violation of the Missouri Merchandising Practices Act
### Mo. Rev. Stat. § 407.010

235.     Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

236.     Plaintiff Thomas Harries (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Missouri State Class against all Defendants.

237.     Plaintiff, the Missouri State Class, and Defendants are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

238.     Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

239.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

240.    In the course of its business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

241.    By failing to disclose the Inflator Defect or facts about the Inflator Defect described herein known to them or that were available to Defendants upon reasonable inquiry, Defendants deprived consumers of all material facts about the safety and functionality of their vehicle. By failing to release material facts about the Inflator Defect, Defendants curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. 15 Mo. Code of Serv. Reg. § 60-9.110.

242.    Moreover, Defendants have otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices

by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

243.    Defendants have known of the Inflator Defect well before issuing formal recalls. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

244.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Missouri MPA.

245.    Defendants deliberately withheld the information about the propensity of the Defective Airbags to spontaneously explode, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

246.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly

asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

247.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Plaintiff, about the true safety and reliability of his Class Vehicle and/or the Defective Airbag installed in it, as well as the quality and the true value of the Class Vehicles.

248.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the Plaintiff and the Missouri State Class, including without limitation by failing to disclose the Inflator Defect in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences or representations being made by Defendants about the safety or reliability of the Class Vehicles and/or the Defective Airbags installed in them. Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of Serv. Reg. §60-9.090.

249.    Because Defendants knew or believed that their statements regarding safety and reliability of the Class Vehicles and/or the Defective Airbags installed in

them were not in accord with the facts and/or had no reasonable basis for such statements in light of their knowledge of the Inflator Defect, Defendants engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of Serv. Reg.60-9.100.

250.    Defendants' conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles were inherently defective and dangerous in that the Defective Airbags contain inflators are prone to explode, even without air-bag deployment, and maim or kill drivers and passengers. Such acts are unfair practices in violation of 15 Mo. Code of Serv. Reg. 60-8.020.

251.    Defendants knew or should have known that its conduct violated the Missouri MPA.

252.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

253.    To protect profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic

consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

254.    Defendants owed Plaintiff and the Missouri State Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.  Intentionally concealed the foregoing from Plaintiff and the Missouri State Class; and/or

      c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff, and members of the Missouri State Class, that contradicted these representations.

255.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

256.    Defendants' failure to disclose and active concealment of the dangers

and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiff and the Missouri State Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

257.    Plaintiff and the Missouri State Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiff and the Missouri State Class either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. Plaintiff and the Missouri State Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

258.    Defendants' violations present a continuing risk to Plaintiff, to the Missouri State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

259.    As a direct and proximate result of Defendants' violations of the Missouri MPA, Plaintiff and the Missouri State Class have suffered injury in-fact and/or actual damage.

260.    Defendants are liable to the Plaintiff and the Missouri State Class  for

damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

**MISSOURI COUNT II:**
**Breach of the Implied Warranty of Merchantability**
**Mo. Ann. Stat. § 400.2-314**

261.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

262.    Plaintiff Thomas Harries (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Missouri State Class against all Defendants.

263.    Defendants are and were at all relevant times a merchant with respect to motor vehicles and/or airbags within the meaning of Mo. Ann. Stat. § 400.2-314(1).

264.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mo. Ann. Stat. § 400.2-314.

265.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are

inherently defective and dangerous in that the Defective Airbags contain inflators that are prone to explode, even without air-bag deployment, and maim or kill drivers and passengers.

266.    Defendants were provided notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, and by internal investigations.

267.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff and the Missouri State Class have been damaged in an amount to be proven at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs and the Classes, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class, and Plaintiffs' counsel as counsel for the Classes;

B.    An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

C.    Injunctive and equitable relief in the form of a comprehensive program to repair or replace the Defective Airbags in all Class Vehicles, and/or buyback all Class Vehicles, and to fully reimburse and make whole all members of the Classes for all costs and economic losses;

D.    Appropriate injunctive and equitable relief;

E.    A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

F.    An order awarding costs, restitution, disgorgement, punitive damages, treble damages and exemplary damages under applicable law, and compensatory damages for economic loss, overpayment damages, and out-of-pocket costs in an amount to be determined at trial;

G.    An order awarding any applicable statutory and civil penalties;

H.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.    An award of costs, expenses and attorneys' fees as permitted by law; and

J.    Such other or further relief as the Court may deem appropriate, just, and equitable.

## X.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: August 23, 2021

Respectfully submitted,

*/s/ James E. Cecchi*

Christopher A. Seeger
Christopher L. Ayers
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 679-8656
cseeger@seegerweiss.com
cayers@seegerweiss.com

James E. Cecchi
Caroline F. Bartlett
Jordan M. Steele
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com
jsteele@carellabyrne.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
J. Mitch Williams
**BEASLEY, ALLEN,
CROW, METHVIN,
PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, AL 36104
Telephone: (334) 269-2343
dee.miles@beasleyallen.com
clay.barnett@beasleyallen.com
mitch.williams@beasleyallen.com

Joseph H. Meltzer
Melissa L. Troutner
**KESSLER TOPAZ MELTZER
& CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7756
jmeltzer@ktmc.com
mtroutner@ktmc.com