James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

[Additional Attorneys on Signature Page]

*Attorney for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLENN SAGER, DAVID MCGUIRE, ORLANDO SANCHEZ, RAFAEL JOSE SANCHEZ PEREZ, STEVEN MILLS, DANIEL EVANS, MARK CHARVAT, MIKE STOTELMYER, TONY RIBEIRO, ROBERT KAHSIN, THOMAS HARRIES, MATT MINER, ANTHONY BOCCHINO, GEORGE HUNTER, JR., OSCAR JONES, THOMAS LAINE, GREGG MACE, DAVID GIBBS, JOSEPH ZUCCARELL, SR., RAY BARLETT, JAMES SMITH, TIMOTHY LOWELL, and JOSEPH GAYDOS, JR., Individually And On Behalf Of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>KEY SAFETY SYSTEMS, INC., GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS LLC, GENERAL MOTORS LLC, and FCA US LLC,<br><br>        Defendants. | Case No.: 21-cv-15867-(RBK)(SAK)<br><br>AMENDED CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

# Table of Contents

I.    INTRODUCTION ...................................................................................1

II.   PARTIES ...............................................................................................6

    A.    Plaintiffs ......................................................................................6

    B.    Defendants.................................................................................15

III.  JURISDICTION AND VENUE...........................................................17

IV.   SUBSTANTIVE ALLEGATIONS .....................................................19

    A.    Definitions................................................................................19

    B.    The Defective Airbags Have a Common Uniform Defect .............20

    C.    Defendants Knew the Defective Airbags in the Class Vehicles
        Contained the Defect.................................................................23

    D.    Despite Their Knowledge, Defendants Concealed The Inflator
        Defect And Continued To Sell the Defective Airbags and Class
        Vehicles with the Defective Airbags As "Safe" And "Reliable." ...39

V.    CLASS ACTION ALLEGATIONS........................................................61

    A.    Numerosity: Federal Rule of Civil Procedure 23(a)(1) ..................65

    B.    Commonality and Predominance: Federal Rule of Civil Procedure
        23(a)(2) and 23(b)(3).................................................................66

    C.    Typicality: Federal Rule of Civil Procedure 23(a)(3)....................70

    D.    Adequacy: Federal Rule of Civil Procedure 23(a)(4) .....................70

    E.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure
        23(b)(2).....................................................................................71

    F.    Superiority: Federal Rule of Civil Procedure 23(b)(3) ..................71

VI.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED.....72

VII.  CALIFORNIA COUNTS .....................................................................73

VIII. CONNECTICUT COUNTS ................................................................104

IX.   FLORIDA COUNTS ..........................................................................124

X.    ILLINOIS COUNTS ..........................................................................151

XI.   MARYLAND COUNTS .....................................................................175

XII.  MASSACHUSETTS COUNTS ..........................................................195

i

XIII.  MICHIGAN COUNTS.........................................................................220

XIV.  MONTANA COUNTS.........................................................................244

XV.  MISSOURI CLAIMS.........................................................................269

XVI.  NEW JERSEY COUNTS.....................................................................290

XVII. NEW YORK COUNTS.......................................................................313

XVIII. NORTH CAROLINA COUNTS ............................................................338

XIX.  OHIO COUNTS...............................................................................363

XX.  PENNSYLVANIA COUNTS.................................................................390

XXI.  TENNESSEE COUNTS .....................................................................414

XXII.  VIRGINIA CLAIMS .........................................................................440

XXIII. PRAYER FOR RELIEF .....................................................................461

XXIV. DEMAND FOR JURY TRIAL..............................................................463

Plaintiffs Glenn Sager, Ray Barlett, Anthony Bocchino, Mark Charvat, Daniel Evans, Joseph Gaydos, Jr., David Gibbs, Thomas Harries, George Hunter, Jr., Oscar Jones, Robert Kahsin, Thomas Laine, Timothy Lowell, Gregg Mace, David McGuire, Steven Mills, Matt Miner, Rafael Jose Sanchez Perez, Tony Ribeiro, Orlando Sanchez, Mike Stotelmyer, James Smith, and Joseph Zuccarell, Sr., individually and on behalf of all others similarly situated, allege the following against General Motors Company, General Motors Holdings LLC, General Motors LLC (collectively "General Motors"), FCA US LLC ("FCA" with General Motors, the "Truck Manufacturers"), and Key Safety Systems, Inc. d/b/a Joyson Safety Systems ("Joyson") (collectively "Defendants") based upon personal knowledge as to allegations specifically pertaining to Plaintiffs and, as to all other matters, upon the investigation of counsel.[1]

## I.    **INTRODUCTION**

1.    This action concerns Defective Airbags (defined below) manufactured by Key Safety Systems, Inc. d/b/a Joyson Safety Systems (previously defined as "Joyson"), the successor-in-interest to Takata Corporation ("Takata"), which contain a defect in design, manufacturing and/or materials that allows moisture

---

[1] Counsel's investigation includes an analysis of publicly available information, including, but not limited to, National Highway Traffic Safety Administration documents, and consumer complaints. Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

contamination, which causes airbag inflators to violently rupture.  (the "Defect" or "Inflator Defect").  Trucks that Defendants FCA and General Motors manufactured, sold, or leased were equipped with airbags containing the Inflator Defect. Joyson misrepresented that its airbags containing the Defect were safe and properly functioning and the Truck Manufacturers misrepresented the Class Vehicles (defined below) containing the Defective Airbags as safe and properly functioning. All Defendants deceptively concealed the Defect and associated safety risk, including the fact that inflators in the Defective Airbags in the Class Vehicles are prone to explode, even without airbag deployment, and may maim or kill drivers and passengers.

2.      An airbag is a critical safety feature of any motor vehicle. Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield. An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact. In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.

3.      As a result of the common, uniform Defect, Defective Airbags in the Class Vehicles are subject to corrosion inside the inflator vessel of the airbags, caused by moisture introduced into the vessel, which can lead the airbag inflators to violently rupture. It is known that Defective Airbags containing the Inflator Defect

are located in the roof-rails of certain trucks manufactured by General Motors ("roof-rail airbags" or "RRAB") and the side-curtains of certain trucks manufactured by FCA ("side airbag inflatable curtain airbag" or "SABIC"). However, the Inflator Defect may also be present in other airbags manufactured and distributed by Joyson.

4.      Because of the common, uniform Inflator Defect, the Defective Airbags in the Class Vehicles fail to perform as they should. Instead of protecting vehicle occupants from bodily injury during accidents, the Defective Airbags may spontaneously explode, and may injure drivers and passengers.

5.      Defendants either knew or should have known of the Inflator Defect, including through, *inter alia*, pre- and post-production testing, failure mode analysis, consumer complaints, and reports of improper airbag deployment and/or explosion, and in light of their respective histories with Takata, a Japanese automotive parts company. In 2013, a series of deaths and injuries associated with defective Takata airbag inflators manufactured by their Mexican subsidiary led Takata to initially recall 3.6 million cars equipped with such airbags. Further fatalities caused by the airbags led the National Highway Traffic Safety Administration ("NHTSA") to order an ongoing, nationwide recall of tens of millions of cars, the largest automotive recall in U.S. history (the "Takata Recalls").

6.      On June 25, 2017, Takata filed for Chapter 11 bankruptcy in the United States and bankruptcy protection in Japan, owing more in compensation than was

possible for its survival. On April 11, 2018, the bankrupt assets of Takata were acquired by Key Safety Systems, Inc., which then renamed itself Joyson Safety Systems. Joyson now owns Takata's supplier factories, including in Mexico, and on information and belief is the successor-in-interest to its core books, records, and personnel.

7.    The Truck Manufacturers are aware of the Takata Recalls and are still facing ongoing litigation for, among other things, concealment and suppression of facts related to the Takata Recalls. The Truck Manufacturers are also aware that Joyson is Takata's successor-in-interest. The Truck Manufacturers therefore knew or should have known that airbags manufactured by Joyson contain similar defects to those triggering the Takata Recalls.

8.    The Inflator Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury. Moreover, the Defective Airbags (defined below) are manufactured in Mexico, where the defective Takata airbags were also manufactured. The Truck Manufacturers are putting profits ahead of safety by continuing to equip vehicles with Joyson airbags containing the Defect, even though they knew or should have known those airbags were defective. Despite the shocking record of airbag failures, injuries, and deaths caused by Joyson's predecessor, Takata, the Truck Manufacturers failed to adequately test the Defective Airbags, to fully investigate the problem, and to

promptly issue recalls. Only relatively recently—on the heels of General Motors' second recall—has the Defect with Joyson airbags come to light. Defendants have delayed repairing the Inflator Defect, and continue to misrepresent and/or conceal material facts regarding the Class Vehicles' airbag safety.

9.      As a result of this misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages. Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased or leased Class Vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive Class Vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed. Plaintiffs and the Classes were deprived of having safe, defect-free airbags and Class Vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as it avoids incurring the costs associated with recalls and installing replacement parts.

10.      Plaintiffs and the Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and paying for childcare. Also, as a direct result of

misconduct by the Truck Manufacturers, each Plaintiff and Class member has out-of-pocket economic damage by virtue of having incurred the expense of taking the time to bring vehicles in for repair.

11.    Plaintiffs and the Classes also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of the airbags and the Class Vehicles. Defendants' false representations and omissions concerning the safety and reliability of the Defective Airbags and Class Vehicles and their concealment of the known Defect and associated safety risks caused Plaintiffs and Class members to purchase, lease, and/or retain their vehicles with diminished value and subject to concealed safety risks.

## II.    PARTIES

### A.    Plaintiffs

12.    Plaintiff Sager resides in Atco, New Jersey. Plaintiff Sager owns a 2016 Chevrolet Silverado, which was purchased used on or around April 1, 2020, from Mall Chevrolet in Cherry Hill, New Jersey. Plaintiff Sager purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Sager would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Sager's 2016

Chevrolet Silverado has diminished as a result of Defendants' deceptive acts and practices.

13.    Plaintiff McGuire resides in Woodland, California. Plaintiff McGuire owns a 2015 Chevrolet Silverado 1500 LT, which was purchased used on or around January 1, 2018, from Woodland Motors in Woodland, California. Plaintiff McGuire purchased his Class Vehicle for personal, family, and/or household use. Plaintiff McGuire would not have purchased his 2015 Chevrolet Silverado 1500 LT or would have paid less for it had Defendants disclosed the Inflator Defect. The value of Plaintiff McGuire's 2015 Chevrolet Silverado 1500 LT has diminished as a result of Defendants' deceptive acts and practices.

14.    Plaintiff Sanchez resides in Norwalk, Connecticut. Plaintiff Sanchez owns a 2016 Chevrolet Silverado, which was purchased used on or around February 28, 2018, from H & L Chevrolet in Darien, Connecticut. Plaintiff Sanchez purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Sanchez would not have purchased his 2016 Chevrolet Silverado or would have paid less for it had Defendants disclosed the Inflator Defect. The value of Plaintiff Sanchez's 2016 Chevrolet Silverado has diminished as a result of Defendants' deceptive acts and practices.

15.    Plaintiff Perez resides in Kissimmee, Florida. Plaintiff Perez owns a 2019 Dodge Ram 2500, which was purchased new on or around November 1, 2019,

from Napleton Chrysler Jeep Dodge Ram in Kissimmee, Florida. Plaintiff Perez purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Perez would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Perez's 2019 Dodge Ram 2500 has diminished as a result of Defendants' deceptive acts and practices.

16.    Plaintiff Mills resides in Eufala, Alabama. Plaintiff Mills owns a 2016 Chevrolet Silverado, which was purchased used on or around August 1, 2020, from Peter Boulware Toyota in Tallahassee, Florida. Plaintiff Mills purchased his Class Vehicle for personal, family and/or household use. Plaintiff Mills would not have purchased his 2016 Chevrolet Silverado or would have paid less for it had Defendants disclosed the Inflator Defect. The value of Plaintiff Mills' 2016 Chevrolet Silverado has diminished as a result of Defendants' deceptive acts and practices.

17.    Plaintiff Evans resides in Hinesville, Georgia. Plaintiff Evans owns a 2015 Dodge Ram 2500, which was purchased new on February 1, 2016, from Gerry Wood in Salisbury, North Carolina. Plaintiff Evans purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Evans would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants

disclosed the Inflator Defect. The value of Plaintiff Evans' 2015 Dodge Ram 2500 has diminished as a result of Defendants' deceptive acts and practices.

18.     Plaintiff Charvat resides in Dekalb, Illinois. Plaintiff Charvat owns a 2018 Dodge Ram 2500 Power Wagon, which was purchased new on May 7, 2018, from Crystal Lake Chrysler in Crystal Lake, Illinois. Plaintiff Charvat purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Charvat would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Charvat's 2018 Dodge Ram 2500 Power Wagon has diminished as a result of Defendants' deceptive acts and practices.

19.     Plaintiff Ribeiro resides in Massachusetts. Plaintiff Ribeiro owns a 2016 Dodge Ram 1500, which was purchased used on or about January 1, 2019, from Lia Toyota in Wilbraham, Massachusetts.  Plaintiff Ribeiro purchased his Class Vehicle for personal, family and/or household use. Plaintiff Ribeiro would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Ribeiro's 2016 Dodge Ram 1500 has diminished as a result of Defendants' deceptive acts and practices.

20.     Plaintiff Stotelmyer resides in Williamsport, Maryland. Plaintiff Stotelmyer owns a 2015 Dodge Ram 3500, which was purchased new on or around

January 1, 2015, from Fitzgerald Chevrolet in Hagerstown, Maryland. Plaintiff Stotelmyer purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Stotelmyer would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Stotelmyer's 2015 Dodge Ram 3500 has diminished as a result of Defendants' deceptive acts and practices.

21.    Plaintiff Kahsin resides in Sterling Heights, Michigan. Plaintiff Kahsin owns a 2017 Dodge Ram 1500, which was purchased used on or around April 1, 2021, from Jim Riehl's Friendly in Warren, Michigan. Plaintiff Kahsin purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Kahsin would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Kahsin's 2017 Dodge Ram 1500 has diminished as a result of Defendants' deceptive acts and practices.

22.    Plaintiff Harries resides in Saint Peters, Missouri. Plaintiff Harries owns a 2015 GMC Sierra, which was purchased used on or around August 1, 2021, from CarMax in Saint Peters, Missouri. Plaintiff Harries purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Harries would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had

Defendants disclosed the Inflator Defect. The value of Plaintiff Harries' 2015 GMC Sierra has diminished as a result of Defendants' deceptive acts and practices..

23.    Plaintiff Miner resides in Buffalo, Montana. Plaintiff Miner owns a 2015 Dodge Ram 1500, which was purchased new on or around July 1, 2015, from Lithia Chrysler Jeep in Billings, Montana. Plaintiff Miner purchased his Class Vehicle for personal, family and/or household use. Plaintiff Miner would not have purchased his 2015 Dodge Ram 1500 or would have paid less for it had Defendants disclosed the Inflator Defect. The value of Plaintiff Miner's 2015 Dodge Ram 1500 has diminished as a result of Defendants' deceptive acts and practices.

24.    Plaintiff Bocchino resides in Bellville, New Jersey. Plaintiff Bocchino owns a 2016 Dodge Ram 2500, which was purchased used on or around July 1, 2019, from Platinum Motors in Toms River, New Jersey. Plaintiff Bocchino purchased his Class Vehicle for personal, family and/or household use. Plaintiff Bocchino would not have purchased his 2016 Dodge Ram 2500, or would have paid less for it, had Defendants disclosed the Inflator Defect. The value of Plaintiff Bocchino's 2016 Dodge Ram 2500 has diminished as a result of Defendants' deceptive acts and practices.

25.    Plaintiff Hunter resides in Vineland, New Jersey. Plaintiff Hunter owns a 2015 Chevrolet Silverado, which was purchased used on or around May 19, 2018, from Matt Blatt in Egg Harbor, New Jersey. Plaintiff Hunter purchased his Class

Vehicle for personal, family and/or household use. Plaintiff Hunter would not have purchased his 2015 Chevrolet Silverado, or would have paid less for it, had Defendants disclosed the Inflator Defect. The value of Plaintiff Hunter's 2015 Chevrolet Silverado has diminished as a result of Defendants' deceptive acts and practices.

26.    Plaintiff Jones resides in Hillside, New Jersey. Plaintiff Jones owns a 2016 GMC Sierra Denali 1500, which was purchased new on or around April 1, 2016, from Maxon Auto Group in Union, New Jersey. Plaintiff Jones purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Jones would not have purchased his 2016 GMC Sierra Denali 1500, or would have paid less for it, had Defendants disclosed the Inflator Defect. The value of Plaintiff Jones' 2016 GMC Sierra Denali 1500 has diminished as a result of Defendants' deceptive acts and practices.

27.    Plaintiff Laine resides in Kent, New York. Plaintiff Laine owns a 2015 Chevrolet Silverado, which was purchased used on or around November 1, 2020, from Update Chevrolet in Attica, New York. Plaintiff Laine purchased his Class Vehicle for personal, family and/or household use. Plaintiff Laine would not have purchased his 2015 Chevrolet Silverado, or would have paid less for it, had Defendants disclosed the Inflator Defect. The value of Plaintiff Laine's 2015 Chevrolet Silverado has diminished as a result of Defendants' acts and practices.

28.     Plaintiff Mace resides in Hicksville, New York. Plaintiff Mace owns a 2018 Dodge Ram 1500 Express, which was purchased new on or around July 1, 2017, from Security Dodge Chrysler in Amityville, New York. Plaintiff Mace purchased his Class Vehicle for personal, family and/or household use. Plaintiff Mace would not have purchased his 2018 Dodge Ram 1500 Express or would not have paid as much for it had Defendants disclosed the Inflator Defect. The value of Plaintiff Mace's 2018 Dodge Ram 1500 Express has diminished as a result of Defendants' deceptive acts and practices.

29.     Plaintiff Gibbs resides in Republic, Ohio. Plaintiff Gibbs owns a 2016 GMC Sierra, which was purchased used on or around September 1, 2020, from Halleen Kia of Sandusky, Ohio. Plaintiff Gibbs purchased his Class Vehicle for personal, family and/or household use. Plaintiff Gibbs would not have purchased his 2016 GMC Sierra, or would have paid less for it, had Defendants disclosed the Inflator Defect. The value of Plaintiff Gibbs' 2016 GMC Sierra has diminished as a result of Defendants' deceptive acts and practices.

30.     Plaintiff Zuccarell resides in Maumee, Ohio. Plaintiff Zuccarell owns a 2015 GMC Sierra 1500, which was purchased used on or around August 1, 2021, from Yark Auto Group in Toledo, Ohio. Plaintiff Zuccarell purchased his Class Vehicle for personal, family and/or household use. Plaintiff Zuccarell would not have purchased his 2015 GMC Sierra, or would have paid less for it, had Defendants

disclosed the Inflator Defect. The value of Plaintiff Zuccarell's 2015 GMC Sierra 1500 has diminished as a result of Defendants' deceptive acts and practices.

31.     Plaintiff Barlett resides in New Castle, Pennsylvania. Plaintiff Barlett owns a 2018 Dodge Ram 1500 Express, which was purchased used on or around June 1, 2020, from Car Connection Super in New Castle, Pennsylvania. Plaintiff Barlett purchased his Class Vehicle for personal, family and/or household use. Plaintiff Barlett would not have purchased his 2018 Dodge Ram 1500 Express or would not have paid as much for it had Defendants disclosed the Inflator Defect. The value of Plaintiff Barlett's 2018 Dodge Ram 1500 Express has diminished as a result of Defendants' deceptive acts and practices.

32.     Plaintiff Smith resides in West Sunbury, Pennsylvania. Plaintiff Smith owns a 2015 Chevrolet Silverado, which was purchased used on or around December 1, 2017, from Colussy Chevrolet in Bridgeville, Pennsylvania. Plaintiff Smith purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Smith would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Smith's 2015 Chevrolet Silverado 1500 has diminished as a result of Defendants' deceptive acts and practices.

33.     Plaintiff Lowell resides in Hernando, Mississippi. Plaintiff Lowell owns a 2016 GMC Sierra 1500, which was purchased used on or around January 1,

2018, from Saab of Memphis in Memphis, Tennessee. Plaintiff Lowell purchased his Class Vehicle for personal, family and/or household use. Plaintiff Lowell would not have purchased his 2016 GMC Sierra 1500 or would not have paid as much for it had Defendants disclosed the Inflator Defect. The value of Plaintiff Lowell's 2016 GMC Sierra 1500 has diminished as result of Defendants' deceptive acts and practices.

34.    Plaintiff Gaydos resides in Johnstown, Pennsylvania. Plaintiff Gaydos owns a 2017 Dodge Ram 1500, which was purchased new from Koons Tysons Chrysler Dodge Jeep Ram on or around February 19, 2017. Plaintiff Gaydos purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Gaydos would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Gaydos' 2017 Dodge Ram 1500 has diminished as a result of Defendants' deceptive acts and practices.

**B.    Defendants**

35.    Key Safety Systems, Inc. d/b/a Joyson Safety Systems ("Joyson"), is incorporated in Delaware with its principal place of business located at 2025 Harmon Road, Auburn Hills, Michigan, 48326. Joyson is owned jointly by Joyson Group (China) and PAG Capital (Hong Kong), and the company is the result of Key Safety Systems, Inc. purchasing troubled Japanese airbag company Takata Corporation.

36.    General Motors LLC ("General Motors LLC") is organized in Delaware and maintains its executive offices at 300 Renaissance Center, Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings LLC.

37.    General Motors Holdings LLC ("General Motors Holdings") is organized in Delaware and maintains its principal executive offices in Detroit, Michigan. The sole member of General Motors LLC is General Motors Company.

38.    General Motors Company ("General Motors Parent") is a Delaware corporation with its principal executive offices in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. General Motors Parent's only asset is its 100% ownership interest in General Motors Holdings. General Motors Parent is also responsible for making reports to NHTSA related to vehicle safety and deciding on vehicle recalls.

39.    FCA US LLC ("FCA"), formerly known as Chrysler Group LLC, is a Delaware limited liability company with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan, and FCA is a citizen of the States of Delaware and Michigan. The sole owner of FCA is Stellantis N.V., a Dutch-domiciled, multinational automotive manufacturing corporation formed in 2021.

### III.    JURISDICTION AND VENUE

40.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Classes are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' Magnuson-Moss claims arise under federal law. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

41.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

42.     This Court has personal jurisdiction over General Motors because it is found, has agents, or transacts business in this District. General Motors maintains 87 primary suppliers in New Jersey (direct and indirect) with a purchase order current within the last 365 days, 79 active dealers in New Jersey and delivered 58,177 vehicles in New Jersey just in 2020 alone.[2] Further, General Motors is committing a tortious act in this state, and causing injury to property in this state arising out of General Motors acts and omissions outside this state.

---

[2] *General Motors in New Jersey*, General Motors, https://www.gm.com/our-company/us/nj.html (last visited Nov. 8, 2021)

43.     This Court has personal jurisdiction over FCA and Joyson because: FCA and Joyson conduct substantial business in this District; some of the actions giving rise to the Amended Complaint took place in this District; and some of Plaintiffs' claims arise out of FCA and Joyson operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of FCA's and Joyson's acts and omissions outside this state. At or about the time of such injuries, FCA and Joyson were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by FCA and Joyson anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use. In addition, FCA has approximately 50 Dodge dealerships in the state of New Jersey.[3]

44.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District. Defendants caused harm to Plaintiff Sager, as well as hundreds of members of the Classes residing in New Jersey.

---

[3] *Dodge Dealerships in New Jersey*, DealerRater, https://www.dealerrater.com /directory/New-Jersey/Dodge/ (last visited Nov. 8, 2021).

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Definitions

45.    Plaintiffs bring this action on behalf of themselves, and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually, and on behalf of those similarly situated, for economic losses stemming from Defendants' breach of express and implied warranties, fraud, deceptive acts and trade practices, and/or false representations and/or omissions concerning the Inflator Defect in the Defective Airbags and Class Vehicles, including but not limited to: benefit of the bargain damages, overpayment damages, damages for diagnosis, repair, and/or replacement of the airbags; damages for diminished value of their vehicles; compensatory, statutory and punitive damages; attorneys' fees; costs; restitution; and/or injunctive relief.

46.    "Class Vehicles" refers to all vehicles in the United States that: (a) were equipped with the Defective Airbags (defined below) as original equipment; and (b) were manufactured, distributed, sold, or leased by the Truck Manufacturers.

47.    "Defective Airbags" refers to airbag modules manufactured by Joyson, including: (a) all airbags containing the Inflator Defect; (b) all airbags subject to the recalls identified in paragraph 48 below; and (c) all airbags manufactured by Joyson subject to any subsequent expansion of pre-existing recalls, subject to new recalls,

19

announced prior to the date of an order granting class certification, or relating to the tendency of such airbags to spontaneously explode, deploy or rupture.

48.    All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, all Defective Airbags have an unreasonably dangerous tendency to explode, even without air-bag deployment, and maim or kill drivers and passengers.

49.    The following tables identify, to the best of Plaintiffs' understanding and without the benefit of discovery, the General Motors and FCA vehicles equipped with the Defective Airbags, along with their respective recall status:

| Recall | Make | Model | Model Years |
|--------|------|-------|-------------|
| 20V-736; 21V-504 | GMC | Sierra 1500 | 2015-2016 |
| 20V-736; 21V-504 | GMC | Sierra 2500/3500 | 2015-2016 |
| 20V-736; 21V-504 | Chevrolet | Silverado 1500 | 2015-2016 |
| 20V-736; 21V-504 | Chevrolet | Silverado 2500/3500 | 2015-2016 |
| 21V-632 | Dodge | Ram 1500 | 2015-2019 |
| 21V-632 | Dodge | Ram 2500 | 2015-2020 |
| 21V-632 | Dodge | Ram 3500 | 2015-2020 |
| 21V-632 | Dodge | Ram 3500 Cab Chassis (10,000 lbs.) | 2016 |
| 21V-632 | Dodge | Ram Classic | 2015-2020 |

## B.    The Defective Airbags Have a Common Uniform Defect

50.    Airbags are designed to take advantage of the physics of a crash. In the case of a head-on collision, a car usually completes its impact progression in a few instants. For example, when traveling at 40 miles per hour, a car will decelerate at a

rate of 3,997 meters per second, taking just 4.5 milliseconds to stop completely, the blink of an eye. Following Newton's second law, the bodies of the occupants will continue to move until an outside force, such as the steering wheel, dashboard, or windshield bring the occupants to a stop. In this way, an airbag not only softens the blow in a collision, but also lowers the impact by stretching the collision out over a longer period of time and spreading the impact over a larger area of the body. For this reason, airbags inflate and then quickly deflate—to gradually bring the occupants' momentum from full speed to zero.

51.    In general, there are five main parts of an airbag system: crash sensors; a control module; initiator; an explosive charge; and the airbag itself. Some airbag designs have added stored gas to this design, either in conjunction with or in place of the explosive charge.

52.    The airbag control module initiates airbag deployment by input from crash sensors located throughout the vehicle. Crash sensors are electronic devices designed to tell when an impact has occurred. The sensors respond to several different sets of stimuli, such as sudden stopping or increased pressure as pieces of the car move due to the force of the collision. Different sensors measure wheel speed, seat occupant status, brake pressure, impact, and more. The airbag control module measures these vehicle status indicators during operation.

53.     Once the airbag control module detects a crash, it then sends an electrical current through the initiator of the system, to rapidly wake-up the inflator mechanism.

54.     In pyrotechnic and hybrid inflators, the initiator then ignites a charge, often solid pellets of sodium azide (NaN3), which explodes. The explosion produces nitrogen gas (N2~) that fills a deflated nylon airbag, at about 200 miles per hour. In compressed gas inflators, stored gas is released from a highly pressurized canister to fill the airbag. The whole reaction takes a mere 1/25 of a second.

55.     The airbag itself has tiny holes that begin releasing the gas the moment it is filled. Airbags are designed to be deflating by the time they make contact with the occupant in order to absorb the impact, rather than resulting in whiplash that could kill or maim the occupant. For this reason, the Inflator Defect is tremendously dangerous to occupants and can be fatally so. If an airbag explodes or deploys in the event of no collision, occupants are assaulted with an airbag inflating at 200 mph in 1/25 of a second and may bombarded with shrapnel.

56.     In the case of the prior Takata Recall, the inflator—the metal cartridge packed with propellant wafers—ignited with too much force, sometimes with little to no stimuli. When the airbag ruptures, it sends metal shards flying through the bag in the same direction as it is inflating—in other words, directly at the occupants' head and neck.

57.    Here, the Defective Airbags are manufactured by Joyson—Takata's successor-in-interest—at Joyson's Mexican facilities. Rather than serve their essential function of protecting Class Vehicle drivers and occupants, the Defective Airbags incorporated in the Class Vehicles contain a defect in design, manufacturing and/or materials that allows moisture accumulation, which causes airbag inflators to violently rupture.

58.    Joyson continues to have numerous issues from its acquisition of Takata—as the Defective Airbags contain the Inflator Defect, leading to the recalls described herein, and just four months ago, Joyson announced the discovery of falsified seat belt testing data from the Takata era.

### C.    Defendants Knew the Defective Airbags in the Class Vehicles Contained the Defect

59.    Defendants knew or had reason to know of the Inflator Defect and the risks it entails well before General Motors and FCA issued their recalls, from, *inter alia,* pre- and post-production testing, failure mode analysis, reports of exploding airbags, consumer complaints, internal investigations, and communications from their networks of dealerships. Defendants have continued to acquire knowledge of the Defect and General Motors delayed nearly nine months before issuing a secondary recall. Despite their knowledge, Defendants continued to conceal the Defect and the pattern of accidents, injuries, and deaths that have resulted from it. Defendants failed to disclose the Defect and this critical safety information with the

consumers who paid for and drive their Class Vehicles every day, including Plaintiffs and members of the Classes.

60.    It is perhaps unsurprising that Defendants have unreasonably and unsafely delayed disclosure of the Inflator Defect following their history endangering the public. As is now public knowledge, millions of General Motors and FCA vehicles contained the dangerous and defective Takata airbag inflators that can explode with too much force and spray metal shrapnel into vehicle passenger compartments. While the dangers of these Takata airbags were widely known for years, General Motors and FCA lobbied regulators to delay recalls for their affected vehicles to avoid a resulting hit to their profits. The Truck Manufacturers reported that recalling their vehicles with Takata inflators cost hundreds of millions of dollars.

61.    Consumers brought a putative class action seeking redress. *See In re Takata Airbag Prods. Liab. Litig.*, Case No. 14-cv-24009 (S.D. Fla.). While other vehicle manufacturers had earlier and voluntarily recalled their vehicles with Takata airbags, it was only years later, with that consumer litigation pending, that the Truck Manufacturers issued belated recalls. And importantly, the Truck Manufacturers did so *only after* regulators from NHTSA denied General Motors' petition for inconsequentiality, in which it attempted to argue that a recall was unnecessary.[4]

---

[4] David Shepardson, *GM Will Recall 7 Million Vehicles for Air Bag issue Worldwide*, Reuters (Nov. 23, 2020, 9:35 AM), https://www.reuters.com/article/us-gm-recall/gm-will-recall-7-million-vehicles-for-air-bag-issue-worldwide-

Here, as in Takata, Defendants knew or should have known that the Defective Airbags, and the Class Vehicles containing them, were unreasonably dangerous.

> **1.    Defendants were aware of the Defect and engaged in a slow and ineffective recall.**

62.    On June 2, 2020, General Motors' Technical Assistance Center received a report from a General Motors dealer regarding an unwanted/uncommanded deployment of a roof-rail airbag in a 2015 model year Chevrolet Silverado. An inspection was conducted on June 22, 2020, and based on the photos obtained in that inspection, the issue was submitted to General Motors' safety program on June 25, 2020. On June 26, 2020, General Motors opened a formal product investigation.

63.    Joyson received the inflator from the field on July 17, 2020, and began engineering analyses on the returned part, including metallurgical and scanning electron microscopy analyses. Joyson found evidence of corrosion and material embrittlement at the inflator end cap.

64.    Joyson observed similar corrosion and embrittlement in a roof-rail airbag inflator returned from the field from a prior incident in 2019.

65.    On October 20, 2020, Joyson informed General Motors that it identified a production period during which moist air might have been introduced into the

---

idUSKBN2831TH (last visited Nov. 8, 2021).

inflator manufacturing process. This supplier production window aligns with the manufacturing dates of inflators from both field cap-separation incidents. On November 18, 2020, General Motors' Safety and Field Action Decision Authority decided to conduct a safety recall on roof-rail airbag inflators produced during this production window.

66.    On November 25, 2020, the first recall was issued, less than 10,000 vehicles were recalled.

67.    On January 15, 2021, according to NHTSA ID 11416553, at least one consumer indicated that they attempted to have their Class Vehicle repaired, but that the parts were not yet available and the infrastructure for repair was not in place. Accordingly, over two months after issuing the recall, General Motors was not in a position to repair the Class Vehicles.

68.    In mid-June 2021, roof-rail airbags in three separate 2015 model year Silverado vehicles—one in Florida and two in Texas—ruptured while the vehicles were unoccupied and not in use within a few weeks' time. In all three inflators, the steel inflator-body sidewall split open, suddenly releasing the gas stored inside the chamber.

69.    General Motors became aware of these three incidents on June 15, June 21, and June 22. On June 24, 2021, General Motors' Safety and Field Action Decision Authority decided to conduct a safety recall.

70.    On July 1, 2021, General Motors issued their second recall, increasing the number of Class Vehicles' affected from under 10,000 vehicles to over 400,000 vehicles.

71.    Similarly, FCA and Joyson had multiple discussions regarding the Defect between December 9, 2020 and July 8, 2021. "It was found that moisture introduced into the inflator during supplier manufacturing may cause internal corrosion over time and potentially leading to Stress Corrosion Cracking ("SCC") in the inflator."

72.    On August 15, 2021, FCA issued a recall for 212,373 Ram pick-ups in the United States, and another 49,334 in Canada and Mexico. Although Defendants knew or should have known that the Defective Airbags installed in millions of Class Vehicles were defective and potentially deadly, only recently have Defendants begun to issue recalls.

73.    Moreover, Defendants are aware that the presence of moisture in the Defective Airbags may result in serious death or injury.  On December 5, 2019, Takata issued a recall of 1.4 million non-ammonium nitrate inflators used in brands of 1995-2000 vehicles. The non-azide inflators were found to absorb moisture and explode when the airbags deploy. Two deaths from these inflators were reported  in Australia. According to Takata's submission to the NHTSA, the issue was caused

by a defective foil seal, which failed to prevent moisture ingress into the airbag casing.

> **2.  Defendants knew or should have known about the publicly reported failures in the Defective Airbags in the Class Vehicles.**

74.    Defendants were also on notice of the Inflator Defect and its attendant safety risks from consumer complaints. These complaints are publicly available online through NHTSA's website.

75.    On information and belief, vehicle manufacturers such as General Motors and FCA monitor these public databases for complaints about their vehicles, in particular in light of their statutory obligations to report known safety defects in their vehicles to NHTSA and consumers. Moreover, in many of these reports, it is expressly clear that General Motors and FCA were directly informed of, and even investigated, the accidents in question. Although the Truck Manufacturers had access to the full body of these complaints in the public database, they failed to act until much later. Below is a small sample of these complaints, which detail consumer experience with the Defect, including the grave safety risks associated with the Defect.

...........................................................

Vehicle:    2015 Chevrolet Silverado 2500
NHTSA ID Number:    11432745
Incident Date:    August 1, 2021
Consumer Location:    ASHLAND, KY

28

VIN:    1GC1KWE80FF****

The contact's father owns a 2015 Chevrolet Silverado 2500. The contact's father received notification of NHTSA Campaign Number: 21V504000 (Air Bags) however, the part to the recall repair was unavailable. The contact stated on September 13, 2021, ***while his father was driving 5 mph over a pothole, the driver's and passenger's side front roof rail air bags deployed inadvertently.*** The contact stated that the air bag warning light was illuminated after the failure. The contact stated no one was injured or needed medical attention. No police report was filed. The driver was able to drive the vehicle to a repair shop. The vehicle was not diagnosed or repaired. A dealer was not contacted. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The manufacturer was made aware of the issue. The failure mileage was approximately 146,000. VIN tool confirms part not available.[5]

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

Vehicle: 2015 Chevrolet Silverado 1500
NHTSA ID Number:        11428106
Incident Date:        July 9, 2021
Consumer Location:        DAYTONA BEACH, FL
VIN:    1GCVKPEC5FZ****

***Side rail airbag deployed knock me out and total my vehicle.***

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

Vehicle: 2017 Ram 2500
NHTSA ID Number:        11407815
Incident Date:        April 8, 2021
Consumer Location:        ORANGE, CA
VIN:    3C6UR5FL1HG****

DRIVING DOWN HIGHWAY AND BOTH SIDE IMPACT AIRBAGS DEPLOYED FROM SEATS AND THE CEILING COVERING ALL SIDE WINDOWS FOR NO APPARENT REASON AT ALL.

---

[5] All emphases added. Complaints available at: https://www.nhtsa.gov/vehicle/.

29

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

Vehicle: 2015 Chevrolet Silverado 1500
NHTSA ID Number:      11395621
Incident Date:      February 6, 2021
Consumer Location:      ALBUQUERQUE, NM
VIN:     3GCUKREC9FG****

I WAS DRIVING AT A SPEED OF 40 MPH ON A DIRT ROAD WHEN *I HIT A LITTLE BUMP AN DRIVER AN PASSENGER CURTAIN AIR BAGS DEPLOY FOR NO REASON AT ALL, CAUSING MYSELF AN WIFE TO RUN OFF THE ROAD INTO AN EMBANKMENT. MY WIFE IS OK I SUFFER A LACERATION TO MY NOSE AN A SPRANG ANKLE.* THIS HAD HAPPEN WILL DELIVERING FOOD AN WATER TO GRANDPARENTS ON THE RESERVATION, THEY HAVE NO RUNNING WATER. THERE WAS NO POLICE REPORT FILED DUE TO COVID 19 AN UNAVAILABLE POLICE ON RESERVATION.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

Vehicle: 2015 Chevrolet Silverado 1500
NHTSA ID Number:      11416553
Incident Date:      January 15, 2021
Consumer Location:      BLOOMINGDALE, NJ
VIN:     1GCVKREC7FZ****

THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 20V736000 (AIR BAGS) HOWEVER, THE PART TO DO THE RECALL REPAIR WAS NOT YET AVAILABLE. THE CONTACT STATED THAT THE MANUFACTURER HAD EXCEEDED A REASONABLE AMOUNT OF TIME FOR THE RECALL REPAIR. HAWTHORNE CHEVROLET (1180 GOFFLE RD, HAWTHORNE, NJ 07506) AND THE MANUFACTURER WERE MADE AWARE OF THE ISSUE. THE MANUFACTURER INSTRUCTED THE DEALER TO PROVIDE THE CONTACT WITH A LOANER VEHICLE SINCE THE REMEDY WAS NOT YET AVAILABLE. THE CONTACT

HAD NOT EXPERIENCED A FAILURE. THE VEHICLE WAS NOT YET REPAIRED. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

Vehicle: 2015 Chevrolet Silverado 1500
NHTSA ID Number:      11390204
Incident Date:      January 27, 2021
Consumer Location:      AURORA, MO
VIN:    1GC1KVEG1FF****

*TL\* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 2500. THE CONTACT STATED THAT WHILE THE HUSBAND WAS DRIVING APPROXIMATELY 35 MPH BOTH THE FRONT AND REAR DRIVER AND PASSENGER SIDE CURTAIN AIR BAGS ERRONEOUSLY DEPLOYED CAUSING THE DRIVER TO LOST CONTROL OF THE STEERING AND CRASH INTO A DITCH. DURING THE INCIDENT THE DRIVER SUSTAINED A NECK INJURY.* NO POLICE REPORT WAS TAKEN. THE CAUSE OF THE FAILURE WAS NOT DETERMINED. THE LOCAL DEALER RELIABLE CHEVROLET LOCATED AT 3655 S CAMPBELL AVE, SPRINGFIELD, MO 65807 WAS NOTIFIED OF THE FAILURE. THE MANUFACTURER WAS NOT YET CONTACTED. THE FAILURE MILEAGE WAS 268,000.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

Vehicle: 2015 Chevrolet Silverado 1500
NHTSA ID Number:      11169960
Incident Date:          December 20, 2018
Consumer Location:      BAYTOWN, TX
VIN:    3GCUKREC6FG****

DRIVING DOWN SINGLE LANE ROAD I BEGAN TO STOP FOR RED LIGHT, AS I BEGAN TO DEPRESS BRAKE PEDAL BUT IT WAS STIFF AND HAD SIGNIFICANT EFFECT SLOWING MY TRUCK. I DROVE OF RIGHT SIDE OF ROAD INTO WET GRASS TOO AVOID COLLISION OF SUV STOPED IN FRONT OF ME. THERE WAS NO LOSS OF CONTROL OR DAMAGE DONE TO EXTERIOR OF TRUCK OR MYSELF . *AS I'M ALMOST*

***COMPLETELY STOPED THE SIDE CURTAIN AIR BAGS DEPLOY FOR NO APPARENT REASON CAUSING SEVER DAMAGE IT THE INTERIOR PANELS, HEADLINER AND BOTH FRONT SEAT BELTS*** THAT HAVE THAT CONTAIN SMALL CHARGE PERMINTLY LOCK AND NOW ARE UN USABLE.I WAS ONLY PERSON IN TRUCK BUT THE PASSENGER FRONT SEAT BELT IS RETRACTED AND LOCKED GUITAR STRING TIGHT.

••••••••••••••••••••••••••••••••••••••••••••••••

Vehicle: 2016 GMC Sierra 2500
NHTSA ID Number:        11155790
Incident Date:                November 27, 2018
Consumer Location:        RIFLE, CO
VIN:        1GT12TE81GF****

***CEILING AIR BAGS DEPLOYED.*** WITH OUT TRUCK BEING COMPROMISED. ALSO SURGING DOESN'T WANT TO STOP REVS AT 1000 RPM AND PUSHES EVEN WHEN BRAKED LEEPS FORWARD.

••••••••••••••••••••••••••••••••••••••••••••••••

Vehicle: 2016 GMC Sierra 1500
NHTSA ID Number:        11113108
Incident Date:                June 27, 2018
Consumer Location:        ARLINGTON, VA
VIN:        3GTU2NEC0GG****

TL* THE CONTACT OWNS A 2016 GMC SIERRA 1500. ***WHILE DRIVING APPROXIMATELY 25 MPH, THE FRONT DRIVER'S SIDE AIR BAG ERRONEOUSLY DEPLOYED AND CAUSED THE CONTACT'S VEHICLE TO CRASH INTO THE REAR OF ANOTHER VEHICLE. THE DRIVER SUSTAINED INJURIES TO THE HEAD, CHEST, AND LEFT ARM THAT REQUIRED MEDICAL ATTENTION.*** THE VEHICLE WAS TOWED TO AN UNDISCLOSED LOCATION. A POLICE REPORT WAS NOT FILED. THE CAUSE OF THE FAILURE WAS NOT DETERMINED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE, BUT THE LOCAL DEALER WAS NOT. THE FAILURE MILEAGE WAS

17,000. THE VIN WAS NOT AVAILABLE.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••

Vehicle: 2016 GMC Sierra 1500
NHTSA ID Number:      10967669
Incident Date:      March 20, 2017
Consumer Location:      WATSON, IL
VIN:    3GTU2NEC7GG****

ON 20 MARCH 17, I WAS TRAVELING DOWN A COUNTRY ROAD WHEN A DOG ENTERED THE ROADWAY. I SWERVED RIGHT AND WAS NOT ABLE TO CORRECT, WITHOUT THE POSSIBILITY OF OVER STEERING AND POSSIBILITY ROLLING MY TRUCK. *I WENT THROUGH A SMALL DITCH MY SIDE AIR BAGS DEPLOYED.* I WAS ABLE TO GET BACK ON THE ROAD.I STOPPED THE TRUCK AND COULD NOT SEE ANY DAMAGE. I RETURNED TO MY FRIENDS HOUSE AND CONTACTED MY INSURANCE,TOW COMPANY AND THE LOCAL SHERIFF DEPT, NOBODY INCLUDING THE REPAIR FACILITY COULD DETECT ANY DAMAGE ASIDE OF THE AIR BAG DEPLOYMENT. *MY INSURANCE ADJUSTER AND THE SERVICE FACILITY BOTH EXPRESSED THEY ARE FAMILIAR OF SUCH ACCIDENTAL SIDE AIR BAG DEPLOYMENTS ON THIS VEHICLE.,*

•••••••••••••••••••••••••••••••••••••••••••••••••••••••

Vehicle: 2015 Chevrolet Silverado 1500
NHTSA ID Number:      10936390
Incident Date:      November 11, 2016
Consumer Location:      GUTHRIE, OK
VIN:    N/A

*THE SIDE CURTAIN AIRBAGS DEPLOYED WHILE I WAS DRIVING ON A PAVED ROADWAY. I DID NOT HIT ANYTHING PRIOR TO INCIDENT.* GM STATES THAT THEY WILL NOT TAKE RESPONSIBILITY FOR THE TRUCK. I WAS THANKFULLY NOT INJURED AND NO ONE ELSE WAS INJURED. THERE IS NO PHYSICAL DAMAGE TO THE TRUCK AT ALL. GM HAS ABSOLUTELY NO CONCERN FOR THE

33

PUBLIC SAFETY. THE RECALL ON THE AIRBAGS HAD BEEN "FIXED" BY BOB HOWARD DEALERSHIP IN OKLAHOMA CITY THE MONTH BEFORE THE AIRBAGS DEPLOYED. THE SEATBELT RECALL WAS ALSO FIXED THE MONTH BEFORE AS WELL. *TR

••••••••••••••••••••••••••••••••••••••••••••••••••••••

Vehicle: 2015 Chevrolet Silverado 1500
NHTSA ID Number:       10908311
Incident Date:        August 20, 2016
Consumer Location:       CRAIG, CO
VIN:     3GCUKPEC9FG****

*WHILE ON A DIRT ROAD DRIVING AT A SLOW SPEED, THE SIDE CURTAIN AIRBAGS DEPLOYED.* THE VEHICLE DID NOT HIT ANYTHING AND NO OTHER DAMAGE OCCURRED. GM SENT A 3RD PARTY TO EVALUATE THE VEHICLE AND DECLARED THE WARRANTY VOID SINCE WE HAD INSTALLED A 4" LIFT KIT. THERE IS CURRENTLY A RECALL FOR TAKATA AIRBAGS ON THIS PARTICULAR TRUCK BUT GM SAYS THIS IS UNRELATED. THIS VEHICLE WAS PURCHASED NEW IN MARCH OF 2016 AND HAD 5089 MILES WHEN THIS INCIDENT OCCURRED. HOW CAN GM DENY THIS CLAIM. SHOULDN'T THEY HAVE TO PROVE THAT THE LIFT KIT CAUSED THE DEPLOYMENT IF THAT IS THEIR REASON FOR DENIAL? NO WHERE IN THE WARRANTY INFORMATION DOES IT STATE INSTALLING A LIFT KIT CAN CAUSE THE SIDE AIR BAGS TO DEPLOY. NO WHERE ON THE INFORMATION PROVIDED FROM THE LIFT KIT MANUFACTURER DOES IT STATE YOUR WARRANTY COULD BE VOID IF YOU INSTALL THE KIT. THIS ISN'T RIGHT. ANY HELP YOU CAN PROVIDE WOULD BE GREATLY APPRECIATED.

••••••••••••••••••••••••••••••••••••••••••••••••••••••

Vehicle: 2015 GMC Sierra 2500
NHTSA ID Number:       10865359
Incident Date:       May 14, 2016
Consumer Location:       EL DORADO HILLS, CA
VIN:     N/A

••••••••••••••••••••••••••••••••••••••••••••••••••••••

*WHILE DRIVING STRAIGHT/UPSLOPE ON A DIRT ROAD THE SIDE AIR BAGS DEPLOYED IN MY 2015 SIERRA 2500 HD PICKUP TRUCK. THERE WAS NO IMPACT AND ABSOLUTELY NO DAMAGE TO THE EXTERIOR OR UNDERCARRIAGE OF THE VEHICLE.* VEHICLE WOULD NOT RESTART FOR SEVERAL MINUTES AFTER THE AIR BAG DEPLOYMENT (IF ON A BUSY STREET I WOULD HAVE BEEN UNABLE TO GET OUT OF ROADWAY)

**• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •**

Vehicle: 2015 Chevrolet Silverado 1500
NHTSA ID Number:        10748531
Incident Date:        June 22, 2015
Consumer Location:        PHILIPSBURG, PA
VIN:        1GCVKREC8FZ****

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO. *THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 14 MPH ON A GRAVEL ROAD, BOTH THE DRIVER AND PASSENGER SIDE AIR BAGS DEPLOYED. THE CONTACT AND THE PASSENGER SUSTAINED INJURIES. THE CONTACT REQUIRED MEDICAL ATTENTION.* THE VEHICLE WAS TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE FAILURE WAS CAUSED BY THE ROUGH ROAD AND THAT THE VEHICLE FUNCTIONED AS DESIGNED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 9,300.

**• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •**

Vehicle:        2016 Dodge Ram 1500
NHTSA ID Number:        11396137
Incident Date:        September 3, 2020
Consumer Location:        HINESVILLE, GA
VIN:  1C6RR6GGXGS****

*SIDE CURTAIN AND DRIVER SEAT AIRBAG DEPLOYED WHILE DRIVING ABOUT 10 MPH AFTER PULLING OUT OF*

35

***THE GAS STATION. THERE WAS NO COLLISION.*** I REPORTED THE SITUATION TO RAM AND THEY TOLD ME SORRY ABOUT YOUR LUCK, WERE NOT TAKING CARE OF IT.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••

Vehicle:      2015 Dodge Ram 2500
NHTSA ID Number:      11174495
Incident Date:      February 1, 2019
Consumer Location:      WARRENTON, MO
VIN:      3C6TR5DT8FG****

TL* THE CONTACT OWNS A 2015 RAM 2500. WHILE DRIVING DOWN A GRAVEL DRIVEWAY, ***THE FRONT SIDE AIR BAGS DEPLOYED WITHOUT WARNING OR AN IMPACT. THERE WERE NO INJURIES.*** AN UNKNOWN DEALER WAS CONTACTED. THE MANUFACTURER WAS CONTACTED AND STATED THAT THE VEHICLE WAS NOT INCLUDED IN A TAKATA AIR BAG RECALL. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS UNKNOWN.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••

Vehicle:      2017 Dodge Ram 2500
NHTSA ID Number:      11407815
Incident Date:      April 8, 2021
Consumer Location:      ORANGE, CA
VIN:      3C6UR5FL1HG****

***DRIVING DOWN HIGHWAY AND BOTH SIDE IMPACT AIRBAGS DEPLOYED FROM SEATS AND THE CEILING COVERING ALL SIDE WINDOWS FOR NO APPARENT REASON AT ALL.***

76.    The above consumer complaints represent a sampling of complaints filed with the NHTSA. Defendants monitored and saw the above quoted consumer complaints for three reasons:

a)    First, pursuant to the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), 49 U.S.C. § 30118, manufacturers are required to monitor reports submitted to NHTSA and report information regarding internal customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects.

b)    Second, vehicle manufacturers like Defendants know that NHTSA is a repository for complaints, and as such can provide an early warning mechanism for responding to design or manufacturing defects that pose a safety hazard. Hence, as courts have found, it is entirely reasonable to assume that Truck Manufacturers closely monitor and analyze complaints made to NHTSA—particularly when they entail a safety hazard.

c)    Third, online reputation management (commonly called "ORM" for short), is now a standard business practice among most major companies and entails monitoring consumer forums, social media and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to

37

solve problems before they damage the individual's or brand's reputation."[6] The growth of the internet and social media, along with the advent of reputation management companies, has led to ORM becoming an integral part of many companies' marketing efforts. Defendants regularly monitored NHTSA in connection with its ORM activities because candid comments from Defendants owners provide valuable data regarding quality control issues and customer satisfaction. Defendants therefore would have learned about the numerous complaints filed with NHTSA.

77.    Defendants, who concealed their knowledge of the nature and extent of the Inflator Defect from the public while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety. Moreover, General Motors and FCA have violated their affirmative duty, imposed under the TREAD Act, to promptly advise customers about known defects, such as the Inflator Defect.

---

[6] Moryt Milo, *Great Businesses Lean Forward, Respond Fast*, Silicon Valley Business Journal (May 17, 2013, 6:00 AM), http://www.bizjournals.com/sanjose /print-edition/2013/05/17/great-businesses-lean-forward-respond.html.

### D. **Despite Their Knowledge, Defendants Concealed The Inflator Defect And Continued To Sell the Defective Airbags and Class Vehicles with the Defective Airbags As "Safe" And "Reliable."**

78.    For Plaintiffs and many consumers, safety is one of the most important factors when buying or leasing a vehicle, and especially for trucks composing the Class Vehicles.

79.    Defendants engaged in unfair and deceptive trade practices and made false representations and/or omissions regarding the Defect and, in advertising and other consumer-facing representations about the Class Vehicles, the Truck Manufacturers touted the safety of the Class Vehicles in national marketing campaigns.

80.    In advertisements and promotional materials, General Motors and FCA maintained that the Class Vehicles were safe and reliable, and did not correct representations about the Class Vehicles' safety and reliability made in the past. Instead, General Motors and FCA repeatedly touted the Class Vehicles' passenger safety systems and assured consumers, including Plaintiffs and members of the Classes that they could rely on their airbags and that the Defective Airbags were safe and defect-free.

81.    Defendants' representations were deceptive, false and misleading because of what they failed to say; Defendants uniformly failed to disclose that the

Defective Airbags in the Class Vehicles are prone to explode, even without air-bag deployment, and maim or kill drivers and passengers.

82.    Plaintiffs, directly or indirectly, were exposed to these advertisements and promotional materials before purchasing or leasing their Class Vehicles. If General Motors and FCA had instead chosen to disclose the truth about the Inflator Defect—including, *inter alia*, at dealerships, on their websites, in brochures, press releases or in other promotional materials—Plaintiffs and Class members would have seen those disclosures and been capable of making an informed purchasing decision. The misleading statements about Class Vehicles' safety in FCA and General Motors' advertisements and promotional materials, as well as omissions of truth about the Inflator Defect, influenced Plaintiffs and Class members' decisions to purchase or lease Class Vehicles.  Had the Defect been disclosed by Defendants, Plaintiffs and Class members would not have purchased or leased their Class Vehicles or would have paid less for them.

### 1.    Labels and window stickers on the Class Vehicles stated that they were equipped with working airbags and seatbelts and failed to disclose the Inflator Defect.

83.    To distribute their vehicles in the United States, the Truck Manufacturers had to "certify to the distributor or dealer at delivery that the vehicle or equipment complies with applicable motor vehicle safety standards prescribed" by NHTSA under Chapter 301 of Title 49 of the U.S. Code. Accordingly, General

Motors and FCA "may not issue the certificate if, in exercising reasonable care," they have "reason to know the certificate is false or misleading in a material respect." 49 U.S.C. § 30115; *see also* 49 U.S.C. § 30112.

84.    Further, since "[c]ertification of a vehicle must be shown by a label or tag permanently fixed to the vehicle," all Class Vehicles have a permanent label certifying compliance with the safety regulations prescribed by NHTSA. 49 U.S.C. § 30115. Since all the Class Vehicles are passenger vehicles, the permanent label must state: "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." 49 C.F.R. § 567.4(g)(5).

85.    These labels were false and misleading because they failed to warn consumers about the Defect, including the risk that the inflators in the Class Vehicles are prone to explode, even without air-bag deployment, and instead indicated that the passenger safety system would function properly. *See* 49 C.F.R. § 571.208 (S4.1.5.4, S4.1.5.5) (Federal motor vehicle safety standards requiring Occupant Restraint Systems with airbags and seatbelts). Vehicle manufacturers have a duty to disclose known safety defects to the public and to NHTSA. When a vehicle manufacturer learns of a safety defect, federal law requires it to disclose the Defect to NHTSA and to the owners, purchasers, and dealers of the vehicle. 49 U.S.C. § 30118(c). However, Defendants failed to promptly disclose the Defect.

86.    Indeed, General Motors acknowledges these obligations in its public SEC filings. In its Form 10-K for fiscal year 2019, General Motors Parent states: "If we or NHTSA determine that either a vehicle or vehicle equipment does not comply with a safety standard or if a vehicle defect creates an unreasonable safety risk, the manufacturer [must] notify owners and provide a remedy."[7] General Motors has since updated the "Vehicle Safety" section of its Form 10-K in fiscal year 2021 to say, "The Safety Act further requires that if we or NHTSA determine a vehicle or an item of vehicle equipment does not comply with a safety standard, or that vehicle or equipment contains a defect that poses an unreasonable safety risk, we must conduct a safety recall to remedy that condition in the affected vehicles."[8]

87.    Likewise, a prior publicly-traded parent of FCA, Fiat Chrysler Automobiles N.V., stated in an SEC filing that "Under U.S. federal law, all vehicles sold in the U.S. must comply with Federal Motor Vehicle Safety Standards ("FMVSS") promulgated by NHTSA, and must be certified by their manufacturer as being in compliance with all such standards at the time of the first purchase of the vehicle. In addition, if a vehicle contains a defect that is related to motor vehicle safety or does not comply with an applicable FMVSS, the manufacturer must notify NHTSA and vehicle owners and provide a remedy at no cost."[9]

---

[7] General Motors, Co., Annual Report (Form 10-K) (Feb. 5, 2020).
[8] General Motors, Co., Annual Report (Form 10-K) (Feb. 10, 2021).
[9] Fiat Chrysler Automobiles N.V., Annual Report (Form 20-F) (Feb. 20, 2018).

88.    The interiors of the Class Vehicles also contain prominent labels that alert the driver and passengers to the vehicle's airbag system. For example, steering wheels and passenger dashboards in the Class Vehicles typically have labels identifying the airbag and safety restraint system, none of which disclosed the Defect or associated safety risk.

89.    General Motors and FCA were also specifically required to include in their vehicles warning labels that alerted consumers of the need to perform airbag maintenance. For example, S4.5.1 of 49 C.F.R. § 571.208 states:

> Air bag maintenance or replacement information. If the vehicle manufacturer recommends periodic maintenance or replacement of an inflatable restraint system, as that term is defined in S4.1.5.1(b) of this standard, installed in a vehicle, that vehicle shall be labeled with the recommended schedule for maintenance or replacement. The schedule shall be specified by month and year, or in terms of vehicle mileage, or by intervals measured from the date appearing on the vehicle certification label provided pursuant to 49 CFR Part 567. The label shall be permanently affixed to the vehicle within the passenger compartment and lettered in English in block capital and numerals not less than three thirty-seconds of an inch high. This label may be combined with the label required by S4.5.1(b) of this standard to appear on the sun visor.

90.    Plaintiffs are unaware of any label in any Class Vehicle that alerted consumers to the Inflator Defect or the need to perform maintenance to prevent improper airbag deployment or explosion.

91.    General Motors and FCA also distributed the Class Vehicles with so-called "Monroney" labels (also known as "window stickers") that described the

equipment and safety features of the Class Vehicles, including the Defective Airbags. Dealers sell Class Vehicles to consumers with these labels visible. An image of a Monroney label for the 2015 Chevrolet Silverado 1500 is included below as an example. In the center of the image, it features a "Five Star" frontal crash rating for drivers. Under "Safety & Security" features, it touts the airbag system and does not disclose the Defect.[10]



---

[10]  Monroney labels for many of the Class Vehicles are available at: https://monroneylabels.com.

92.     As shown in these examples, Monroney labels uniformly assured consumers that the Class Vehicles had working airbags. This information would have suggested to any reasonable consumer that the passenger safety system did not suffer from the Defect and would perform its intended function.

93.     Had General Motors and FCA disclosed the Defect on the Monroney labels or other labels or marketing for the Class Vehicles, Plaintiffs and Class members would have seen that disclosure and would not have purchased or leased their Class Vehicles or would have paid less for them.

> **2.     Joyson, General Motors, and FCA marketed the Airbags and Class Vehicles as safe and reliable, but failed to disclose and concealed the Inflator Defect.**

94.     Joyson—then Key Safety Systems—advertised its Defective Airbags on its website, but failed to disclose and concealed the Defect. On its page detailing its airbag inflator offerings, Key Safety Systems (KSS) stated:

> KSS is known as an innovator in the design of key safety components such as lighter, smaller, environmentally friendly inflators . . . KSS Inflators are designed to meet the most stringent global customer requirements for design, performance, quality, and cost, and they reflect the company's commitment to providing the highest quality and most technologically advanced airbag systems.[11]

95.     By failing to disclose and concealing the Defect—and instead touting the Defective Airbags' safety—Joyson misled consumers and represented that the

---

[11] *Inflators*, Key Safety Systems, https://web.archive.org/web/20150907201322 /http://keysafetyinc.com/inflators.asp (last visited Nov. 8, 2021).

Defective Airbags would perform as promised, despite knowledge that the airbags contained an undisclosed Defect.

96.    General Motors and FCA's advertisements for the Class Vehicles also left out a vital part of the story like their other consumer-facing representations. By uniformly omitting any information about the Inflator Defect, General Motors and FCA misled consumers into believing that their airbags would function properly, despite their knowledge to the contrary.

97.    Brochures and press releases for the Class Vehicles and Defendants' vehicles use similar language to send a misleading message of safety. Illustrative examples are described below.

a.    In the brochure for the 2015 GMC Sierra 1500, General Motors specifically touted the safety features of the Class Vehicle including the Defective Airbags.[12]

---

[12] 2015 GMC Sierra 1500, Auto-Brochures https://www.autobrochures.com/makes/ GMC/Sierra/GMC_US%20Sierra_2015.pdf (last visited Nov. 8, 2021)



b.      In the sales brochure for the 2016 GMC Sierra 1500, General Motors advertised the capability of the Class Vehicle's "safety alert system" and airbags.[13]

---

[13] 2016 GMC Sierra 1500, Auto-Brochures, https://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20Sierra_2016.pdf (last visited Nov. 8, 2021).



       c.     In the sales brochure for the 2015 GMC Sierra HD, General

Motors stated "[t]he new Sierra HD raises the bar for pickup truck safety."[14]

---

[14] 2015 GMC Sierra HD, Motorologist, http://www.motorologist.com/wp-content/uploads/2015-gmc-sierra-hd-brochure.pdf (last visited Nov. 8, 2021).



d.      In the sales brochure for the 2016 GMC Sierra HD, General Motors touted the Class Vehicle's ability to protect occupants of the vehicle through its various safety technologies.[15]



---

[15] 2016 GMC Sierra HD, Auto-Brochures, https://www.auto-brochures.com/makes/ GMC/Sierra/GMC_US%20Sierra_2016.pdf?bcs-agent-scanner=1c332355-502b-3442-b9a3-1e615b037b4a (last visited Nov. 8, 2021).

e.      In the sales brochure for 2016 Chevrolet Silverado 1500, General Motors touted the Class Vehicle as "surrounded by safety". General Motors stated the Class Vehicle has features "that help protect you from the unexpected", including the vehicle's "six airbags and a 360-degree sensor system."[16]

# SURROUNDED BY SAFETY.

The available Enhanced Driver Alert Package has features that help protect you from the unexpected, including the Safety Alert Driver Seat, Lane Keep Assist, Forward Collision Alert, front and rear park assist and IntelliBeam™ headlamps.



**SAFETY ALERT DRIVER SEAT.** The available Safety Alert Driver Seat uses directional vibration pulses from the seat cushion instead of audible crash avoidance alerts to help indicate the direction of potential collision threats. The patented warning approach is tied into other onboard crash avoidance systems.



**LANE KEEP ASSIST.** At speeds above 60 km/h (37 mph), this available camera-based system monitors road lines and will gently turn the steering wheel if the vehicle begins changing lanes without the use of a turn signal. New for 2016.



**FORWARD COLLISION ALERT.** This available feature continually monitors how close your Silverado is to the vehicle in front of you. If the system determines that a front-end collision with a detected vehicle is imminent, it alerts the driver to a potential crash.

**REAR VISION CAMERA.** When the Silverado transmission is in Reverse, the available rear vision camera with dynamic guiding lines allows the driver to view objects directly behind the vehicle via the available screen in the centre stack. So it's easier to back up, park or hook up a trailer.



**INTELLIBEAM HEADLAMPS.** When oncoming headlamps are sensed or when tail lamps are detected in front of you, available IntelliBeam headlamps intuitively adjust between low and high beams.



**FRONT AND REAR PARK ASSIST.** Ideal when pulling into a parking spot at low speeds, this available system senses stationary objects and alerts you if an object is too close. If equipped, the rear vision camera automatically displays a live image of the area behind the vehicle on the available Chevrolet MyLink screen after you shift into Reverse.



**SIX AIRBAGS.** Silverado 1500 includes six airbags¹ and a 360-degree sensor system, including single-stage frontal airbags. There are also available head-curtain side-impact airbags with rollover protection and seat-mounted side-impact airbags.

**AVAILABLE ONSTAR® AUTOMATIC CRASH RESPONSE.²** In a crash, built-in sensors can alert a specially trained OnStar Advisor, who is connected into your Silverado to see if you need help – even if you can't ask for it. Advisors can use GPS technology to pinpoint your location and request emergency help.

**SAFETY STARTS WITH YOU.** Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic, surroundings and road conditions at all times. Read the Silverado Owner's Manual for more important safety information.



f.      In the sales brochure for the 2015 Chevrolet Silverado HD, General Motors stated "[a]t Chevrolet, we believe safety is as important to truck

---

[16] 2016 Chevrolet Silverado 1500, Auto-Brochures, https://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20Sierra_2016.pdf?bcs-agent-scanner=1c3 32355-502b-3442-b9a3-1e615b037b4a (last visited Nov. 8, 2021).

buyers as it is to car buyers. That is why the new Silverado HD sets the benchmark for pickup truck safety."[17]



A / LANE DEPARTURE WARNING   B / FORWARD COLLISION ALERT

At Chevrolet, we believe safety is as important to truck buyers as it is to car buyers. That is why the new Silverado HD sets a benchmark for pickup truck safety. Silverado offers the Driver Alert Package. The package includes Forward Collision Alert (FCA) to warn you when you're rapidly approaching another vehicle and a collision is imminent, Lane Departure Warning (LDW) to alert you if you wander from your lane without using your turn signal, the Safety Alert Driver Seat that uses vibrations in the seat cushions to signal the direction of a potential hazard and Front and Rear Park Assist to help ease you into or out of tight spaces. Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic,

surroundings and road conditions at all times. Read the vehicle Owner's Manual for more important safety information.

SAFETY ALERT DRIVER SEAT  The available Safety Alert Driver Seat helps warn the driver of potential traffic danger using directional vibration pulses from the seat cushion. The patented warning approach is tied into other on-board crash avoidance systems.

A / LANE DEPARTURE WARNING  This available technology alerts the driver when Silverado HD drifts over a lane line without signaling while traveling at least 35 mph.

B / FORWARD COLLISION ALERT  To help prevent frontal crashes, this available technology alerts drivers when they are

closing in too quickly on a vehicle ahead. The warning gives the driver critical additional time to react and potentially avoid a crash.

ABS BRAKES  Four-wheel, four-channel, antilock disc brakes (ABS) help provide straight, more controlled stops by preventing wheel lock-up in most road conditions.

REAR VISION CAMERA  When Silverado HD's transmission is in reverse, the available Rear Vision Camera with dynamic grid lines allows the driver to view objects directly behind the vehicle via the available 8" diagonal screen in the center stack. So it's easier to back up, park or hook up a trailer.

SIX AVAILABLE AIR BAGS  Silverado HD offers up to six air bags† and a 360-degree sensor system, including single-stage frontal air bags, head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags.

ONSTAR  The safety and security of OnStar† is available on Silverado HD. In the event of a crash, a vehicle sensor can automatically send an alert to a specially trained OnStar Advisor who can be immediately connected into your vehicle. Even if you can't respond, OnStar can send whatever help you need, based on GPS coordinates, crash data and a prediction of injury severity.

g.     Similarly, in the sales brochure for the 2016 Chevrolet Silverado HD, General Motors touted the capability of the Class Vehicle's safety systems.[18]

---

[17] 2015 Chevrolet Silverado HD, Auto-Brochures, https://www.auto-brochures.com /makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2015.pdf (last visited Nov. 8, 2021).

[18] 2016 Chevrolet Silverado HD, Auto-Brochures, https://www.auto-brochures.com /makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2016.pdf (last visited Nov. 8, 2021).

# SURROUNDED BY SAFETY.



With the available Driver Alert Package, you get features that help protect you from the unexpected, including the Safety Alert Driver Seat, Lane Departure Warning, Forward Collision Alert, and Front and Rear Park Assist.



**SAFETY ALERT DRIVER SEAT.** The available Safety Alert Driver Seat uses directional vibration pulses from the seat cushion instead of audible crash avoidance alerts to help indicate the direction of potential threats. The patented warning approach is tied into other onboard crash avoidance systems.

**FORWARD COLLISION ALERT.** This available feature continually monitors how close your vehicle is to the vehicle in front of you. If the system determines that a front-end collision with a detected vehicle is imminent, it alerts the driver to a potential crash.



**LANE DEPARTURE WARNING.** If you unintentionally change lanes (without a turn signal), this available camera-based system sends an alert. The camera, mounted near the inside rearview mirror, reads traffic lane markings when identifiable and provides audible and visual alerts.



**REAR VISION CAMERA.** When the Silverado HD transmission is in Reverse, the available rear vision camera with dynamic guiding lines allows the driver to view objects directly behind the vehicle via the screen in the center stack. So it's easier to back up, park or hook up a trailer.



**FRONT AND REAR PARK ASSIST.** Ideal when pulling into a parking spot at low speeds, this available system senses stationary objects and alerts you if an object is too close. The available rear vision camera automatically displays a live image of the area behind the vehicle on the screen in the center stack after you shift into Reverse.

**ABS BRAKES.** Four-wheel, four-channel, antilock disc brakes (ABS) help provide straight, more controlled stops by preventing wheel lockup in most road conditions.



**AIR BAGS.** Standard on 2500HD are six air bags, including frontal air bags, head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags. 3500HD has frontal air bags† standard, and available are head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags.

**AVAILABLE ONSTAR® AUTOMATIC CRASH RESPONSE.²** In a crash, built-in sensors can alert a specially trained OnStar Advisor, who can be connected into your Silverado HD to see if you need help — even if you can't ask for it. Advisors can use GPS technology to pinpoint your location and request emergency help. OnStar Guidance Plan³ is standard for the first six months (available on WT⁴).

**SAFETY STARTS WITH YOU.** Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic, surroundings and road conditions at all times. Read the Silverado HD Owner's Manual for more important safety information.

98.    FCA also touted the capabilities of their Class Vehicles in terms of performance, safety and reliability. As shown below:

a.    In the sales brochure for the 2015 Ram 1500, FCA touted the 2015 Ram 1500 as "Dependable [and] Sensible." FCA further stated, "When you deliver all the refinements of a Ram, comparisons to the wannabe competitors are welcome. The 2015 Ram 1500 stands up to all of them—and frequently stands above."[19]

---

[19] 2015 Dodge Ram 1500, Dealer eProcess, https://cdn.dealereprocess.org/cdn/brochures/ram/2015-1500.pdf?bcs-agent-scanner=03ba9dbd-d25c-764c-baff-98a2439c0943 (last visited Nov. 8, 2021).





RAM 1500. THE PICKUP THAT BRINGS IT ALL TOGETHER. These are the combinations that define leadership: one of the most extensive powertrain lineups in the industry, standing out with exceptional fuel efficiency, jaw-dropping towing and payload numbers for invaluable work capability—and priceless peace of mind for those demanding recreational needs. Nimble agility and responsive comfort for highways, off-roads and even at-rest loading. Class-exclusive[1]* suspensions. State-of-the-art technology. And people-centric interiors that give you seating, storage, communications and telematics at impressive levels of convenience and practicality. The 2015 Ram 1500 delivers a sleek aerodynamic exterior, legendary components and quality so good, it's backed by a 5-Year/100,000-Mile Powertrain Limited Warranty,[2] one of the best in the business. When you deliver all the refinements of a Ram, comparisons to the wannabe competitors are welcome. The 2015 Ram 1500 stands up to all of them—and frequently stands above. For a bigger picture that includes specs, videos, blogs and owner input, click over and bookmark RAMTRUCKS.COM

     b.    In the sales brochure for the 2016 Ram 1500, FCA states "Ram 1500 Does It All."[20]

     c.    In the sales brochure of the 2017 Ram 1500, FCA touted the safety features of the Class Vehicle stating that "Ram technology starts with safety and security."[21]

---

[20] 2016 Dodge Ram 1500, Auto-Brochures, https://www.auto-brochures.com/makes/ram/Ram_US%201500_2016.pdf?bcs-agent-scanner=14b821b3-9357-314c-8640-a207633d54c1 (last visited Nov. 8, 2021).

[21] 2017 Dodge Ram 1500, Auto-Brochures, https://www.auto-brochures.com/makes/ram/Ram_US%201500_2017.pdf?bcs-agent-scanner=d0687ab2-dbbb-2845-92dc-d6a505af78bf (last visited Nov. 8, 2021).



d.     In the sales brochure of the 2018 Ram 1500, touted the safety and security of the Class Vehicle, "Ram surrounds you with protection including advanced multistage front airbags, supplemental front side-mounted airbags, and side-curtain airbags." Further, FCA stated "Ram safety and security. It's all about you."[22]

---

[22] 2018 Dodge Ram 1500, Auto-Brochures, https://www.auto-brochures.com/makes/ram/Ram_US%201500_2018.pdf?bcs-agent-scanner=9a8104de-c6ac-eb45-8cf7-2e1c9fb5055c (last visited Nov. 8, 2021).



e.    In the sales brochure of the 2019 Ram 1500, FCA states "THE ALL-NEW 2019 RAM 1500: UNCOMPROMISING DURABILITY, CAPABILITY, LUXURY, SAFETY, TECHNOLOGY AND EFFICIENCY."[23]

---

[23] 2019 Dodge Ram 1500, Auto-Brochures, https://www.auto-brochures.com /makes/ram/Ram_US%201500_2019.pdf?bcs-agent-scanner=428fce91-e821-2b40-a0fe-550d3f1e3755 (last visited Nov. 8, 2021).



THE ALL-NEW
2019 RAM 1500:
UNCOMPROMISING
DURABILITY,
CAPABILITY, LUXURY,
SAFETY, TECHNOLOGY
AND EFFICIENCY.
PERIOD.

   f.  In the sales brochure of the 2019 Ram 1500 Classic, FCA states the Ram 1500 Classic "is engineered for all-around strength—and that includes jaw-dropping procedures to help ensure safety and stability. To achieve it, our engineers employed testing protocols that involved some of the most brutal conditions imaginable."[24]

---

[24] 2019 Dodge Ram Classic, Auto-Brochures, https://www.auto-brochures.com/ makes/ram/Ram_US%201500_2019-cl.pdf (last visited Nov. 8, 2021).



g.     Similarly, in the sales brochure of the 2020 Ram 1500 Classis, FCA touted the same capabilities of the Class Vehicle. FCA stated the Ram 1500 Classic "is engineered for all-around strength—and that includes jaw-dropping procedures to help ensure safety and stability. To achieve it, our engineers employed testing protocols that involved some of the most brutal conditions imaginable."[25]

---

[25] 2020 Dodge Ram 1500, Auto-Brochures, https://www.auto-brochures.com/ makes/ram/Ram_US%201500_2020-cl.pdf (last visited Nov. 8, 2021).



99.     Further, online and video advertisements further paint a misleading representation of safety, for example:

a.     In a 2020 video advertisement, General Motors highlighted the engineering teams that work on family vehicles, a voiceover stated: "The Chevy family of SUVs: we don't just take safety seriously, we take it personally."[26]

---

[26] Sam McEachern, *New Chevrolet Ad Shines Spotlight on Brand's Vehicle Safety: Video*, GM Authority (Aug. 22, 2020), http://gmauthority.com/blog/2020/08/new-chevrolet-ad-shines-spotlight-on-brands-vehicle-safety-video/.

b.     In print advertisements, Chevrolet touted that its Silverado 1500 is the first ever pickup truck to receive a perfect 5 star rating for overall vehicle score safety.

c.     For 2018, Chevrolet marketed the safety features of its vehicles on chevrolet.com by stating: "the safety of drivers and passengers is of high priority. That's why we offer a comprehensive and innovative approach to safety aimed at helping you make your drive safer before, during and after a collision. It's this 'prevent, protect, respond' philosophy that drives Chevrolet in its efforts to deliver outstanding vehicle safety."[27]

d.     For 2019, Chevrolet marketed the safety features of its vehicles on chevrolet.com by stating: "Nothing is more important than feeling confident and secure when you're on the road. That's why your safety and well-being are at the core of everything we do. And with a wide range of available features and technologies, our vehicles are constantly working to help you drive as safely as possible."[28]

e.     Likewise, for the 2018 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "We design our trucks to last and to help

---

[27]    Chevrolet   Safety   (Mar.   12,   2018),   http://www.chevrolet.com/safety [https://web.archive.org/web/20180312123148/http://www.chevrolet.com/safety].
[28]    Chevrolet   Safety   (Aug.   12,   2019),   http://www.chevrolet.com/safety [https://web.archive.org/web/20190812225714mp_/https://www.chevrolet.com/safety].

keep you safe and secure. That's why every Ram 1500 is equipped with some of the most advanced safety and security technology available, including dynamic crumple zones, side-impact door beams and an advanced airbag system."[29]

       f.    For the 2019 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "Your peace of mind is our top of mind. That's why the All-New 2019 Ram 1500 has been fully redesigned with a high-strength steel frame and more than 100 standard and available safety and security features."[30]

       g.    For the 2020 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "The 2020 Ram 1500 is designed for safety and security from the ground up. So whether you're hauling big loads or transporting precious cargo, you can do it all with confidence."[31]

    100.  The above represents a sampling of Defendants' advertisements.

    101.  Based on information and belief, every single advertisement for a Defective Airbag and/or Class Vehicle omitted *any* mention of the Defect, that the

---

[29] Dodge Trucks (May 7, 2017), http://www.ramtrucks.com/ram-1500.html [https://web.archive.org/web/20170507194019/http://www.ramtrucks.com/ram-1500.html].

[30] Dodge Trucks (Apr. 1, 2018), https://www.ramtrucks.com/2019/ram-1500.html [https://web.archive.org/web/20180401023715mp_/https://www.ramtrucks.com/2019/ram-1500.html].

[31] Dodge Trucks (July 26, 2020), https://www.ramtrucks.com/ram-1500/safety-security.html [https://web.archive.org/web/20200726125527/https://www.ramtrucks.com/ram-1500/safety-security.html].

Class Vehicles' airbags could fail due to the Inflator Defect, and the associated safety risk. Defendants' deceptive actions harmed Plaintiffs and the Classes. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, fraudulent misrepresentations, concealment, omissions and/or failure to disclose that the Class Vehicles carried a dangerous safety Defect, owners and lessees of the Class Vehicles have suffered economic losses.

## V.    CLASS ACTION ALLEGATIONS

102.    This case is about Defendants' legal responsibility for their knowledge, conduct, and products. The proposed Class members' claims all derive directly from a single course of conduct by Defendants. The objective facts are the same for all Class members. Within each Claim for Relief asserted by the respective proposed Classes, the same legal standards govern. Additionally, many states share the same legal standards and elements of proof, facilitating multistate or nationwide classes for some or all claims.

103.    Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated, as members of the proposed Classes under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or (c)(4) defined as follows:

104.    **Nationwide Class:** All persons or entities in the United States that purchased or leased a Class Vehicle (the "Nationwide Class" or "Class");

105.   **California Class:** All persons or entities that purchased or leased a Class Vehicle in the State of California and all persons or entities in the State of California that purchased, leased, or owns a Class Vehicle (the "California Sub-Class");

106.   **Song-Beverly Class:** All persons or entities that purchased or leased a Class Vehicle in the State of California (the "Song-Beverly Sub-Class");

107.   **Connecticut Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Connecticut and all persons or entities in the State of Connecticut that purchased, leased, or owns a Class Vehicle (the "Connecticut Sub-Class");

108.   **Florida Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Florida and all persons or entities in the State of Florida that purchased, leased, or owns a Class Vehicle (the "Florida Sub-Class");

109.   **Illinois Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Illinois and all persons or entities in the State of Illinois that purchased, leased, or owns a Class Vehicle (the "Illinois Sub-Class");

110.   **Maryland Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Maryland and all persons or entities in the State of Maryland that purchased, leased, or owns a Class Vehicle (the "Maryland Sub-Class");

111.   **Massachusetts Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Massachusetts and all persons or entities in the State of Massachusetts that purchased, leased, or owns a Class Vehicle (the "Massachusetts Sub-Class");

112.   **Michigan Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Michigan and all persons or entities in the State of Michigan that purchased, leased, or owns a Class Vehicle (the "Michigan Sub-Class");

113.   **Missouri Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Missouri and all persons or entities in the State of Missouri that purchased, leased, or owns a Class Vehicle (the "Missouri Sub-Class");

114.   **Montana Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Montana and all persons or entities in the State of Montana that purchased, leased, or owns a Class Vehicle (the "Montana Sub-Class");

115.   **New Jersey Class:** All persons or entities that purchased or leased a Class Vehicle in the State of New Jersey and all persons or entities in the State of New Jersey that purchased, leased, or owns a Class Vehicle (the "New Jersey Sub-Class");

116.   **New York Class:** All persons or entities that purchased or leased a Class Vehicle in the State of New York and all persons or entities in the State of

New York that purchased, leased, or owns a Class Vehicle (the "New York Sub-Class");

117. **North Carolina Class:** All persons or entities that purchased or leased a Class Vehicle in the State of North Carolina and all persons or entities in the State of North Carolina that purchased, leased, or owns a Class Vehicle (the "North Carolina Sub-Class");

118. **Ohio Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Ohio and all persons or entities in the State of Ohio that purchased, leased, or owns a Class Vehicle (the "Ohio Sub-Class");

119. **Pennsylvania Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Pennsylvania and all persons or entities in the State of Pennsylvania that purchased, leased, or owns a Class Vehicle (the "Pennsylvania Sub-Class");

120. **Tennessee Class:** All persons or entities that purchased or leased a Class Vehicle in the State of Tennessee and all persons or entities in the State of Tennessee that purchased, leased, or owns a Class Vehicle (the "Tennessee Sub-Class");

121. **Virginia Class:** All persons or entities who purchased or leased a Class Vehicle in the Commonwealth of Virginia and all persons or entities in the Commonwealth of Virginia who purchased, leased, or owns a Class Vehicle (the

"Virginia Sub-Class") (collectively with the New Jersey Sub-Class and Missouri Sub-Class, the "Sub-Classes").

122.    Excluded from the Classes are:

a.    Defendants' and their parents, subsidiaries and corporate affiliates, officers, directors, employees, assigns, and successors; and

b.    The Court, Court staff, Defendants' counsel, judicial officers and all respective immediate family members of the excluded entities described above.

123.    Plaintiffs reserve the right to amend the Class definitions, including if discovery and further investigation reveal that any Class should be expanded, reduced, divided into subclasses under Rule 23(c)(5), or otherwise modified. The Class and Sub-Classes are collectively referred to herein as the "Classes."

A.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

124.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are hundreds of thousands of Class Vehicles and Class members nationwide. The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

### B.   Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

125.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These include, without limitation, the following:

a.   Whether the Defect exists in the Defective Airbags and the Class Vehicles;

b.   Whether Defendants knew, or should have known, about the Defect, and, if so, how long they have known or should have known about it;

c.   Whether the Defect presents a safety risk;

d.   Whether Defendants had a duty to disclose the Defect in the Defective Airbags and the Class Vehicles and the associated safety risks to consumers, including Plaintiffs and Class members;

e.   Whether Defendants breached their duty to disclose the Defect and/or that the Defect presents a safety risk;

f.   Whether Defendants' representations and certifications concerning the Defective Airbags and Class Vehicle safety were deceptive, false, and/or misleading given the Defect and the risk that the Defective Airbags will explode or deploy without a collision and can maim or kill drivers and passengers;

g.   Whether Defendants fraudulently concealed the Defect;

h.      Whether Defendants negligently or falsely misrepresented or omitted material facts regarding the Defect and/or that the Defect presents a safety risk;

i.      Whether Defendants made material misrepresentations and/or omissions concerning the standard, quality, or grade of Class Vehicles and the Defect;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices, in trade or commerce, by failing to disclose the Defect and/or that the Class Vehicles were designed, manufactured, and sold with the Defective Airbags;

k.      Whether Truck Manufacturers breached their express warranties in that Class Vehicles were defective with respect to design and manufacture, including workmanship and materials;

l.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used in violation of the implied warranty of merchantability;

m.      Whether Truck Manufacturers violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* and/or any other statutory duties under state laws;

n.      Whether Defendants were unjustly enriched by the conduct alleged herein;

o.      Whether Defendants' unfair and deceptive acts, misrepresentations, and failure to disclose and/or concealment of the Defect caused Plaintiffs and Class members to overpay for their Class Vehicles;

p.      Whether members of the Classes would pay less for a Class Vehicle if Defendants, at the time of purchase, disclosed the Defect and/or that the Defect presents a safety risk;

q.      Whether Defendants violated the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1791, *et seq.*;

r.      Whether Defendants violated the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*;

s.      Whether Defendants violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;

t.      Whether Defendants violated the Connecticut Unlawful Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.*;

u.      Whether Defendants violated the Florida Unfair & Deceptive Trade Practices Act, Fla. Stat. § 501.201, *et seq.*;

v.      Whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*;

w.      Whether Defendants violated the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et seq.*;

68

x.      Whether Defendants violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 1, *et seq.*;

y.      Whether Defendants violated the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*;

z.      Whether Defendants violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

aa.      Whether Defendants violated the Montana Unfair Trade Practices And Consumer Protection Act, Mont. Code Ann. § 30-14-101, *et seq.*;

bb.      Whether Defendants violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, *et seq.*;

cc.      Whether Defendants violated the New York General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.*;

dd.      Whether Defendants violated the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*;

ee.      Whether Defendants violated the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.*;

ff.      Whether Defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201-1, *et seq.*;

gg.      Whether Defendants violated Virginia Consumer Protection Act, Va. Code. Ann. §§ 59.1-196, *et seq.*; and

hh.    Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount.

## C.    Typicality: Federal Rule of Civil Procedure 23(a)(3)

126.   Plaintiffs' claims are typical of the Class members' claims whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and Class members purchased or leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based on the same legal theories as the claims of the other Class members.

## D.    Adequacy: Federal Rule of Civil Procedure 23(a)(4)

127.   Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automobile defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### E.     Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

128.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, for the Class as a whole.

### F.     Superiority: Federal Rule of Civil Procedure 23(b)(3)

129.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims individually against Defendants such that it would be impracticable for members of the Classes to individually seek redress for Defendants' wrongful conduct.

130.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

131.   Any applicable statute of limitations has been tolled by Defendants' knowing, willful, and active concealment of the Defect and the omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Defective Airbags and the Class Vehicles and could not have reasonably discovered the Defect or Defendants' deception with respect to the Defect.

132.   Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing the Defect and/or that the Class Vehicles contained a Defect and corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitation, Plaintiffs and members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the Defect or that Defendants were concealing the Defect.

133.   At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality, and grade of the Defective Airbags and the Class Vehicles and to disclose the Defect and corresponding safety risk.

134.   Defendants knowingly, actively, and affirmatively concealed the facts and underlying deceptive conduct alleged herein. Plaintiffs and members of the Classes reasonably relied on Defendants' knowing, active, and affirmative concealment. Plaintiffs could not have reasonably discovered the Defect through due diligence.

135.   For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CAUSES OF ACTION

VII.   <u>CALIFORNIA COUNTS</u>

### COUNT 1
**Violation Of The Magnuson-Moss Warranty Act ("MMWA")**
**15 U.S.C. § 2301 et seq.**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, On Behalf of Plaintiff McGuire and the California Sub-Class Against Defendant General Motors)**

136.   Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

137.   Plaintiff McGuire brings this count on behalf of himself and the members of the Nationwide Class or, alternatively, on behalf of the California Sub-Class.

138.    Plaintiff McGuire satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

139.    Plaintiff McGuire and members of the Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

140.    General Motors is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

141.    The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

142.    The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

143.    General Motors provided Plaintiff McGuire and members of the Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to Plaintiff McGuire and members of the Class, General Motors promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles. As alleged herein, General Motors breached these warranties.

144.    Plaintiff McGuire and members of the Class experienced the Inflator Defect within the warranty periods but General Motors failed to inform Plaintiff

McGuire and members of the Class of the existence of the Inflator Defect and associated safety risk, and failed to provide a suitable remedy or repair of the Inflator Defect free of charge within a reasonable time.

145.   General Motors was provided notice by letter dated November 8, 2021, that Plaintiffs would pursue a claim under the MMWA on behalf of a Class.

146.   Any attempt by General Motors to disclaim or limit its express or implied warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitations are unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in General Motors' warranty periods are also unconscionable and inadequate to protect Plaintiff McGuire and members of the Classes. Among other things, Plaintiff McGuire and members of the Classes did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and members of the Class, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that they posed a safety risk.

147.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

148.   General Motors breached these warranties by failing to disclose and fraudulently concealing information regarding the standard, quality, or grade of the

Class Vehicles and/or the presence of the Inflator Defect and corresponding safety risk. Without limitation, the Class Vehicles share a common defect in design, material, manufacturing, and/or workmanship that fails to operate as represented by General Motors and presents a safety risk.

149.   Affording General Motors a reasonable opportunity to cure its breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, General Motors knew, or was reckless in not knowing, of the material omissions concerning the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, but failed to repair or replace the Inflator Defect and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff McGuire resort to an informal dispute resolution procedure and/or afford General Motors a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

150.   Plaintiff McGuire and members of the Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to General Motors. Thus, Plaintiff McGuire and members of the Classes have not re-accepted their Class Vehicles by retaining them.

151.   The amount in controversy of Plaintiff McGuire's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

152.   Plaintiff McGuire, individually and on behalf of members of the Class, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 2
### Fraud By Omission or Fraudulent Concealment
### (On Behalf of Plaintiff McGuire And the California Sub-Class Against Defendants Joyson and General Motors)

153.   Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

154.   Plaintiff McGuire brings this count on behalf of himself and the members of the California Sub-Class.

155.   General Motors and Joyson intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the Class Vehicles contain the Inflator Defect and corresponding safety risk, with the intent that Plaintiff McGuire and members of the California Sub-Class rely on General Motors' and Joyson's omissions. As a

direct result of General Motors' and Joyson's fraudulent conduct, Plaintiff McGuire and members of the California Sub-Class have suffered actual damages.

156.   General Motors and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect, concealed the defect, and never intended to repair or replace the Inflator Defect during the warranty periods. To date, General Motors and Joyson have not provided Plaintiff McGuire and members of the California Sub-Class with a repair or remedy for the Inflator Defect.

157.   General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff McGuire and members of the California Sub-Class because General Motors and Joyson possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. General Motors and Joyson also owed a duty to disclose the Inflator Defect and its corresponding safety risk because the Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), places a duty on manufacturers to report vehicle defects. Rather than disclose the defect, General Motors and Joyson intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

158.    The Inflator Defect is material to Plaintiff McGuire and members of the California Sub-Class because Plaintiff McGuire and members of the California Sub-Class had a reasonable expectation that the vehicles would not contain a defect, such as the Inflator Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk. No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials, or workmanship, such as the Inflator Defect and its corresponding safety risks.

159.    Plaintiff McGuire and members of the California Sub-Class would not have purchased or leased the Class Vehicles but for General Motors' and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles.

160.    General Motors and Joyson knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. General Motors and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff McGuire and members of the California Sub-Class from seeking replacement or repair of the Inflator Defect during the applicable warranty periods. Further, General Motors and Joyson intended to induce Plaintiff McGuire and members of the California Sub-Class into purchasing or leasing the Class Vehicles and to discourage

them from seeking replacement or repair of the Inflator Defect in order to decrease costs and increase profits.

161. General Motors and Joyson acted with malice, oppression, and fraud.

162. Plaintiff McGuire and members of the California Sub-Class reasonably relied upon General Motors' and Joyson's knowing concealment and omissions. As a direct and proximate result of General Motors' and Joyson's omissions and active concealment of material facts regarding the Inflator Defect and associated safety risk, Plaintiff McGuire and members of the California Sub-Class have suffered actual damages in an amount to be determined at trial.

## COUNT 3
### Violation of Consumers Legal Remedies Act ("CLRA"), Cal Civ. Code § 1750 *et seq.*
### (On Behalf of Plaintiff McGuire and the California Sub-Class Against Defendants Joyson and General Motors)

163. Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

164. Plaintiff McGuire brings this count on behalf of himself and the members of the California Sub-Class.

165. CLRA "protect[s] consumers against unfair and deceptive business practices." *See* Cal. Civ. Code § 1760.

166.    Plaintiff McGuire and members of the California Sub-Class are persons within the context of the CLRA, *see* Cal. Civ. Code § 1761(d), who purchased and/or leased Class Vehicles for personal, family, or household use.

167.    The Class Vehicles are goods within the meaning of Cal. Civ. Code § 1761(a).

168.    General Motors and Joyson violated and continues to violate the CLRA by engaging in unfair and deceptive trade practices, including, *inter alia*: (1) representing that the Class Vehicles have characteristics which they do not; (2) representing that the Class Vehicles are of a particular standard when they are of another; and (3) advertising the Class Vehicles with the intent not to sell them as advertised. *See* Cal. Civ. Code, § 1770(a)(5), (7), (9).

169.    General Motors and Joyson further violated the CLRA by failing to disclose within the warranty period, or any time thereafter, the material fact that the Class Vehicles possessed the Inflator Defect and its corresponding safety hazard.

170.    General Motors and Joyson also violated the CLRA by actively concealing the material fact that the Class Vehicles possessed the Inflator Defect and its corresponding safety hazard and/or transferring the cost of repair or replacement of the Inflator Defect to Plaintiff McGuire and members of the California Sub-Class.

171.    The fact that the Inflator Defect exists in the Class Vehicles and exposes consumers to a corresponding safety hazard is material because Plaintiff

McGuire and members of the California Sub-Class had a reasonable expectation that the vehicles would not suffer from a defect and its corresponding safety hazard.

172.    General Motors and Joyson have knowingly and willfully engaged in deceptive and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, and omission of materials facts concerning the Class Vehicles' Inflator Defect and corresponding safety risk in connection with the sale and/or advertisement of Class Vehicles. General Motors and Joyson unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety hazard.

173.    Information regarding the Inflator Defect as described in this Amended Complaint is material to consumers in that the defect poses a safety risk.

174.    General Motors' and Joyson's unlawful acts and practices affect the public interest, and trade and commerce in the State of California, and present a continuing safety hazard to Plaintiff McGuire and the members of the California Sub-Class.

175.    As a proximate and direct result of General Motors' and Joyson's violations of the CLRA, Plaintiff McGuire and members of the California Sub-Class have suffered premature failure of the airbags, diminution of Class Vehicle resale

value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

176.    Plaintiff McGuire and members of the California Sub-Class also seek an order enjoining General Motors' and Joyson's unfair and/or deceptive acts or practices.

177.    General Motors' and Joyson's violations of the CLRA were willful and oppressive.

178.    Plaintiff McGuire has provided General Motors and Joyson with notice of their violations of the CLRA pursuant to Cal. Civ. Code § 1782(a) by letter dated November 8, 2021. To the extent General Motors and Joyson do not remedy their violations of the CLRA within thirty days of receiving the demand letter, Plaintiff McGuire and members of the California Sub-Class will be entitled to seek monetary relief for General Motors' and Joyson's violation of the CLRA, including  actual damages, punitive damages, statutory damages, restitution, attorneys' fees, and any other relief proper under the CLRA. *See* Cal. Civ. Code § 1780.

**COUNT 4**
**Violation Of Unfair Competition Law ("UCL"),**
**Cal Civ. Code § 17200 et seq.**
**(On Behalf of Plaintiff McGuire and the California Sub-Class Against**
**Defendants Joyson and General Motors)**

179.    Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

180.    Plaintiff McGuire brings this count on behalf of himself and the members of the California Sub-Class.

181.    The California Business & Professions Code § 17200, *et seq*. (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."

182.    As alleged herein, General Motors and Joyson have violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices.

183.    In violation of the UCL, General Motors and Joyson employed deceptive and/or unconscionable acts or practices, fraud, false pretense, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale and/or lease of Class Vehicles. General Motors and Joyson knowingly concealed, suppressed, and/or omitted material facts regarding the Inflator Defect and corresponding safety risk, and misrepresented the standard, quality, or grade of the Class Vehicles, which directly caused harm to Plaintiff McGuire and members of the California Sub-Class.

184.    General Motors and Joyson actively suppressed the fact of the Inflator Defect's existence in Class Vehicles and that it presents a safety hazard because of materials, workmanship, design, and/or manufacturing defects. Further, General Motors and Joyson employed unfair, unlawful, and fraudulent business practices to

deny repair or replacement of the Defective Airbags within a reasonable time in violation of the UCL.

185.    General Motors and Joyson breached their warranties, the CLRA, the Song-Beverly Consumer Warranty Act, and the Magnuson-Moss Warranty Act as alleged herein in violation of the UCL.

186.    General Motors' and Joyson's unfair, unlawful, and fraudulent business practices were likely to deceive a reasonable consumer. Plaintiff McGuire and members of the California Sub-Class has no reasonable way to know that Class Vehicles contained the Inflator Defect and that the Class Vehicles were defective in materials, workmanship, design, and/or manufacture and posed a corresponding safety risk. General Motors and Joyson possessed superior knowledge as to the quality and characteristic of the Class Vehicles, including the Inflator Defect and its associated safety risk, and any reasonable consumer would have relied on General Motors' and Joyson's misrepresentations and omissions as did Plaintiff McGuire and members of the California Sub-Class.

187.    General Motors and Joyson intentionally and knowingly misrepresented and omitted facts regarding the Inflator Defect in the Class Vehicles and its associated safety hazard with the intent to mislead Plaintiff McGuire and the members of the California Sub-Class. Defendants knew, or should have known, that

the Class Vehicles possessed the Inflator Defect and exposes consumers to a corresponding safety hazard.

188.    General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety hazard to Plaintiff McGuire and the members of the California Sub-Class because General Motors and Joyson possessed superior knowledge regarding the defect and the corresponding safety hazard. General Motors and Joyson also owed a duty to disclose the Inflator Defect because General Motors and Joyson made partial representations regarding the safety of the Class Vehicles and thus owed a duty to reveal the complete truth to Plaintiff McGuire and members of the California Sub-Class. Rather than disclose the defect, General Motors and Joyson engaged in unfair, unlawful, and fraudulent business practices in order to sell additional Class Vehicles and avoid the cost of repair or replacement of the Defective Airbags.

189.    General Motors' and Joyson's unfair, unlawful, and fraudulent acts or practices, affirmative misrepresentations, and/or material omissions regarding the Inflator Defect were intended to mislead consumers and misled Plaintiff McGuire and members of the California Sub-Class.

190.    At all relevant times, General Motors' and Joyson's unfair and deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the Inflator Defect, and its corresponding safety hazard were material to

Plaintiff McGuire and members of the California Sub-Class. When Plaintiff McGuire and members of the California Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free from defects that pose an unavoidable safety hazard. Had General Motors and Joyson disclosed that the Class Vehicles contained the Inflator Defect and/or pose an unavoidable safety hazard, Plaintiff McGuire and members of the California Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

191. General Motors and Joyson had a continuous duty to Plaintiff McGuire and members of the California Sub-Class to refrain from unfair, unlawful, and fraudulent practices under the UCL and to disclose the Inflator Defect and associated safety hazard. Defendants' unfair, unlawful, and fraudulent acts or practices, affirmative misrepresentations, and/or material omissions regarding the Inflator Defect and corresponding safety hazard are substantially injurious to consumers. As a result of General Motors' and Joyson's knowing, intentional concealment, and/or omission of the Inflator Defect and associated safety hazard in violation of the UCL, Plaintiff McGuire and members of the California Sub-Class have suffered damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of, *inter alia*, out-of-pocket costs for diagnosis and repair or replacement of the Defective Airbags, and the diminished value of their

vehicles as a result of General Motors' and Joyson's unfair, unlawful, and fraudulent acts and practices in the course of its business.

192.   General Motors and Joyson have knowingly and willfully engaged in the unfair, unlawful, and fraudulent business practices alleged herein. Further, General Motors and Joyson unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety hazard.

193.   General Motors' and Joyson's unfair, unlawful, and fraudulent acts and practices have harmed and continue to harm Plaintiff McGuire and members of the California Sub-Class, have negatively affected the public interest, and present a continuing safety hazard to Plaintiff McGuire and members of the California Sub-Class.

194.   The repairs instituted by Defendants, if any, have not been adequate.

195.   Plaintiff McGuire and members of the California Sub-Class also seek an order enjoining General Motors' and Joyson's unfair, unlawful, and fraudulent practices and award costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the UCL and California law.

**COUNT 5**
**Violation of the Song-Beverly Consumer Warranty Act,**
**Cal Civ. Code § 1791 et seq.**
**(On Behalf of Plaintiff McGuire and the California Sub-Class Against**
**Defendant General Motors)**

196.    Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

197.    Plaintiff McGuire and brings this count on behalf of himself and the California Sub-Class.

198.    Plaintiff McGuire and members of the California Sub-Class purchased or leased the Class Vehicles from General Motors by and through General Motors' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, each General Motors was the manufacturer, distributor, warrantor, and/or seller of Class Vehicles. General Motors knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

199.    General Motors provided Plaintiff McGuire and members of the Classes with one or more express warranties, which are covered under Cal. Civ. Code § 1791.2. Under warranties provided to Plaintiff McGuire and members of the California Sub-Class, General Motors promised to repair or replace covered defective components arising out of defects in materials and/or workmanship,

including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles. As alleged herein, General Motors breached these warranties.

200. Plaintiff McGuire and members of the California Sub-Class experienced the Inflator Defect within the warranty periods but General Motors failed to inform Plaintiff McGuire and members of the California Sub-Class of the existence of the Inflator Defect and associated safety hazard, and failed to provide a suitable repair or replacement of the defective inflator free of charge within a reasonable time.

201. General Motors impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

202. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, General Motors breached its implied warranty of merchantability.

203. General Motors was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording General Motors a reasonable opportunity cure its breach of implied warranties would be unnecessary

90

and futile here because General Motors has known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Inflator Defect free of charge within a reasonable time.

204.    General Motors breached its express and implied warranties in violation of Cal. Civ. Code § 1791 *et seq.*

205.    As a direct and proximate result of General Motors' breach of its express and implied warranties, Plaintiff McGuire and members of the California Sub-Class have been damaged in an amount to be proven at trial.

206.    Plaintiff McGuire and members of the California Sub-Class have been excused from performance of any warranty obligations as a result of General Motors' conduct described herein.

207.    Plaintiff McGuire and members of the California Sub-Class seek actual damages, costs, attorneys' fees, and statutory damages a result of General Motors' willful conduct alleged herein. Plaintiff McGuire and members of the California Sub-Class also seek reimbursement, replacement of the Defective Airbags and/or the revocation of the purchase or lease of the Class Vehicles, and all other relief available under Cal. Civ. Code § 1794.

208.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

**COUNT 6**
**Breach of Express Warranty**
**(On Behalf of Plaintiff McGuire and the California Sub-Class Against Defendant General Motors)**

209.    Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

210.    Plaintiff McGuire brings this count on behalf of himself and the California Sub-Class.

211.    General Motors marketed the Class Vehicles as safe, high quality, and reliable vehicles. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiff McGuire and members of the California Sub-Class.

212.    General Motors is and was at all relevant times a "merchant" and "seller" of motor vehicles (i.e., the Class Vehicles) under Cal. Com. Code §§ 2103(1)(d), 2104(1) and 10103(c).

213.    With respect to leases, General Motors is and was at all relevant times a "lessor" of motor vehicles (i.e., the Class Vehicles) under Cal. Com. Code § 10103(a)(16).

214.    The Class Vehicles are and were at all relevant times goods within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

215.    In connection with the purchase or lease of each of the Class Vehicles, General Motors provides warranty coverage for the Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Under the warranties provided to Plaintiff McGuire and members of the California Sub-Class, General Motors promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, General Motors breached these warranties.

216.    General Motors' warranties formed a basis of the bargain that was reached when Plaintiff McGuire and members of the California Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, General Motors knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

217.    Plaintiff McGuire and members of the California Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the defect and associated safety risk, which were known and concealed by General Motors. Despite the existence of the warranties,

93

General Motors failed to adequately inform Plaintiff McGuire and members of the California Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the Inflator Defect free of charge within a reasonable time.

218.    General Motors breached the express warranty promising to repair and correct a manufacturing defect, design defect, and/or defect in materials or workmanship of any parts it supplied.

219.    On information and belief, General Motors has not suitably repaired or replaced the Inflator Defect free of charge for Plaintiff McGuire and members of the California Sub-Class despite the existence of the defect in the Class Vehicles at the time of sale or lease.

220.    General Motors further breached its express warranties by selling Class Vehicles that were defective with respect to materials, workmanship, design, and manufacture.

221.    Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of airbag materials, workmanship, design, and/or manufacturing defects.

222.    General Motors was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording General Motors a

reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because General Motors has known of and concealed the Inflator Defect and has failed to provide a suitable repair or replacement of the Inflator Defect free of charge within a reasonable time.

223.    Plaintiff McGuire also provided notice by letter dated November 8, 2021. General Motors has yet to cure its breach of written warranties and has failed to provide a suitable repair or replacement of the Inflator Defect free of charge within a reasonable time.

224.    Any attempt by General Motors to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff McGuire and members of the California Sub-Class. Among other things, Plaintiff McGuire and members of the California Sub-Class did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between Defendant and members of the Classes, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

225.    Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff McGuire and members of the California Sub-Class whole because, on information and belief, General Motors has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

226.    General Motors knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff McGuire and members of the California Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

227.    General Motors' warranties formed a basis of the bargain that was reached when Plaintiff McGuire and members of the California Sub-Class purchased or leased their Class Vehicles.

228.    Plaintiff McGuire and members of the California Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the defect, which was known and concealed by General Motors. Despite the existence of the warranties, Defendant failed to inform Plaintiff McGuire and members of the California Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiff McGuire and members of the California Sub-Class.

229.    Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

230.    As a direct and proximate result of General Motors' breach of express warranties, Plaintiff McGuire and members of the California Sub-Class have been damaged in an amount to be determined at trial.

231.    Finally, because of General Motors' breach of express warranty as set forth herein, Plaintiff McGuire and members of the California Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff McGuire and members of the California Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT 7**
**Breach of Implied Warranty of Merchantability,**
**(On Behalf of Plaintiff McGuire and the California Sub-Class Against Defendant General Motors)**

232.    Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

233.    Plaintiff McGuire brings this count on behalf of himself and the California Sub-Class.

234.    Plaintiff McGuire and members of the California Sub-Class purchased or leased the Class Vehicles from General Motors by and through General Motors' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, General Motors was the manufacturer, distributor, warrantor, and/or seller of Class Vehicles. General Motors knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

235.    General Motors is and was at all relevant times a "merchant" and "seller" of motor vehicles (i.e., the Class Vehicles) within the meaning of the Cal. Com. Code §§ 2103(1)(d), 2104(1), and 10103(c).

236.    With respect to leases, General Motors is and was at all relevant times a "lessor" of motor vehicles (i.e., the Class Vehicles) within the meaning of the Cal. Com. Code § 10103(a)(16).

237.    The Class Vehicles are and were at all relevant times goods within the meaning of the Cal. Com. Code §§ 2105(1) and 10103(a)(8).

238.    General Motors impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

239.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent

defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, General Motors breached its implied warranty of merchantability.

240.   General Motors cannot disclaim its implied warranty as it knowingly sold or leased a defective product.

241.   General Motors was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording General Motors a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because General Motors has known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Inflator Defect free of charge within a reasonable time.

242.   Plaintiff McGuire also provided notice via letter dated November 8, 2021. Defendant has not cured its breach of implied warranties and failed to provide a suitable repair or replacement of the Inflator Defect free of charge within a reasonable time.

243.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff McGuire and members of the California Sub-Class have been damaged in an amount to be proven at trial.

244.    Any attempt by General Motors to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff McGuire and members of the California Sub-Class. Among other things, Plaintiff McGuire and members of the California Sub-Class did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and members of the Classes, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

245.    Plaintiff McGuire and members of the California Sub-Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

246.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

**COUNT 8**
**Unjust Enrichment**
**(On Behalf of Plaintiff McGuire And The California Sub-Class Against Defendants Joyson and General Motors)**

247.   Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

248.   Plaintiff McGuire brings this count on behalf of himself and the members of the California Sub-Class.

249.   Plaintiff McGuire and members of the California Sub-Class conferred a benefit on General Motors and Joyson by purchasing the Class Vehicles. General Motors and Joyson were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

250.   General Motors and Joyson unjustly profited from the sale of the Class Vehicles at inflated prices as a result of their false representations, omissions, and concealment of the Inflator Defect in the Class Vehicles.

251.   As a proximate result of General Motors and Joyson's false representations, omissions, and concealment of the Inflator Defect in the Class Vehicles, and as a result of General Motors and Joyson's ill-gotten gains, benefits, and profits, General Motors and Joyson have been unjustly enriched at the expense of Plaintiff McGuire and members of the California Sub-Class. It would be inequitable for General Motors and Joyson to retain their ill-gotten profits without

paying the value thereof to Plaintiff McGuire and members of the California Sub-Class.

252.    Plaintiff McGuire and members of the California Sub-Class are entitled to restitution of the amount of General Motors and Joyson's ill-gotten gains, benefits, and profits, including interest, resulting from their unlawful, unjust, and inequitable conduct.

253.    Plaintiff McGuire and members of the California Sub-Class seek an order requiring General Motors and Joyson to disgorge their gains and profits to Plaintiff McGuire and members of the California Sub-Class, together with interest, in a manner to be determined by the Court.

**COUNT 9**
**Negligent Misrepresentation**
**(On Behalf of Plaintiff McGuire and the California Sub-Class Against Defendants Joyson and General Motors)**

254.    Plaintiff McGuire incorporates and re-alleges each preceding paragraph as though fully set forth herein.

255.    Plaintiff McGuire brings this count on behalf of himself and the members of the California Sub-Class.

256.    General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff McGuire and members of the California Sub-Class because General Motors and Joyson possessed superior and exclusive

knowledge regarding the defect and the associated risks. General Motors and Joyson also made partial disclosures regarding the safety of the Class Vehicles while knowing that the Class Vehicles possessed the Inflator Defect and failing to disclose the existence of the Inflator Defect and its corresponding safety hazard.

257.    General Motors and Joyson negligently omitted material facts including the standard, quality, or grade of the Class Vehicles and/or presence of the Inflator Defect in the Class Vehicles. As a direct result of General Motors and Joyson's negligent conduct, Plaintiff McGuire and members of the California Sub-Class have suffered actual damages.

258.    The Inflator Defect is material to Plaintiff McGuire and members of the California Sub-Class because Plaintiff McGuire and members of the California Sub-Class had a reasonable expectation that the vehicles would not contain a defect, such as the Inflator Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk. No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials, or workmanship, such as the Inflator Defect.

259.    Plaintiff McGuire and members of the California Sub-Class would not have purchased the Class Vehicles but for General Motors and Joyson's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and/or existence of the Inflator Defect and corresponding safety risk, or would have

paid less for the Class Vehicles. Plaintiff McGuire and members of the California Sub-Class justifiably relied upon Defendant's negligent omissions of material facts.

260.   As a direct and proximate result of General Motors and Joyson's negligent omissions of material facts regarding the standard, quality, or grade of the Class Vehicles and/or the presence of the Inflator Defect and corresponding safety risk, Plaintiff McGuire and members of the California Sub-Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## VIII.  <u>CONNECTICUT COUNTS</u>

**COUNT 10**
**Violation Of The Magnuson-Moss Warranty Act ("MMWA"),**
**15 U.S.C. § 2301** *et seq.*
**(On Behalf of the Nationwide Class Or, Alternatively, On Behalf of Plaintiff Sanchez and the Connecticut Sub-Class Against Defendant General Motors)**

261.   Plaintiff Sanchez incorporates and re-alleges each preceding paragraph as though fully set forth herein.

262.   Plaintiff Sanchez brings this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of himself and the members of the Connecticut Sub-Class.

263.   Plaintiff Sanchez satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

264.   Plaintiff Sanchez and members of the Connecticut Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

265.   General Motors is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

266.   The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

267.   The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

268.   General Motors provided Plaintiff Sanchez and members of the Connecticut Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, General Motors promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the airbags, at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Inflator Defect, General Motors knew or should have known that the majority of failures occur outside of the warranty periods.

269.   Any attempt by General Motors to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, General

Motors' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff Sanchez and members of the Connecticut Sub-Class. Among other things, Plaintiff Sanchez and members of the Connecticut Sub-Class did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and members of the Classes, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

270.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

271.   General Motors breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by General Motors.

272.   Plaintiff Sanchez and members of the Connecticut Sub-Class have had sufficient direct dealings with General Motors or their agents (dealerships) to

establish privity of contract between General Motors, on the one hand, and Plaintiff Sanchez and members of the Connecticut Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Sanchez and each of the other members of the Classes are intended third-party beneficiaries of contracts between General Motors and its dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

273.     Affording General Motors a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, General Motors knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the Defective Airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Sanchez resorts to an informal dispute resolution procedure and/or afford General Motors a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

274.    Plaintiff Sanchez and members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to General Motors. Thus, Plaintiff Sanchez and members of the Classes have not re-accepted their Class Vehicles by retaining them.

275.    General Motors were provided notice by letter dated November 8, 2021, that Plaintiffs would pursue a claim under the MMWA on behalf of a class.

276.    The amount in controversy of Plaintiff Sanchez's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

277.    Plaintiff Sanchez, individually and on behalf of members of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

### COUNT 11
### Fraud By Omission Or Fraudulent Concealment
### (On Behalf of Plaintiff Sanchez and the Connecticut Sub-Class Against Defendants Joyson and General Motors)

278.    Plaintiff Sanchez incorporates and re-alleges each preceding paragraph as though fully set forth herein.

279.    Plaintiff Sanchez brings this count on behalf of himself and members of the Connecticut Sub-Class.

280. General Motors and Joyson intentionally, knowingly, or recklessly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the Class Vehicles contain an Inflator Defect and corresponding safety risk, with the intent that Plaintiff Sanchez and members of the Connecticut Sub-Class rely on General Motors and Joyson's omissions. As a direct result of General Motors and Joyson's fraudulent conduct, Plaintiff Sanchez and members of the Connecticut Sub-Class have suffered actual damages.

281. General Motors and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained an Inflator Defect, concealed the Defect and never intended to repair or replace the Inflator Defect during the warranty periods. To date, General Motors and Joyson have not provided Plaintiff Sanchez and members of the Connecticut Sub-Class with a repair or remedy for the Inflator Defect.

282. General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Sanchez and members of the Connecticut Sub-Class because General Motors and Joyson possessed superior and exclusive knowledge regarding the Defect. Further, General Motors and Joyson had a duty to disclose any information relating to the safety, quality, functionality, and

reliability of Class Vehicles because they consistently marketed the Class Vehicles as safe.

283.    Once General Motors and Joyson made representations to the public about the safety, quality, functionality, and reliability of the Class Vehicles, General Motors and Joyson were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud. Rather than disclose the Defect, General Motors and Joyson intentionally and knowingly concealed, suppressed, and/or omitted materials facts including the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

284.    The Inflator Defect is material to Plaintiff Sanchez and members of the Connecticut Sub-Class because Plaintiff Sanchez and members of the Connecticut Sub-Class had a reasonable expectation that the Class Vehicles would not contain a defect, such as the Inflator Defect, and corresponding safety risk. No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials, or workmanship, such as the Inflator Defect.

285.    Plaintiff Sanchez and members of the Connecticut Sub-Class would not have purchased or leased the Class Vehicles but for General Motors and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles.

286.    General Motors and Joyson knew their concealment and suppression of materials facts was false and misleading and knew the effect of concealing those material facts. General Motors and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Sanchez and members of the Connecticut Sub-Class from seeking replacement or repair of the Inflator Defect during the applicable warranty periods. Further, General Motors and Joyson intended to induce Plaintiff Sanchez and members of the Connecticut Sub-Class into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Inflator Defect in order to decrease costs and increase profits.

287.    General Motors and Joyson acted with malice, oppression, and fraud.

288.    General Motors and Joyson's misrepresentations and omissions were done with knowledge and intent to induce Plaintiff Sanchez and members of the Connecticut Sub-Class to rely upon General Motors and Joyson's deceptive misrepresentations and decide to purchase and/or lease a Class Vehicle.

289.    Plaintiff Sanchez and members of the Connecticut Sub-Class reasonably relied upon General Motors and Joyson's knowing concealment and omissions. As a direct and proximate result of General Motors and Joyson's omissions and active concealment of material facts regarding the Inflator Defect and associated safety risk, Plaintiff Sanchez and members of the Connecticut Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 12**
**Violation of the Connecticut Unlawful Trade Practices Act**
**Conn. Gen. Stat. § 42-110a, *et seq*.**
**(On Behalf of Plaintiff Sanchez and the Connecticut Sub-Class Against Defendants Joyson and General Motors)**

290.    Plaintiff Sanchez incorporates and re-alleges each preceding paragraph as though fully set forth herein.

291.    Plaintiff Sanchez brings this cause of action on behalf of himself and on behalf of the members of the Connecticut Sub-Class.

292.    General Motors and Joyson, Plaintiff Sanchez, and Connecticut Sub-Class members are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

293.    General Motors and Joyson engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

294.    The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

295.    General Motors and Joyson concealed the fact that Class Vehicles had Defective Airbags that made them unsafe to drive.

296.    General Motors and Joyson violated the Connecticut UTPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

297. General Motors and Joyson's acts and practices, as described throughout this Amended Complaint, constitute "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" by General Motors and Joyson, that are unlawful, as enumerated in Conn. Gen. Stat. § 42-110b(a)

298.    General Motors and Joyson intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Plaintiff Sanchez and the Connecticut Sub-Class.

299.    General Motors and Joyson knew or should have known that its conducted violated the Connecticut UTPA.

300.    General Motors and Joyson's fraudulent concealment of the true characteristics of the Defective Airbags in the Class Vehicles were material to the Plaintiff Sanchez and the Connecticut Sub-Class.

301.    General Motors and Joyson's violations present a continuing risk to Plaintiff Sanchez as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

302.    General Motors and Joyson had an ongoing duty to their customers to refrain from unfair and deceptive practices under the Connecticut UTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of General Motors' and Joyson's deceptive and unfair acts and practices made in the course of General Motors' and Joyson's business.

303.    The repairs instituted by General Motors and Joyson, if any, have not been adequate.

304.    As a direct and proximate result of General Motors' and Joyson's violations of the Connecticut UTPA, the Plaintiff Sanchez and the Connecticut Sub-Class have suffered injury-in-fact and/or actual damage.

305.    Pursuant to Conn. Gen. Stat. § 42-110g, Plaintiff Sanchez and the Connecticut Sub-Class seek an order enjoining Defendants' unfair and/or deceptive

acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Connecticut UTPA.

## COUNT 13
### Breach Of Express Warranty
### Conn. Gen. Stat. § 42a-2-313
### (On Behalf of Plaintiff Sanchez and the Connecticut Sub-Class Against Defendant General Motors)

306.    Plaintiff Sanchez incorporates and re-alleges each preceding paragraph as though fully set forth herein

307.    Plaintiff Sanchez brings this cause of action on his own behalf and on behalf of the members of the Connecticut Sub-Class.

308.    General Motors is and are at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-104(1).

309.    The Class Vehicles are "goods" within the meaning of Conn. Gen. Stat. Ann. § 42a-2-105(1).

310.    General Motors provided all purchasers and lessees of the Class Vehicles with the express warranty, which became a material part of the bargain.

311.    In connection with the purchase or lease of each of the Class Vehicles, General Motors provides warranty coverage for the Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, Defendant General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and

extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Under the warranties provided to Plaintiff Sanchez and members of the Connecticut Sub-Class, General Motors promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, General Motors breached these warranties.

312.    General Motors marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that General Motors would stand behind the quality of its products and promptly repair any defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiff Sanchez and members of the Connecticut Sub-Class.

313.    Under the warranties provided to Plaintiff Sanchez and members of the Connecticut Sub-Class, General Motors promised to repair or replace covered components arising out of Defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, General Motors breached these warranties.

314.    General Motors breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

315.   On information and belief, General Motors has not suitably repaired or replaced the Defective Airbags for Plaintiff Sanchez and members of the Connecticut Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

316.   General Motors further breached their express warranties by selling Class Vehicles that were defective with respect to materials, workmanship, design and manufacture.

317.   Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing defects which cause a failure to deploy the airbags as warranted.

318.   The Inflator Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiff Sanchez and the Connecticut Sub-Class Members.

319.   Plaintiff Sanchez relied on General Motorss' express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

320.   Under the express Warranties, General Motorss were obligated to correct the Inflator Defect in the vehicles owned or leased by Plaintiff Sanchez and the Connecticut Sub-Class Members.

117

321.   Plaintiff Sanchez and members of the Connecticut Sub-Class have had sufficient direct dealings with General Motors or their agents, their authorized dealerships, to establish privity of contract between General Motors, on the one hand, and Plaintiff Sanchez and members of the Connecticut Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Sanchez and members of the Connecticut Sub-Class are intended third-party beneficiaries of contracts between General Motors and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

322.   General Motors' attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, General Motors' warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

323.   The time limits contained in General Motors' warranty period were also unconscionable and inadequate to protect Plaintiff Sanchez and the Connecticut Sub-Class Members. Among other things, Plaintiff Sanchez and the Connecticut Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in

bargaining power existed between General Motors and the Class members, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale.

324.    Plaintiff Sanchez and the Connecticut Sub-Class Members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of General Motors' conduct described herein.

325.    Plaintiff Sanchez and the Connecticut Sub-Class Members were not required to notify General Motors of the breach because affording General Motors a reasonable opportunity to cure its breach of written warranty would have been futile. General Motors was also on notice of the Inflator Defect from the complaints and service requests it received from Plaintiffs and the Class Members and through other internal and external sources.

326.    Because General Motors has not been able to remedy the Inflator Defect, any limitation on remedies included in the warranties causes the warranties to fail their essential purposes, rendering these limitations null and void.

327.    Due to General Motors' breach of warranty as set forth herein, Plaintiff Sanchez and the members of the Connecticut Sub-Class assert as an additional and/or alternative remedy, as set forth in Conn. Gen. Stat. Ann. § 42a-2-711, for a revocation of acceptance of the goods and for a return to Plaintiff Sanchez and the

Connecticut Sub-Class of the purchase price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed under Conn. Gen. Stat. Ann. §§ 42a-2-711 and 42a-2-608.

328.    As a direct and proximate cause of General Motors' breach, Plaintiff Sanchez and the Connecticut Sub-Class members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Sanchez and the Connecticut Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

329.    As a direct and proximate result of General Motors' breach of express warranties, Plaintiff Sanchez and the Connecticut Sub-Class Members have been damaged in an amount to be determined at trial.

**COUNT 14**
**Breach Of Implied Warranty Of Merchantability,**
**Conn. Gen. Stat. Ann. § 42a-2-314**
**(On Behalf Of Plaintiff Sanchez And The Connecticut Sub-Class Against Defendant General Motors)**

330.    Plaintiff Sanchez incorporates and re-alleges each preceding paragraph as though fully set forth herein

331.    Plaintiff Sanchez brings this cause of action on his own behalf and on behalf of the members of the Connecticut Sub-Class.

332.    General Motors is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

333.    The Class Vehicles are "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

334.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

335.    General Motors sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty.

336.    General Motors knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. General Motors directly sold and marketed vehicles equipped with the airbags to customers through authorized dealers, like those from whom Plaintiff Sanchez the members of the Connecticut Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. General Motors knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff Sanchez and the Connecticut Sub-Class members, with no modification to the Defective Airbags.

337.    General Motors provided Plaintiff Sanchez and the members of the Connecticut Sub-Class with an implied warranty that the Class Vehicles and their

components and parts are merchantable and fit for the ordinary purposes for which they were sold.

338.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their airbags were manufactured, supplied, distributed, and/or sold by General Motors were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their airbags would be fit for their intended use while the Class Vehicles were being operated.

339.    Contrary to the applicable implied warranties, the Class Vehicles and their airbags at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Sanchez and Connecticut Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their airbags and the existence of the Inflator Defect at the time of sale or lease and thereafter. General Motors knew of the Inflator Defect at the time these sale or lease transactions occurred.

340.    As a result of General Motors' breach of the applicable implied warranties, Plaintiff Sanchez and the Connecticut Sub-Class members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Inflator Defect, Plaintiff Sanchez and the Connecticut Sub-Class members were harmed and suffered actual damages in that the Class

Vehicles' airbag components are substantially certain to fail before their expected useful life has run.

341.    General Motors' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Conn. Gen. Stat. Ann. § 42a-2-314.

342.    Plaintiff Sanchez and the Connecticut Sub-Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of General Motors' conduct described herein.

343.    Plaintiff Sanchez and the Connecticut Sub-Class members were not required to notify General Motors of the breach because affording General Motors a reasonable opportunity to cure its breach of written warranty would have been futile. General Motors was also on notice of the Inflator Defect from the complaints and service requests it received from Plaintiff Sanchez and the members of the Connecticut Sub-Class, and through other internal sources.

344.    As a direct and proximate cause of General Motors' breach, Plaintiff Sanchez and the Connecticut Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Sanchez and the

Connecticut Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

345.    As a direct and proximate result of General Motors' breach of the implied warranty of merchantability, Plaintiff Sanchez and the Connecticut Sub-Class Members have been damaged in an amount to be proven at trial.

## IX.    FLORIDA COUNTS

### COUNT 15
### Violation Of The Magnuson-Moss Warranty Act ("MMWA"),
### 15 U.S.C. § 2301 *et seq.*
### (On Behalf Of Plaintiffs And The Nationwide Class Or, Alternatively, On Behalf Of Plaintiffs Perez And Mills And The Florida Sub-Class Against Defendants General Motors and FCA)

346.    Plaintiffs Perez and Mills incorporate and re-allege each preceding paragraph as though fully set forth herein.

347.    Plaintiffs Perez and Mills bring this count on behalf of themselves and the Nationwide Class or, alternatively, on behalf of themselves and the members of the Florida Sub-Class.

348.    Plaintiffs Perez and Mills satisfy the MMWA jurisdictional requirement because they allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

349.    Plaintiffs Perez and Mills and members of the Florida Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

350.   Truck Manufacturers are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

351.   The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

352.   The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

353.   Truck Manufacturers  provided Plaintiff Perez and Mills and members of the Florida Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, Truck Manufacturers  promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Inflator Defect, Truck Manufacturers  knew or should have known that the majority of Defective Airbag failures occur outside of the warranty periods.

354.   Any attempt by Truck Manufacturers  to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also

unconscionable and inadequate to protect Plaintiffs Perez and Mills and members of the Florida Sub-Class. Among other things, Plaintiffs Perez and Mills and members of the Florida Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

355.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7). Truck Manufacturers breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by Truck Manufacturers. Upon information and belief, Truck Manufacturers have acknowledged that the Class Vehicles are not of the standard, quality, or grade that Truck Manufacturers represented at the time of purchase or lease and contain the Inflator Defect.

356.    Plaintiffs Perez and Mills and members of the Florida Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents (dealerships)

to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Perez and Mills and members of the Florida Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Perez and Mills and each of the other members of the Classes are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

357. Affording Truck Manufacturers a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Truck Manufacturers knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs Perez and Mills resort to an informal dispute resolution procedure and/or afford Truck Manufacturers a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

358.   Plaintiffs Perez and Mills and members of the Florida Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to Truck Manufacturers. Thus, Plaintiffs Perez and Mills and members of the Florida Sub-Class have not re-accepted their Class Vehicles by retaining them.

359.   Truck Manufacturers were provided notice by letter dated November 8, 2021 that Plaintiffs Perez and Mills would pursue claims on behalf of a class.

360.   The amount in controversy of Plaintiffs Perez's and Mills' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

361.   Plaintiffs Perez and Mills, individually and on behalf of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 16
### Fraud By Omission Or Fraudulent Concealment
### (On Behalf Of Plaintiffs Perez And Mills And The Florida Sub-Class Against All Defendants)

362.   Plaintiffs Perez and Mills incorporate and re-allege each preceding paragraph as though fully set forth herein.

363.   Plaintiffs Perez and Mills bring this count on behalf of themselves and the members of the Florida Sub-Class.

364.   Defendants intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the Class Vehicles contain an Inflator Defect and corresponding safety risk, with the intent that Plaintiffs Perez and Mills and members of the Florida Sub-Class rely on Defendants' omissions. As a direct result of Defendants' fraudulent conduct, Plaintiffs Perez and Mills and members of the Florida Sub-Class have suffered actual damages.

365.   Defendants knew (at the time of sale or lease and thereafter) that the Class Vehicles contained an Inflator Defect, concealed the Defect and never intended to repair or replace the Inflator Defect during the warranty periods. To date, Defendants have not provided Plaintiffs Perez and Mills and members of the Florida Sub-Class with a repair or remedy for the Inflator Defect.

366.   Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs Perez and Mills and members of the Florida Sub-Class because Defendants possessed superior and exclusive knowledge regarding the Defect. Further, Defendants had a duty to disclose any information relating to the safety, quality, functionality, and reliability of Class Vehicles because they consistently marketed the Class Vehicles as safe.

367.   Once Defendants made representations to the public about the safety, quality, functionality, and reliability of the Class Vehicles, Defendants were under a

duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud. Rather than disclose the Defect, Defendants intentionally and knowingly concealed, suppressed, and/or omitted materials facts including the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

368. The Inflator Defect is material to Plaintiffs Perez and Mills and members of the Florida Sub-Class because Plaintiffs Perez and Mills and members of the Florida Sub-Class had a reasonable expectation that the vehicles would not contain a defect, such as the Inflator Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk. No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials, or workmanship, such as the Inflator Defect.

369. Plaintiffs Perez and Mills and members of the Florida Sub-Class would not have purchased or leased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles.

370.   Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiffs Perez and Mills and members of the Florida Sub-Class from seeking replacement or repair of the Inflator Defect during the applicable warranty periods. Further, Defendants intended to induce Plaintiffs Perez and Mills and members of the Florida Sub-Class into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Inflator Defect in order to decrease costs and increase profits.

371.   Defendants acted with malice, oppression, and fraud.

372.   Plaintiffs Perez and Mills and members of the Florida Sub-Class reasonably relied upon Defendants' knowing concealment and omissions. As a direct and proximate result of Defendants' omissions and active concealment of material facts regarding the Inflator Defect and associated safety risk, Plaintiffs Perez and Mills and members of the Florida Sub-Class have suffered actual damages in an amount to be determined at trial.

## COUNT 17
### Violation Of Florida's Deceptive And Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*
### (On Behalf Of Plaintiffs Perez and Mills And The Florida Sub-Class Against All Defendants)

373.   Plaintiffs Perez and Mills incorporate and re-allege each preceding paragraph as though fully set forth herein.

374.   Plaintiffs Perez and Mills bring this count on behalf of themselves and the Florida Sub-Class.

375.   Plaintiffs Perez and Mills and the members of the Florida Sub-Class are "consumers" within the meaning of the FDUTPA, Fla. Stat. § 501.203(7).

376.   Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

377.   The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Defendants engaged in unfair and deceptive practices that violated the FDUTPA as described above.

378.   In the course of their businesses, Defendants failed to disclose and actively concealed the Inflator Defect contained in the Class Vehicles and the corresponding dangers and risks posed by the Class Vehicles, as described above and otherwise engaged in activities with a tendency or capacity to deceive.

379.   In violation of the FDUTPA, Defendants employed unfair and deceptive acts or practices, fraud false pretense, misrepresentation, and/or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and/or lease of Class Vehicles. Defendants knowingly concealed, suppressed, and omitted material facts regarding the Inflator Defect and associated safety hazard and misrepresented the standard, quality, or grade of the Class Vehicles, which directly caused harm to Plaintiffs Perez and Mills and the members of the Florida Sub-Class.

380.   Defendants actively suppressed the fact that the airbags in the Class Vehicles are defective and present a safety hazard because of materials, workmanship, design, and/or manufacturing defects. Further, Defendants employed unfair and deceptive trade practices by denying repairs or replacement of the airbags within a reasonable time in violation of the FDUTPA. Defendants also breached their warranties as alleged above in violation of the FDUTPA.

381.   The repairs instituted by Defendants, if any, have not been adequate.

382.   Defendants know or should have known of the Inflator Defect contained in the Class Vehicles. Prior to installing the defective airbags in the Class Vehicles, Defendants knew or should have known the airbags in Class Vehicles contained the Inflator Defect due to pre-production testing and failure mode analysis. Defendants also should have known of the Inflator Defect after receiving numerous

complaints about the Inflator Defect from consumers and dealers, and complaints made to NHTSA. Defendants, nevertheless, failed to disclose and actively concealed the dangers and risks posed by the Defective Airbags in the Class Vehicles.

383.   By failing to disclose and by actively concealing the Defective Airbags in the Class Vehicles, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA.

384.   In the course of Defendants' businesses, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect.

385.   Defendants' unfair and deceptive trade practices were likely intended to deceive a reasonable consumer. Plaintiffs Perez and Mills and members of the Florida Sub-Class had no reasonable way to know that the Class Vehicles contained the Inflator Defect, which were defective in materials, workmanship, design and/or manufacture and posed a serious and significant health and safety risk. Defendants possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Inflator Defect within their vehicles and its associated safety risks, and any reasonable consumer would have relied on Defendants' omissions, as Plaintiffs Perez and Mills and members of the Florida Sub-Class did.

386.   Defendants intentionally and knowingly omitted material facts regarding the Class Vehicles and the Inflator Defect installed in Class Vehicles with an intent to mislead Plaintiffs Perez and Mills and the Florida Sub-Class.

387.   Defendants knew or should have known that their conduct violated the FDUTPA.

388.   To protect their profits, avoid remediation costs and public relation problems, and increase their profits, Defendants concealed the defective nature and safety risk posed by the Class Vehicles with the Inflator Defect installed in them. Defendants allowed unsuspecting car purchasers and lessees to continue to buy or lease the Class Vehicles and continue to drive them, despite the safety risk they pose.

389.   Defendants owed Plaintiffs Perez and Mills and the members of the Florida Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and the existence of the Inflator Defect because Defendants:

a.  Possessed exclusive knowledge of the Inflator Defect and its associated safety hazard; and/or

b.  Intentionally concealed the foregoing from Plaintiffs Perez and Mills and the Florida Sub-Class.

390.   Because Defendants fraudulently concealed the Inflator Defect in the Class Vehicles, and now that the Defect has been disclosed, the value of the Class Vehicles has greatly diminished, and they are now worth significantly less than they otherwise would be. Further, Plaintiffs Perez and Mills and the Florida Sub-Class were deprived of the benefit of the bargain they reached at the time of purchase or lease.

391.  Defendants' failure to disclose and active concealment of the Inflator Defect in the Class Vehicles were material to Plaintiffs Perez and Mills and the Florida Sub-Class. A vehicle made by an honest and reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a dishonest and disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly reports on and remedies them.

392.  Plaintiffs Perez and Mills and the Florida Sub-Class suffered ascertainable losses caused by Defendants' omissions and their failure to disclose material information. Had Plaintiffs Perez and Mills and the Florida Sub-Class members been aware of the Inflator Defect that existed in the Class Vehicles and Defendants' complete disregard for the safety of its consumers, Plaintiffs Perez and Mills and the Florida Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs Perez and Mills and the Florida Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

393.  Plaintiffs Perez and Mills and the Florida Sub-Class risk loss of use of their vehicles as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiffs Perez and Mills, the Florida Class, and the public in general. Defendants' unlawful acts and practices complained of above affect the public interest.

136

394.   As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs Perez and Mills and the Florida Sub-Class have suffered injury-in-fact and/or actual damage.

395.   Plaintiffs Perez and Mills and the Florida Sub-Class are entitled to recover their actual damages, under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat § 501.2105(1).

396.   Plaintiffs Perez and Mills and the Florida Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

### COUNT 18
### Breach Of Express Warranty
### Fla. Stat. §§ 672.313, 680.21, and 680.1031
### (On Behalf Of Plaintiffs Perez and Mills And The Florida Sub-Class Against Defendants General Motors and FCA)

397.   Plaintiffs Perez and Mills incorporate and re-allege each preceding paragraph as though fully set forth herein.

398.   Plaintiffs Perez and Mills brings this count on behalf of themselves and the Florida Sub-Class.

399.   Truck Manufacturers are and were at all relevant times "merchant[s]" with respect of motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "seller[s]" of motor vehicles under § 672.103(1)(d).

400.   With respect to leases, Truck Manufacturers are and were at all relevant times "lessor[s]" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

401.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

402.   Truck Manufacturers provided Plaintiffs Perez and Mills and members of the Florida Sub-Class with one or more express warranties. Under warranties provided to members of the Class, Truck Manufacturers promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Timing Chain System Defect, Truck Manufacturers knew or should have known that the majority of Timing Chain System failures occur outside the warranty periods.

403.   In connection with the purchase or lease of each of the Class Vehicles, Truck Manufacturers provide warranty coverage for the Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, Defendant General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Defendant FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited

Warranty for 5 years or 60,000 miles. Under the warranties provided to Plaintiffs Perez and Mills and members of the Florida Sub-Class, Truck Manufacturers promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Truck Manufacturers breached these warranties.

404.   Truck Manufacturers marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that Truck Manufacturers would stand behind the quality of their products and promptly repair any defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiffs Perez and Mills and members of the Florida Sub-Class.

405.   Under the warranties provided to Plaintiffs Perez and Mills and members of the Florida Sub-Class, Truck Manufacturers promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Truck Manufacturers breached these warranties.

406.   Truck Manufacturers' warranties formed a basis of the bargain that was reached when Plaintiffs Perez and Mills and members of the Florida Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator

Defect, Truck Manufacturers knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

407.   Plaintiffs Perez and Mills and members of the Florida Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by Truck Manufacturers. Despite the existence of the warranties, Truck Manufacturers failed to adequately inform Plaintiffs Perez and Mills and members of the Florida Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

408.   Truck Manufacturers breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

409.   On information and belief, Truck Manufacturers have not suitably repaired or replaced the Defective Airbags free or charge for Plaintiffs Perez and Mills and members of the Florida Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

410.   Truck Manufacturers further breached their express warranties by selling Class Vehicles that were defective with respect to materials, workmanships, design and manufacture.

411.   Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because the airbag materials, workmanship, design, and/or manufacturing defects which cause failure to perform as warranted.

412.   Plaintiffs Perez and Mills and members of the Florida Sub-Class have had sufficient direct dealings with Defendant and their agent, their authorized dealerships, to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Perez and Mills and members of the Florida Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Perez and Mills and each of the other members of the Classes are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

413.   Truck Manufacturers were provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA, and through their own testing. Affording Truck Manufacturers a reasonable opportunity to cure their breach of written warranties

would be unnecessary and futile here because Truck Manufacturers have known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

414.    Truck Manufacturers were further provided notice by Plaintiff Perez of their breach of express warranties by letter dated November 8, 2021. Truck Manufacturers have not cured their breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

415.    Any attempt by Truck Manufacturers to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Perez and Mills and members of the Florida Sub-Class. Among other things, Plaintiffs Perez and Mills and members of the Florida Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power exited between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class

Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

416.   Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs Perez and Mills and members of the Florida Sub-Class whole because, on information and belief, Truck Manufacturers have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

417.   Truck Manufacturers knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiffs Perez and Mills and members of the Florida Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

418.   Plaintiffs Perez and Mills and members of the Florida Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Truck Manufacturers. Despite the existence of the warranties, Truck Manufacturers failed to inform Plaintiffs Perez and Mills and members of the Florida Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiffs Perez and Mills and members of the Florida Sub-Class.

419.   Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe, reliable transportation.

420.   As a direct and proximate result of Truck Manufacturers' breach of express warranties, Plaintiffs Perez and Mills and members of the Florida Sub-Class have been damaged in an amount to be determined at trial.

421.   Finally, because Truck Manufacturers' breach of express warranty as set forth herein, Plaintiffs Perez and and Mills members of the Florida Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of goods and the return to Plaintiffs Perez and Mills and members of the Florida Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT 19**
**Breach Of Implied Warranty**
**Fla Stat. §§ 672.314, 372.315, and 680.1031**
**(On Behalf Of Plaintiff Perez And Mills And The Florida Sub-Class)**

422.   Plaintiffs Perez and Mills incorporate and re-allege each preceding paragraph as though fully set forth herein.

423.   Plaintiffs Perez and Mills bring this count on behalf of themselves and the Florida Sub-Class.

424.   Plaintiffs Perez and Mills and members of the Florida Sub-Class purchased or leased the Class Vehicles, manufactured by Truck Manufacturers by

and through its authorized agents for retail sales, or were otherwise expected to be the eventual purchasers or lessees of the Class Vehicles when bought from a third party. At all relevant times, Truck Manufacturers were the manufacturer, distributor, warrantor and/or seller of Class Vehicles. Truck Manufacturers knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

425.   Truck Manufacturers are and were at all relevant times "merchant[s]" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "seller[s]" of motor vehicles under § 672.103(1)(d).

426.   With respect to leases, Truck Manufacturers are and were at all relevant times "lessor[s]" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

427.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

428.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Fla. Stat. § 672.314.

429.   Truck Manufacturers impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

430.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of

providing safe and reliable transportation. The Class Vehicles contain an inherent defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Truck Manufacturers breached the implied warranty of merchantability.

431.   Truck Manufacturers cannot disclaim its implied warranty as it knowingly sold or leased a defective product.

432.   Truck Manufacturers were provided notice of the Inflator Defect by numerous consumer complaints made to Truck Manufacturers' authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording Truck Manufacturers a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Truck Manufacturers have known of and concealed the Inflator Defect and, on information and belief, have refused to repair or replace the Inflator Defect free of charge within a reasonable time.

433.   As a direct and proximate result of Truck Manufacturers' breach of the implied warranty of merchantability, Plaintiffs Perez and Mills and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

434.   Any attempt by Truck Manufacturers to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitation is unenforceable because it knowingly sold or leased a defective product without

informing consumers about the defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Perez and Mills and members of the Florida Sub-Class. Among other things, Plaintiffs Perez and Mills and members of the Florida Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

435.   Plaintiffs Perez and Mills and members of the Florida Sub-Class have been excused from performance of any warranty obligations as a result of Truck Manufacturers' conduct described herein.

436.   The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

## COUNT 20
### Negligent Misrepresentation
**(On Behalf Of Plaintiffs Perez And Mills And The Florida Sub-Class Against All Defendants)**

437.   Plaintiffs Perez and Mills incorporate and re-allege each preceding paragraph as though fully set forth herein.

438.   Plaintiffs Perez and Mills assert this count on behalf of themselves and members of the Florida Sub-Class.

439.    Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs Perez and Mills and members of the Florida Sub-Class because Defendants possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbag's failure. Defendants also made partial disclosures regarding the safety of the Class Vehicles while knowing that Class Vehicles possessed the Inflator Defect and failing to disclose its existence and its corresponding safety hazard.

440.    Defendants negligently misrepresented and omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the airbags installed in the Class Vehicles are defective and prone to premature failure, exposing drivers, occupants, and members of the public to safety risks. As a direct result of Defendants' negligent conduct, Plaintiffs Perez and Mills and members of the Florida Sub-Class have suffered actual damages.

441.    The fact that the airbags installed in the Class Vehicles are prone to premature failure is material because Plaintiffs Perez and Mills and members of the Florida Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

442.    The fact that the airbags installed in the Class Vehicles are prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. When the airbags fail, drivers

may be unable to accelerate or maintain speed or may experience injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

443.   Plaintiffs Perez and Mills and members of the Florida Sub-Class would not have purchased the Class Vehicles but for Defendants' negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiffs Perez and Mills and members of the Florida Sub-Class justifiably relied upon Defendants' negligent false representations and omissions of material facts.

444.   As a direct and proximate result of Defendants' negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the Inflator Defect, Plaintiffs Perez and Mills and members of the Florida Sub-Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT 21
## Unjust Enrichment
### (On Behalf Of Plaintiffs Perez And Mills And The Florida Sub-Class Against All Defendants)

445.   Plaintiffs Perez and Mills incorporate and re-allege each preceding paragraph as though fully set forth herein.

446.   Plaintiffs Perez and Mills assert this count on behalf of themselves and members of the Florida Sub-Class.

447.   Plaintiffs Perez and Mills and members of the Florida Sub-Class conferred a benefit on Defendants by leasing or purchasing the Class Vehicles. Defendants were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

448.   Defendants unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions, and concealment of the Inflator Defect in the Class Vehicles.

449.   As a proximate result of Defendants' false representations, omissions, and concealment of the Airbag in the Class Vehicles, and as a result of Defendants' ill-gotten gains, benefits, and profits, Defendants have been unjustly enriched at the expense of Plaintiffs Perez and Mills and members of the Florida Sub-Class. It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiffs Perez and Mills and members of the Florida Sub-Class.

450.   Plaintiffs Perez and Mills and members of the Florida Sub-Class are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits, and profits, including interest, resulting from their unlawful, unjust, and inequitable conduct.

451.    Plaintiffs Perez and Mills and members of the Florida Sub-Class seek an order requiring Defendants to disgorge their gains and profits to Plaintiff Perez and members of the Florida Sub-Class, together with interest, in a manner to be determined by the Court.

## X.    ILLINOIS COUNTS

### COUNT 22
**Violation Of The Magnuson-Moss Warranty Act ("MMWA"),
15 U.S.C. § 2301 *et seq.*
(On Behalf Of Plaintiff Charvat And The Nationwide Class Or, Alternatively,
On Behalf Of Plaintiff Charvat And The Illinois Sub-Class Against Defendant
FCA)**

452.    Plaintiff Charvat incorporates and re-alleges each preceding paragraph as though fully set forth herein.

453.    Plaintiff Charvat brings this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of himself and the members of the Illinois Sub-Class.

454.    Plaintiff Charvat satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

455.    Plaintiff Charvat and members of the Illinois Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

456.    FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

457.   The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

458.   The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

459.   FCA provided Plaintiff Charvat and members of the Illinois Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of failures occur outside of the warranty periods.

460.   Any attempt by FCA to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Charvat and members of the Illinois Sub-Class. Among other things, Plaintiff Charvat and members of the Illinois Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in

bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

461. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

462. FCA breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by FCA.

463. Plaintiff Charvat and members of the Illinois Sub-Class have had sufficient direct dealings with FCA or its agents (dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiff Charvat and members of the Illinois Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Charvat and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with

the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

464.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, FCA knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Charvat resorts to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

465.   Plaintiff Charvat and members of the Illinois Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to FCA. Thus, Plaintiff Charvat and members of the Illinois Sub-Class have not re-accepted their Class Vehicles by retaining them.

466.   FCA was provided notice by letter dated November 8, 2021 that Plaintiff Charvat would pursue claims on behalf of a class.

467.   The amount in controversy of Plaintiff Charvat's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds

the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

468.    Plaintiff Charvat, individually and on behalf of the Classes, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 23
### Fraud By Omission Or Fraudulent Concealment
### (On Behalf Of Plaintiff Charvat And The Illinois Sub-Class Against Defendants Joyson and FCA)

469.    Plaintiff Charvat incorporates and re-alleges each preceding paragraph as though fully set forth herein.

470.    Plaintiff Charvat asserts this count on behalf of himself and members of the Illinois Sub-Class.

471.    FCA and Joyson intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiff Charvat and members of the Illinois Sub-Class rely on FCA and Joyson's misrepresentations and omissions. As a direct result of FCA and Joyson's fraudulent conduct, members of the Classes have suffered actual damages.

472.   FCA and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To date, FCA and Joyson have not provided Plaintiff and members of the Illinois Sub-Class with a repair or remedy for the Inflator Defect.

473.   FCA and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Charvat and members of the Illinois Sub-Class because FCA and Joyson possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the Defect, FCA and Joyson intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

474.   Plaintiff Charvat and members of the Illinois Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

475.   The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiff Charvat and members of the Illinois Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

156

476.   The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect. Plaintiff Charvat and members of the Illinois Sub-Class would not have purchased the Class Vehicles but for FCA's and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect, or would have paid less for the Class Vehicles.

477.   FCA and Joyson knew their false misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts. FCA and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Charvat and members of the Illinois Sub-Class from seeking replacement or repair of the airbags within the warranty periods.

478.   FCA and Joyson acted with malice, oppression, and fraud.

479.   Plaintiff Charvat and members of the Illinois Sub-Class reasonably relied upon FCA's and Joyson's knowing, affirmative and active false representations, concealment and omissions. As a direct and proximate result of FCA's and Joyson's false representations, omissions and active concealment of

material facts regarding the Inflator Defect, Plaintiff Charvat and members of the Illinois Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 24**
**Violation Of The Illinois Consumer Fraud And Deceptive**
**Business Practices Act,**
**815 Ill. Comp. Stat §§ 505/1 *et seq.***
**(On Behalf Of Plaintiff Charvat And The Illinois Sub-Class Against**
**Defendants Joyson and FCA)**

480.    Plaintiff Charvat incorporates and re-alleges each preceding paragraph as though fully set forth herein.

481.    Plaintiff Charvat asserts this count on behalf of himself and members of the Illinois Sub-Class.

482.    FCA and Joyson's practices, acts, policies and course of conduct, as described above, constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts with the intent that consumers, including Plaintiff Charvat and members of the Illinois Sub-Class, rely upon such concealment, suppression, omission in connection with the sale or advertisement of merchandise of Class Vehicles in violation of the Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA"), 815 Ill. Comp. Stat. § 505/1 *et seq.* (the "Consumer Fraud Act"), when purchasing and/or leasing their respective Class Vehicles with the Inflator Defect.

483.   FCA and Joyson intentionally concealed, suppressed and omitted to Plaintiff Charvat and members of the Illinois Sub-Class at the time of purchase or lease, that the Class Vehicles contained manufacturing, materials and/or workmanship defects, with the intent that Plaintiff Charvat and members of the Illinois Sub-Class rely upon such concealment, suppression, failure to disclose or omission.

484.   FCA and Joyson knew and intentionally concealed, suppressed and omitted to consumers who purchased or leased the Class Vehicles, including Plaintiff Charvat and members of the Illinois Sub-Class, the existence of defects and problems in the airbags, despite the fact that FCA and Joyson possessed prior knowledge of the inherent defects to the Class Vehicles' airbags.

485.   FCA and Joyson actively concealed from Plaintiff Charvat and members of the Illinois Sub-Class the fact that the airbags were defective.

486.   FCA and Joyson represented to Plaintiff Charvat and members of the Illinois Sub-Class that the Class Vehicles were of merchantable quality, in proper working order, and fit for the ordinary purposes for which passenger vehicles are used when in fact the Class Vehicles were not of merchantable quality, were not in proper working order, and/or were unfit for the ordinary purposes for which passenger vehicles are used because of airbag materials, workmanship, design and/or manufacture defects.

487.   FCA and Joyson's acts of commission and omission were done with knowledge and intent to induce Plaintiff Charvat and members of the Illinois Sub-Class to rely upon FCA and Joyson's deceptive misrepresentations and decide to purchase and/or lease a Class Vehicle.

488.   FCA and Joyson's deceptive acts of commission and omission were material and in regard to facts material to a consumer's decision to purchase and/or lease a Class Vehicle.

489.   FCA and Joyson's conduct was in the course of conduct involving trade or commerce in the sale and/or lease of the Class Vehicles and/or related activities.

490.   FCA and Joyson's acts of commission and omission caused Plaintiff Charvat and members of the Illinois Sub-Class to suffer ascertainable losses of money and property in that they were forced to expend sums of money at its dealerships and elsewhere to repair and/or replace the airbags and/or airbag components of their Class Vehicles, despite the fact that FCA and Joyson had prior knowledge of the Defects at the time of placing Class Vehicles into the stream of commerce.

491.   In addition to direct monetary losses, Plaintiff Charvat and members of the Illinois Sub-Class suffered an ascertainable loss by paying for the repair out of pocket and by receiving less value than what was promised to them at the time of purchase and/or lease. Specifically, Plaintiff Charvat and members of the Illinois

Sub-Class paid for a vehicle that is now worth significantly less because of the existence of the Inflator Defect, because of the damage it causes to the Class Vehicles, and because the purchase price of the Class Vehicles included a warranty program that was supposed to provide free repairs for all defects in materials or workmanship that occurred during the warranty period, but instead were deprived of the value of this warranty due to FCA and Joyson's knowing concealment.

492.  The repairs instituted by FCA and Joyson, if any, have not been adequate.

493.  A causal relationship exists between FCA's and Joyson's deceptive and unlawful conduct and the ascertainable losses suffered by Plaintiff Charvat and members of the Illinois Sub-Class. Consumers, including Plaintiff Charvat and members of the Illinois Sub-Class, relied upon FCA's and Joyson's misrepresentations, concealments, and omissions in deciding to purchase and/or lease their Class Vehicles. Had the Inflator Defect in the Class Vehicles been disclosed, they would not have purchased them, would have paid less for the Class Vehicles had they decided to purchase them, or taken affirmative steps to prevent the catastrophic damage to their Class Vehicles' airbags during the warranty period.

494.  Plaintiff Charvat and members of the Illinois Sub-Class demand judgment against FCA and Joyson for restitution, disgorgement, statutory and actual monetary damages, interest, costs, attorneys' fees and injunctive relief including a

declaratory judgment and an appropriate court order prohibiting FCA and Joyson from further deceptive acts and practices described in this complaint.

**COUNT 25**
**Breach Of Express Warranty**
**810 Ill. Comp. Stat. §§ 5/2-313, 5/2a-103, And 5/2a-210**
**(On Behalf Of Plaintiff Charvat And The Illinois Sub-Class Against Defendant FCA)**

495.    Plaintiff Charvat incorporates and re-alleges each preceding paragraph as though fully set forth herein.

496.    Plaintiff Charvat brings this count on behalf of himself and the Illinois Sub-Class.

497.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "seller" and "lessor" of motor vehicles under § 5/2-103(1)(d) and 5/2A-103(1)(p).

498.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

499.    FCA provided Plaintiff Charvat and members of the Illinois Sub-Class with one or more express warranties. Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective engine components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, FCA

knew or should have known that the majority of failures occur outside of the warranty periods.

500.    In connection with the purchase or lease of each of the Class Vehicles, FCA provided warranty coverage for Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, Defendant FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles. Under the warranties provided to Plaintiff Charvat and members of the Illinois Sub-Class, FCA promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, FCA breached these warranties.

501.    FCA marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that FCA would stand behind the quality of its products and promptly repair any defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiff Charvat and members of the Illinois Sub-Class.

502.    Under the warranties provided to Plaintiff Charvat and members of the Illinois Sub-Class, FCA promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no

cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, FCA breached these warranties.

503.    FCA's warranties formed a basis of the bargain that was reached when Plaintiff Charvat and members of the Illinois Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

504.    Plaintiff Charvat and members of the Illinois Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by FCA. Despite the existence of the warranties, FCA failed to adequately inform Plaintiff Charvat and members of the Illinois Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

505.    FCA breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

506.    On information and belief, FCA has not suitably repaired or replaced the Defective Airbags free of charge for Plaintiff Charvat and members of the Illinois Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

507.  FCA further breached their express warranties by selling Class Vehicles that were defective with respect to airbag materials, workmanship, design and manufacture, although FCA knew of the Inflator Defect.

508.  Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing defects which cause airbag failure and/or failure to perform as warranted.

509.  Plaintiff Charvat and members of the Illinois Sub-Class have had sufficient direct dealings with FCA or its agents, its authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Charvat and members of the Illinois Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Charvat and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

510.  FCA was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and

through their own testing. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and has failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

511.   FCA was further provided notice by Plaintiff Charvat of its breach of express warranties by letter dated November 8, 2021. FCA has not cured its breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

512.   Any attempt by FCA to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Charvat and members of the Illinois Sub-Class. Among other things, Plaintiff Charvat and members of the Illinois Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

513.   Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Charvat and members of the Illinois Sub-Class whole because, on information and belief, FCA has failed and/or refused to adequately provide the promised remedies within a reasonable time.

514.   FCA knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff Charvat and members of the Illinois Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

515.   FCA's warranties formed a basis of the bargain that was reached when Plaintiff Charvat and members of the Illinois Sub-Class purchased or leased their Class Vehicles.

516.   Plaintiff Charvat and members of the Illinois Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by FCA. Despite the existence of the warranties, FCA failed to inform Plaintiff Charvat and members of the Illinois Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiff Charvat and members of the Illinois Sub-Class.

517.    Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

518.    As a direct and proximate result of FCA's breach of express warranties, Plaintiff Charvat and members of the Illinois Sub-Class have been damaged in an amount to be determined at trial.

519.    Finally, because of FCA's breach of express warranty as set forth herein, Plaintiff Charvat and members of the Illinois Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Charvat and members of the Illinois Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT 26**
**Breach Of The Implied Warranty Of Merchantability**
**810 Ill. Comp. Stat. §§ 5/2-314, 5/2a-103, 5/2a-212, And 5/2-315**
**(On Behalf Of Plaintiff Charvat And The Illinois Sub-Class Against Defendant FCA)**

520.    Plaintiff Charvat incorporates and re-alleges each preceding paragraph as though fully set forth herein.

521.    Plaintiff Charvat brings this count on behalf of himself and the Illinois Sub-Class.

522.   FCA is and was at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" and "lessors" of motor vehicles under § 5/2-103(1)(d) and 5/2A-103(1)(p).

523.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

524.   Plaintiff Charvat and members of the Illinois Sub-Class purchased or leased the Class Vehicles from FCA by and through FCA's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, FCA was the manufacturer, distributor, warrantor and/or seller of Class Vehicles. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

525.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 810 Ill. Comp. Stat. § 5/2-314.

526.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Inflator Defect – (at the time of sale or lease and thereafter) and present

an undisclosed safety risk to drivers and occupants. Thus, FCA breached its implied warranty of merchantability.

527.    Plaintiff Charvat and members of the Illinois Sub-Class have had sufficient direct dealings with FCA or its agents, its authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Charvat and members of the Illinois Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Charvat and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

528.    FCA was provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording FCA a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because FCA have known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Defective Airbag free of charge within a reasonable time.

529.   FCA were further provided notice by Plaintiff Charvat of its breach of implied warranties by letter dated November 8, 2021. FCA has not cured its breach of implied warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

530.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff Charvat and members of the Illinois Sub-Class have been damaged in an amount to be proven at trial.

531.   Any attempt by FCA to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Charvat and members of the Illinois Sub-Class. Among other things, Plaintiff Charvat and members of the Illinois Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Illinois Sub-Class, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

532.    Plaintiff Charvat and members of the Illinois Sub-Class have been excused from performance of any warranty obligations as a result of FCA's conduct described herein.

533.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

### COUNT 27
### Unjust Enrichment
### (On Behalf Of Plaintiff Charvat And The Illinois Sub-Class Against Defendants Joyson and FCA)

534.    Plaintiff Charvat incorporates and re-alleges each preceding paragraph as though fully set forth herein.

535.    Plaintiff Charvat asserts this count on behalf of himself and members of the Illinois Sub-Class.

536.    Plaintiff Charvat and members of the Illinois Sub-Class conferred a benefit on Joyson and FCA by leasing or purchasing the Class Vehicles. Joyson and FCA were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

537.    Joyson and FCA unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Inflator Defect in the Class Vehicles.

538.    As a proximate result of Joyson's and FCA's false representations, omissions and concealment of the Inflator Defect in the Class Vehicles, and as a

172

result of Joyson's and FCA's ill-gotten gains, benefits and profits, Joyson and FCA have been unjustly enriched at the expense of Plaintiff Charvat and members of the Illinois Sub-Class. It would be inequitable for Joyson and FCA to retain their ill-gotten profits without paying the value thereof to Plaintiff Charvat and members of the Illinois Sub-Class.

539.    Plaintiff Charvat and members of the Illinois Sub-Class are entitled to restitution of the amount of Joyson's and FCA's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

540.    Plaintiff Charvat and members of the Illinois Sub-Class seek an order requiring Joyson and FCA to disgorge their gains and profits to Plaintiff Charvat and members of the Illinois Sub-Class, together with interest, in a manner to be determined by the Court.

## COUNT 28
## Negligent Misrepresentation
### (On Behalf Of Plaintiff Charvat And The Illinois Sub-Class Against Defendants Joyson and FCA)

541.    Plaintiff Charvat incorporates and re-alleges each preceding paragraph as though fully set forth herein.

542.    Plaintiff Charvat asserts this count on behalf of himself and members of the Illinois Sub-Class.

543.    Joyson and FCA owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Charvat and members of the Illinois Sub-Class

because Joyson and FCA possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbag's failure. Joyson and FCA also made partial disclosures regarding the safety of the Class Vehicles while knowing that Class Vehicles possessed the Inflator Defect and failing to disclose its existence and its corresponding safety hazard.

544.   Joyson and FCA negligently misrepresented and omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in the Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks. As a direct result of Joyson's and FCA's negligent conduct, Plaintiff Charvat and members of the Illinois Sub-Class have suffered actual damages.

545.   The fact that the airbags installed in the Class Vehicles are prone to premature failure is material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

546.   Plaintiff Charvat and members of the Illinois Sub-Class would not have purchased the Class Vehicles but for Joyson's and FCA's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the

Class Vehicles. Plaintiff Charvat and members of the Illinois Sub-Class justifiably relied upon Joyson's and FCA's negligent false representations and omissions of material facts.

547.   As a direct and proximate result of Joyson's and FCA's negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the Inflator Defect, Plaintiff Charvat and members of the Illinois Sub-Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## XI.    MARYLAND COUNTS

### COUNT 29
### Violation Of The Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.*
### (On Behalf Of Plaintiff Stotelmyer and the Nationwide Class Or, Alternatively, On Behalf Of Plaintiff Stotelmyer and the Maryland Sub-Class Against Defendant FCA)

548.   Plaintiff Stotelmyer incorporates and re-alleges each preceding paragraph as though fully set forth herein.

549.   Plaintiff Stotelmyer brings this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of himself and the members of the Maryland Sub-Class.

550.   Plaintiff Stotelmyer satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

551. Plaintiff Stotelmyer and members of the Maryland Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

552. FCA is "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

553. The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

554. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. See 15 U.S.C. § 2310(d)(1).

555. FCA provided Plaintiff Stotelmyer and members of the Maryland Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of failures occur outside of the warranty periods.

556. Any attempt by FCA to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitations are unenforceable because they knowingly sold or leased a defective

product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Stotelmyer and members of the Maryland Sub-Class. Among other things, Plaintiff Stotelmyer and members of the Maryland Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

557.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

558.   FCA breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by FCA.

559.   Plaintiff Stotelmyer and members of the Maryland Sub-Class have had sufficient direct dealings with FCA or its agents (dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiff Stotelmyer and members of the Maryland Sub-Class, on the other hand. Nonetheless, privity is not required here

because Plaintiff Stotelmyer and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

560.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, FCA knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Stotelmyer resorts to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

561.    Plaintiff Stotelmyer and members of the Maryland Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to FCA. Thus, Plaintiff Stotelmyer and

members of the Maryland Sub-Class have not re-accepted their Class Vehicles by retaining them.

562.   FCA was provided notice by letter dated November 8, 2021 that Plaintiff Stotelmyer would pursue claims on behalf of a class. The amount in controversy of Plaintiff Stotelmyer's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

563.   Plaintiff Stotelmyer, individually and on behalf of the Classes, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 30
### Fraud By Omission Or Fraudulent Concealment
### (On Behalf Of Plaintiff Stotelmyer And The Maryland Sub-Class Against Defendants Joyson and FCA)

564.   Plaintiff Stotelmyer incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

565.   Plaintiff Stotelmyer brings this Count on behalf of himself and the Maryland Sub-Class.

566.   Joyson and FCA intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the Class Vehicles contain an Inflator Defect and

corresponding safety risk, with the intent that Plaintiff Stotelmyer and members of the Maryland Sub-Class rely on Joyson's and FCA's omissions. As a direct result of Joyson's and FCA's fraudulent conduct, Plaintiff Stotelmyer and members of the Maryland Sub-Class have suffered actual damages.

567.    Joyson and FCA knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect, concealed the defect, and never intended to repair or replace the Inflator Defect during the warranty periods. To date, Joyson and FCA have not provided Plaintiff Stotelmyer or members of the Maryland Sub- Class with a repair or remedy for the Inflator Defect.

568.    Joyson and FCA owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Stotelmyer and members of the Maryland Sub-Class because Joyson and FCA possessed superior and exclusive knowledge regarding the defect and made a partial disclosure regarding the safety of the Class Vehicles. Joyson and FCA also owed a duty to disclose the Inflator Defect and its corresponding safety risk because the Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), places a duty on manufacturers to report vehicle defects. Rather than disclose the defect, Joyson and FCA intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

569.    The Inflator Defect is material to Plaintiff Stotelmyer and members of the Maryland Sub-Class because Plaintiff Stotelmyer and members of the Maryland Sub-Classes had a reasonable expectation that the vehicles would not contain a defect, such as the Inflator Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk. No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials, or workmanship, such as the Inflator Defect.

570.    Plaintiff Stotelmyer and members of the Maryland Sub-Class would not have purchased or leased the Class Vehicles but for Joyson's and FCA's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles.

571.    Joyson and FCA knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Joyson and FCA knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Stotelmyer and members of the Maryland Sub-Class from seeking replacement or repair of the Inflator Defect during the applicable warranty periods. Further, Defendant intended to induce Plaintiff Stotelmyer and members of the Maryland Sub-Class into purchasing or leasing the Class Vehicles and to discourage them from seeking

replacement or repair of the Inflator Defect in order to decrease costs and increase profits.

572.   Joyson and FCA acted with malice, oppression, and fraud.

573.   Plaintiff Stotelmyer and members of the Maryland Sub-Class reasonably relied upon Joyson's and FCA's knowing concealment and omissions. As a direct and proximate result of Joyson's and FCA's omissions and active concealment of material facts regarding the Inflator Defect and associated safety risk, Plaintiff Stotelmyer and members of the Maryland Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 31**
**Violation Of The Maryland Consumer Protection Act**
**Md. Code Ann., Com. Law § 13-101,** *et seq.*
**(On Behalf Of Plaintiff Stotelmyer And The Maryland Sub-Class Against**
**Defendants Joyson and FCA)**

574.   Plaintiff Stotelmyer incorporates and re-alleges each preceding paragraph as though fully set forth herein.

575.   Plaintiff Stotelmyer brings this count on behalf of himself and the members of the Maryland Sub-Class.

576.   Plaintiff Stotelmyer and members of the Maryland Sub-Class are consumers within the context of the MCPA, *see* Md. Code Ann., Com. Law § 13-301(c)(1)(iii), who purchased and/or leased Class Vehicles for personal, family, or household use.

577.    Joyson and FCA are persons within the context of the MCPA. *See* Md. Code Ann., Com. Law § 13-101(h).

578.    The MCPA prohibits a person from engaging in any unfair, abusive, or deceptive trade practice within the State of Maryland. *See* Md. Code Ann., Com. Law § 13-303.

579.    Joyson and FCA violated Md. Code Ann., Com. Law § 13-301(2)(iv) and § 13-303 by representing that Class Vehicles are of a particular standard, quality, or grade, when they are not.

580.    Joyson and FCA violated Md. Code Ann., Com. Law § 13-301(2) and § 13-303 by failing to state a material fact that deceives or tends to deceive.

581.    Joyson and FCA violated Md. Code Ann., Com. Law § 13-301(5)(i) and § 13-303 by advertising Class Vehicles without intent to sell or lease as advertised.

582.    Joyson and FCA violated Md. Code Ann., Com. Law § 13-301(7) and § 13-303 by selling Class Vehicles knowing that a service, replacement, or repair was needed.

583.    Joyson and FCA violated Md. Code Ann., Com. Law § 13-301(5)(i) and § 13-303 by deception, fraud, false pretense, false promise, misrepresentation, knowing concealment, suppression, and/or omission of material facts concerning

183

Class Vehicles with the intent to deceive Plaintiff Stotelmyer and members of the Maryland Sub-Class.

584.   Joyson and FCA committed unfair and deceptive acts in the course of trade and commerce within the context of the MCPA as described in this Amended Complaint in violation of Md. Code Ann., Com. Law § 13-301 and § 13-303.

585.   Joyson and FCA committed unconscionable, deceptive, and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, and omission of materials facts concerning the Class Vehicles' Inflator Defect and corresponding safety risk in connection with the sale and/or advertisement of Class Vehicles.

586.   Joyson and FCA fraudulently, intentionally, negligently, and/or recklessly misrepresented to Plaintiff Stotelmyer and members of the Maryland Sub-Class the characteristics of Class Vehicle airbags with respect to materials, manufacture, durability, design, longevity, maintenance, and operating costs.

587.   Joyson and FCA intended that Plaintiff Stotelmyer and members of the Maryland Sub-Class would, in the course of their decision to expend money in purchasing, leasing, and/or repairing Class Vehicles, reasonably rely upon misrepresentations, misleading characterizations, and material omissions

concerning the quality of Class Vehicle airbags with respect to materials, workmanship, design, manufacture, and information in the owner's manuals.

588.    Information regarding the Inflator Defect as described in this Complaint is material to consumers in that the Defect poses a safety risk.

589.    If Joyson and FCA had not concealed the Defect from Plaintiff Stotelmyer and members of the Maryland Sub-Class within the express warranty period, the Inflator Defect would have been repaired without cost to purchasers as promised under the original warranty.

590.    Joyson and FCA violated the MCPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicle engines were defectively designed and/or manufactured.

591.    As a proximate and direct result of Joyson's and FCA's unfair and deceptive trade practices, Plaintiff Stotelmyer and members of the Maryland Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm.

592.    Plaintiff Stotelmyer and members of the Maryland Sub-Class experienced diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

593.    The repairs instituted by Joyson and FCA, if any, have not been adequate.

594.    The conduct of Joyson and FCA offends public policy as established by statutes and common law, is immoral, unethical, oppressive, and/or unscrupulous and caused unavoidable and substantial injury to Class Vehicle owners and lessees (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

595.    Plaintiff Stotelmyer and members of the Maryland Sub-Class demand judgment against Joyson and FCA for restitution, disgorgement, statutory and actual monetary damages, including interest, costs, and attorneys' fees and injunctive relief, including a declaratory judgment and an appropriate court order prohibiting Joyson and FCA from further deceptive acts and practices as described in the Amended Complaint.

**COUNT 32**
**Breach Of Express Warranty**
**Md. Code Ann., Com. Law § 2-313, *et seq.***
**(On Behalf Of Plaintiff Stotelmyer And The Maryland Sub-Class Against Defendant FCA)**

596.    Plaintiff Stotelmyer incorporates and re-alleges each preceding paragraph as though fully set forth herein.

597.    Plaintiff Stotelmyer brings this count on behalf of himself and the members of the Maryland Sub-Class.

598.    FCA marketed the Class Vehicles as safe, built to last, and reliable vehicles. These statements helped conceal the existence of the Inflator Defect and

its corresponding safety risk from Plaintiff Stotelmyer and members of the Maryland Sub-Class.

599.   FCA is and was at all relevant times a "merchant" and "seller" of motor vehicles (i.e., the Class Vehicles) within the meaning of Md. Code Ann., Com. Law §§ 2-103(d) and 2-104.

600.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles (i.e., the Class Vehicles) within the meaning of Md. Code Ann., Com. Law § 2A-103(1)(p).

601.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Ann., Com. Law §§ 2-105(1) and 2A-103(1)(h).

602.   In connection with the purchase or lease of each of the Class Vehicles, FCA also provides warranty coverage for the Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, Defendant FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles. Under the warranties provided to Plaintiff Stotelmyer and members of the Maryland Sub-Class, FCA promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, FCA breached these warranties.

187

603.   FCA's warranties formed a basis of the bargain that was reached when Plaintiff Stotelmyer and members of the Maryland Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

604.   Plaintiff Stotelmyer and members of the Maryland Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by FCA. Despite the existence of the warranties, FCA failed to adequately inform Plaintiff Stotelmyer and members of the Maryland Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the Inflator Defect free of charge within a reasonable time.

605.   FCA breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

606.   On information and belief, FCA has not suitably repaired or replaced the Inflator Defect free of charge for Plaintiff Stotelmyer and members of the Maryland Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

607.   FCA further breached its express warranties by selling Class Vehicles that were defective with respect to materials, workmanship, design, and manufacture.

608.   Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of airbag materials, workmanship, design, and/or manufacturing defects which cause failure and/or failure to perform as warranted.

609.   FCA was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and has failed to provide a suitable repair or replacement of the Inflator Defect free of charge within a reasonable time.

610.   Any attempt by FCA to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Stotelmyer and members of the Maryland Sub-Class. Among other things, Plaintiff Stotelmyer and the members of the Maryland Sub-Class did not determine these time

189

limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Maryland Sub-Class, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

611.    Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Stotelmyer and members of the Maryland Sub-Class whole because, on information and belief, FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

612.    FCA knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff Stotelmyer and members of the Maryland Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

613.    Plaintiff Stotelmyer and the members of the Maryland Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the defect, which was known and concealed by FCA. Despite the existence of the warranties, FCA failed to inform Plaintiff Stotelmyer and members of the Maryland Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully

transferred the costs of repair or replacement of the airbags to Plaintiff Stotelmyer and members of the Maryland Sub-Class.

614.   Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

615.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff Stotelmyer and members of the Maryland Sub-Class have been damaged in an amount to be determined at trial.

616.   Finally, because of FCA's breach of express warranty as set forth herein, Plaintiff Stotelmyer and members of the Maryland Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Stotelmyer and members of the Maryland Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT 33**
**Breach Of Implied Warranty Of Merchantability**
**Md. Code Ann., Com. Law § 2-314**
**(On Behalf Of Plaintiff Stotelmyer And The Maryland Sub-Class Against Defendant FCA)**

617.   Plaintiff Stotelmyer incorporates and re-alleges each preceding paragraph as though fully set forth herein.

618.   Plaintiff Stotelmyer brings this count on behalf of himself and the members of the Maryland Sub-Class.

619.   Plaintiff Stotelmyer and members of the Maryland Sub-Class purchased or leased the Class Vehicles from FCA by and through Defendant's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, FCA was the manufacturer, distributor, warrantor, and/or seller of Class Vehicles. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

620.   FCA is and was at all relevant times a "merchant" and "seller" of motor vehicles (i.e., the Class Vehicles) within the meaning of Md. Code Ann., Com. Law §§ 2-103(d) and 2-104.

621.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles (i.e., the Class Vehicles) within the meaning of Md. Code Ann., Com. Law § 2A-103(1)(p).

622.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Ann., Com. Law §§ 2-105(1) and 2A-103(1)(h).

623.   FCA impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

624.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Inflator Defect – (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, FCA breached its implied warranty of merchantability.

625.   FCA was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording FCA a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Inflator Defect free of charge within a reasonable time.

626.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and members of the Maryland Sub-Class have been damaged in an amount to be proven at trial.

627.   Any attempt by FCA to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in FCA's warranty periods were also unconscionable and

inadequate to protect Plaintiff Stotelmyer and members of the Maryland Sub-Class. Among other things, Plaintiff Stotelmyer and members of the Maryland Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Maryland Sub-Class, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

628.    Plaintiff Stotelmyer and members of the Maryland Sub-Class have been excused from performance of any warranty obligations as a result of FCA's conduct described herein.

629.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

## COUNT 34
## Unjust Enrichment
### (On Behalf Of Plaintiff Stotelmyer And The Maryland Sub-Class Against Defendants Joyson and FCA)

630.    Plaintiff Stotelmyer incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

631.    Plaintiff Stotelmyer brings this Count on behalf of himself and the Maryland Sub-Class.

632.    FCA and Joyson have received and retained a benefit from Plaintiff Stotelmyer and inequity has resulted.

633.    FCA and Joyson have benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's and Joyson's concealment of the Defective Airbag at a profit, and Plaintiff Stotelmyer and the Class have overpaid for the cars and been forced to pay other costs.

634.    Thus, all Maryland Sub-Class Members conferred a benefit on FCA and Joyson.

635.    It is inequitable for FCA and Joyson to retain these benefits.

636.    Plaintiff Stotelmyer and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's and Joyson's conduct.

637.    FCA and Joyson knowingly accepted the benefits of its unjust conduct.

638.    As a result of FCA's and Joyson's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## XII.    MASSACHUSETTS COUNTS

### COUNT 35
### Violation Of The Magnuson-Moss Warranty Act ("MMWA"),
### 15 U.S.C. § 2301 *et seq.*
### (On Behalf Of Plaintiff Ribeiro And The Nationwide Class Or, Alternatively, On Behalf Of Plaintiff Ribeiro And The Massachusetts Sub-Class Against Defendant FCA)

639.    Plaintiff Ribeiro incorporates and re-alleges each preceding paragraph as though fully set forth herein.

640.   Plaintiff Ribeiro brings this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of himself and the members of the Massachusetts Sub-Class.

641.   Plaintiff Ribeiro satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

642.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

643.   FCA is "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

644.   The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

645.   The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

646.   FCA provided Plaintiff Ribeiro and members of the Massachusetts Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles.

However, given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of failures occur outside of the warranty periods.

647.   Any attempt by FCA to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Ribeiro and members of the Massachusetts Sub-Class. Among other things, Plaintiff Ribeiro and members of the Massachusetts Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

648.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

649.   FCA breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or

workmanship that is prone to premature failure and fails to operate as represented by FCA.

650.    Plaintiff Ribeiro and members of the Massachusetts Sub-Class have had sufficient direct dealings with FCA or its agents (dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiff Ribeiro and members of the Massachusetts Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Ribeiro and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

651.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, FCA knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Ribeiro resorts to an informal dispute resolution

procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

652.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to FCA. Thus, Plaintiff Ribeiro and members of the Massachusetts Sub-Class have not re-accepted their Class Vehicles by retaining them.

653.   FCA was provided notice by letter dated November 8, 2021 that Plaintiff Ribeiro would pursue claims on behalf of a class. The amount in controversy of Plaintiff Ribeiro's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

654.   Plaintiff Ribeiro, individually and on behalf of the Classes, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 36
### Fraud By Omission Or Fraudulent Concealment
### (On Behalf Of Plaintiff Ribeiro And The Massachusetts Sub-Class Against Defendants Joyson and FCA)

655.   Plaintiff Ribeiro incorporates and re-alleges each preceding paragraph as though fully set forth herein.

656.   Plaintiff Ribeiro asserts this count on behalf of himself and members of the Massachusetts Sub-Class.

657.   FCA and Joyson intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiff Ribeiro and members of the Massachusetts Sub-Class rely on FCA and Joyson's misrepresentations and omissions. As a direct result of FCA and Joyson's fraudulent conduct, members of the Classes have suffered actual damages.

658.   FCA and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To date, FCA and Joyson have not provided Plaintiff Ribeiro and members of the Massachusetts Sub-Class with a repair or remedy for the Inflator Defect.

659.   FCA and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Ribeiro and members of the Massachusetts Sub-Class because FCA and Joyson possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the Defect, FCA and Joyson intentionally and knowingly concealed, suppressed and/or omitted material facts including the

200

standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

660.    The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiff Ribeiro and members of the Massachusetts Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

661.    The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect. Plaintiff Ribeiro and members of the Massachusetts Sub-Class would not have purchased the Class Vehicles but for FCA and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect, or would have paid less for the Class Vehicles.

662.    FCA and Joyson knew their false misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts. FCA and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would

discourage Plaintiff Ribeiro and members of the Massachusetts Sub-Class from seeking replacement or repair of the airbags within the warranty periods. Further, FCA and Joyson intended to induce Plaintiff Ribeiro and members of the Massachusetts Sub-Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the airbags within the warranty periods, thereby unlawfully transferring the cost of repair or replacement from FCA and Joyson to Plaintiff Ribeiro and members of the Massachusetts Sub-Class, in order to decrease costs and increase profits.

663.   FCA and Joyson acted with malice, oppression, and fraud.

664.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class reasonably relied upon FCA and Joyson's knowing, affirmative and active false representations, concealment and omissions. As a direct and proximate result of FCA and Joyson's false representations, omissions and active concealment of material facts regarding the Inflator Defect, Plaintiff Ribeiro and members of the Massachusetts Sub-Class have suffered actual damages in an amount to be determined at trial.

## COUNT 37
## Violation Of The Massachusetts Consumer Protection Act ("MCPA")
## Mass. Gen. Laws ch. 93A, § 1, *et seq.*
## (On Behalf Of Plaintiff Ribeiro And The Massachusetts Sub-Class Against Defendants Joyson and FCA)

665.   Plaintiff Ribeiro incorporates and re-alleges each preceding paragraph as though fully set forth herein.

666.   Plaintiff Ribeiro brings this count on behalf of himself and the Massachusetts Sub-Class.

667.   FCA and Joyson, Plaintiff Ribeiro, and members of the Massachusetts Sub-Class are "person[s]" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

668.   Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

669.   The MCPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a).

670.   FCA and Joyson committed unconscionable, deceptive and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false promise, misrepresentation and/or the knowing concealment, suppression and omission of materials facts concerning the Class Vehicles' Inflator Defect and corresponding safety risk with the intent that Plaintiff Ribeiro and members of the Massachusetts Sub-Class would rely upon their omissions in connection with the sale and/or advertisement of Class Vehicles.

671.   FCA and Joyson intended that Plaintiff Ribeiro and members of the Massachusetts Sub-Class would, in the course of their decision to expend money in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon material omissions concerning the quality of Class Vehicle engines with respect to materials, workmanship, design, and manufacture.

672.   Information regarding the Inflator Defect as described in this Amended Complaint is material to consumers in that the defect poses a safety risk.

673.   If FCA and Joyson had not concealed the Defect from Plaintiff Ribeiro and members of the Massachusetts Sub-Class within the express warranty period, the Inflator Defect would have been repaired without cost to purchasers as promised under the original warranty.

674.   FCA and Joyson failed to disclose and omitted the existence of the Inflator Defect in the Class Vehicles. Defendants' omissions caused Plaintiff Ribeiro and members of the Massachusetts Sub-Class to be unaware at the time of their purchase of their Class Vehicles that the Inflator Defect and its accompanying safety hazard existed.

675.   FCA and Joyson owed a duty to disclose the material fact that the Class Vehicles contained the Inflator Defect to Plaintiff Ribeiro and members of the Massachusetts Sub-Class, but failed to do so. FCA and Joyson had a duty to disclose that the airbags were defective because knowledge of the existence of the Inflator

Defect was in the superior control of Defendants. Further, FCA and Joyson were under a duty to disclose the defect because it posed a safety hazard.

676.   Plaintiff and members of the Massachusetts Sub-Class used FCA and Joyson's products and had business dealings with Defendants either directly or indirectly through FCA and Joyson's authorized dealers and other third parties, and were the intended recipients of the Class Vehicles designed, manufactured and distributed by FCA and Joyson.

677.   FCA and Joyson's deceptive conduct was likely to deceive a reasonable consumer, and did in fact deceive reasonable consumers including Plaintiff Ribeiro and members of the Massachusetts Sub-Class.

678.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class reasonably relied upon FCA and Joyson's material omissions. They had no way knowing that FCA and Joyson's representations were false and misleading. Plaintiff Ribeiro and members of the Massachusetts and members of the Massachusetts Class did not (and could not) unravel FCA and Joyson's deception on their own.

679.   The facts concealed and omitted by FCA and Joyson from Plaintiff Ribeiro and members of the Massachusetts Sub-Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease. Had Plaintiff Ribeiro and members of the Massachusetts Sub-Class known the Inflator Defect in the Class Vehicles, they

would not have purchased or leased their Class Vehicles, or would have paid less for their Class Vehicles.

680.   The repairs instituted by FCA and Joyson, if any, have not been adequate.

681.   Plaintiff Riberio has provided FCA and Joyson with notice of its violations of the MCPA pursuant to Mass. Gen. Laws ch. 93A, § 9 by letter dated November 8, 2021. To the extent FCA and Joyson do not remedy their violations of the MCPA within thirty days of receiving the demand letter, Plaintiff Riberio and members of the Massachusetts Sub-Class will be entitled to seek monetary relief for FCA and Joyson's violation of the MCPA. Plaintiff Ribeiro and members of the Massachusetts Sub-Class suffered ascertainable loss and actual damages as a direct and proximate result of FCA and Joyson's conduct. Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff and members of the Massachusetts Sub-Class seek monetary relief against Defendants measures as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for Plaintiff Ribeiro, and each member of the Massachusetts Sub-Class. Because Defendants' conduct was committed willfully and knowingly, Plaintiff Ribeiro and members of the Massachusetts Sub-Class are entitled to recover, for Plaintiff Ribeiro and each member of the Massachusetts Sub-Class, up to three times actual damages, but no less than two times actual damages.

**COUNT 38**
**Breach Of Express Warranty,**
**Mass. Gen. Laws ch. 106, §§ 2-313, 2a-103, and 2a-210 *et seq.***
**(On Behalf Of Plaintiff Ribeiro And The Massachusetts Sub-Class Against**
**Defendant FCA)**

682.    Plaintiff Ribeiro incorporates and re-alleges each preceding paragraph as though fully set forth herein.

683.    Plaintiff Ribeiro brings this count on behalf of himself and the Massachusetts Sub-Class.

684.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 § 2-104(a), and "seller" and "lessor" of motor vehicles under § 2-103(1)(d) and § 2A-103(1)(p).

685.    The Class members are and were at all relevant times "buyers" with respect to the Class Vehicles under Mass. Gen. Laws ch. 106 § 2-103(1)(a).

686.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

687.    FCA provided Plaintiff Ribeiro and members of the Massachusetts Sub-Class with one or more express warranties. Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However FCA knew or should have known that the majority of airbag failures occur outside of the warranty periods.

688.   FCA marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that Defendants would stand behind the quality of their products and promptly repair any defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiff Ribeiro and members of the Massachusetts Sub-Class.

689.   In connection with the purchase or lease of each of the Class Vehicles, FCA provided warranty coverage for Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, Defendant FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles. Under the warranties provided to Plaintiff Riberio and members of the Illinois Sub-Class, FCA promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, FCA breached these warranties.

690.   Under the warranties provided to Plaintiff Ribeiro and members of the Massachusetts Sub-Class, FCA promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, FCA breached these warranties.

691.    FCA's warranties formed a basis of the bargain that was reached when Plaintiff Ribeiro and members of the Massachusetts Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

692.    Plaintiff and members of the Massachusetts Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by FCA. Despite the existence of the warranties, FCA failed to adequately inform Plaintiff Ribeiro and members of the Massachusetts Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

693.    FCA breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

694.    On information and belief, FCA have not suitably repaired or replaced the Defective Airbags free of charge for Plaintiff Ribeiro and members of the Massachusetts Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

695.    Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials,

workmanship, design and/or manufacturing defects which cause failure and/or failure to perform as warranted.

696.    Plaintiff Ribeiro and members of the Massachusetts Sub-Class have had sufficient direct dealings with FCA or their agents, their authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Ribeiro and members of the Massachusetts Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Ribeiro and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

697.    FCA was provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

698.    FCA was further provided notice by Plaintiff Ribeiro of their breach of express warranties by letter dated November 8, 2021. Despite this notice, FCA has not cured its breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

699.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Ribeiro and members of the Massachusetts Sub-Class. Among other things, Plaintiff Ribeiro and members of the Massachusetts Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between Defendant and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

700.    Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Ribeiro and members of the Massachusetts Sub-Class whole because, on information and belief, Defendant has failed and/or refused to adequately provide the promised remedies within a reasonable time.

211

701.   FCA knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff Ribeiro and members of the Massachusetts Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

702.   FCA's warranties formed a basis of the bargain that was reached when Plaintiff Ribeiro and members of the Massachusetts Sub-Class purchased or leased their Class Vehicles.

703.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by FCA. Despite the existence of the warranties, FCA failed to inform Plaintiff Ribeiro and members of the Massachusetts Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiff Ribeiro and members of the Massachusetts Sub-Class.

704.   Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

705.    As a direct and proximate result of FCA's breach of express warranties, Plaintiff Ribeiro and members of the Massachusetts Sub-Class have been damaged in an amount to be determined at trial.

706.    Finally, because of FCA's breach of express warranty as set forth herein, Plaintiff Ribeiro and members of the Massachusetts Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Ribeiro and members of the Massachusetts Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

### COUNT 39
### Breach Of Implied Warranty
### Mass. Gen. Laws ch. 106 §§ 2-314 And 2a-212
### (On Behalf Of Plaintiff Ribeiro And The Massachusetts Sub-Class Against Defendant FCA)

707.    Plaintiff Ribeiro incorporates and re-alleges each preceding paragraph as though fully set forth herein.

708.    Plaintiff Ribeiro brings this count on behalf of himself and the members of the Massachusetts Sub-Class.

709.    Plaintiff Ribeiro and members of the Massachusetts Sub-Class purchased or leased the Class Vehicles, manufactured by FCA, from FCA by and through its authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all

relevant times, FCA was the manufacturer, distributor, warrantor and/or seller of Class Vehicles. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

710.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 § 2-104(1), and "seller" of motor vehicles under Mass. Gen. Laws ch. 106 § 2-103(1)(d).

711.  With respect to leases, FCA is and was at all relevant times "lessor" of motor vehicles under Mass. Gen. Laws ch. 106 § 2A-103(1)(p).

712.  Plaintiff Ribeiro and members of the Massachusetts Sub-Class are and were at all relevant times "buyer[s]" of the Class Vehicles under Mass. Gen. Laws ch. 106 §2- 103(1)(a).

713.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

714.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212.

715.  FCA impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

716.  The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of

providing safe and reliable transportation. The Class Vehicles contain an inherent defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, FCA breached the implied warranty of merchantability.

717.   FCA cannot disclaim its implied warranty as it knowingly sold or leased a defective product.

718.   FCA was provided notice of the Inflator Defect by numerous consumer complaints made to FCA's authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording FCA a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and, on information belief, has refused to repair or replace the Inflator Defect free of charge within a reasonable time.

719.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff Ribeiro and members of the Massachusetts Sub-Class have been damaged in an amount to be proven at trial.

720.   Any attempt by FCA to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and

inadequate to protect Plaintiff Ribeiro and members of the Massachusetts Sub-Class. Among other things, Plaintiff Ribeiro and members of the Massachusetts Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Massachusetts Sub-Class, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

721.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class have been excused from performance of any warranty obligations as a result of FCA's conduct described herein.

722.   The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

## COUNT 40
### Unjust Enrichment
### (On Behalf Of Plaintiff Ribeiro And The Massachusetts Sub-Class Against Defendants Joyson and FCA)

723.   Plaintiff Ribeiro incorporates and re-alleges each preceding paragraph as though fully set forth herein.

724.   Plaintiff Ribeiro asserts this count on behalf of himself and members of the Massachusetts Sub-Class.

725.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class conferred a benefit on Joyson and FCA by leasing or purchasing the Class Vehicles.

Joyson and FCA were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

726.   Joyson and FCA unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Inflator Defect in the Class Vehicles.

727.   As a proximate result of Joyson's and FCA's false representations, omissions and concealment of the Inflator Defect in the Class Vehicles, and as a result of Joyson's and FCA's ill-gotten gains, benefits and profits, Joyson and FCA have been unjustly enriched at the expense of Plaintiff Ribeiro and members of the Massachusetts Sub-Class. It would be inequitable for Joyson and FCA to retain their ill-gotten profits without paying the value thereof to Plaintiff Ribeiro and members of the Massachusetts Sub-Class.

728.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class are entitled to restitution of the amount of Joyson's and FCA's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

729.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class seek an order requiring Joyson and FCA to disgorge their gains and profits to Plaintiff Ribeiro and members of the Massachusetts Sub-Class, together with interest, in a manner to be determined by the Court.

**COUNT 41**
**Negligent Misrepresentation**
**(On Behalf Of Plaintiff Ribeiro And The Massachusetts Sub-Class Against Defendants Joyson and FCA)**

730.   Plaintiff Ribeiro incorporates and re-alleges each preceding paragraph as though fully set forth herein.

731.   Plaintiff Ribeiro asserts this count on behalf of himself and members of the Massachusetts Sub-Class.

732.   Joyson and FCA owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Ribeiro and members of the Massachusetts Sub-Class because Joyson and FCA possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbag's failure. Joyson and FCA also made partial disclosures regarding the safety of the Class Vehicles while knowing that Class Vehicles possessed the Inflator Defect and failing to disclose its existence and its corresponding safety hazard.

733.   Joyson and FCA negligently misrepresented and omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in the Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks. As a direct result of Joyson's and FCA's negligent conduct, Plaintiff Ribeiro and members of the Massachusetts Sub-Class have suffered actual damages.

734.   The fact that the airbags installed in the Class Vehicles are prone to premature failure is material because Plaintiff Ribeiro and members of the Massachusetts Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

735.   The fact that the airbags installed in the Class Vehicles are prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

736.   Plaintiff Ribeiro and members of the Massachusetts Sub-Class would not have purchased the Class Vehicles but for Defendants' negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiff Ribeiro and members of the Massachusetts Sub-Class justifiably relied upon Joyson's and FCA's negligent false representations and omissions of material facts.

737.   As a direct and proximate result of Joyson and FCA's negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the Inflator Defect, Plaintiff Ribeiro and members

of the Massachusetts Sub-Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## XIII.  MICHIGAN COUNTS

### COUNT 42
**Violation Of The Magnuson-Moss Warranty Act ("MMWA"),**
**15 U.S.C. § 2301 *et seq.***
**(On Behalf Of Plaintiff Kahsin And The Nationwide Class Or, Alternatively,**
**On Behalf Of Plaintiff Kahsin And The Michigan Sub-Class Against**
**Defendant FCA)**

738.   Plaintiff Kahsin incorporates and re-alleges each preceding paragraph as though fully set forth herein.

739.   Plaintiff Kahsin brings this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of himself and the members of the Michigan Sub-Class.

740.   Plaintiff satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

741.   Plaintiff Kahsin and members of the Michigan Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

742.   FCA is "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

743.   The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

744. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

745. FCA provided Plaintiff Kahsin and members of the Michigan Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, FCA knew or should have known that the majority of failures occur outside of the warranty periods.

746. Any attempt by FCA to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Kahsin and members of the Michigan Sub-Class. Among other things, Plaintiff Kahsin and members of the Michigan Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew

or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

747.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

748.    FCA breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by FCA.

749.    Plaintiff Kahsin and members of the Michigan Sub-Class have had sufficient direct dealings with FCA or its agents (dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiff Kahsin and members of the Michigan Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Kahsin and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

750.    Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, FCA knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Kahsin resorts to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

751.    Plaintiff Kahsin and members of the Michigan Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to FCA. Thus, Plaintiff Kahsin and members of the Michigan Sub-Class have not re-accepted their Class Vehicles by retaining them.

752.    FCA was provided notice by letter dated November 8, 2021 that Plaintiff Kahsin would pursue claims on behalf of a class.

753.    The amount in controversy of Plaintiff Kahsin's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds

the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

754.   Plaintiff Kahsin, individually and on behalf of the Classes, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 43
## Fraud By Omission Or Fraudulent Concealment
### (On Behalf Of Plaintiff Kahsin And The Michigan Sub-Class Against Defendants Joyson and FCA)

755.   Plaintiff Kahsin incorporates and re-alleges each preceding paragraph as though fully set forth herein.

756.   Plaintiff Kahsin asserts this count on behalf of himself and members of the Michigan Sub-Class.

757.   Joyson and FCA intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiff Kahsin and members of the Michigan Sub-Class rely on Joyson's and FCA's misrepresentations and omissions. As a direct result of Joyson's and FCA's fraudulent conduct, members of the Classes have suffered actual damages.

758.    Joyson and FCA knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To date, Joyson and FCA have not provided Plaintiff Kahsin and members of the Michigan Sub-Class with a repair or remedy for the Inflator Defect.

759.    Joyson and FCA owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Kahsin and members of the Michigan Sub-Class because Joyson and FCA possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the Defect, Joyson and FCA intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

760.    The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiff Kahsin and members of the Michigan Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

761.    The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable

consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

762.   Plaintiff Kahsin and members of the Michigan Sub-Class would not have purchased the Class Vehicles but for Joyson's and FCA's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect, or would have paid less for the Class Vehicles.

763.   Joyson and FCA knew their false misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Joyson and FCA knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Kahsin and members of the Michigan Sub-Class from seeking replacement or repair of the airbags within the warranty periods. Further, Joyson and FCA intended to induce Plaintiff Kahsin and members of the Michigan Sub-Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the airbags within the warranty periods, thereby unlawfully transferring the cost of repair or replacement from Joyson and FCA to Plaintiff Kahsin and members of the Michigan Sub-Class, in order to decrease costs and increase profits.

764.   Joyson and FCA acted with malice, oppression, and fraud.

765. Plaintiff Kahsin and members of the Michigan Sub-Class reasonably relied upon Joyson and FCA knowing, affirmative and active false representations, concealment and omissions. As a direct and proximate result of Joyson and FCA's false representations, omissions and active concealment of material facts regarding the Inflator Defect, Plaintiff Kahsin and members of the Michigan Sub-Class have suffered actual damages in an amount to be determined at trial.

## COUNT 44
### Violations Of The Michigan Consumer Protection Act, ("Michigan CPA"), Mich. Comp. Laws §§ 445.901, *et seq.* (On Behalf Of Plaintiff Kahsin And The Michigan Sub-Class Against Defendants Joyson and FCA)

766. Plaintiff Kahsin incorporates and re-alleges each preceding paragraph as though fully set forth herein.

767. Plaintiff Kahsin brings this count on behalf of himself and members of the Michigan Sub-Class.

768. Plaintiff Kahsin and members of the Michigan Sub-Class are "person[s]" within the meaning of the Michigan CPA. *See* Mich. Comp. Laws § 445.902(1)(d).

769. Plaintiff Kahsin and members of the Michigan Sub-Class are permitted to bring this action for injunctive relief and actual damages under the Michigan CPA. *See* Mich. Comp. Laws § 445.911.

770.    Joyson and FCA are "person[s]" engaged in "trade or commerce" within the meaning of the Michigan CPA. *See* Mich. Comp. Laws § 445.902(1)(d) and (g).

771.    The Michigan CPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . ." Mich. Comp. Laws § 445.903(1). Joyson and FCA engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including, inter alia: "[r]epresenting that goods or services have . . . characteristics . . . that [they do] not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

772.    Joyson and FCA violated the Michigan CPA by employing unfair, unconscionable, or deceptive acts or practices, and/or by engaging in fraud, misrepresentations, concealment, suppression and/or omissions of material facts

with the intent that others rely upon such concealment, suppression and/or omissions, in connection with the sale and/or lease of Class Vehicles.

773. Joyson and FCA knowingly concealed, suppressed and/or omitted material facts regarding the Inflator Defect and its corresponding safety risk, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Kahsin and members of the Michigan Sub-Class. Plaintiff Kahsin and members of the Michigan Sub-Class could not reasonably have known about the Inflator Defect and its corresponding safety risk as the information was in the superior and exclusive control of Joyson and FCA.

774. Joyson and FCA intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Inflator Defect with the intent to mislead Plaintiff Kahsin and members of the Michigan Sub-Class. Joyson and FCA knew, or should have known, that the Inflator Defect was a latent defect and that the airbags were likely to fail outside of the periods of the manufacturer's warranties. Joyson and FCA also knew, or should have known, that the Inflator Defect in the Class Vehicles could pose a safety risk.

775. Joyson and FCA owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Kahsin and members of the Michigan Sub-Class because they possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbags. Rather than disclose the Defect,

Joyson and FCA engaged in unfair, unconscionable and deceptive trade practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the airbags to Plaintiff Kahsin and members of the Michigan Sub-Class.

776.    Joyson's and FCA's unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Inflator Defect were intended to mislead consumers and misled Plaintiff and members of the Michigan Sub-Class.

777.    At all relevant times, Joyson's and FCA's unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or omissions regarding the Inflator Defect and its corresponding safety risk were material to Plaintiff Kahsin and members of the Michigan Sub-Class. When Plaintiff Kahsin and members of the Michigan Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' airbags were free from latent defects and would last beyond the periods of the manufacturer's warranties. Had Joyson and FCA disclosed that the airbags was prone to premature failure and/or an unavoidable safety risk, Plaintiff Kahsin and members of the Michigan Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles. Further, had Joyson and FCA disclosed that the airbags in the Class Vehicles would not last beyond the warranty periods without need for

repair or replacement, Plaintiff Kahsin and members of the Michigan Sub-Class would have demanded repair or replacement during the warranty periods at no cost—as provided for in Joyson's and FCA's warranties.

778.    Joyson and FCA had a continuous duty to Plaintiff Kahsin and members of the Michigan Sub-Class to refrain from unfair and deceptive practices under the Michigan CPA and to disclose the Inflator Defect. Joyson's and FCA's unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Inflator Defect and corresponding safety risk are substantially injurious to consumers. As a result of Joyson and FCA knowing, intentional concealment, suppression and/or omission of the Inflator Defect in violation of the Michigan CPA, Plaintiff Kahsin and members of the Michigan Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the airbags and/or actual damages in the amount of the cost to replace the airbags and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Joyson's and FCA's unfair, unconscionable and deceptive acts and practices in the course of their business.

779.    Joyson's and FCA's unfair, unconscionable and deceptive acts and practices occurred in the conduct of trade or commerce.

780.    Joyson and FCA have knowingly and willfully engaged in the unfair, unconscionable and deceptive acts and practices alleged herein. Further, Joyson and FCA unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

781.    Joyson's and FCA's unfair, unconscionable and deceptive acts and practices affect the public interest and present a continuing safety risk to Plaintiff Kahsin and members of the Michigan Sub-Class as well as the public.

782.    The repairs instituted by Joyson and FCA, if any, have not been adequate.

783.    As a direct and proximate result of Joyson's and FCA's violations of the Michigan CPA, Plaintiff Kahsin and members of the Michigan Sub-Class have suffered actual damages and/or injury in fact.

784.    As a result of Joyson's and FCA's unlawful conduct, Plaintiff Kahsin and members of the Michigan Sub-Class are entitled to actual damages, costs of litigation, attorneys' fees, injunctive and other equitable relief. *See* Mich. Comp. Laws § 445.911.

**COUNT 45**
**Breach Of Express Warranty,**
**Mich. Comp. Laws §§ 440.2313, 440.2803, And 440.2860**
**(On Behalf Of Plaintiff Kahsin and the Michigan Sub-Class Against**
**Defendant FCA)**

785.    Plaintiff Kahsin incorporates and re-alleges each preceding paragraph as though fully set forth herein.

786.    Plaintiff Kahsin brings this count on behalf of himself and the Michigan Sub-Class.

787.    FCA is and was at all relevant times "merchants" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1), and "sellers" and "lessors" of motor vehicles under § 440.2103(1)(c)and § 440.2803(1)(p).

788.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

789.    FCA provided Plaintiff Kahsin and members of the Michigan Sub-Class with one or more express warranties. For illustrative purposes, FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles. Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective engine components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, FCA knew or should have known

233

that the majority of Timing Chain System failures occur outside of the warranty periods.

790.   Under the warranties provided to Plaintiff Kahsin and members of the Michigan Sub-Class, FCA promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Defendants breached these warranties.

791.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiff Kahsin and members of the Michigan Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

792.   Plaintiff Kahsin and members of the Michigan Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by FCA. Despite the existence of the warranties, FCA failed to adequately inform Plaintiff Kahsin and members of the Michigan Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

793.   FCA breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

794.   On information and belief, FCA have not suitably repaired or replaced the Defective Airbags free of charge for Plaintiff Kahsin and members of the Michigan Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

795.   FCA further breached their express warranties by selling Class Vehicles that were defective with respect to airbag materials, workmanship, design and manufacture.

796.   Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing defects which cause failures and/or failure to perform as warranted.

797.   Plaintiff Kahsin and members of the Michigan Sub-Class have had sufficient direct dealings with FCA or its agents, their authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Kahsin and members of the Michigan Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Kahsin and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the

ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

798. FCA were provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because FCA have known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defect free of charge within a reasonable time.

799. FCA were further provided notice by Plaintiff Kahsin of their breach of express warranties by letter dated November 8, 2021. Despite this notice, FCA have not cured its breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

800. Any attempt by FCA to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Kahsin and members of the Michigan Sub-Class. Among other

things, Plaintiff Kahsin and members of the Michigan Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

801.    Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Kahsin and members of the Michigan Sub-Class whole because, on information and belief, FCA have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

802.    FCA knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff Kahsin and members of the Michigan Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

803.    FCA's warranties formed a basis of the bargain that was reached when Plaintiff Kahsin and members of the Michigan Sub-Class purchased or leased their Class Vehicles.

804.    Plaintiff Kahsin and members of the Michigan Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by FCA.

Despite the existence of the warranties, FCA failed to inform Plaintiff Kahsin and members of the Michigan Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiff Kahsin and members of the Michigan Sub-Class.

805.   Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

806.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff Kahsin and members of the Michigan Sub-Class have been damaged in an amount to be determined at trial.

807.   Finally, because of FCA's breach of express warranty as set forth herein, Plaintiff Kahsin and members of the Michigan Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Kahsin and members of the Michigan Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT 46**
**Breach of Implied Warranty Of Merchantability,**
**Mich. Comp. Laws 440.2314 and 440.2860**
**(On Behalf Of Plaintiff Kahsin and The Michigan Sub-Class Against**
**Defendant FCA)**

808.   Plaintiff Kahsin incorporates and re-alleges each preceding paragraph as though fully set forth herein.

809.   Plaintiff Kahsin brings this count on behalf of himself and the Michigan Sub-Class.

810.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1), and "seller" and "lessor" of motor vehicles under § 440.2103(1)(c) and § 440.2803(1)(p).

811.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

812.   Plaintiff Kahsin and members of the Michigan Sub-Class purchased or leased the Class Vehicles from FCA by and through FCA's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, FCA was the manufacturers, distributors, warrantors and/or sellers of Class Vehicles. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

813.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

814.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Inflator Defect – (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, FCA breached its implied warranty of merchantability.

815.   Plaintiff Kahsin and members of the Michigan Sub-Class have had sufficient direct dealings with FCA or its agents, their authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Kahsin and members of the Michigan Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Kahsin and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were

240

designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

816.   FCA was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording FCA a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and, on information and belief, have refused to repair or replace the Defective Airbags free of charge within a reasonable time.

817.   FCA was further provided notice by Plaintiff Kahsin of their breach of implied warranties by letter dated November 8, 2021. Despite this notice, FCA has not cured its breach of implied warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

818.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff Kahsin and members of the Michigan Sub-Class have been damaged in an amount to be proven at trial.

819.   Any attempt by FCA to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect.

The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Kahsin and members of the Michigan Sub-Class. Among other things, Plaintiff Kahsin and members of the Michigan Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Michigan Sub-Class, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

820.    Plaintiff Kahsin and members of the Michigan Sub-Class have been excused from performance of any warranty obligations as a result of FCA's conduct described herein.

821.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

**COUNT 47**
**Unjust Enrichment**
**(On Behalf Of Plaintiff Kahsin and the Michigan Sub-Class Against Defendants Joyson and FCA)**

822.    Plaintiff Kahsin incorporates and re-alleges each preceding paragraph as though fully set forth herein.

823.    Plaintiff Kahsin asserts this count on behalf of himself and members of the Michigan Sub-Class.

824.   Plaintiff and members of the Michigan Sub-Class conferred a benefit on Defendants by leasing or purchasing the Class Vehicles. Joyson and FCA were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

825.   Joyson and FCA unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Inflator Defect in the Class Vehicles.

826.   As a proximate result of Joyson's and FCA's false representations, omissions and concealment of the Inflator Defect in the Class Vehicles, and as a result of Joyson's and FCA's ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiff Kahsin and members of the Michigan Sub-Class. It would be inequitable for Joyson and FCA to retain their ill-gotten profits without paying the value thereof to Plaintiff Kahsin and members of the Michigan Sub-Class.

827.   Plaintiff Kahsin and members of the Michigan Sub-Class are entitled to restitution of the amount of Joyson's and FCA's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

828.   Plaintiff Kahsin and members of the Michigan Sub-Class seek an order requiring Joyson's and FCA's to disgorge their gains and profits to Plaintiff Kahsin

and members of the Michigan Sub-Class, together with interest, in a manner to be determined by the Court.

## XIV.  **MONTANA COUNTS**

**COUNT 48**
**Violation Of The Magnuson-Moss Warranty Act ("MMWA"),**
**15 U.S.C. § 2301** *et seq.*
**(On Behalf Of Plaintiff Miner And The Nationwide Class Or, Alternatively,**
**On Behalf Of Plaintiff Miner And The Montana Sub-Class Against Defendant**
**FCA)**

829.   Plaintiff Miner incorporates and re-alleges each preceding paragraph as though fully set forth herein.

830.   Plaintiff Miner brings this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of himself and the members of the Montana Sub-Class. Plaintiff satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

831.   Plaintiff Miner and members of the Montana Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

832.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

833.   The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

834.   The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

835.   FCA provided Plaintiff Miner and members of the Montana Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective engine components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, FCA knew or should have known that the majority of failures occur outside of the warranty periods.

836.   Any attempt by FCA to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Miner and members of the Montana Sub-Class. Among other things, Plaintiff Miner and members of the Montana Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have

245

known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

837.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

838.   FCA breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by FCA.

839.   Plaintiff Miner and members of the Montana Sub-Class have had sufficient direct dealings with FCA or its agents (dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiff Miner and members of the Montana Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Miner and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

840.   Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, FCA knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Miner resorts to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

841.   Plaintiff Miner and members of the Montana Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to FCA. Thus, Plaintiff Miner and members of the Montana Sub-Class have not re-accepted their Class Vehicles by retaining them.

842.   FCA was provided notice by letter dated November 8, 2021 that Plaintiff Miner would pursue claims on behalf of a class.

843.   The amount in controversy of Plaintiff Miner's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

247

844.   Plaintiff Miner, individually and on behalf of the Classes, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 49
### Fraud By Omission Or Fraudulent Concealment
### (On Behalf Of Plaintiff Miner And The Montana Sub-Class Against Defendants Joyson and FCA)

845.   Plaintiff Miner incorporates and re-alleges each preceding paragraph as though fully set forth herein.

846.   Plaintiff Miner asserts this count on behalf of himself and members of the Montana Sub-Class.

847.   FCA and Joyson intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiff Miner and members of the Montana Sub-Class rely on FCA's and Joyson's misrepresentations and omissions. As a direct result of FCA's and Joyson's fraudulent conduct, members of the Classes have suffered actual damages.

848.   FCA and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To

date, FCA and Joyson have not provided Plaintiff Miner and members of the Montana Sub-Class with a repair or remedy for the Inflator Defect.

849.   FCA and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Miner and members of the Montana Sub-Class because FCA and Joyson possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the Defect, FCA and Joyson intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

850.   The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiff Miner and members of the Montana Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

851.   The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect. Plaintiff Miner and members of the

Montana Sub-Class would not have purchased the Class Vehicles but for FCA's and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect, or would have paid less for the Class Vehicles.

852.   FCA and Joyson knew their false misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts. FCA and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Miner and members of the Montana Sub-Class from seeking replacement or repair of the airbags within the warranty periods. Further, FCA and Joyson intended to induce Plaintiff Miner and members of the Montana Sub-Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the airbags within the warranty periods, thereby unlawfully transferring the cost of repair or replacement from FCA and Joyson to Plaintiff Miner and members of the Montana Sub-Class, in order to decrease costs and increase profits.

853.   FCA and Joyson acted with malice, oppression, and fraud.

854.   Plaintiff Miner and members of the Montana Sub-Class reasonably relied upon FCA's and Joyson's knowing, affirmative and active false representations, concealment and omissions. As a direct and proximate result of

Defendants' false representations, omissions and active concealment of material facts regarding the Inflator Defect, Plaintiff Miner and members of the Montana Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 50**
**Violations Of The Montana Unfair Trade Practices And Consumer Protection Act ("MUTPCPA")**
**Mont. Code Ann. §§ 30-14-101 *et seq.***
**(On Behalf Of Plaintiff Miner And The Montana Sub-Class Against Defendants Joyson and FCA)**

855.    Plaintiff Miner incorporates and re-alleges each preceding paragraph as though fully set forth herein.

856.    Plaintiff Miner brings this count on behalf of himself and members of the Montana Sub-Class.

857.    Plaintiff Miner and members of the Montana Sub-Class are "persons" within the meaning of the MUTPCPA. *See* Mont. Code Ann. § 30-14-102(6).

858.    Plaintiff Miner and members of the Montana Sub-Class are permitted to bring this action for injunctive relief and actual damages under the MUTPCPA. *See* Mont. Code Ann. § 30-14-222(2)(a).

859.    FCA and Joyson are "persons" engaged in "trade or commerce" within the meaning of the MUTPCPA. *See* Mont. Code Ann. § 30-14-102(6) and (8)(a).

860.    The MUTPCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Mont. Code Ann. § 30-14-103.

251

861.   FCA and Joyson violated the MUTPCPA by employing unfair, unconscionable, or deceptive acts or practices, and/or by engaging in fraud, misrepresentations, concealment, suppression and/or omissions of material facts with the intent that others rely upon such concealment, suppression and/or omissions, in connection with the sale and/or lease of Class Vehicles.

862.   FCA and Joyson knowingly concealed, suppressed and/or omitted material facts regarding the Inflator Defect and its corresponding safety risk, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Miner and members of the Montana Sub-Class. Plaintiff Miner and members of the Montana Sub-Class could not reasonably have known about the Inflator Defect and its corresponding safety risk as the information was in the superior and exclusive control of FCA and Joyson.

863.   FCA and Joyson intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Inflator Defect with the intent to mislead Plaintiff Miner and members of the Montana Sub-Class. FCA and Joyson knew, or should have known, that the Inflator Defect was a latent defect and that the airbags were likely to fail outside of the periods of the manufacturer's warranties. FCA and Joyson also knew, or should have known, that the Inflator Defect in the Class Vehicles poses a safety risk.

252

864.   FCA and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Miner and members of the Michigan Sub-Class because they possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbags. Rather than disclose the Defect, FCA and Joyson engaged in unfair, unconscionable and deceptive trade practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the airbags to Plaintiff Miner and members of the Montana Sub-Class.

865.   FCA's and Joyson's unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Inflator Defect were intended to mislead consumers and misled Plaintiff Miner and members of the Montana Sub-Class.

866.   At all relevant times, FCA's and Joyson's unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or omissions regarding the Inflator Defect and its corresponding safety risk were material to Plaintiff Miner and members of the Montana Sub-Class. When Plaintiff Miner and members of the Montana Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' airbags were free from latent defects and would last beyond the periods of the manufacturer's warranties. Had FCA and Joyson disclosed that the airbags was prone to premature failure and/or an

unavoidable safety risk, Plaintiff Miner and members of the Montana Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles. Further, had FCA and Joyson disclosed that the airbags in the Class Vehicles would not last beyond the warranty periods without need for repair or replacement, Plaintiff Miner and members of the Montana Sub-Class would have demanded repair or replacement during the warranty periods at no cost—as provided for in FCA's and Joyson's warranties.

867.    FCA and Joyson had a continuous duty to Plaintiff Miner and members of the Montana Sub-Class to refrain from unfair and deceptive practices under the MUTPCPA and to disclose the Inflator Defect. FCA's and Joyson's unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Inflator Defect and corresponding safety risk are substantially injurious to consumers. As a result of FCA and Joyson knowing, intentional concealment, suppression and/or omission of the Inflator Defect in violation of the MUTPCPA, Plaintiff Miner and members of the Montana Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the airbags and/or actual damages in the amount of the cost to replace the airbags and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value

of their vehicles as a result of FCA's and Joyson's unfair, unconscionable and deceptive acts and practices in the course of their business.

868.   FCA's and Joyson's unfair, unconscionable and deceptive acts and practices occurred in the conduct of trade or commerce.

869.   FCA and Joyson have knowingly and willfully engaged in the unfair, unconscionable and deceptive acts and practices alleged herein. Further, FCA and Joyson unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

870.   FCA's and Joyson's unfair, unconscionable and deceptive acts and practices affect the public interest and present a continuing safety risk to Plaintiff Miner and members of the Montana Sub-Class as well as the public.

871.   The repairs instituted by FCA and Joyson, if any, have not been adequate.

872.   As a direct and proximate result of FCA's and Joyson's violations of the MUTPCPA, Plaintiff Miner and members of the Montana Sub-Class have suffered actual damages and/or injury in fact.

873.   As a result of FCA's and Joyson's unlawful conduct, Plaintiff Miner and members of the Montana Sub-Class are entitled to actual damages, costs of

litigation, attorneys' fees, injunctive and other equitable relief. *See* Mont. Code Ann. §§ 30-14-222(2)(a) and (4).

**COUNT 51**
**Breach Of Express Warranty,**
**(On Behalf Of Plaintiff Miner The Montana Sub-Class Against Defendant FCA)**

874.    Plaintiff Miner incorporates and re-alleges each preceding paragraph as though fully set forth herein.

875.    Plaintiff Miner brings this count on behalf of himself and the Montana Sub-Class.

876.    FCA is and was at all relevant times "merchants" with respect to motor vehicles under Mont. Code Ann. § 30-2-104, and "sellers" and "lessors" of motor vehicles under § 30-2-103(1)(d).

877.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code Ann. § 30-2-105(1).

878.    FCA provided Plaintiff Miner and members of the Montana Sub-Class with one or more express warranties.    FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles. Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective airbag components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent

256

nature of the Defect, FCA knew or should have known that the majority of failures occur outside of the warranty periods.

879.   Under the warranties provided to Plaintiff Miner and members of the Montana Sub-Class, FCA promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, FCA breached these warranties.

880.   FCA's warranties formed a basis of the bargain that was reached when Plaintiff Miner and members of the Montana Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

881.   Plaintiff Miner and members of the Montana Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by FCA. Despite the existence of the warranties, FCA failed to adequately inform Plaintiff Miner and members of the Montana Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

882.   FCA breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

883.   On information and belief, FCA have not suitably repaired or replaced the Defective Airbags free of charge for Plaintiff Miner and members of the Montana Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

884.   FCA further breached its express warranties by selling Class Vehicles that were defective with respect to engine materials, workmanship, design and manufacture.

885.   Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of airbag materials, workmanship, design and/or manufacturing defects which cause failures and/or failure to perform as warranted.

886.   Plaintiff Miner and members of the Montana Sub-Class have had sufficient direct dealings with FCA or its agents, its authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Miner and members of the Montana Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Miner and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the

ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

887.   FCA was provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defect free of charge within a reasonable time.

888.   FCA was further provided notice by Plaintiff Miner of its breach of express warranties by letter dated November 8, 2021. Despite this notice, FCA has not cured its breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

889.   Any attempt by FCA to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Miner and members of the Montana Sub-Class. Among other things, Plaintiff Miner

and members of the Montana Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

890.   Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Miner and members of the Montana Sub-Class whole because, on information and belief, FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

891.   FCA knew that the Class Vehicles were inherently defective and did not conform to its warranties, and Plaintiff Miner and members of the Montana Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

892.   FCA's warranties formed a basis of the bargain that was reached when Plaintiff Miner and members of the Montana Sub-Class purchased or leased their Class Vehicles.

893.   Plaintiff Miner and members of the Montana Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by FCA. Despite the

existence of the warranties, FCA failed to inform Plaintiff Miner and members of the Montana Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiff Miner and members of the Montana Sub-Class.

894.    Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

895.    As a direct and proximate result of FCA's breach of express warranties, Plaintiff Miner and members of the Montana Sub-Class have been damaged in an amount to be determined at trial.

896.    Finally, because of FCA's breach of express warranty as set forth herein, Plaintiff Miner and members of the Montana Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Miner and members of the Montana Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT 52
## Breach Of Implied Warranty Of Merchantability,
## (On Behalf Of Plaintiff Miner And The Montana Sub-Class Against Defendant FCA)

897.   Plaintiff Miner incorporates and re-alleges each preceding paragraph as though fully set forth herein.

898.   Plaintiff Miner brings this count on behalf of himself and the Montana Sub-Class.

899.   FCA is and was at all relevant times "merchants" with respect to motor vehicles under Mont. Code Ann. § 30-2-104, and "sellers" and "lessors" of motor vehicles under § 30-2-103(1)(d).

900.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code Ann. § 30-2-105(1).

901.   Plaintiff Miner and members of the Montana Sub-Class purchased or leased the Class Vehicles from Defendants by and through FCA's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, FCA was the manufacturers, distributors, warrantors and/or sellers of Class Vehicles. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

902.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for

which such goods are used is implied by law pursuant to Mont. Code Ann. § 30-2-314.

903.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Inflator Defect – (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, FCA breached its implied warranty of merchantability.

904.   Plaintiff Miner and members of the Montana Sub-Class have had sufficient direct dealings with FCA or its agents, its authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Miner and members of the Montana Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Miner and each of the other members of the Classes are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

905.    FCA was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and through its own testing. Affording FCA a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Defective Airbags free of charge within a reasonable time.

906.    FCA was further provided notice by Plaintiff Miner of its breach of implied warranties by letter dated November 8, 2021. Despite this notice, FCA has not cured its breach of implied warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

907.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff Miner and members of the Montana Sub-Class have been damaged in an amount to be proven at trial.

908.    Any attempt by FCA to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Miner and members of the Montana Sub-Class. Among other things, Plaintiff Miner and members of the Montana Sub-Class did not

determine these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between FCA and members of the Montana Sub-Class, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

909. Plaintiff Miner and members of the Montana Sub-Class have been excused from performance of any warranty obligations as a result of FCA's conduct described herein.

910. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

## COUNT 53
## Unjust Enrichment
### (On Behalf Of Plaintiff Miner And The Montana Sub-Class Against Defendants Joyson and FCA)

911. Plaintiff Miner incorporates and re-alleges each preceding paragraph as though fully set forth herein.

912. Plaintiff Miner asserts this count on behalf of himself and members of the Montana Sub-Class.

913. Plaintiff and members of the Montana Sub-Class conferred a benefit on FCA and Joyson by leasing or purchasing the Class Vehicles. Defendants were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

914.    FCA and Joyson knowingly and unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Inflator Defect in the Class Vehicles.

915.    As a proximate result of FCA and Joyson's false representations, omissions and concealment of the Inflator Defect in the Class Vehicles, and as a result of FCA and Joyson's ill-gotten gains, benefits and profits, FCA and Joyson have been unjustly enriched at the expense of Plaintiff Miner and members of the Montana Sub-Class. It would be inequitable for FCA and Joyson to retain their ill-gotten profits without paying the value thereof to Plaintiff Miner and members of the Montana Sub-Class.

916.    Plaintiff Miner and members of the Montana Sub-Class are entitled to restitution of the amount of FCA and Joyson's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

917.    Plaintiff Miner and members of the Montana Sub-Class seek an order requiring FCA and Joyson to disgorge their gains and profits to Plaintiff Miner and members of the Montana Sub-Class, together with interest, in a manner to be determined by the Court.

## COUNT 54
## Negligent Misrepresentation
## (On Behalf Of Plaintiff Miner and the Montana Sub-Class Against Defendants Joyson and FCA)

918.    Plaintiff Miner incorporates and re-alleges each preceding paragraph as though fully set forth herein.

919.    Plaintiff Miner asserts this count on behalf of himself and members of the Montana Sub-Class.

920.    FCA and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Miner and members of the Montana Sub-Class because FCA and Joyson possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbag's failure. FCA and Joyson also made partial disclosures regarding the safety of the Class Vehicles while knowing that Class Vehicles possessed the Inflator Defect and failing to disclose its existence and its corresponding safety hazard.

921.    FCA and Joyson negligently and falsely without any reasonable ground for believing it to be true misrepresented and omitted past or existing material facts including the standard, quality, or grade of the Class Vehicles and the fact that the airbags installed in the Class Vehicles are defective and prone to premature failure, exposing drivers, occupants, and members of the public to safety risks. As a direct result of FCA's and Joyson's negligent conduct and intent to induce, Plaintiff Miner

and members of the Montana Sub-Class, unaware of this falsity, have suffered actual damages.

922.   The fact that the airbags installed in the Class Vehicles are prone to premature failure is material because Plaintiff Miner and members of the Montana Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

923.   The fact that the airbags installed in the Class Vehicles are prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

924.   Plaintiff Miner and members of the Montana Sub-Class would not have purchased the Class Vehicles but for FCA and Joyson's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiff Miner and members of the Montana Sub-Class justifiably relied upon the truth of FCA and Joyson's negligent false representations and omissions of material facts.

925.   As a direct and proximate result of FCA and Joyson's negligent false representations and omissions of material facts regarding the standard, quality or

grade of the Class Vehicles and/or the Inflator Defect, Plaintiff Miner and members of the Montana Sub-Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## XV.  **MISSOURI CLAIMS**

### COUNT 55
**Violation of the Magnuson-Moss Warranty Act ("MMWA")**
**15 U.S.C. § 2301 *et seq.***
**(on behalf of Plaintiffs and the Nationwide Class, or alternatively, on behalf of Plaintiff Harries and the Missouri Sub-Class Against Defendant General Motors)**

926.    Plaintiff Harries incorporates and re-alleges each preceding paragraph as though fully set forth herein.

927.    Plaintiff Harries brings this count on behalf of himself and the members of the Nationwide Class or, alternatively, on behalf of the Missouri Sub-Class.

928.    Plaintiff Harries satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

929.    Plaintiff Harries and members of the Classes are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

930.    Each defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

269

931.    The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

932.    The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. See 15 U.S.C. § 2310(d)(1).

933.    General Motors provided Plaintiff Harries and members of the Classes with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to Plaintiff Harries and members of the Classes, General Motors promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles. As alleged herein, General Motors breached these warranties.

934.    Plaintiff Harries and members of the Classes experienced the Inflator Defect within the warranty periods but General Motors failed to inform Plaintiff Harries and members of the Classes of the existence of the Inflator Defect and associated safety risk, and failed to provide a suitable remedy or repair of the Inflator Defect free of charge within a reasonable time.

935.    General Motors was provided notice by letter dated November 8, 2021, that Plaintiffs would pursue a claim under the MMWA on behalf of a class.

936.    Any attempt by General Motors to disclaim or limit its express or implied warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitations are unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in General Motors' warranty periods are also unconscionable and inadequate to protect Plaintiff Harries and members of the Classes. Among other things, Plaintiff Harries and members of the Classes did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and members of the Classes, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that they posed a safety risk.

937.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

938.    General Motors breached these warranties by failing to disclose and fraudulently concealing information regarding the standard, quality, or grade of the Class Vehicles and/or the presence of the Inflator Defect and corresponding safety risk. Without limitation, the Class Vehicles share a common defect in design, material, manufacturing, and/or workmanship that fails to operate as represented by Defendants and presents a safety risk.

271

939.   Affording General Motors a reasonable opportunity to cure its breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, General Motors knew, or was reckless in not knowing, of the material omissions concerning the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, but failed to repair or replace the Inflator Defect and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Harries resort to an informal dispute resolution procedure and/or afford General Motors a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

940.   Plaintiff Harries and members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to General Motors. Thus, Plaintiff Harries and members of the Classes have not re-accepted their Class Vehicles by retaining them.

941.   The amount in controversy of Plaintiff Harries' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

942.    Plaintiff Harries, individually and on behalf of members of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 56
## Fraud by Omission or Fraudulent Concealment
## (On behalf of Plaintiff Harries and the Missouri Sub-Class Against Defendants Joyson and General Motors)

943.    Plaintiff Harries incorporates and re-alleges each preceding paragraph as though fully set forth herein.

944.    Plaintiff Harries brings this count on behalf of himself and the members of the Missouri Sub-Class.

945.    General Motors and Joyson intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Class Vehicles contain an Inflator Defect and corresponding safety risk, with the intent that Plaintiff Harries and members of the Missouri Sub-Class rely on General Motors and Joyson's omissions.  As a direct result of General Motors and Joyson's fraudulent conduct, Plaintiff Harries and members of the Missouri Sub-Class have suffered actual damages.

946.    General Motors and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect, concealed the defect and never intended to repair or replace the Inflator Defect during the warranty

273

periods.  To date, General Motors and Joyson have not provided Plaintiff Harries and members of the Missouri Sub-Class with a repair or remedy for the Inflator Defect.

947.   General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Harries and members of the Missouri Sub-Class because General Motors and Joyson possessed superior and exclusive knowledge regarding the defect and made a partial disclosure regarding the safety of the Class Vehicles.  Rather than disclose the defect, General Motors and Joyson intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

948.   The Inflator Defect is material to Plaintiff Harries and members of the Missouri Sub-Class because Plaintiff Harries and members of the Missouri Sub-Class had a reasonable expectation that the vehicles would not contain a defect, such as the Inflator Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk.  No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

949.    Plaintiff Harries and members of the Missouri Sub-Class would not have purchased or leased the Class Vehicles but for General Motors and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles.

950.    General Motors and Joyson knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts.  General Motors and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Harries and members of the Missouri Sub-Class from seeking replacement or repair of the Defect during the applicable warranty periods.  Further, General Motors and Joyson intended to induce Plaintiff Harries and members of the Missouri Sub-Class into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Inflator Defect in order to decrease costs and increase profits.

951.    General Motors and Joyson acted with malice, oppression and fraud.

952.    Plaintiff Harries and members of the Missouri Sub-Class reasonably relied upon General Motors and Joyson's knowing concealment and omissions.  As a direct and proximate result of General Motors and Joyson's omissions and active concealment of material facts regarding the Inflator Defect and associated safety

risk, Plaintiff Harries and members of the Missouri Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 57**
**Missouri Merchandising Practices Act ("MMPA"),**
**Mo. Rev. Stat. § 407.010, et seq.**
**(on behalf of Plaintiff Harries and the Missouri Sub-Class Against Defendants Joyson and General Motors)**

953.    Plaintiff Harries incorporates and re-alleges each preceding paragraph as though fully set forth herein.

954.    Plaintiff Harries brings this claim on behalf of himself and the Missouri Sub-Class.

955.    Plaintiff, the Missouri Sub-Class, and General Motors and Joyson are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

956.    General Motors and Joyson engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

957.    The Missouri Merchandising Practices Act ("MMPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.1.

958.    In the course of its business, General Motors and Joyson willfully failed to disclose and actively concealed the dangerous risks posed by the many safety

276

issues and the serious Inflator Defect discussed above. General Motors and Joyson compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

959.    By failing to disclose the Inflator Defect or facts about the Inflator Defect described herein known to them or that were available to General Motors and Joyson upon reasonable inquiry, General Motors and Joyson deprived consumers of all material facts about the safety and functionality of their vehicle. By failing to release material facts about the Inflator Defect, General Motors and Joyson curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. 15 Mo. Code of Serv. Reg. § 60-9.110.

960.    Moreover, General Motors and Joyson have otherwise engaged in activities with a tendency or capacity to deceive. General Motors and Joyson also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

961.   General Motors and Joyson have known of the Inflator Defect well before issuing formal recalls. General Motors and Joyson failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

962.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, General Motors and Joyson engaged in unfair or deceptive business practices in violation of the MMPA.

963.   General Motors and Joyson deliberately withheld the information about the propensity of the Defective Airbags to spontaneously explode, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

964.   In the course of General Motors' and Joyson's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. General Motors and Joyson compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

278

965.   General Motors' and Joyson's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Plaintiff, about the true safety and reliability of his Class Vehicle and/or the Defective Airbag installed in it, as well as the quality and the true value of the Class Vehicles.

966.  General Motors and Joyson intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the Plaintiff Harries and members of the Missouri Sub-Class, including without limitation by failing to disclose the Inflator Defect in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences or representations being made by General Motors and Joyson about the safety or reliability of the Class Vehicles and/or the Defective Airbags installed in them. Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of Serv. Reg. § 60-9.090.

967.  Because General Motors and Joyson knew or believed that their statements regarding safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them were not in accord with the facts and/or had no reasonable basis for such statements in light of their knowledge of the Inflator Defect,

Defendants engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of Serv. Reg. § 60-9.100.

968.   General Motors' and Joyson's conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles were inherently defective and dangerous in that the Defective Airbags contain inflators are prone to explode, even without air-bag deployment, and maim or kill drivers and passengers. Such acts are unfair practices in violation of 15 Mo. Code of Serv. Reg. § 60-8.020.

969.   General Motors and Joyson knew or should have known that its conduct violated the MMPA.

970.   As alleged above, General Motors and Joyson made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. General Motors' and Joyson's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

971.   To protect profits and to avoid remediation costs and a public relations nightmare, General Motors and Joyson concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to

buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

972.   General Motors and Joyson owed Plaintiff Harries and members of the Missouri Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiff Harries and members of the Missouri Sub-Class; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff Harries, and members of the Missouri Sub-Class, that contradicted these representations.

973.   Because General Motors and Joyson fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by General Motors' and Joyson's conduct, they are now worth significantly less than they otherwise would be.

974.   General Motors' and Joyson's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiff Harries and members of the Missouri Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an

otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

975.    Plaintiff Harries and members of the Missouri Sub-Class suffered ascertainable loss caused by General Motors' and Joyson's misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and General Motors' and Joyson's complete disregard for safety, Plaintiff Harries and members of the Missouri Sub-Class either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. Plaintiff Harries and members of the Missouri Sub-Class did not receive the benefit of their bargain as a result of General Motors' and Joyson's misconduct.

976.    General Motors' and Joyson's violations present a continuing risk to Plaintiff, to the Missouri Sub-Class, as well as to the general public. General Motors' and Joyson's unlawful acts and practices complained of herein affect the public interest.

977.    The repairs instituted by General Motors and Joyson, if any, have not been adequate.

978.    As a direct and proximate result of General Motors' and Joyson's violations of the MMPA, Plaintiff Harries and members of the Missouri Sub-Class have suffered injury in-fact and/or actual damage.

979.    General Motors and Joyson are liable to the Plaintiff Harries and members of the Missouri Sub-Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining General Motors' and Joyson's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT 58
## Breach of Express Warranty
### (On behalf of Plaintiff Harries and the Missouri Sub-Class Against Defendant General Motors)

980.    Plaintiff Harries incorporates and re-alleges each preceding paragraph as though fully set forth herein.

981.    Plaintiff Harries brings this count on behalf of himself and the Missouri Sub-Class.

982.    General Motors marketed the Class Vehicles as safe, built to last and reliable vehicles. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiff Harries and members of the Missouri Sub-Class.

983.    General Motors is and was at all relevant times a "merchant" with respect to of motor vehicles under Mo. Rev. Stat. § 400.2-104(1), and a "seller" of motor vehicles under Mo. Rev. Stat. § 400.2-103(1)(d).

984.    With respect to leases, General Motors is and was at all relevant times a "lessor" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p).

985.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. §§ 400.2-105(1) and 400.2A-103(1)(h).

986.    General Motors marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that General Motors would stand behind the quality of its products and promptly repair any Defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiff Harries and members of the Missouri Sub-Class.

987.    Under the warranties provided to Plaintiff Harries and members of the Missouri Sub-Class, General Motors promised to repair or replace covered components arising out of Defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. For illustrative purposes, General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles.  As alleged herein, General Motors breached these warranties.

988.   General Motors breached the express warranty promising to repair and correct a manufacturing Defect or Defect in materials or workmanship of any parts it supplied.

989.   On information and belief, General Motors have not suitably repaired or replaced the Defective Airbags for Plaintiff Harries and members of the Missouri Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

990.   General Motors further breached their express warranties by selling Class Vehicles that were Defective with respect to materials, workmanship, design and manufacture.

991.   Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing Defects which cause a failure to deploy the airbags as warranted.

992.   Plaintiff Harries and members of the Missouri Sub-Class have had sufficient direct dealings with General Motors or its agents, its authorized dealerships, to establish privity of contract between General Motors, on the one hand, and Plaintiff Harries and members of the Missouri Sub-Class, on the other hand.   Nonetheless, privity is not required here because Plaintiff Harries and members of the Missouri Sub-Class are intended third-party beneficiaries of

contracts between General Motors and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

993. General Motors was provided notice of the Inflator Defect by its engineers, numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and through its own testing. Affording General Motors a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because General Motors has known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defective Airbags within a reasonable time.

994. Any attempt by General Motors to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because they knowingly sold or leased a Defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff Harries and members of the Missouri Sub-Class. Among other things, Plaintiff Harries and members of the Missouri Sub-Class did not determine these time limitations, the terms of which

unreasonably favored General Motors.  A gross disparity in bargaining power existed between General Motors and members of the Classes, and General Motors knew or should have known that the Class Vehicles were Defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

995.  Further, the limited warranty promising to repair and/or correct a manufacturing Defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Harries and members of the Missouri Sub-Class whole because, on information and belief, General Motors has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

996.  General Motors knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff Harries and members of the Missouri Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

997.  General Motors' warranties formed a basis of the bargain that was reached when Plaintiff Harries and members of the Missouri Sub-Class purchased or leased their Class Vehicles.

998.  Plaintiff Harries and members of the Missouri Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by General Motors.  Despite the existence of the warranties, General Motors failed to

287

inform Plaintiff Harries and members of the Missouri Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods.

999.    Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

1000. As a direct and proximate result of General Motors' breach of express warranties, Plaintiff Harries and members of the Missouri Sub-Class have been damaged in an amount to be determined at trial.

1001. Finally, because of General Motors' breach of express warranty as set forth herein, Plaintiff Harries and members of the Missouri Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Harries and members of the Missouri Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT 59
### Breach of the Implied Warranty of Merchantability
### Mo. Ann. Stat. § 400.2-314
### (on behalf of Plaintiff Harries and the Missouri Sub-Class Against Defendant General Motors)

1002. Plaintiff Harries incorporates and re-alleges each preceding paragraph as though fully set forth herein.

288

1003. Plaintiff Harries brings this claim on behalf of himself and the Missouri Sub-Class.

1004. General Motors is and are at all relevant times a merchant with respect to motor vehicles and/or airbags within the meaning of Mo. Ann. Stat. § 400.2-314(1).

1005. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mo. Ann. Stat. § 400.2-314.

1006. The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags contain inflators that are prone to explode, even without air-bag deployment, and maim or kill drivers and passengers.

1007. General Motors was provided notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, and by internal investigations.

1008. As a direct and proximate result of General Motors' breach of the warranties of merchantability, Plaintiff Harries and members of the Missouri Sub-Class have been damaged in an amount to be proven at trial.

## XVI.  <u>NEW JERSEY COUNTS</u>

### COUNT 60
**Violation of the Magnuson-Moss Warranty Act ("MMWA")**
**15 U.S.C. § 2301 *et seq.***
**(on behalf of Plaintiffs and the Nationwide Class, or alternatively, on behalf of**
**Plaintiffs Hunter, Jones, Bocchino, and Sager and the New Jersey Sub-Class**
**Against Defendants General Motors and FCA)**

1009.  Plaintiffs Hunter, Jones, Bocchino, and Sager incorporate and re-allege each preceding paragraph as though fully set forth herein.

1010.  Plaintiffs Hunter, Jones, Bocchino, and Sager bring this count on behalf of themselves and the members of the Nationwide Class or, alternatively, on behalf of the California Sub-Class.

1011.  Plaintiffs Hunter, Jones, Bocchino, and Sager satisfy the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

1012.  Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1013.  Each Truck Manufacturer is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1014.  The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1015. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. See 15 U.S.C. § 2310(d)(1).

1016. Truck Manufacturers provided Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes, Truck Manufacturers promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles. As alleged herein, Truck Manufacturers breached these warranties.

1017. Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes experienced the Inflator Defect within the warranty periods but Truck Manufacturers failed to inform Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes of the existence of the Inflator Defect and associated safety risk, and failed to provide a suitable remedy or repair of the Inflator Defect free of charge within a reasonable time.

1018. Truck Manufacturers were provided notice by letter dated November 8, 2021, that Plaintiffs would pursue a claim under the MMWA on behalf of a class.

1019. Any attempt by Truck Manufacturers to disclaim or limit its express or implied warranties is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitations are unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Truck Manufacturers' warranty periods are also unconscionable and inadequate to protect Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes. Among other things, Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that they posed a safety risk.

1020. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

1021. Truck Manufacturers breached these warranties by failing to disclose and fraudulently concealing information regarding the standard, quality, or grade of the Class Vehicles and/or the presence of the Inflator Defect and corresponding safety risk. Without limitation, the Class Vehicles share a common defect in design, material, manufacturing, and/or workmanship that fails to operate as represented by Truck Manufacturers and presents a safety risk.

1022. Affording Truck Manufacturers a reasonable opportunity to cure its breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Truck Manufacturers knew, or was reckless in not knowing, of the material omissions concerning the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, but failed to repair or replace the Inflator Defect and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs Hunter, Jones, Bocchino, and Sager resort to an informal dispute resolution procedure and/or afford Truck Manufacturers a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

1023. Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to Truck Manufacturers. Thus, Plaintiffs Hunter, Jones, Bocchino, and Sager and members of the Classes have not re-accepted their Class Vehicles by retaining them.

1024. The amount in controversy of Plaintiffs Hunter, Jones, Bocchino, and Sager's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1025. Plaintiffs Hunter, Jones, Bocchino, and Sager, individually and on behalf of members of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 61
### Fraud by Omission or Fraudulent Concealment
### (on behalf of Plaintiffs Hunter, Jones, Bocchino and Sager and the New Jersey Sub-Class Against All Defendants)

1026. Plaintiffs Hunter, Jones, Bocchino and Sager re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1027. Plaintiffs Hunter, Jones, Bocchino and Sager bring this claim on behalf of themselves and the New Jersey Sub-Class.

1028. Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the Defect installed in Class Vehicles is defective, exposing drivers and occupants to safety risk with the intent that Plaintiffs Hunter, Jones, Bocchino and members of the New Jersey Sub-Class rely on Defendants' misrepresentations and omissions. As a direct result of Defendants' fraudulent conduct, members of the Classes have suffered actual damages.

1029. Defendants intentionally and knowingly concealed and suppressed material facts from regulators and consumers regarding the Inflator Defect that causes the airbags to spontaneously deploy.

1030. A reasonable consumer would not have expected that the Class Vehicles contain inflators are prone to explode, even without air-bag deployment, and maim or kill drivers and passengers. Defendants knew that reasonable consumers expect that their vehicle has working airbags, and would rely on those facts in deciding whether to purchase, lease, or retain a new or used motor vehicle. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

1031. Defendants ensured that Plaintiffs Hunter, Jones, Bocchino and Sager and the members of the New Jersey Sub-Class did not discover this information through actively concealing it and misrepresenting the Class Vehicles' safety systems without disclosing the truth. Defendants intended for Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class to rely on their omissions—which they did by purchasing and leasing the Class Vehicles at the prices they paid.

1032. Defendants had a duty to disclose the Inflator Defect because:

a.      Defendants had exclusive and/or far superior knowledge and access to the facts about this hidden and complex safety Defect. Defendants also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class;

      b.      Defendants knew the Inflator Defect (and its safety risks) was a material fact that would affect Plaintiffs Hunter, Jones, Bocchino and Sager's and members of the New Jersey Sub-Class's decisions to buy or lease Class Vehicles;

      c.      Defendants are subject to statutory duties to disclose known safety Defects to consumers and NHTSA; and

      d.      Defendants made incomplete representations about the safety and reliability of the Class Vehicles and their passenger safety systems, while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class that the Class Vehicles contained the dangerous Inflator Defect. Because they volunteered to provide information about the Class Vehicles that they offered for sale to Plaintiffs and the Class, Defendants had the duty to disclose the whole truth. They did not.

1033. To this day, Defendants have not made full and adequate disclosure, continue to defraud Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class, and continue to conceal material information regarding the Inflator Defect. The omitted and concealed facts were material because a reasonable person would find them important in purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class

Vehicles purchased or leased by Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class.

1034. Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect profits, and to avoid recalls that would hurt the brand's image and cost money. They did so at the expense of Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class. Had they been aware of the Inflator Defect in the Class Vehicles, and Defendants' callous disregard for safety, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class either would not have paid as much as they did for their Class Vehicles, or they would not have purchased or leased them.

1035. Accordingly, Defendants are liable to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

1036. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of Plaintiffs Hunter, Jones, Bocchino and Sager's and members of the New Jersey Sub-Class's rights and well-being; and to enrich themselves. Their misconduct warrants an assessment of punitive damages

297

in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT 62
### Unjust Enrichment
**(on behalf of Plaintiffs Hunter, Jones, Bocchino and Sager and the New Jersey Sub-Class Against All Defendants)**

1037. Plaintiffs Hunter, Jones, Bocchino and Sager re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1038. Plaintiffs Hunter, Jones, Bocchino and Sager assert this count on behalf of themselves and the New Jersey Sub-Class.

1039. Because of their conduct, Defendants caused damages to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class.

1040.  Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class conferred a benefit on the Defendants by overpaying for Class Vehicles at prices that were artificially inflated by Defendants' concealment of the Inflator Defect and misrepresentations regarding the Class Vehicles' safety.

1041. As a result of Defendants' fraud and deception, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class were not aware of the facts concerning the Class Vehicles and did not benefit from the Defendants' misconduct.

1042. Defendants knowingly benefitted from their unjust conduct. They sold and leased Class Vehicles equipped with an Inflator Defect for more than what the

vehicles were worth, at the expense of Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class.

1043. Defendants readily accepted and retained these benefits from Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class.

1044. It is inequitable and unconscionable for Defendants to retain these benefits because they misrepresented that the Class Vehicles were safe, and intentionally concealed, suppressed, and failed to disclose the Inflator Defect to consumers. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class would not have purchased or leased the Class Vehicles or paid less for them had Defendants not concealed the Inflator Defect.

1045. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class do not have an adequate remedy at law.

1046. Equity cannot in good conscience permit the Defendants to retain the benefits that they derived from Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of the Defendants' unjust enrichment is necessary.

**COUNT 63**
**Violation of the New Jersey Consumer Fraud Act ("NJCFA")**
**N.J. Stat. Ann. § 56:8-2,** *et seq.*
**(on behalf of Plaintiffs Hunter, Jones, Bocchino and Sager and the New Jersey**
**Sub-Class Against All Defendants)**

1047. Plaintiffs Hunter, Jones, Bocchino and Sager incorporate and re-allege

each preceding paragraph as though fully set forth herein.

1048. Plaintiffs Hunter, Jones, Bocchino and Sager bring this count on behalf

of themselves and the New Jersey Sub-Class against all Defendants.

1049. The NJCFA prohibits:

> [t]he act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false promise,
> misrepresentation, or the knowing, concealment, suppression, or
> omission of any material fact with intent that others rely upon such
> concealment, suppression or omission, in connection with the sale or
> advertisement of any merchandise or real estate, or with the subsequent
> performance of such person as aforesaid, whether or not any person has
> in fact been misled, deceived or damaged thereby, is declared to be an
> unlawful practice . . . .

N.J. Stat. Ann. § 56:8-2.

1050. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New

Jersey Sub-Class are consumers who purchased or leased Class Vehicles for

personal, family, or household use.

1051. In violation of the NJCFA, Defendants employed unconscionable

commercial practices, deception, fraud, false pretense and/or false promise by

providing Class Vehicles that contain the Inflator Defect and present an undisclosed

safety risk to drivers and occupants of the Class Vehicles. Further, Defendants misrepresented the standard, quality or grade of the Class Vehicles which were sold or leased with the latent Defect and failed to disclose the Inflator Defect and corresponding safety risk in violation of the NJCFA.

1052. Defendants' misrepresentations and fraudulent omissions were material to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class. When Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Defective Airbags would not pose an unavoidable safety risk. Had Defendants disclosed that the Defective Airbags was prone to an unavoidable safety risk, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey State Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

1053. Further, had Defendants disclosed that about the Defective Airbags in the Class Vehicles, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class would have demanded repair or replacement during the warranty periods at no cost to Plaintiffs and members of the Classes—as provided for in Defendants' warranties.

1054. Defendants knowingly concealed, suppressed and/or omitted the existence of the Inflator Defect and safety risk in the Class Vehicles at the time of sale or lease and at all relevant times thereafter.

1055. Defendants unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent Defect and corresponding safety risk.

1056. Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class because Defendants possessed superior and exclusive knowledge regarding the Defect and the risks associated with the Defective Airbags' failure. Rather than disclose the Defect, Defendants intentionally concealed the Defect with the intent to mislead Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Defective Airbags to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class.

1057. Had Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class known about the Inflator Defect at the time of purchase, including the safety hazard posed by the Defect, they would not have bought the Class Vehicles or would have paid much less for them.

1058. The repairs instituted by Defendants, if any, have not been adequate.

1059. As a direct and proximate result of Defendants' wrongful conduct in violation of the NJCFA, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class have suffered and continue to suffer harm by the threat of the unexpected failure of the Defective Airbags and/or actual damages in the amount of the cost to replace the Defective Airbags, and damages to be determined at trial. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class have also suffered the ascertainable loss of the diminished value of their vehicles.

1060. As a result of Defendants' fraudulent and/or deceptive conduct, misrepresentations and/or knowing omissions, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial. *See* N.J. Stat. Ann. § 56:8-19. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class also seek an order enjoining Defendants' unlawful, fraudulent and/or deceptive practices, and any other just and proper declaratory or equitable relief available under the NJCFA. *See* N.J. Stat. Ann. § 56:8-19.

**COUNT 64**
**Breach of Express Warranty**
**N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-210**
**(on behalf of Plaintiffs Hunter, Jones, Bocchino and Sager and the New Jersey Sub-Class Against Defendants General Motors and FCA)**

1061. Plaintiffs Hunter, Jones, Bocchino and Sager incorporate and re-allege each preceding paragraph as though fully set forth herein.

1062. Plaintiffs Hunter, Jones, Bocchino and Sager bring this claim on behalf of themselves and the New Jersey State Class.

1063. Truck Manufacturers are and were at all relevant times "merchants" under N.J. Stat. Ann. § 12A:2-104(1), and "sellers" and "lessors" of motor vehicles and/or automotive parts under § 12A:2-103(1)(d) and § 12A:2A-103(1)(p).

1064. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

1065. Truck Manufacturers provided Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class with one or more express warranties.

1066. Truck Manufacturers marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that Truck Manufacturers would stand behind the quality of their products and promptly repair any Defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiffs Hunter, Jones, Bocchino and members of the New Jersey State Class.

304

1067. Under the warranties provided to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class, Truck Manufacturers promised to repair or replace covered components arising out of Defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. For illustrative purposes, Defendant General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Defendant FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles. Under the warranties provided to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class, Truck Manufacturers promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Truck Manufacturers breached these warranties.

1068. Truck Manufacturers breached the express warranty promising to repair and correct a manufacturing Defect or Defect in materials or workmanship of any parts they supplied.

1069. On information and belief, Truck Manufacturers have not suitably repaired or replaced the Defective Airbags for Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

1070. Truck Manufacturers further breached their express warranties by selling Class Vehicles that were Defective with respect to materials, workmanship, design and manufacture.

1071. Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing Defects which cause a failure to deploy the airbags as warranted.

1072. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents, their authorized dealerships, to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the

Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1073. Truck Manufacturers were provided notice of the Inflator Defect by their engineers, numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording Truck Manufacturers a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because Truck Manufacturers have known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defective Airbags within a reasonable time.

1074. Any attempt by Truck Manufacturers to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitation is unenforceable because they knowingly sold or leased a Defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class. Among other things, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed

between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class Vehicles were Defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1075. Further, the limited warranty promising to repair and/or correct a manufacturing Defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class whole because, on information and belief, Truck Manufacturers have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1076. Truck Manufacturers knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1077. Truck Manufacturers' warranties formed a basis of the bargain that was reached when Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class purchased or leased their Class Vehicles.

1078. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Truck Manufacturers.  Despite the existence of the

warranties, Truck Manufacturers failed to inform Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods.

1079. Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

1080. As a direct and proximate result of Truck Manufacturers' breach of express warranties, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class have been damaged in an amount to be determined at trial.

1081. Finally, because of Truck Manufacturers' breach of express warranty as set forth herein, Plaintiff Sager and members of the New Jersey Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT 65**
**Breach of Implied Warranty of Merchantability**
**N.J. Stat. Ann. §§ 12A:2-314, 12A:2A-103, and 12A:2A-212**
**(On Behalf of Plaintiffs Hunter, Jones, Bocchino, and Sager and the New**
**Jersey Sub-Class Against Defendants General Motors and FCA)**

1082. Plaintiffs Hunter, Jones, Bocchino and Sager incorporate and re-allege each preceding paragraph as though fully set forth herein.

1083. Plaintiffs Hunter, Jones, Bocchino and Sager brings this claim on behalf of themselves and the New Jersey Sub-Class against all Defendants.

1084. Truck Manufacturers are and were at all relevant times "merchants" with respect to motor vehicles and/or automotive parts under N.J. Stat. Ann.§ 12A:2-104(1), and "sellers" and "lessors" of motor vehicles and/or automotive parts under § 12A:2-103(1)(d) and § 12A:2A-103(1)(p).

1085. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

1086. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class purchased or leased the Class Vehicles from Truck Manufacturers by and through Truck Manufacturers' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Truck Manufacturers were the manufacturers, distributors, warrantors and/or sellers of Class Vehicles. Truck

Manufacturers knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

1087. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

1088. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent Defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Truck Manufacturers breached their implied warranty of merchantability.

1089. Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents, their authorized dealerships, to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey State Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their

implied warranties.  The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1090. Truck Manufacturers were provided notice of the Inflator Defect by their engineers, numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording Truck Manufacturers a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Truck Manufacturers have known of and concealed the Inflator Defect and, on information and belief, have refused to repair or replace the Defective Airbags within a reasonable time.

1091. As a direct and proximate result of Truck Manufacturers' breach of the implied warranty of merchantability, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class have been damaged in an amount to be proven at trial.

1092. Any attempt by Truck Manufacturers to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitation is unenforceable because they knowingly sold or leased a Defective product without informing consumers about the Defect.  The time limits contained in Truck

312

Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class.  Among other things, Plaintiffs Hunter, Jones, Bocchino and Sager and members of the New Jersey Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers.  A gross disparity in bargaining power existed between Truck Manufacturers and members of the New Jersey Sub-Class, and Truck Manufacturers knew or should have known that the Class Vehicles were Defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

## XVII. <u>NEW YORK COUNTS</u>

**COUNT 66**
**Violation Of The Magnuson-Moss Warranty Act ("MMWA"),**
**15 U.S.C. § 2301,** ***et seq.***
**(On Behalf Of Plaintiffs Mace and Laine and the Nationwide Class Or, Alternatively, On Behalf Of Plaintiffs Mace and Laine and the New York Sub-Class Against Defendants General Motors and FCA)**

1093. Plaintiffs Mace and Laine incorporate and re-allege each preceding paragraph as though fully set forth herein.

1094. Plaintiffs Mace and Laine bring this count on behalf of themselves and the Nationwide Class or, alternatively, on behalf of themselves and the members of the New York Sub-Class.

1095. Plaintiffs Mace and Laine satisfy the MMWA jurisdictional requirement because they allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

1096. Plaintiffs Mace and Laine and members of the New York Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1097. Truck Manufacturers are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1098. The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1099. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

1100. Truck Manufacturers provided Plaintiffs Mace and Laine and members of the New York Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, Truck Manufacturers promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, Truck

Manufacturers knew or should have known that the majority of failures occur outside of the warranty periods.

1101. Any attempt by Truck Manufacturers to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Mace and Laine and members of the New York Sub-Class. Among other things, Plaintiffs Mace and Laine and members of the New York Sub-Class did not determine these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

1102. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

1103. Truck Manufacturers breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the

315

Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by Truck Manufacturers.

1104. Plaintiffs Mace and Laine and members of the New York Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents (dealerships) to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Mace and Laine and members of the New York Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Mace and Laine and each of the other members of the Classes are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1105. Affording Truck Manufacturers a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Truck Manufacturers knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but

failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs Mace and Laine resort to an informal dispute resolution procedure and/or afford Truck Manufacturers a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

1106. Plaintiffs Mace and Laine and members of the New York Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to Truck Manufacturers. Thus, Plaintiffs Mace and Laine and members of the New York Sub-Class have not re-accepted their Class Vehicles by retaining them.

1107. Truck Manufacturers were provided notice by letter dated November 8, 2021 that Plaintiffs Mace and Laine would pursue claims on behalf of a class.

1108. The amount in controversy of Plaintiffs Mace and Laine's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1109. Plaintiffs Mace and Laine, individually and on behalf of the Classes, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

**COUNT 67**
**Fraudulent Concealment**
**(On Behalf Of Plaintiffs Mace and Laine and the New York Sub-Class Against All Defendants)**

1110. Plaintiffs Mace and Laine incorporate and re-allege each preceding paragraph as though fully set forth herein.

1111. Plaintiffs Mace and Laine bring this claim on behalf of themselves and the members of the New York Sub-Class.

1112. Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiffs Mace and Laine and members of the New York Sub-Class rely on Defendants' misrepresentations and omissions. As a direct result of Defendants' fraudulent conduct, members of the Classes have suffered actual damages.

1113. Defendants knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To date, Defendants have not provided Plaintiffs Mace and Laine and members of the New York Sub-Class with a repair or remedy for the Inflator Defect.

1114. Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs Mace and Laine and members of the New

York Sub-Class because Defendants possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the Defect, Defendants intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

1115. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiffs Mace and Laine and members of the New York Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

1116. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

1117. Plaintiffs Mace and Laine and members of the New York Sub-Class would not have purchased the Class Vehicles but for Defendants' omissions and

concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect, or would have paid less for them.

1118. Defendants knew their false misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiffs Mace and Laine and members of the New York Sub-Class from seeking replacement or repair of the airbags within the warranty periods. Further, Defendants intended to induce Plaintiffs Mace and Laine and members of the New York Sub-Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the airbags within the warranty periods, thereby unlawfully transferring the cost of repair or replacement from Defendants to Plaintiffs Mace and Laine members of the New York Sub-Class, in order to decrease costs and increase profits.

1119. Defendants acted with malice, oppression, and fraud.

1120. Plaintiffs Mace and Laine and members of the New York Sub-Class reasonably relied upon Defendants' knowing, affirmative and active false representations, concealment and omissions. As a direct and proximate result of Defendants' false representations, omissions and active concealment of material facts regarding the Inflator Defect, Plaintiffs Mace and Laine and members of the

New York Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 68**
**Violation Of The New York General Business Law, ("Nygbl"),**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf Of Plaintiffs Mace and Laine and the New York Sub-Class**
**Against All Defendants)**

1121. Plaintiffs Mace and Laine incorporate and re-allege each preceding paragraph as though fully set forth herein.

1122. Plaintiffs Mace and Laine bring this count on behalf of themselves and members of the New York Sub-Class.

1123. Plaintiffs Mace and Laine and members of the New York Sub-Class purchased or leased their Class Vehicles for personal or household use.

1124. Plaintiffs Mace and Laine and members of the New York Sub-Class are permitted to bring this action for injunctive relief and actual damages under the NYGBL. *See* N.Y. GEN. BUS. LAW § 349(h).

1125. Defendants are engaged in the conduct of "business, trade or commerce" within the meaning of the NYGBL. *See* N.Y. GEN. BUS. LAW § 349(a).

1126. The NYGBL prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." *See* N.Y. GEN. BUS. LAW § 349(a).

1127. Defendants violated the NYGBL by engaging in deceptive acts or practices directed to consumers in connection with the sale and/or lease of Class Vehicles.

1128. Defendants knowingly concealed, suppressed and/or omitted material facts regarding the Inflator Defect and its corresponding safety risk, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiffs Mace and and Laine members of the New York Sub-Class. Plaintiffs Mace and Laine and members of the New York Sub-Class could not reasonably have known about the Inflator Defect and its corresponding safety risk as the information was in the superior and exclusive control of Defendants.

1129. Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Inflator Defect with the intent to mislead Plaintiffs Mace and Laine and members of the New York Sub-Class. Defendants knew, or should have known, that the Inflator Defect was a latent defect and that the airbags were likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Inflator Defect in the Class Vehicles could pose a safety risk.

1130. Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs Mace and Laine and members of the New York Sub-Class because they possessed superior and exclusive knowledge regarding

the Defect and the risks associated with the airbag. Rather than disclose the Defect, Defendants engaged in deceptive acts or practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the airbags to Plaintiffs Mace and Laine and members of the New York Sub-Class.

1131. Defendants' deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Inflator Defect were intended to mislead consumers, were misleading to reasonable consumers, and misled Plaintiffs Mace and Laine and members of the New York Sub-Class.

1132. At all relevant times, Defendants' deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the Inflator Defect and its corresponding safety risk were material to Plaintiffs Mace and Laine and members of the New York Sub-Class. When Plaintiffs Mace and Laine and members of the New York Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' airbags were free from latent defects and would last beyond the periods of the manufacturer's warranties. Had Defendants disclosed that the airbags were prone to premature failure and/or an unavoidable safety risk, Plaintiffs Mace and Laine and members of the New York Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles. Further, had Defendants disclosed that the airbags in the Class Vehicles would not last beyond the warranty periods without need for repair

or replacement, Plaintiffs Mace and Laine and members of the New York Sub-Class would have demanded repair or replacement during the warranty periods at no cost—as provided for in Defendants' warranties.

1133. Defendants had a continuous duty to Plaintiffs Mace and Laine and members of the New York Sub-Class to refrain from unfair and deceptive practices under the NYGBL and to disclose the Inflator Defect. Defendants' deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Inflator Defect and corresponding safety risk are substantially injurious to consumers. As a result of Defendants' knowing, intentional concealment, suppression and/or omission of the Inflator Defect in violation of the NYGBL, Plaintiffs Mace and Laine and members of the New York Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the airbags and/or actual damages in the amount of the cost to replace the airbags and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive acts or practices in the course of their business.

1134. Defendants' deceptive acts or practices occurred in the conduct of business, trade or commerce.

1135. Defendants have knowingly and willfully engaged in the deceptive acts or practices alleged herein. Further, Defendants unconscionably marketed the Class

324

Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

1136. Defendants' deceptive acts or practices affect the public interest and present a continuing safety risk to Plaintiffs Mace and Laine and members of the New York Sub-Class as well as the public.

1137. The repairs instituted by Defendants, if any, have not been adequate.

1138. As a direct and proximate result of Defendants' violations of the NYGBL, Plaintiffs Mace and Laine and members of the New York Sub-Class have suffered actual damages and/or injury in fact.

1139. As a result of Defendants' unlawful conduct, Plaintiffs Mace and Laine and members of the New York Sub-Class are entitled to actual damages, treble damages, costs of litigation, attorneys' fees, injunctive and other equitable relief. *See* N.Y. GEN. BUS. LAW § 349(h).

**COUNT 69**
**Breach Of Express Warranty,**
**N.Y. U.C.C. Law §§ 2-313, 2a-103, and 2a-210**
**(On Behalf Of Plaintiffs Mace and Laine and the New York Sub-Class**
**Against Defendants FCA and General Motors)**

1140. Plaintiffs Mace and Laine incorporate and re-allege each preceding paragraph as though fully set forth herein.

1141. Plaintiffs Mace and Laine bring this count on behalf of themselves and the New York Sub-Class.

1142. Truck Manufacturers are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. U.C.C. LAW § 2-104(1), and "sellers" and "lessors" of motor vehicles under § 2-103(1)(d) and § 2A-103(1)(p).

1143. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. LAW §§ 2-105(1) and 2A-103(1)(h).

1144. Truck Manufacturers provided Plaintiffs Mace and Laine and members of the New York Sub-Class with one or more express warranties. For illustrative purposes, Defendant General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Defendant FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles. Under the warranties provided to Plaintiffs Mace and Laine and members of the New York Sub-Class, Truck Manufacturers promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Truck Manufacturers breached these warranties.

1145. Under warranties provided to members of the Classes, Truck Manufacturers promised to repair or replace covered defective airbag components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, Truck Manufacturers knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

1146. Under the warranties provided to Plaintiffs Mace and Laine and members of the New York Sub-Class, Truck Manufacturers promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Truck Manufacturers breached these warranties.

1147. Truck Manufacturers' warranties formed a basis of the bargain that was reached when Plaintiffs Mace and Laine and members of the New York Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, Truck Manufacturers knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

1148. Plaintiffs Mace and Laine and members of the New York Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were

known and concealed by Truck Manufacturers. Despite the existence of the warranties, Truck Manufacturers failed to adequately inform Plaintiffs Mace and Laine and members of the New York Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

1149. Truck Manufacturers breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

1150. On information and belief, Truck Manufacturers have not suitably repaired or replaced the Defective Airbags free of charge for Plaintiffs Mace and Laine and members of the New York Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

1151. Truck Manufacturers further breached their express warranties by selling Class Vehicles that were defective with respect to airbag materials, workmanship, design and manufacture.

1152. Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing defects which cause failures and/or failure to perform as warranted.

1153. Plaintiffs Mace and Laine and members of the New York Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents, their authorized dealerships, to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Mace and Laine and members of the New York Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Mace and Laine and each of the other members of the Classes are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1154. Truck Manufacturers were provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording Truck Manufacturers a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because Truck Manufacturers have known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defect free of charge within a reasonable time.

329

1155. Truck Manufacturers were further provided notice by Plaintiffs Mace and Laine of their breach of express warranties by letter dated November 8, 2021. Despite this notice, Truck Manufacturers have not cured their breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1156. Any attempt by Truck Manufacturers to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Mace and Laine and members of the New York Sub-Class. Among other things, Plaintiffs Mace and Laine and members of the New York Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1157. Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is

insufficient to make Plaintiffs Mace and Laine and members of the New York Sub-Class whole because, on information and belief, Truck Manufacturers have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1158. Truck Manufacturers knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiffs Mace and Laine and members of the New York Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1159. Truck Manufacturers' warranties formed a basis of the bargain that was reached when Plaintiffs Mace and Laine and members of the New York Sub-Class purchased or leased their Class Vehicles.

1160. Plaintiffs Mace and Laine and members of the New York Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Truck Manufacturers. Despite the existence of the warranties, Truck Manufacturers failed to inform Plaintiffs Mace and Laine and members of the New York Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiffs Mace and Laine and members of the New York Sub-Class.

1161. Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

1162. As a direct and proximate result of Truck Manufacturers' breach of express warranties, Plaintiffs Mace and Laine and members of the New York Sub-Class have been damaged in an amount to be determined at trial.

1163. Finally, because of Truck Manufacturers' breach of express warranty as set forth herein, Plaintiffs Mace and Laine and members of the New York Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs Mace and Laine and members of the New York Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT 70**
**Breach Of Implied Warranty Of Merchantability,**
**N.Y. U.C.C. §§ 2-314, 2a-103, and 2a-212**
**(On Behalf Of Plaintiffs Mace and Laine and the New York Sub-Class**
**Against Defendants FCA And General Motors)**

1164. Plaintiffs Mace and Laine incorporate and re-allege each preceding paragraph as though fully set forth herein.

1165. Plaintiffs Mace and Laine bring this count on behalf of themselves and the New York Sub-Class.

1166. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. U.C.C. LAW § 2-104(1), and "sellers" and "lessors" of motor vehicles under § 2-103(1)(d) and § 2A-103(1)(p).

1167. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. LAW §§ 2-105(1) and 2A-103(1)(h).

1168. Plaintiffs Mace and Laine and members of the New York Sub-Class purchased or leased the Class Vehicles from Truck Manufacturers by and through Truck Manufacturers' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Truck Manufacturers were the manufacturers, distributors, warrantors and/or sellers of Class Vehicles. Truck Manufacturers knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

1169. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.Y. U.C.C. LAW §§ 2-314 and 2A-212.

1170. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent

defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Truck Manufacturers breached their implied warranty of merchantability.

1171. Plaintiffs Mace and Laine and members of the New York Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents, their authorized dealerships, to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Mace and Laine and members of the New York Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Mace and Laine and each of the other members of the Classes are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1172. Truck Manufacturers were provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording Truck Manufacturers a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Truck Manufacturers have known of

and concealed the Inflator Defect and, on information and belief, have refused to repair or replace the Defective Airbags free of charge within a reasonable time.

1173. Truck Manufacturers were further provided notice by Plaintiffs Mace and Laine of their breach of implied warranties by letter dated November 8, 2021. Despite this notice, Truck Manufacturers have not cured their breach of implied warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1174. As a direct and proximate result of Truck Manufacturers' breach of the implied warranty of merchantability, Plaintiffs Mace and Laine and members of the New York Sub-Class have been damaged in an amount to be proven at trial.

1175. Any attempt by Truck Manufacturers to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Mace and Laine and members of the New York Sub-Class. Among other things, Plaintiffs Mace and Laine and members of the New York Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed between

Defendants and members of the New York Sub-Class, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1176. Plaintiffs Mace and Laine and members of the New York Sub-Class have been excused from performance of any warranty obligations as a result of Truck Manufacturers' conduct described herein.

1177. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

## COUNT 71
### Unjust Enrichment
### (On Behalf Of Plaintiffs Mace and Laine and the New York Sub-Class Against All Defendants)

1178. Plaintiffs Mace and Laine incorporate and re-allege each preceding paragraph as though fully set forth herein.

1179. Plaintiffs Mace and Laine bring this claim on behalf of themselves and the members of the New York Sub-Class.

1180. Plaintiffs Mace and Laine and members of the New York Sub-Class conferred a benefit on Defendants by leasing or purchasing the Class Vehicles. Defendants were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

1181. Defendants unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Inflator Defect in the Class Vehicles.

1182. As a proximate result of Defendants' false representations, omissions and concealment of the Inflator Defect in the Class Vehicles, and as a result of Defendants' ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiffs Mace and Laine and members of the New York Sub-Class. It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiffs Mace and Laine and members of the New York Sub-Class.

1183. Plaintiffs Mace and Laine and members of the New York Sub-Class are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

1184. Plaintiffs Mace and Laine and members of the New York Sub-Class seek an order requiring Defendants to disgorge their gains and profits to Plaintiffs Mace and Laine members of the New York Sub-Class, together with interest, in a manner to be determined by the Court.

## XVIII. <u>NORTH CAROLINA COUNTS</u>

### COUNT 72

**Violation Of The Magnuson-Moss Warranty Act ("MMWA"),
15 U.S.C. § 2301, *et seq.*
(On Behalf Of Plaintiffs and the Nationwide Class Or, Alternatively, On
Behalf Of Plaintiff Evans and the North Carolina Sub-Class Against
Defendant FCA)**

1185.  Plaintiff Evans incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1186.  Plaintiff Evans brings this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of himself and the members of the North Carolina Sub-Class.

1187.  Plaintiff Evans satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

1188.  Plaintiff Evans and members of the North Carolina Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1189.  FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1190.  The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1191. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

1192. FCA provided Plaintiff Evans and members of the North Carolina Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, FCA knew or should have known that the majority of failures occur outside of the warranty periods.

1193. Any attempt by FCA to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitations are unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Evans and members of the North Carolina Sub-Class. Among other things, Plaintiff Evans and members of the North Carolina Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and Defendant

knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

1194. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

1195. FCA breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by FCA.

1196. Plaintiff Evans and members of the North Carolina Sub-Class have had sufficient direct dealings with FCA or its agents (dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiff Evans and members of the North Carolina Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Evans and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were

designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1197. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, FCA knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Evans resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

1198. Plaintiff Evans and members of the North Carolina Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to FCA. Thus, Plaintiff Evans and members of the North Carolina Sub-Class have not re-accepted their Class Vehicles by retaining them.

1199. FCA was provided notice by letter dated November 8, 2021that Plaintiff Evans would pursue claims on behalf of a class.

1200.  The amount in controversy of Plaintiff Evans's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1201. Plaintiff Evans, individually and on behalf of the Classes, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 73
### Fraud By Omission Or Fraudulent Concealment
### (On Behalf Of Plaintiff Evans and the North Carolina Sub-Class Against Defendants Joyson and FCA)

1262. Plaintiff Evans incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1202. Plaintiff Evans asserts this count on behalf of himself and members of the North Carolina Sub-Class.

1203. Joyson and FCA intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiff Evans and members of the North Carolina Sub-Class rely on Joyson and FCA's

misrepresentations and omissions. As a direct result of Joyson and FCA's fraudulent conduct, members of the Classes have suffered actual damages.

1204. Joyson and FCA's knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To date, Joyson and FCA have not provided Plaintiff Evans and members of the North Carolina Sub-Class with a repair or remedy for the Inflator Defect.

1205. Joyson and FCA owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Evans and members of the North Carolina Sub-Class because Joyson and FCA possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the Defect, Joyson and FCA intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

1206. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiff Evans and members of the North Carolina Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

1207. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

1208. Plaintiff Evans and members of the North Carolina Sub-Class would not have purchased the Class Vehicles but for Joyson and FCA's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect, or would have paid less for the Class Vehicles.

1209. Joyson and FCA knew their false misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Joyson and FCA knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Evans and members of the North Carolina Sub-Class from seeking replacement or repair of the airbags within the warranty periods. Further, Joyson and FCA intended to induce Plaintiff Mills and members of the North Carolina Sub-Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the airbags within the warranty periods, thereby unlawfully transferring the cost of repair or replacement from Joyson and

FCA to Plaintiff Evans and members of the North Carolina Sub-Class, in order to decrease costs and increase profits.

1210. Joyson and FCA acted with malice, oppression, and fraud.

1211. Plaintiff Evans and members of the North Carolina Sub-Class reasonably relied upon Joyson and FCA's knowing, affirmative and active false representations, concealment and omissions. As a direct and proximate result of Joyson and FCA's false representations, omissions and active concealment of material facts regarding the Inflator Defect, Plaintiff Evans and members of the North Carolina Sub-Class have suffered actual damages in an amount to be determined at trial.

## COUNT 74

**Violation Of The North Carolina Unfair & Deceptive Trade Practices Act ("NCDTPA") N.C. Gen. Stat. § 75-1.1,** *et seq.*
**(On Behalf Of Plaintiff Evans and the North Carolina Sub-Class Against Defendants Joyson and FCA)**

1212. Plaintiff Evans incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1213. Plaintiff Evans brings this count on behalf of himself and the members of the North Carolina Sub-Class.

1214. Joyson and FCA engaged in "commerce" in North Carolina within the meaning of the NCDTPA. *See* N.C. GEN. STAT. § 75-1.1(b).

345

1215. The NCDTPA prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a).

1216. In violation of the NCDTPA, Joyson and FCA employed deceptive and/or unconscionable acts or practices, fraud, false pretense, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale and/or lease of Class Vehicles in North Carolina. Joyson and FCA knowingly concealed, suppressed and/or omitted material facts regarding the Inflator Defect and corresponding safety risk, and misrepresented the standard, quality, or grade of the Class Vehicles, which directly caused harm to Plaintiff Evans and members of the North Carolina Sub-Class.

1217. Joyson and FCA intentionally and knowingly misrepresented and omitted facts regarding the Inflator Defect with the intent to mislead Plaintiff Evans and members of the North Carolina Sub-Class. Joyson and FCA knew, or should have known, that the Inflator Defect was a latent defect and that the Inflator Defect was likely to fail outside of the periods of the manufacturer's warranties. Joyson and FCA also knew, or should have known, that the Inflator Defect in the Class Vehicles could pose a safety risk to occupants.

1218. Joyson and FCA owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Evans and members of the North Carolina Sub-

346

Class because it possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbag's failure. Rather than disclose the Defect, Joyson and FCA engaged in deceptive trade practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Inflator Defect and/or the airbag to Plaintiff Evans and members of the North Carolina Sub-Class.

1219. Joyson and FCA's unconscionable or deceptive acts or practices, affirmative misrepresentations, and/or material omissions regarding the Inflator Defect were intended to mislead consumers and misled Plaintiff Evans and members of the North Carolina Sub-Class.

1220. At all relevant times, Joyson and FCA's unconscionable or deceptive acts or practices, affirmative misrepresentations, and/or omissions regarding the Inflator Defect and its corresponding safety risk were material to Plaintiff Evans and members of the North Carolina Sub-Class. When Plaintiff Evans and members of the North Carolina Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would not contain the Inflator Defect and would not pose an unavoidable safety risk. Had Joyson and FCA disclosed that the Inflator Defect existed in the Class Vehicle and/or presented unavoidable safety risk, Plaintiff Evans and members of the North Carolina Sub-Class would not have purchased or leased the Class Vehicles or would

have paid less for their vehicles. Further, had Joyson and FCA disclosed that the Inflator Defect existed in the Class Vehicles and/or presented an unavoidable safety risk, Plaintiff Evans and members of the North Carolina Sub-Class would have demanded repair or replacement during the warranty periods at no cost—as provided for in Joyson and FCA's warranties.

1221. Joyson and FCA had a continuous duty to Plaintiff Evans and members of the North Carolina Sub-Class to refrain from unfair and deceptive practices under the NCDTPA and to disclose the Inflator Defect. Joyson and FCA's unconscionable or deceptive acts or practices, affirmative misrepresentations, and/or material omissions regarding the Inflator Defect and its corresponding safety risk are substantially injurious to consumers. As a result of Joyson and FCA's knowing, intentional concealment and/or omission of the Inflator Defect and corresponding safety risk in violation of the NCDTPA, Plaintiff Evans and members of the North Carolina Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the airbags and/or actual damages in the amount of the cost to replace the Inflator Defect, or the airbag, and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss of the benefit of the bargain they reached at the time of purchase or lease, and diminished value of their vehicles as a result of Joyson and FCA's deceptive and unfair acts and practices in the course of their business.

348

1222. Joyson and FCA's unlawful acts and practices occurred in the conduct of business activities and commerce.

1223. Joyson and FCA have knowingly and willfully engaged in the unfair and deceptive trade practices alleged herein. Further, Joyson and FCA unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

1224. Joyson and FCA's unlawful acts and practices affect the public interest and present a continuing safety risk to Plaintiff Evans and members of the North Carolina Sub-Class, as well as the public.

1225. The repairs instituted by Joyson and FCA, if any, have not been adequate.

1226. As a direct and proximate result of Joyson and FCA's violations of the NCDTPA, Plaintiff Evans and members of the North Carolina Sub-Class have suffered actual financial loss, actual damages, and/or injury-in-fact.

1227. Plaintiff Evans and members of the North Carolina Sub-Class seeks actual damages and treble damages against Defendants in an amount to be determined at trial because Joyson and FCA acted wantonly or with such conscious indifference to the consequences that malice may be inferred.

1228. Plaintiff Evans and members of the North Carolina Sub-Class also seek an order enjoining Joyson and FCA's unfair, unlawful, and/or deceptive practices, awarding costs and attorneys' fees, and any other just and proper relief available under the NCDTPA.

## COUNT 75

**Breach Of Express Warranty,**
**N.C. Gen. Stat. §§ 25-2-313 and 25-2a-103**
**(On Behalf Of Plaintiff Evans and the North Carolina Sub-Class Against**
**Defendant FCA)**

1229. Plaintiff Evans incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1230. Plaintiff Evans brings this count on behalf of himself and the North Carolina Sub-Class.

1231. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. GEN. STAT. § 25-2-104(1), and "sellers" of motor vehicles under § 25-2-103(1)(d).

1232. With respect to leases, FCA is a "lessor" of motor vehicles under N.C. GEN. STAT. § 25-2A-103(1)(p).

1233. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. GEN. STAT. §§ 25-2-105(1) and 25-2A-103(1)(h).

1234. FCA provided Plaintiff Evans and members of the North Carolina Sub-Class with one or more express warranties. For illustrative purposes, FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles.

1235. Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, FCA knew or should have known that the majority of airbag failures occur outside of the warranty periods.

1236. Under the warranties provided to Plaintiff Evans and members of the North Carolina Sub-Class, FCA promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, FCA breached these warranties.

1237. FCA's warranties formed a basis of the bargain that was reached when Plaintiff Evans and members of the North Carolina Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, FCA knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

1238. Plaintiff Evans and members of the North Carolina Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by FCA. Despite the existence of the warranties, FCA failed to adequately inform Plaintiff Evans and members of the North Carolina Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

1239. FCA breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

1240. On information and belief, FCA has not suitably repaired or replaced the Defective Airbags free of charge for Plaintiff Evans and members of the North Carolina Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

1241. FCA further breached its express warranties by selling Class Vehicles that were defective with respect to airbag materials, workmanship, design and manufacture.

1242. Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing defects which cause airbag failure and/or failure to perform as warranted.

352

1243. Plaintiff Evans and members of the North Carolina Sub-Class have had sufficient direct dealings with FCA or its agents, its authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Evans and members of the North Carolina Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Evans and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1244. FCA was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and through its own testing. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and has failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1245. FCA was further provided notice by Plaintiff Evans of its breach of express warranties by letter dated November 8, 2021. Despite this notice, FCA has

not cured its breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1246. Any attempt by FCA to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Evans and members of the North Carolina Sub-Class. Among other things, Plaintiff Evans and members of the North Carolina Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1247. Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Evans and members of the North Carolina Sub-Class whole because, on information and belief, FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1248. FCA knew that the Class Vehicles were inherently defective and did not conform to its warranties, and Plaintiff Evans and members of the North Carolina

354

Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1249. FCA's warranties formed a basis of the bargain that was reached when Plaintiff Evans and members of the North Carolina Sub-Class purchased or leased their Class Vehicles.

1250. Plaintiff Evans and members of the North Carolina Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by FCA. Despite the existence of the warranties, FCA failed to inform Plaintiff Evans and members of the North Carolina Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags and damaged airbag parts to Plaintiff Evans and members of the North Carolina Sub-Class.

1251. Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

1252. As a direct and proximate result of FCA's breach of express warranties, Plaintiff Evans and members of the North Carolina Sub-Class have been damaged in an amount to be determined at trial.

1253. Finally, because of FCA's breach of express warranty as set forth herein, Plaintiff Evans and members of the North Carolina Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Evans and members of the North Carolina Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT 76

**Breach Of Implied Warranty,**
**N.C. Gen. Stat. §§ 25-2-314, 25-2-315, 25-2a-103, and 252a-212**
**(On Behalf Of Plaintiff Evans and the North Carolina Sub-Class Against**
**Defendant FCA)**

1254. Plaintiff Evans incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1255. Plaintiff Evans brings this count on behalf of himself and the North Carolina Sub-Class.

1256. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. GEN. STAT. § 25-2-104(1), and a "seller" of motor vehicles under § 25-2-103(1)(d).

1257. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.C. STAT. GEN. § 25-2A-103(1)(p).

1258. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Stat. Gen. §§ 25-2-105(1) and 25-2A-103(1)(h).

1259. Plaintiff Evans and members of the North Carolina Sub-Class purchased or leased the Class Vehicles from FCA by and through FCA's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, FCA was the manufacturer, distributor, warrantor and/or seller of Class Vehicles. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

1260. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.C. GEN. STAT. §§ 25-2-314 and 25-2A-212.

1261. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, FCA breached its implied warranty of merchantability.

1262. Plaintiff Evans and members of the North Carolina Sub-Class have had sufficient direct dealings with FCA or its agents, its authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Evans and members of the North Carolina Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Evans and each of the other members of the Classes are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1263. FCA was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and through its own testing. Affording FCA a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Defective Airbags free of charge within a reasonable time.

1264. FCA was further provided notice by Plaintiff Evans of its breach of implied warranties by letter dated November 8, 2021. Despite this notice, FCA has

not cured its breach of implied warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1265. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff Evans and members of the North Carolina Sub-Class have been damaged in an amount to be proven at trial.

1266. Any attempt by FCA to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Evans and members of the North Carolina Sub-Class. Among other things, Plaintiff Evans and members of the North Carolina Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the North Carolina Sub-Class, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1267. Plaintiff Evans and members of the North Carolina Sub-Class have been excused from performance of any warranty obligations as a result of FCA's conduct described herein.

1268.  The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

## COUNT 77

### Negligent Misrepresentation
### (On Behalf Of Plaintiff Evans and the North Carolina Sub-Class Against Defendants Joyson and FCA)

1269.  Plaintiff Evans incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1270.  Plaintiff Evans asserts this count on behalf of himself and members of the North Carolina Sub-Class.

1271.  FCA and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Evans and members of the North Carolina Sub-Class because FCA and Joyson possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbag's failure. FCA and Joyson also made partial disclosures regarding the safety of the Class Vehicles while knowing that Class Vehicles possessed the Inflator Defect and failing to disclose its existence and its corresponding safety hazard.

1272.  FCA and Joyson negligently misrepresented and omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in the Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks. As a direct

result of FCA and Joyson's negligent conduct, Plaintiff Evans and members of the North Carolina Sub-Class have suffered actual damages.

1273. The fact that the airbags installed in the Class Vehicles are prone to premature failure is material because Plaintiff Evans and members of the North Carolina Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

1274. The fact that the airbags installed in the Class Vehicles are prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Airbag Defect.

1275. Plaintiff Evans and members of the North Carolina Sub-Class would not have purchased the Class Vehicles but for FCA and Joyson's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiff Evans and members of the North Carolina Sub-Class justifiably relied upon FCA and Joyson's negligent false representations and omissions of material facts.

1276. As a direct and proximate result of FCA and Joyson's negligent false representations and omissions of material facts regarding the standard, quality or

grade of the Class Vehicles and/or the Inflator Defect, Plaintiff Evans and members of the North Carolina Sub-Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT 78

### Unjust Enrichment
### (On Behalf Of Plaintiff Evans and the North Carolina Sub-Class
### Against Defendants Joyson and FCA)

1277. Plaintiff Evans incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1278. Plaintiff Evans asserts this count on behalf of himself and members of the North Carolina Sub-Class.

1279. Plaintiff Evans and members of the North Carolina Sub-Class conferred a benefit on FCA and Joyson by leasing or purchasing the Class Vehicles. FCA and Joyson were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

1280. FCA and Joyson unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions, and concealment of the Inflator Defect in the Class Vehicles.

1281. As a proximate result of FCA and Joyson's false representations, omissions and concealment of the Inflator Defect in the Class Vehicles, and as a result of FCA and Joyson's ill-gotten gains, benefits and profits, FCA and Joyson

have been unjustly enriched at the expense of Plaintiff Evans and members of the North Carolina Sub-Class. It would be inequitable for FCA and Joyson to retain their ill-gotten profits without paying the value thereof to Plaintiff Evans and members of the North Carolina Sub-Class.

## XIX.  OHIO COUNTS

### COUNT 79
**Violation Of The Magnuson-Moss Warranty Act ("MMWA"),**
**15 U.S.C. § 2301, *et seq.***
**(On Behalf Of Plaintiffs Gibbs and Zuccarell and the Nationwide Class Or, Alternatively, On Behalf Of Plaintiffs Gibbs And Zuccarell and The Ohio Sub-Class Against Defendant General Motors)**

1282.  Plaintiffs Gibbs and Zuccarell incorporate and re-allege each preceding paragraph as though fully set forth herein.

1283.  Plaintiffs Gibbs and Zuccarell bring this count on behalf of themselves and the Nationwide Class or, alternatively, on behalf of themselves and the members of the Ohio Sub-Class. Plaintiffs Gibbs and Zuccarell and the Classes satisfy the MMWA jurisdictional requirement because they allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

1284.  Plaintiffs Gibbs and Zuccarell and members of the Classes are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1285.  General Motors is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1286. The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1287. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

1288.  General Motors provided Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, General Motors promised to repair or replace covered defective airbag components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, General Motors knew or should have known that the majority of failures occur outside of the warranty periods.

1289. Any attempt by General Motors to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitations are unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods are also unconscionable and inadequate to protect Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class. Among other things, Plaintiffs Gibbs and Zuccarell and members of the Ohio

Sub-Class did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and members of the Classes, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

1290.  The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

1291. General Motors breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by General Motors.

1292. Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have had sufficient direct dealings with General Motors or its agents (dealerships) to establish privity of contract between General Motors, on the one hand, and Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Gibbs and Zuccarell and each of the other members of the Classes are intended third-party beneficiaries of contracts between General Motors and its dealers, specifically, of its implied

365

warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles, the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1293.  Affording General Motors a reasonable opportunity to cure their breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, General Motors knew of the material misrepresentations and omissions concerning the standard, quality, or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs Gibbs and Zuccarell resort to an informal dispute resolution procedure and/or afford General Motors a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

1294.  Plaintiffs Gibbs and Zuccarell and members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to General Motors. Thus, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have not re-accepted their Class Vehicles by retaining them.

1295. General Motors was provided notice by letter dated November 8, 2021 that Plaintiffs Gibbs and Zuccarell would pursue claims on behalf of a class.

1296. The amount in controversy of Plaintiffs Gibbs and Zuccarell's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1297. Plaintiffs Gibbs and Zuccarell, individually and on behalf of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 80
### Fraud By Omission Or Fraudulent Concealment
**(On Behalf Of Plaintiffs Gibbs and Zuccarell and the Ohio Sub-Class Against Defendants Joyson and General Motors)**

1298. Plaintiffs Gibbs and Zuccarell incorporate and re-allege each preceding paragraph as though fully set forth herein.

1299. Plaintiffs Gibbs and Zuccarell bring this count on behalf of themselves and members of the Ohio Sub-Class.

1300. General Motors and Joyson intentionally and knowingly falsely misrepresented concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants, and members of the public to safety risks with the intent that Plaintiffs

Gibbs and Zuccarell and members of the Ohio Sub-Class rely on General Motors and Joyson's misrepresentations and omissions. As a direct result of General Motors and Joyson's fraudulent conduct, members of the Classes have suffered actual damages.

1301. General Motors and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To date, General Motors and Joyson have not provided Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class with a repair or remedy for the Inflator Defect.

1302.  General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class because General Motors and Joyson possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the defect, General Motors and Joyson intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

1303. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiffs Gibbs and Zuccarell and

members of the Ohio Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

1304. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the drivers and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect. Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class would not have purchased the Class Vehicles but for General Motors and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect, or would have paid less for the Class Vehicles.

1305. General Motors and Joyson knew their false misrepresentations, concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. General Motors and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class from seeking replacement or repair of the airbags within the warranty periods. Further, General Motors and Joyson intended to induce Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the airbags

within the warranty periods, thereby unlawfully transferring the cost of repair or replacement from General Motors and Joyson to Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class, in order to decrease costs and increase profits.

1306.   General Motors and Joyson acted with malice, oppression, and fraud.

1307.   Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class reasonably relied upon General Motors and Joyson's knowing, affirmative and active false representations, concealment and omissions. As a direct and proximate result of General Motors and Joyson's false representations, omissions and active concealment of material facts regarding the Inflator Defect, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 81**
**Violation Of The Consumer Sales Practices Act,**
**Ohio Rev. Code Ann. § 1345.01, *et seq.***
**(On Behalf Of Plaintiff and the Ohio Sub-Class Against Defendants Joyson and General Motors)**

1308.  Plaintiffs Gibbs and Zuccarell incorporate and re-allege each preceding paragraph as though fully set forth herein.

1309.  Plaintiffs Gibss and Zuccarell asset this count on behalf of themselves and the Ohio Sub-Class.

1310. Plaintiffs Gibbs and Zuccarell and the members of the Ohio Sub-Class are "consumers" pursuant to the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01(D) ("Ohio CSPA").

1311. General Motors and Joyson are "suppliers" as defined by the Ohio CSPA, , Ohio Rev. Code Ann. § 1345.01(C).

1312. The purchases of the Class Vehicles by Plaintiffs Gibbs and Zuccarell and the members of the Ohio Sub-Class were "consumer transactions" as defined by the Ohio CSPA, Ohio Rev. Code Ann. § 1345.01(A).

1313. By willfully failing to disclose and actively concealing the existence of the Inflator Defect in the Class Vehicles, General Motors and Joyson engaged in deceptive business practices prohibited by the Ohio CSPA, Ohio Rev. Code Ann. § 1345.02, including:

  (a) representing that the Class Vehicles have characteristics, uses, benefits, and quality which they do not have;

  (b) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

  (c) advertising the Class Vehicles with the intent not to sell them as advertised; and

  (d) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

1314. In the course of General Motors and Joyson's business, General Motors and Joyson failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and the Defective Airbags installed in them as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, General Motors and Joyson engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1315. General Motors and Joyson have known of the Inflator Defect in the Class Vehicles for years and failed to disclose and actively conceal the damages and risks of costly damages and repairs, and associated safety risks, posed by the Defect.

1316. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by

372

presenting themselves as reputable manufacturers that value safety, General Motors and Joyson engaged in unfair and deceptive business practices in violation of the Ohio CSPA. General Motors and Joyson deliberately withheld the information about the propensity of the Defective Airbags to prematurely fail, causing airbag damage and associated safety risk, in order to ensure that consumers would purchase the Class Vehicles.

1317. In the course of General Motors and Joyson's business, they willfully failed to disclose and actively concealed the existence of the Inflator Defect and its associated safety risk discussed above. General Motors and Joyson compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1318. General Motors and Joyson's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the members of the Class, about the true safety and reliability of Class Vehicles, the quality of General Motors and Joyson's brands, and the true value of the Class Vehicles.

1319. General Motors and Joyson intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the members of the Class.

1320. General Motors and Joyson knew or should have known that their conduct violated the Ohio CSPA.

1321. As alleged above, General Motors and Joyson made material misstatements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1322. To protect their profits and to avoid remediation costs and a public relations nightmare, General Motors and Joyson concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their associated safety risk, and allowed unsuspecting new and used car purchasers to continue to buy the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1323. General Motors and Joyson owed the members of the Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Timing Chain System Defect because General Motors and Joyson:

> (a) Possessed exclusive and superior knowledge of the risks posed by the foregoing;
>
> (b) Intentionally concealed the foregoing from the Class; and/or

374

(c) Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Class that contradicted these representations.

1324. Because General Motors and Joyson fraudulently concealed the Inflator Defect in the Class Vehicles, and disclosure of their existence would create a reasonable consumer to be deterred from purchasing the Class Vehicles, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to the Class Vehicles by General Motors and Joyson's conduct, they are now worth significantly less than they otherwise would be.

1325. General Motors and Joyson's failure to disclose and active concealment of the risks posed by the Inflator Defect in the Class Vehicles were material to members of the Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than properly remedies them.

1326. General Motors and Joyson's actions as set forth above occurred in the conduct of trade or commerce.

1327. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of General Motors and Joyson in this Complaint, including, but not limited to, the failure to

honor implied warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the Ohio CSPA. These cases include, but are not limited to, the following: *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382); *State ex rel. Montgomery v. Ford Motor Co.* (OPIF #10002123); *State ex rel. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025); *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 WL 533403 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077); *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 WL 431737 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388); *State ex rel. Petro v. Craftmatic Org., Inc.* (OPIF #10002347); *Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586); *State ex rel. Brown v. Lyons, et al.* (OPIF #10000304); *Brinkman v. Mazda Motor of Am., Inc.* (OPIF #10001427); *Khouri v. Lewis* (OPIF #10001995); *Mosley v. Performance Mitsubishi aka Automanage, Inc.* (OPIF #10001326); *Walls v. Harry Williams d/b/a Butch's Auto Sales* (OPIF #10001524); and *Brown v. Spears* (OPIF #10000403).

1328. Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class suffered ascertainable loss caused by General Motors and Joyson's misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and General Motors and Joyson's disregard for safety, Plaintiffs Gibbs and Zuccarell would have paid

less for their vehicles or would not have purchased them at all. Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class had no way of discerning that General Motors and Joyson's representations were false and misleading, or otherwise learning facts the General Motors and Joyson had concealed or failed to disclose.

1329. Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class did not receive the benefit of their bargains as a result of General Motors and Joyson's misconduct.

1330. General Motors and Joyson's violations present a continuing risk to Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class, as well as to the general public. General Motors and Joyson's unlawful acts and practices complained of herein affect the public interest.

1331. The repairs instituted by General Motors and Joyson, if any, have not been adequate.

1332. As a direct and proximate result of General Motors and Joyson's violations of the Ohio CSPA, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have suffered injury-in-fact and/or actual damage.

1333. Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class also seek declaratory relief, punitive damages, an order enjoining General Motors and Joyson's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees

and costs pursuant to Ohio Rev. Code Ann. § 1345.09, as well as other proper and just relief under the Ohio CSPA.

## COUNT 82
### Breach Of Express Warranty
### Ohio Rev. Code Ann. §§ 1302.26 and 1310.01(On Behalf Of Plaintiffs Gibbs and Zuccarell and the Ohio Sub-Class Against Defendant General Motors)

1334.  Plaintiffs Gibbs and Zuccarell incorporate and re-allege each preceding paragraph as though fully set forth herein.

1335.   Plaintiffs Gibbs and Zuccarell bring this count on behalf of themselves and the Ohio Sub-Class.

1336.  General Motors is and was at all relevant times a "merchant" and "seller" of motor vehicles (i.e., the Class Vehicles) within the meaning of Ohio Rev. Code Ann. §§ 1302.01(A)(5) and 1310.01(A)(20), and 1302.01(A)(4).

1337.   With respect to leases, General Motors is and was at all relevant times a "lessor" of motor vehicles (i.e., the Class Vehicles) within the meaning of Ohio Rev. Code Ann. § 1310.01(A)(20).

1338.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(A)(8) and 1310.01(A)(8).

1339.  General Motors provided Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class with one or more express warranties. For illustrative purposes, General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for

Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Under warranties provided to members of the Classes, General Motors promised to repair or replace covered defective airbag components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, General Motors knew or should have known that the majority of airbag failures occur outside of the warranty periods.

1340. Under the warranties provided to Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class, General Motors promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Defendant breached these warranties.

1341. General Motors' warranties formed a basis of the bargain that was reached when Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, General Motors knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

1342.  Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the defect and associated safety risk, which were known and concealed by General Motors. Despite the existence of the warranties, General Motors failed to adequately inform Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the Inflator Defect free of charge within a reasonable time.

1343.  General Motors breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

1344.  On information and belief, General Motors has not suitably repaired or replaced the defective Airbags free of charge for Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class despite the existence of the defect in the Class Vehicles at the time of sale or lease.

1345.  General Motors further breached its express warranties by selling Class Vehicles that were defective with respect to materials, workmanship, design, and manufacture.

1346.  Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials,

workmanship, design, and/or manufacturing defects which cause failures and/or failure to perform as warranted.

1347. Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have had sufficient direct dealings with General Motors or its agents, its authorized dealerships, to establish privity of contract between General Motors, on the one hand, and Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Gibbs and Zuccarell and each of the other members of the Classes are intended third-party beneficiaries of contracts between General Motors and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1348. General Motors was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording General Motors a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because Defendant has known of and concealed the Inflator Defect and has failed to provide a suitable repair or replacement of the Inflator Defect free of charge within a reasonable time.

381

1349.  General Motors was further provided notice of its breach of express warranties by letter dated November 8, 2021. Despite this notice, General Motors has not cured its breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1350.  Any attempt by General Motors to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because it knowingly sold or a defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class. Among other things, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between Defendant and members of the Classes, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1351.  Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-

Class whole because, on information and belief, General Motors has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1352.  General Motors knew that the Class Vehicles were inherently defective and did not conform to its warranties, and Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1353.  General Motors' warranties formed a basis of the bargain that was reached when Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class purchased or leased their Class Vehicles.

1354.  Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the defect, which was known and concealed by General Motors. Despite the existence of the warranties, General Motors failed to inform Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class.

1355.  Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

1356.  As a direct and proximate result of General Motors' breach of express warranties, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have been damaged in an amount to be determined at trial.

1357.  Finally, because of General Motors' breach of express warranty as set forth herein, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT 83
### Breach Of Implied Warranty Of Merchantability,

### Ohio Rev. Code Ann. §§ 103.27, 1310.01, and 1310.19
### (On Behalf Of Plaintiffs Gibbs and Zuccarell and the Ohio Sub-Class Against Defendant General Motors)

1358.  Plaintiffs Gibbs and Zuccarell incorporate and re-allege each preceding paragraph as though fully set forth herein.

1359.  Plaintiffs Gibbs and Zuccarell bring this count on behalf of themselves and the Ohio Sub-Class.

1360.  Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class purchased or leased the Class Vehicles from Defendant by and through General Motors' authorized agents for retail sales, or were otherwise expected to be the

eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, each General Motors was the manufacturer, distributor, warrantor, and/or seller of Class Vehicles. General Motors knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

1361. General Motors is and was at all relevant times a "merchant" and "seller" of motor vehicles (i.e., the Class Vehicles) within the meaning of Ohio Rev. Code Ann. §§ 1302.01(A)(5) and 1310.01(A)(20), and 1302.01(A)(4).

1362. With respect to leases, General Motors is and was at all relevant times a "lessor" of motor vehicles (i.e., the Class Vehicles) within the meaning of Ohio Rev. Code Ann. § 1310.01(A)(20).

1363. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(A)(8) and 1301.01(A)(8).

1364. General Motors impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

1365. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Inflator Defect – (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, General Motors breached its implied warranty of merchantability.

1366. Plaintiffs and Zuccarell and members of the Ohio Sub-Class have had sufficient direct dealings with General Motors or its agents, its authorized dealerships, to establish privity of contract between General Motors, on the one hand, and Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Gibbs and Zuccarell and each of the other members of the Classes are intended third-party beneficiaries of contracts between General Motors and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1367. General Motors was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording General Motors a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because General Motors has known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Inflator Defect free of charge within a reasonable time.

1368. General Motors was further provided notice by Plaintiffs Gibbs and Zuccarell of its breach of implied warranties by letter dated November 8, 2021.

Despite this notice, General Motors has not cured its breach of implied warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1369. As a direct and proximate result of General Motors' breach of the implied warranty of merchantability, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have been damaged in an amount to be proven at trial.

1370. Any attempt by General Motors to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class. Among other things, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and members of the Ohio Sub-Class, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1371. Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have been excused from performance of any warranty obligations as a result of General Motors' conduct described herein.

1372. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

**COUNT 84**
**Negligent Misrepresentation**
**(On Behalf Of Plaintiffs Gibbs And Zuccarell and the Ohio Sub-Class Against Defendants Joyson and General Motors)**

1373. Plaintiffs Gibbs and Zuccarell incorporate and re-allege each preceding paragraph as though fully set forth herein.

1374. Plaintiffs Gibbs and Zuccarell bring this count on behalf themselves and the members of the Ohio Sub-Class.

1375. General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class because General Motors and Joyson possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbag's failure. General Motors and Joyson also made partial disclosures regarding the safety of the Class Vehicles while knowing that the Class Vehicles possessed the Inflator Defect and failing to disclose its existence and its corresponding safety hazard.

1376.  General Motors and Joyson negligently misrepresented and omitted material facts including the standard, quality, or grade of the Class Vehicles and/or presence of the Inflator Defect in the Class Vehicles. As a direct result of General Motors and Joyson's negligent conduct, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have suffered actual damages.

1377.  The fact that the airbags installed in the Class Vehicles are prone to premature failure is material because Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

1378.  The fact that the airbags installed in the Class Vehicles are prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials, or workmanship, such as the Inflator Defect.

1379.  Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class would not have purchased the Class Vehicles but for General Motors and Joyson's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiffs Gibbs and Zuccarell and members

of the Ohio Sub-Class justifiably relied upon Defendants' negligent false representations and omissions of material facts.

1380. As a direct and proximate result of General Motors and Joyson's negligent false representations and omissions of material facts regarding the standard, quality, or grade of the Class Vehicles and/or the Inflator Defect, Plaintiffs Gibbs and Zuccarell and members of the Ohio Sub-Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## XX.  PENNSYLVANIA COUNTS

### COUNT 85
### Violation Of The Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.*
### (On Behalf Of Plaintiffs Barlett and Smith and the Nationwide Class Or, Alternatively, On Behalf Of Plaintiffs Barlett and Smith and the Pennsylvania Sub-Class Against Defendants General Motors and FCA)

1381. Plaintiffs Barlett and Smith incorporate and re-allege each preceding paragraph as though fully set forth herein.

1382. Plaintiffs Barlett and Smith bring this count on behalf of themselves and the Nationwide Class or, alternatively, on behalf of themselves and the members of the Pennsylvania Sub-Class.

1383. Plaintiffs Barlett and Smith satisfy the MMWA jurisdictional requirement because they allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

1384. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1385. Truck Manufacturers are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1386. The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1387. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

1388. Truck Manufacturers provided Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to members of the Classes, Truck Manufacturers promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, Truck Manufacturers knew or should have known that the majority of failures occur outside of the warranty periods.

1389. Any attempt by Truck Manufacturers to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, Truck

Manufacturers' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class. Among other things, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

1390. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

1391. Truck Manufacturers breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by Truck Manufacturers.

1392. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents (dealerships) to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Barlett and Smith and each of the other members of the Classes are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1393. Affording Truck Manufacturers a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Truck Manufacturers knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs Barlett and Smith resort to

an informal dispute resolution procedure and/or afford Truck Manufacturers a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

1394. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to Defendants. Thus, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class have not re-accepted their Class Vehicles by retaining them.

1395. Truck Manufacturers were provided notice by letter dated November 8, 2021 that Plaintiffs Barlett and Smith would pursue claims on behalf of a class.

1396. The amount in controversy of Plaintiffs Barlett and Smith's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1397. Plaintiffs Barlett and Smith, individually and on behalf of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 86
## Fraud By Omission Or Fraudulent Concealment
### (On Behalf Of Plaintiffs Barlett and Smith and the Pennsylvania Sub-Class Against All Defendants)

1398. Plaintiffs Barlett and Smith incorporate and re-allege each preceding paragraph as though fully set forth herein.

1399. Plaintiffs Barlett and Smith assert this count on behalf of themselves and members of the Pennsylvania Sub-Class.

1400. Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class rely on Defendants' misrepresentations and omissions. As a direct result of Defendants' fraudulent conduct, members of the Classes have suffered actual damages.

1401. Defendants knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To date, Defendants have not provided Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class with a repair or remedy for the Inflator Defect.

1402. Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs Barlett and Smith and members of the

Pennsylvania Sub-Class because Defendants possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the Defect, Defendants intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

1403. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

1404. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

1405. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class would not have purchased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class

Vehicles and existence of the Inflator Defect, or would have paid less for the Class Vehicles.

1406. Defendants knew their false misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class from seeking replacement or repair of the airbags within the warranty periods. Further, Defendants intended to induce Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the airbags within the warranty periods, thereby unlawfully transferring the cost of repair or replacement from Defendants to Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class, in order to decrease costs and increase profits.

1407. Defendants acted with malice, oppression, and fraud.

1408. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class justifiably relied upon Defendants' knowing, affirmative and active false representations, concealment and omissions. As a direct and proximate result of Defendants' false representations, omissions and active concealment of material facts regarding the Inflator Defect, Plaintiffs Barlett and Smith and members of the

Pennsylvania Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 87**
**Violation Of The Pennsylvania Unfair Trade Practices And Consumer Protection Law, 73 P.S. §§ 201-1, *et seq.***
**(On Behalf Of Plaintiffs Barlett and Smith and the Pennsylvania Sub-Class Against All Defendants)**

1409. Plaintiffs Barlett and Smith incorporate and re-allege each preceding paragraph as though fully set forth herein.

1410. Plaintiffs Barlett and Smith assert this count on behalf of themselves and members of the Pennsylvania Sub-Class.

1411. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class are persons within the context of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 *et seq.* (hereinafter "PUTPCPL"), specifically § 201-2(2).

1412. Defendants are persons within the context of PUTPCPL, § 201-2(2).

1413. Defendants are engaged in trade and commerce within the context of PUTPCPL, § 201-2(3).

1414. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class purchased and/or leased Class Vehicles for personal, family or household use.

1415. Defendants committed unfair and deceptive acts in the course of trade and commerce as described in this complaint in violation of PUTPCPL, §§ 201-2(4)(v), (vii), (ix) and (xxi), *inter alia*.

1416. Defendants committed unconscionable, deceptive and unfair trade practices including but not limited to deception, fraud, false pretense, false promise, misrepresentation and the knowing concealment, suppression and omission of material facts concerning the class airbags with intent that Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class would rely upon their misrepresentations in connection with the sale and/or advertisement of Class Vehicles.

1417. Defendants fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class the characteristics of Class Vehicle airbags with respect to material, manufacture, durability, design, longevity, maintenance and operating costs. Defendants extensively advertised that Class Vehicles were superior in construction and extolled the quality and virtues of Class Vehicles, including superior materials, workmanship, design, manufacture, safety, durability, reliability and performance. In fact, class airbags contained a known defect as described in this complaint that caused class airbags to prematurely fail.

1418. Defendants actively suppressed the fact that Class Vehicles were prematurely failing because of materials, workmanship, design and manufacture defects.

1419. As reasonable consumers, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class had no reasonable way to know that Class Vehicles contained airbags which were defective in materials, workmanship, design and manufacture. Any reasonable consumer under the circumstances would have relied on the representations of Defendants who alone possessed the knowledge as to the quality and characteristics of the Class Vehicles, including the airbags' durability.

1420. If Defendants had not concealed the class Inflator Defect from Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class within the express warranty period, class airbags would have been repaired without cost to purchasers as promised under the original warranty.

1421. Defendants fraudulently concealed unmistakable manifestations of impending class airbag failures within the express warranty period without inspecting, repairing or replacing damaged class airbags.

1422. Defendants violated the PUTPCPL by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that class airbags were defective in materials, workmanship, design and manufacture.

1423. Defendants further violated the PUTPCPL by failing to inform prospective Class Vehicle purchasers that Defendants had not properly tested the airbags.

1424. Defendants committed unfair and deceptive trade practices as described in this complaint. Defendants repeatedly violated the PUTPCPL on multiple occasions with their continuous course of conduct including omissions of material fact and misrepresentations.

1425. As a proximate and direct result of Defendants' unfair and deceptive trade practices, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class purchased or leased Class Vehicles and sustained an ascertainable loss and financial harm.

1426. Plaintiffs Barlett and members of the Pennsylvania Sub-Class experienced premature class airbag failure, diminution of Class Vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

1427. The repairs instituted by Defendants, if any, have not been adequate.

1428. The conduct of Defendants offends public policy as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused unavoidable substantial injury to Class Vehicle owners (who were unable to

have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

1429. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class demand judgment against Defendants for restitution, disgorgement, statutory and actual monetary damages including multiple damages, interest, costs, attorneys' fees and injunctive relief including a declaratory judgment and an appropriate court order prohibiting Defendants from further deceptive acts and practices described in this complaint.

## COUNT 88
### Breach Of Express Warranty
### 13 Pa. Cons. Stat. §§ 2313 and 2a103
### (On Behalf Of Plaintiffs Barlett and Smith and The Pennsylvania Sub-Class Against Defendants FCA and General Motors)

1430. Plaintiffs Barlett and Smith incorporate and re-allege each preceding paragraph as though fully set forth herein.

1431. Plaintiffs Barlett and Smith bring this count on behalf of themselves and the Pennsylvania Sub-Class.

1432. Truck Manufacturers are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" and "lessors" of motor vehicles under § 2103(a) and § 2A103(a).

1433. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1434. Truck Manufacturers provided Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class with one or more express warranties. For illustrative purposes, Defendant General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Defendant FCA currently offers a Basic Limited Warranty for Class Vehicles sold under the Dodge brand for 3 years or 36,000 miles and a Powertrain Limited Warranty for 5 years or 60,000 miles. Under the warranties provided to Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class, Truck Manufacturers promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Truck Manufacturers breached these warranties.

1435. Under the warranties provided to members of the Classes, Truck Manufacturers promised to repair or replace covered defective airbag components arising out of defects in materials and/or workmanship at no cost to owners and lessees of the Class Vehicles. However, given the latent nature of the Defect, Truck Manufacturers knew or should have known that the majority of airbag failures occur outside of the warranty periods.

1436. Under the warranties provided to Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class, Truck Manufacturers promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Truck Manufacturers breached these warranties.

1437. Truck Manufacturers' warranties formed a basis of the bargain that was reached when Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, Truck Manufacturers knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

1438. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by Truck Manufacturers. Despite the existence of the warranties, Truck Manufacturers failed to adequately inform Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class that the Class Vehicles contained the Inflator Defect and failed to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

1439. Truck Manufacturers breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

1440. On information and belief, Truck Manufacturers have not suitably repaired or replaced the Defective Airbags free of charge for Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

1441. Truck Manufacturers further breached their express warranties by selling Class Vehicles that were defective with respect to airbag materials, workmanship, design and manufacture.

1442. Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of airbag materials, workmanship, design and/or manufacturing defects which cause failures and/or failure to perform as warranted.

1443. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents, their authorized dealerships, to establish privity of contract between Truck Manufacturers, on the one hand, and Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Barlett and Smith and each of the other members of the

Classes are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1444. Truck Manufacturers were provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording Truck Manufacturers a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because Truck Manufacturers have known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1445. Truck Manufacturers were further provided notice by Plaintiff of their breach of express warranties by letter dated November 8, 2021. Despite this notice, Truck Manufacturers have not cured their breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1446. Any attempt by Truck Manufacturers to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here.

Specifically, Truck Manufacturers' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class. Among other things, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed between Truck Manufacturers and members of the Classes, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1447. Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class whole because, on information and belief, Truck Manufacturers have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1448. Truck Manufacturers knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiffs Barlett and Smith

and members of the Pennsylvania Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1449. Truck Manufacturers' warranties formed a basis of the bargain that was reached when Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class purchased or leased their Class Vehicles.

1450. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Truck Manufacturers. Despite the existence of the warranties, Truck Manufacturers failed to inform Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class.

1451. Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

1452. As a direct and proximate result of Truck Manufacturers' breach of express warranties, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class have been damaged in an amount to be determined at trial.

1453. Finally, because of Truck Manufacturers' breach of express warranty as set forth herein, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT 89
## Breach Of Implied Warranty Of Merchantability,
## 13 Pa. Cons. Stat. §§ 2314, 2a103, and 2a212
## (On Behalf Of Plaintiffs Barlett and Smith and the Pennsylvania Sub-Class
## Against Defendants FCA and General Motors)

1454. Plaintiffs Barlett and Smith incorporate and re-allege each preceding paragraph as though fully set forth herein.

1455. Plaintiffs Barlett and Smith bring this count on behalf of themselves and the Pennsylvania Sub-Class.

1456. Truck Manufacturers are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" and "lessors" of motor vehicles under § 2103(a) and § 2A103(1)(p).

1457. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1458. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class purchased or leased the Class Vehicles from Truck Manufacturers by and through Truck Manufacturers' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Truck Manufacturers were the manufacturers, distributors, warrantors and/or sellers of Class Vehicles. Truck Manufacturers knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

1459. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 13 Pa. Cons. Stat. § 2314.

1460. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Inflator Defect – (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Truck Manufacturers breached their implied warranty of merchantability.

1461. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class have had sufficient direct dealings with Truck Manufacturers or their agents, their authorized dealerships, to establish privity of contract between Truck

410

Manufacturers, on the one hand, and Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs Barlett and Smith and each of the other members of the Classes are intended third-party beneficiaries of contracts between Truck Manufacturers and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1462. Truck Manufacturers were provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording Truck Manufacturers a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Truck Manufacturers have known of and concealed the Inflator Defect and, on information and belief, have refused to repair or replace the Defective Airbags free of charge within a reasonable time.

1463. Truck Manufacturers were further provided notice by Plaintiffs Barlett and Smith of their breach of implied warranties by letter dated November 8, 2021. Despite this notice, Truck Manufacturers have not cured their breach of implied

warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1464. As a direct and proximate result of Truck Manufacturers' breach of the implied warranty of merchantability, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class have been damaged in an amount to be proven at trial.

1465. Any attempt by Truck Manufacturers to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Truck Manufacturers' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Truck Manufacturers' warranty periods were also unconscionable and inadequate to protect Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class. Among other things, Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class did not determine these time limitations, the terms of which unreasonably favored Truck Manufacturers. A gross disparity in bargaining power existed between Defendants and members of the Pennsylvania Sub-Class, and Truck Manufacturers knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1466. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class have been excused from performance of any warranty obligations as a result of Truck Manufacturers' conduct described herein.

1467. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

### COUNT 90
### Unjust Enrichment
### (On Behalf Of Plaintiffs Barlett and Smith and the Pennsylvania Sub-Class Against All Defendants)

1468. Plaintiffs Barlett and Smith incorporate and re-allege each preceding paragraph as though fully set forth herein.

1469. Plaintiffs Barlett and Smith assert this count on behalf of themselves and members of the Pennsylvania Sub-Class.

1470. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class conferred a benefit on Defendants by leasing or purchasing the Class Vehicles. Defendants were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

1471. Defendants knowingly and unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Inflator Defect in the Class Vehicles.

1472. As a proximate result of Defendants' false representations, omissions and concealment of the Inflator Defect in the Class Vehicles, and as a result of

Defendants' ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class. It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class.

1473. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

1474. Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class seek an order requiring Defendants to disgorge their gains and profits to Plaintiffs Barlett and Smith and members of the Pennsylvania Sub-Class, together with interest, in a manner to be determined by the Court.

## XXI.  TENNESSEE COUNTS

### COUNT 91
### Violation Of The Magnuson-Moss Warranty Act ("MMWA"),
### 15 U.S.C. § 2301, *et seq.*
### (On Behalf Of Plaintiff Lowell and the Nationwide Class Or, Alternatively, On Behalf Of Plaintiff Lowell and the Tennessee Sub-Class Against Defendant General Motors)

1475. Plaintiff Lowell incorporates and re-alleges each preceding paragraph as though fully set forth herein

1476. Plaintiff Lowell brings this count on behalf of himself and the Nationwide Class or, alternatively, on behalf of himself and the members of the Tennessee Sub-Class.

1477. Plaintiff Lowell satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

1478. Plaintiff Lowell and members of the Tennessee Sub-Class are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1479. General Motors is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1480. The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1481. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

1482. General Motors provided Plaintiff Lowell and members of the Tennessee Sub-Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under the warranties provided to members of the Classes, General Motors promised to repair or replace covered defective components arising out of defects in materials and/or workmanship at no cost to owners and lessees of

the Class Vehicles. However, given the latent nature of the Defect, General Motors knew or should have known that the majority of failures occur outside of the warranty periods.

1483. Any attempt by General Motors to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff Lowell and members of the Tennessee Sub-Class. Among other things, Plaintiff Lowell and members of the Tennessee Sub-Class did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and members of the Classes, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the airbags would fail well before their useful lives.

1484. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

1485. General Motors breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Inflator Defect. Without limitation, the

Class Vehicles share a common Inflator Defect in design, material, manufacturing, and/or workmanship that is prone to premature failure and fails to operate as represented by General Motors.

1486. Plaintiff Lowell and members of the Tennessee Sub-Class have had sufficient direct dealings with General Motors or its agents (dealerships) to establish privity of contract between General Motors, on the one hand, and Plaintiff Lowell and members of the Tennessee Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Lowell and each of the other members of the Classes are intended third-party beneficiaries of contracts between General Motors and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1487. Affording General Motors a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, General Motors knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Inflator Defect, but failed to repair or replace the airbags and/or disclose the Inflator Defect. Under the circumstances, the

remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Lowell resorts to an informal dispute resolution procedure and/or afford General Motors a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

1488. Plaintiff Lowell and members of the Tennessee Sub-Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to General Motors. Thus, Plaintiff Lowell and members of the Tennessee Sub-Class have not re-accepted their Class Vehicles by retaining them.

1489. General Motors was provided notice by letter dated November 8, 2021 that Plaintiff Lowell would pursue claims on behalf of a class.

1490. The amount in controversy of Plaintiff Lowell's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1491. Plaintiff Lowell, individually and on behalf of the Classes, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

**COUNT 92**
**Fraud By Omission Or Fraudulent Concealment**
**(On Behalf Of Plaintiff Lowell and the Tennessee Sub-Class Against Defendants Joyson and General Motors)**

1492. Plaintiff Lowell incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1493. Plaintiff Lowell brings this claim on behalf of himself and the members of the Tennessee Sub-Class.

1494. General Motors and Joyson intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the airbags installed in Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks with the intent that Plaintiff Lowell and members of the Tennessee Sub-Class rely on General Motors and Joyson's misrepresentations and omissions. As a direct result of General Motors and Joyson's fraudulent conduct, members of the Classes have suffered actual damages.

1495. General Motors and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect during the warranty periods. To date, General Motors and Joyson have not provided Plaintiff Lowell and members of the Tennessee Sub-Class with a repair or remedy for the Inflator Defect.

1496. General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Lowell and members of the Tennessee

Sub-Class because General Motors and Joyson possessed superior and exclusive knowledge regarding the Defect and made a partial disclosure regarding the safety of the Class Vehicles. Rather than disclose the Defect, General Motors and Joyson intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

1497. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is material because Plaintiff Lowell and members of the Tennessee Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

1498. The fact that the airbags installed in the Class Vehicles are defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

1499. Plaintiff Lowell and members of the Tennessee Sub-Class would not have purchased the Class Vehicles but for General Motors and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class

Vehicles and existence of the Inflator Defect, or would have paid less for the Class Vehicles.

1500. General Motors and Joyson knew their false misrepresentation, concealment, and suppression of material facts was false and misleading and knew the effect of concealing those material facts. General Motors and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Lowell and members of the Tennessee Sub-Class from seeking replacement or repair of the airbags within the warranty periods. Further, General Motors and Joyson intended to induce Plaintiff Lowell and members of the Tennessee Sub-Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the airbags within the warranty periods, thereby unlawfully transferring the cost of repair or replacement from General Motors and Joyson to Plaintiff Lowell and members of the Tennessee Sub-Class, in order to decrease costs and increase profits.

1501. General Motors and Joyson acted with malice, oppression, and fraud.

1502. Plaintiff Lowell and members of the Tennessee Sub-Class reasonably relied upon General Motors and Joyson's knowing, affirmative and active false representations, concealment and omissions and Plaintiff Lowell was ignorant of its falsity. As a direct and proximate result of General Motors and Joyson's false representations, omissions and active concealment of material facts regarding the

Inflator Defect, Plaintiff Lowell and members of the Tennessee Sub-Class have suffered actual damages in an amount to be determined at trial.

**COUNT 93**
**Violation Of The Tennessee Consumer Protection Act ("TCPA"),**
**Tenn. Code Ann. §§ 47-18-101, *et seq.***
**(On Behalf Of Plaintiff Lowell and the Tennessee Sub-Class Against**
**Defendants Joyson and General Motors)**

1503. Plaintiff Lowell incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1504. Plaintiff Lowell brings this count on behalf of himself and members of the Tennessee Sub-Class.

1505. Plaintiff Lowell and members of the Tennessee Sub-Class purchased or leased their Class Vehicles for personal or household use.

1506. Plaintiff Lowell and members of the Tennessee Sub-Class are permitted to bring this action for injunctive relief and actual damages under the TCPA. *See* TENN. CODE ANN. § 47-18-109.

1507. General Motors and Joyson are engaged in the conduct of "business, trade or commerce" within the meaning of the TCPA. *See* TENN. CODE ANN. § 47-18-103(20).

1508. The TCPA prohibits "deceptive acts or practices affecting the conduct of any trade or commerce..." *See* TENN. CODE ANN. § 47-18-104.

1509. General Motors and Joyson violated the TCPA by engaging in deceptive acts or practices directed to consumers in connection with the sale and/or lease of Class Vehicles.

1510. General Motors and Joyson knowingly concealed, suppressed and/or omitted material facts regarding the Inflator Defect and its corresponding safety risk, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Lowell and members of the Tennessee Sub-Class. Plaintiff Lowell and members of the Tennessee Sub-Class could not reasonably have known about the Inflator Defect and its corresponding safety risk as the information was in the superior and exclusive control of General Motors and Joyson.

1511. General Motors and Joyson intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Inflator Defect with the intent to mislead Plaintiff Lowell and members of the Tennessee Sub-Class. General Motors and Joyson knew, or should have known, that the Inflator Defect was a latent defect and that the airbags were likely to fail outside of the periods of the manufacturer's warranties.

1512. General Motors and Joyson also knew, or should have known, that the Inflator Defect in the Class Vehicles could cause the airbags to fail or not perform as intended.

1513. General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Lowell and members of the Tennessee Sub-Class because they possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbags. Rather than disclose the Defect, General Motors and Joyson engaged in unfair or deceptive acts in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the airbags to Plaintiff Lowell and members of the Tennessee Sub-Class.

1514. General Motors and Joyson's unfair or deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Inflator Defect were intended to mislead consumers, were misleading to reasonable consumers, and misled Plaintiff Lowell and members of the Tennessee Sub-Class.

1515. At all relevant times, General Motors and Joyson's unfair or deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the Inflator Defect and its corresponding safety risk were material to Plaintiff Lowell and members of the Tennessee Sub-Class. When Plaintiff Lowell and members of the Tennessee Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' airbags were free from latent defects and would last beyond the periods of the manufacturer's warranties. Had General Motors and Joyson disclosed that the airbags were prone to premature failure and/or an unavoidable safety risk, Plaintiff Lowell and members of the

424

Tennessee Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles. Further, had Defendants disclosed that the airbags in the Class Vehicles would not last beyond the warranty periods without need for repair or replacement, Plaintiff Lowell and members of the Tennessee Sub-Class would have demanded repair or replacement during the warranty periods at no cost—as provided for in General Motors and Joyson's warranties.

1516. General Motors and Joyson had a continuous duty to Plaintiff Lowell and members of the Tennessee Sub-Class to refrain from unfair and deceptive practices under the TCPA and to disclose the Inflator Defect. General Motors and Joyson's deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Inflator Defect and corresponding safety risk are substantially injurious to consumers. As a result of General Motors and Joyson's knowing, intentional concealment, suppression and/or omission of the Inflator Defect in violation of the TCPA, Plaintiff Lowell and members of the Tennessee Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the airbags and/or actual damages in the amount of the cost to replace the airbags and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of General Motors and Joyson's unfair and deceptive acts or practices in the course of their business.

1517. General Motors and Joyson's deceptive acts or practices occurred in the conduct of business, trade or commerce.

1518. General Motors and Joyson have knowingly and willfully engaged in the unfair and deceptive acts or practices alleged herein. Further, General Motors and Joyson unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

1519. General Motors and Joyson's unfair and deceptive acts or practices affect the public interest and present a continuing safety risk to Plaintiff Lowell and members of the Tennessee Sub-Class as well as the public.

1520. The repairs instituted by General Motors and Joyson, if any, have not been adequate.

1521. As a direct and proximate result of General Motors and Joyson's violations of the TCPA, Plaintiff Lowell and members of the Tennessee Sub-Class have suffered actual damages and/or injury in fact.

1522. As a result of General Motors and Joyson's unlawful conduct, Plaintiff Lowell and members of the Tennessee Sub-Class are entitled to actual damages, treble damages, costs of litigation, attorneys' fees, injunctive and other equitable relief. *See* TENN. CODE ANN. § 47-18-109.

**COUNT 94**
**Breach Of Express Warranty**
**(On Behalf Of Plaintiff Lowell and the Tennessee Sub-Class Against Defendant General Motors)**

1523. Plaintiff Lowell incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1524. Plaintiff Lowell brings this count on behalf of himself and the Tennessee Sub-Class.

1525. General Motors is and was at all relevant times a "merchant" with respect to motor vehicles under TENN. CODE ANN. § 47-2-104(1), and a "seller" and "lessor" of motor vehicles under § 47-2-103(1)(d) & 47-2A-103(1)(p), respectively.

1526. The Class Vehicles are and were at all relevant times "goods" within the meaning of TENN. CODE ANN. § 47-2-105(1).

1527. General Motors provided Plaintiff Lowell and members of the Tennessee Sub-Class with one or more express warranties. For illustrative purposes, Defendant General Motors currently offers Bumper-to-Bumper Limited Warranty coverage for Class Vehicles sold under the Chevrolet and GMC brands for 3 years or 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Under warranties provided to members of the Classes, General Motors promised to repair or replace covered defective airbag components arising out of defects in materials and/or workmanship at no cost to owners and

427

lessees of the Class Vehicles. However, given the latent nature of the Defect, General Motors knew or should have known that the majority of airbag failures occur outside of the warranty periods.

1528. Under the warranties provided to Plaintiff Lowell and members of the Tennessee Sub-Class, General Motors promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, General Motors breached these warranties.

1529. General Motors' warranties formed a basis of the bargain that was reached when Plaintiff Lowell and members of the Tennessee Sub-Class purchased or leased their Class Vehicles. Given the latent nature of the Inflator Defect, General Motors knew or should have known that the majority of the airbag failures occur outside of the warranty periods.

1530. Plaintiff Lowell and members of the Tennessee Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety risk, which were known and concealed by General Motors. Despite the existence of the warranties, General Motors failed to adequately inform Plaintiff Lowell and members of the Tennessee Sub-Class that the Class Vehicles contained the Inflator Defect and failed

to provide a suitable repair or replacement of the airbags free of charge within a reasonable time.

1531. General Motors breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

1532. On information and belief, General Motors has not suitably repaired or replaced the Defective Airbags free of charge for Plaintiff Lowell and members of the Tennessee Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

1533. General Motors further breached its express warranties by selling Class Vehicles that were defective with respect to airbag materials, workmanship, design and manufacture.

1534. Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of airbag materials, workmanship, design and/or manufacturing defects which cause failures and/or failure to perform as warranted

1535. Plaintiff Lowell and members of the Tennessee Sub-Class have had sufficient direct dealings with General Motors or its agents, their authorized dealerships, to establish privity of contract between General Motors, on the one hand, and Plaintiff Lowell and members of the Tennessee Sub-Class, on the other

hand. Nonetheless, privity is not required here because Plaintiff Lowell and each of the other members of the Classes are intended third-party beneficiaries of contracts between General Motors and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1536. General Motors was provided notice of the Inflator Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA and through its own testing. Affording General Motors a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because General Motors has known of and concealed the Inflator Defect and has failed to provide a suitable repair or replacement of the Defective Airbag free of charge within a reasonable time.

1537. General Motors was further provided notice by Plaintiff Lowell of its breach of express warranties by letter dated November 8, 2021. Despite this notice, General Motors has not cured its breach of express warranties and failed to provide a suitable repair or replacement of the Defective Airbag free of charge within a reasonable time.

1538. Any attempt by General Motors to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff Lowell and members of the Tennessee Sub-Class. Among other things, Plaintiff Lowell and members of the Tennessee Sub-Class did not determine these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between General Motors and members of the Classes, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1539. Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Lowell and members of the Tennessee Sub-Class whole because, on information and belief, Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1540. General Motors knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff Lowell and members of the

Tennessee Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1541. General Motors' warranties formed a basis of the bargain that was reached when Plaintiff Lowell and members of the Tennessee Sub-Class purchased or leased their Class Vehicles.

1542. Plaintiff Lowell and members of the Tennessee Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by General Motors. Despite the existence of the warranties, General Motors failed to inform Plaintiff Lowell and members of the Tennessee Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods, and, thus, wrongfully transferred the costs of repair or replacement of the airbags to Plaintiff Lowell and members of the Tennessee Sub-Class.

1543. Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

1544. As a direct and proximate result of General Motors' breach of express warranties, Plaintiff Lowell and members of the Tennessee Sub-Class have been damaged in an amount to be determined at trial.

1545. Finally, because of General Motors' breach of express warranty as set forth herein, Plaintiff Lowell and members of the Tennessee Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Lowell and members of the Tennessee Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT 95
### Breach Of Implied Warranty Of Merchantability,
### Tenn. Code Ann.  §§ 75-2-314 and 75-2-103
### (On Behalf Of Plaintiff Lowell and the Tennessee Sub-Class Against
### Defendant General Motors)

1546. Plaintiff Lowell incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1547. Plaintiff Lowell brings this count on behalf of himself and the Tennessee Sub-Class.

1548. General Motors is and was at all relevant times a "merchant" with respect to motor vehicles under TENN. CODE ANN. § 47-2-104(1), and a "seller" and "lessor" of motor vehicles under § 47-2-103(1)(d).

1549. The Class Vehicles are and were at all relevant times "goods" within the meaning of TENN. CODE ANN. § 47-2-105(1).

1550. Plaintiff Lowell and members of the Tennessee Sub-Class purchased or leased the Class Vehicles from General Motors by and through General Motors'

authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, General Motors was the manufacturer, distributor, warrantor and/or seller of Class Vehicles. General Motors knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

1551. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to TENN. CODE ANN. § 47-2-314.

1552. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, General Motors breached its implied warranty of merchantability.

1553. Plaintiff Lowell and members of the Tennessee Sub-Class have had sufficient direct dealings with General Motors or its agents, its authorized dealerships, to establish privity of contract between General Motors, on the one hand, and Plaintiff Lowell and members of the Tennessee Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Lowell and each of

the other members of the Classes are intended third-party beneficiaries of contracts between General Motors and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1554. General Motors was provided notice of the Inflator Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording General Motors a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because General Motors has known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Defective Airbag free of charge within a reasonable time.

1555. General Motors was further provided notice by Plaintiff Lowell of its breach of implied warranties by letter dated November 8, 2021. Despite this notice, General Motors has not cured its breach of implied warranties and failed to provide a suitable repair or replacement of the Defective Airbags free of charge within a reasonable time.

1556. As a direct and proximate result of General Motors' breach of the implied warranty of merchantability, Plaintiff Lowell and members of the Tennessee Sub-Class have been damaged in an amount to be proven at trial.

1557. Any attempt by General Motors to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff Lowell and members of the Tennessee Sub-Class. Among other things, Plaintiff Lowell and members of the Tennessee Sub-Class did not determine these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and members of the Tennessee Sub-Class, and General Motors knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1558. Plaintiff Lowell and members of the Tennessee Sub-Class have been excused from performance of any warranty obligations as a result of General Motors' conduct described herein.

1559.  The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

**COUNT 96**
**Unjust Enrichment**
**(On Behalf Of Plaintiff Lowell and the Tennessee Sub-Class Against Defendants Joyson and General Motors)**

1560.  Plaintiff Lowell incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1561.  Plaintiff Lowell brings this claim on behalf of himself and the members of the Tennessee Sub-Class.

1562.  Plaintiff Lowell and members of the Tennessee Sub-Class conferred a benefit on Defendants by leasing or purchasing the Class Vehicles. General Motors and Joyson were and should have been reasonably expected to provide Class Vehicles free from the Inflator Defect.

1563.  General Motors and Joyson knowingly and unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Inflator Defect in the Class Vehicles.

1564.  As a proximate result of General Motors and Joyson's false representations, omissions and concealment of the Inflator Defect in the Class Vehicles, and as a result of General Motors and Joyson's ill-gotten gains, benefits and profits, General Motors and Joyson have been unjustly enriched at the expense

437

of Plaintiff Lowell and members of the Tennessee Sub-Class. It would be inequitable for General Motors and Joyson to retain their ill-gotten profits without paying the value thereof to Plaintiff Lowell and members of the Tennessee Sub-Class.

1565. Plaintiff Lowell and members of the Tennessee Sub-Class are entitled to restitution of the amount of General Motors and Joyson's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

1566. Plaintiff Lowell and members of the Tennessee Sub-Class seek an order requiring General Motors and Joyson to disgorge their gains and profits to Plaintiff Lowell and members of the Tennessee Sub-Class, together with interest, in a manner to be determined by the Court.

## COUNT 97
### Negligent Misrepresentation
### (On Behalf Of Plaintiff Lowell and the Tennessee Sub-Class Against Defendants Joyson and General Motors)

1567. Plaintiff Lowell incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1568. Plaintiff Lowell asserts this count on behalf of himself and members of the Tennessee Sub-Class.

1569. General Motors and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Lowell and members of the Tennessee

Sub-Class because General Motors and Joyson possessed superior and exclusive knowledge regarding the Defect and the risks associated with the airbag's failure. General Motors and Joyson also made partial disclosures regarding the safety of the Class Vehicles while knowing that Class Vehicles possessed the Inflator Defect and failing to disclose its existence and its corresponding safety hazard.

1570. General Motors and Joyson negligently misrepresented and omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the airbags installed in the Class Vehicles are defective and prone to premature failure, exposing drivers, occupants, and members of the public to safety risks. As a direct result of General Motors and Joyson's negligent conduct, Plaintiff Lowell and members of the Tennessee Sub-Class have suffered actual damages.

1571. The fact that the airbags installed in the Class Vehicles are prone to premature failure is material because Plaintiff Lowell and members of the Tennessee Sub-Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the airbags that would present a safety risk.

1572. The fact that the airbags installed in the Class Vehicles are prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. No reasonable consumer expects a vehicle to contain a defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

1573. Plaintiff Lowell and members of the Tennessee Sub-Class would not have purchased the Class Vehicles but for General Motors and Joyson's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiff Lowell and members of the Tennessee Sub-Class justifiably relied upon General Motors and Joyson's negligent false representations and omissions of material facts.

1574. As a direct and proximate result of General Motors and Joyson's negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the Inflator Defect, Plaintiff Lowell and members of the Tennessee Sub-Class have relied to their detriment and suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## XXII. VIRGINIA CLAIMS

### COUNT 98
### Violation of the Magnuson-Moss Warranty Act ("MMWA")
### 15 U.S.C. § 2301 *et seq.*
### (on behalf of Plaintiffs and the Nationwide Class, or alternatively, on behalf of Plaintiff Gaydos and the Virginia Sub-Class Against FCA)

1575. Plaintiff Gaydos incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1576. Plaintiff Gaydos brings this count on behalf of himself and the members of the Nationwide Class or, alternatively, on behalf of the California Sub-Class.

1577. Plaintiff Gaydos satisfies the MMWA jurisdictional requirement because he alleges diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

1578. Plaintiff Gaydos and members of the Classes are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1579. FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

1580. The Class Vehicles are "consumer product[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1581. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. See 15 U.S.C. § 2310(d)(1).

1582. FCA provided Plaintiff Gaydos and members of the Classes with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Under warranties provided to Plaintiff Gaydos and members of the Classes, FCA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles. As alleged herein, FCA breached these warranties.

1583. Plaintiff Gaydos and members of the Classes experienced the Inflator Defect within the warranty periods but FCA failed to inform Plaintiff Gaydos and members of the Classes of the existence of the Inflator Defect and associated safety risk, and failed to provide a suitable remedy or repair of the Inflator Defect free of charge within a reasonable time.

1584. FCA was provided notice by letter dated November 8, 2021, that Plaintiffs would pursue a claim under the MMWA on behalf of a class.

1585. Any attempt by FCA to disclaim or limit its express or implied warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitations are unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in FCA's warranty periods are also unconscionable and inadequate to protect Plaintiff Gaydos and members of the Classes. Among other things, Plaintiff Gaydos and members of the Classes did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that they posed a safety risk.

1586. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

1587. FCA breached these warranties by failing to disclose and fraudulently concealing information regarding the standard, quality, or grade of the Class Vehicles and/or the presence of the Inflator Defect and corresponding safety risk. Without limitation, the Class Vehicles share a common defect in design, material, manufacturing, and/or workmanship that fails to operate as represented by FCA and presents a safety risk.

1588. Affording FCA a reasonable opportunity to cure its breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, FCA knew, or was reckless in not knowing, of the material omissions concerning the standard, quality, or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, but failed to repair or replace the Inflator Defect and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff Gaydos resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

1589. Plaintiff Gaydos and members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to FCA. Thus, Plaintiff Gaydos and members of the Classes have not re-accepted their Class Vehicles by retaining them.

1590.  The amount in controversy of Plaintiff Gaydos' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1591.  Plaintiff Gaydos, individually and on behalf of members of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT 99
### Fraud By Omission or Fraudulent Concealment
### (On behalf of Plaintiff Gaydos and the Virginia Sub-Class Against FCA and Joyson)

1592.  Plaintiff Gaydos incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1593.  Plaintiff Gaydos brings this count on behalf of himself and the members of the Virginia Sub-Class.

1594. FCA and Joyson intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Class Vehicles contain the Inflator Defect and corresponding safety risk, with the intent that Plaintiff Gaydos and members of the Virginia Sub-Class rely on FCA and Joyson's omissions.  As a direct result of FCA

and Joyson's fraudulent conduct, Plaintiff Gaydos and members of the Virginia Sub-Class have suffered actual damages.

1595. FCA and Joyson knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Inflator Defect, concealed the defect and never intended to repair or replace the Inflator Defect during the warranty periods.

1596. FCA and Joyson owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff Gaydos and members of the Virginia Sub-Class because FCA and Joyson possessed superior and exclusive knowledge regarding the Defect. Rather than disclose the Defect, FCA and Joyson intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the presence of the Inflator Defect and corresponding safety risk, to sell additional Class Vehicles and avoid the cost of repair or replacement.

1597. The Inflator Defect is material to Plaintiff Gaydos and members of the Virginia Sub-Class because Plaintiff Gaydos and members of the Virginia Sub-Class had a reasonable expectation that the vehicles would not contain a defect, such as the Inflator Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk.  No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials or workmanship, such as the Inflator Defect.

1598. Plaintiff Gaydos and members of the Virginia Sub-Class would not have purchased or leased the Class Vehicles but for FCA and Joyson's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles.

1599. FCA and Joyson knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. FCA and Joyson knew their concealment and suppression of the Inflator Defect would sell more Class Vehicles and would discourage Plaintiff Gaydos and members of the Virginia Sub-Class from seeking replacement or repair of the Inflator Defect during the applicable warranty periods. Further, FCA and Joyson intended to induce Plaintiff Gaydos and members of the Virginia Sub-Class into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Inflator Defect in order to decrease costs and increase profits.

1600. FCA and Joyson acted with malice, oppression and fraud.

1601. Plaintiff Gaydos and members of the Virginia Sub-Class reasonably relied upon FCA and Joyson's knowing concealment and omissions. As a direct and proximate result of FCA and Joyson's omissions and active concealment of material facts regarding the Inflator Defect and associated safety risk, Plaintiff Gaydos and

members of the Virginia Sub-Class have suffered actual damages in an amount to be determined at trial.

## COUNT 100
### Violation of Virginia Consumer Protection Act ("VCPA")
### Va. Code Ann. § 59.1-200(A), *et seq.*
### (on behalf of Plaintiff Gaydos and the Virginia Sub-Class Against FCA and Joyson)

1602. Plaintiff Gaydos incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1603. Plaintiff Gaydos brings this count on behalf of himself and the members of the Virginia Sub-Class.

1604. Plaintiff Gaydos and members of the Virginia Sub-Class, and FCA and Joyson are "persons" as defined by Va. Code Ann. § 59.1-198.

1605. The sale or lease of the Class Vehicles by Plaintiff Gaydos and members of the Virginia Sub-Class were for personal, family or household purposes and are "consumer transaction[s]" as defined by Va. Code Ann. § 59.1-198.

1606. The Class Vehicles are "goods" as defined by Va. Code Ann. § 59.1-198.

1607. FCA and Joyson are "suppliers" as defined by Va. Code Ann. § 59.1-198.

1608. FCA and Joyson violated the Virginia Consumer Protection Act ("VCPA"), Va. Code Ann. § 59.1-200(A), by inter alia: (1) "[m]isrepresenting that

447

the Class Vehicles have certain quantities, characteristics, ingredients, uses, or benefits;" (2) "[m]isrepresenting that the goods or services are of a particular standard, quality, grade, style, or model;" (3) "[a]dvertising goods or services with the intent not to sell them as advertised;" and (4) "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

1609. In the course of their businesses, FCA and Joyson willfully failed to disclose and actively concealed the Inflator Defect and otherwise engaged in activities with a tendency or capacity to deceive as discussed herein. FCA and Joyson also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that other rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1610. In violation of the VCPA, FCA and Joyson employed unfair and deceptive acts or practices, fraud, false pretense, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and/or lease of Class Vehicles. FCA and Joyson knowingly concealed, suppressed and/or omitted material facts regarding the Inflator Defect and associated safety hazard and

misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Gaydos and members of the Virginia Sub-Class.

1611. FCA and Joyson actively suppressed the fact that the Class Vehicles contained Defective Airbags that present a safety hazard because of materials, workmanship, design and/or manufacturing defects. Further, FCA and Joyson employed unfair and deceptive trade practices to deny repair or replacement of the Inflator Defect within a reasonable time in violation of the VCPA. FCA and Joyson also breached their warranties as alleged herein in violation of the VCPA.

1612. FCA and Joyson's unfair and deceptive trade practices were likely to deceive a reasonable consumer.  Plaintiff Gaydos and members of the Virginia Sub-Class had no reasonable way to know that Class Vehicles contained airbags which were defective in materials, workmanship, design and/or manufacture and posed a safety risk.  FCA and Joyson possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Inflator Defect and associated safety risks, and any reasonable consumer would have relied on FCA and Joyson's omissions as the Plaintiff Gaydos and members of the Virginia Sub-Class did.

1613. FCA and Joyson intentionally and knowingly omitted facts regarding the Inflator Defect and associated safety hazard with the intent to mislead Plaintiff Gaydos and Virginia Sub-Class members.  FCA and Joyson knew, or should have known, that the airbags are defective and the risks associated with their failure.

1614. FCA and Joyson owed a duty to disclose the Defective Airbags and their corresponding safety hazard to Plaintiff Gaydos and members of the Virginia Sub-Class because FCA and Joyson possessed superior and exclusive knowledge regarding the Inflator Defect and associated safety risks. Rather than disclose the defect, FCA and Joyson engaged in unfair and deceptive trade practices in order to sell additional Class Vehicles and avoid the cost of repair or replacement of the Inflator Defect.

1615. FCA and Joyson's unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Inflator Defect were intended to mislead consumers and misled Plaintiff Gaydos and members of the Virginia Sub-Class

1616. At all relevant times, FCA and Joyson's unfair and deceptive acts or practices, and/or omissions regarding the Inflator Defect and its corresponding safety hazard were material to Plaintiff Gaydos and members of the Virginia Sub-Class. When Plaintiff Gaydos and members of the Virginia Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free from safety defects and/or pose an unavoidable safety hazard. Had FCA and Joyson disclosed that the airbags were defective and would fail and/or pose an unavoidable safety hazard, Plaintiff Gaydos and members

of the Virginia Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

1617. FCA and Joyson had a continuous duty to Plaintiff Gaydos and members of the Virginia Sub-Class to refrain from unfair and deceptive practices under the VCPA and to disclose the defect and associated safety hazard.  FCA and Joyson's unfair and deceptive acts or practices, and/or material omissions regarding the Inflator Defect and corresponding safety hazard are substantially injurious to consumers.  As a result of FCA and Joyson's knowing, intentional concealment and/or omission of the Inflator Defect and associated safety hazard in violation of the VCPA, Plaintiff Gaydos and members of the Virginia Sub-Class have suffered harm and/or continue to suffer harm by the threat of their airbags failing to perform in the manner that they should and/or an unavoidable safety hazard, and damages to be determined at trial.  Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of, inter alia, out-of-pocket costs for diagnosis and repair or replacement of the Inflator Defect, deprivation of the benefit of the bargain at the time of purchase or lease, and the diminished value of their vehicles as a result of FCA and Joyson's deceptive and unfair acts and practices in the course of its business.

1618. FCA and Joyson have knowingly and willfully engaged in the unfair and deceptive trade practices alleged herein.  Further, FCA and Joyson

451

unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed defect and corresponding safety hazard.

1619. FCA and Joyson's deceptive acts or practices occurred in the conduct of trade or commerce. FCA and Joyson knew or should have known that its unlawful conduct violated the VCPA.

1620. FCA and Joyson's unlawful acts and practices affect the public interest, and trade and commerce in the State of Virginia, and present a continuing safety hazard to Plaintiff Gaydos and members of the Virginia Sub-Class.

1621. The repairs instituted by FCA and Joyson, if any, have not been adequate.

1622. As a direct and proximate result of FCA and Joyson's violations of the VCPA, Plaintiff Gaydos and members of the Virginia Sub-Class have suffered actual damages and/or injury in fact, including, inter alia: (1) out-of-pocket monies for diagnosis, repair and/or replacement of the defective airbags; (2) deprivation of the benefit of the bargain at the time of purchase or lease, including the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the Inflator Defect; and/or (3) the diminished resale value of the Class Vehicles containing the Inflator Defect.

1623. Plaintiff Gaydos and members of the Virginia Sub-Class seek actual damages against FCA and Joyson in an amount to be determined at trial and/or statutory damages pursuant to the VCPA based on FCA and Joyson's wanton and willful conduct, costs, attorneys' fees, restitution, disgorgement of funds, and any other just and proper relief available under the VCPA.  See Va. Code § 59.1-204.

## COUNT 101
## Breach of Express Warranty
## (Va. Code Ann. §§ 8.2-313 and 8.2A-210)
## (on behalf of Plaintiff Gaydos and the Virginia Sub-Class against Defendant FCA)

1624. Plaintiff Gaydos incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1625. Plaintiff Gaydos brings this cause of action on his own behalf and on behalf of the members of the Virginia Sub-Class against Defendant FCA.

1626. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Va. Code Ann. §§ 8.2-104(1) and 8.2A-103(1)(t), and a "seller" of motor vehicles under § 8.2-103(1)(d).

1627. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Va. Code 8.2A-103(1)(p).

1628. The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code Ann. §§ 8.2-105(1) and 8.2A-103(1)(h).

1629. FCA marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that FCA would stand behind the quality of their products and promptly repair any Defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk from Plaintiff Gaydos and members of the Virginia Sub-Class.

1630. In connection with the purchase or lease of each of the Class Vehicles, FCA provides warranty coverage for the Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, Defendant FCA currently offers a Basic Limited Warranty coverage for Class Vehicles sold under the Dodge brand for 3 years and 36,000 miles and extended warranty coverage for Powertrain components for 5 years or 60,000 miles. Under the warranties provided to Plaintiff Gaydos and members of the Virginia Sub-Class, FCA promised to repair or replace covered components arising out of Defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time.  As alleged herein, FCA breached these warranties.

1631. FCA breached the express warranty promising to repair and correct a manufacturing Defect or Defect in materials or workmanship of any parts it supplied.

1632. On information and belief, FCA has not suitably repaired or replaced the Defective Airbags for Plaintiff Gaydos and members of the Virginia Sub-Class despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

1633. FCA further breached its express warranties by selling Class Vehicles that were Defective with respect to materials, workmanship, design and manufacture.

1634. Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing Defects which cause a failure to deploy the airbags as warranted.

1635. Plaintiff Gaydos and members of the Virginia Sub-Class have had sufficient direct dealings with FCA or its agents, its authorized dealerships, to establish privity of contract between FCA, on the one hand, and Plaintiff Gaydos and members of the Virginia Sub-Class, on the other hand. Nonetheless, privity is not required here because Plaintiff Gaydos and members of the Virginia Sub-Class are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

1636. FCA was provided notice of the Inflator Defect by its engineers, numerous consumer complaints made to its authorized dealers nationwide,

complaints to NHTSA and through its own testing. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and has failed to provide a suitable repair or replacement of the Defective Airbags within a reasonable time.

1637. Any attempt by FCA to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a Defective product without informing consumers about the Defect. The time limits contained in FCA's warranty periods were also unconscionable and inadequate to protect Plaintiff Gaydos and members of the Virginia Sub-Class. Among other things, Plaintiff Gaydos and members of the Virginia Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Classes, and FCA knew or should have known that the Class Vehicles were Defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1638. Further, the limited warranty promising to repair and/or correct a manufacturing Defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Gaydos and members of the Virginia Sub-Class

whole because, on information and belief, FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1639. FCA knew that the Class Vehicles were inherently defective and did not conform to its warranties, and Plaintiff Gaydos and members of the Virginia Sub-Class were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1640. FCA's warranties formed a basis of the bargain that was reached when Plaintiff Gaydos and members of the Virginia Sub-Class purchased or leased their Class Vehicles.

1641. Plaintiff Gaydos and members of the Virginia Sub-Class experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by FCA. Despite the existence of the warranties, FCA failed to inform Plaintiff Gaydos and members of the Virginia Sub-Class that the Class Vehicles contained the Inflator Defect during the warranty periods.

1642. Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

1643.  As a direct and proximate result of FCA's breach of express warranties, Plaintiff Gaydos and members of the Virginia Sub-Class have been damaged in an amount to be determined at trial.

1644.  Finally, because of FCA's breach of express warranty as set forth herein, Plaintiff Gaydos and members of the Virginia Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff Gaydos and members of the Virginia Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT 102
### Breach of Implied Warranty of Merchantability
### (On behalf of Plaintiff Gaydos and the Virginia Sub-Class Against Defendant FCA)

1645.  Plaintiff Gaydos incorporates and re-alleges each preceding paragraph as though fully set forth herein.

1646.  Plaintiff Gaydos brings this count on behalf of himself and the members of the Virginia Sub-Class.

1647.  Plaintiff Gaydos and members of the Virginia Sub-Class purchased or leased the Class Vehicles, manufactured by FCA, from FCA by and through its authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party.  At all relevant times, FCA was the manufacturer, distributor, warrantor and/or seller of Class

Vehicles. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

1648. FCA is and was at all relevant times "sellers" of motor vehicles under Va. Code Ann. § 8-2-313(1)-(2), and "merchants" with respect to motor vehicles within the meaning of §§ 8-2-104(1) and 8.2A-103(1)(t).

1649. With respect to leases, FCA is and was at all relevant times "lessors" of motor vehicles under Va. Code Ann. § 8-2A-103(1)(p).

1650. Plaintiff Gaydos and members of the Virginia Sub-Class are and were at all relevant times "buyers" with respect to the Class Vehicles under Va. Code Ann. § 8-2-313(1).

1651. The Class Vehicles are and were at all relevant times "goods" within the meaning Va. Code Ann. §§ 8-2-105(1) and 8.2A-103(1)(h).

1652. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Va. Code Ann. §§ 8.2-314 and 8.2A-212.

1653. FCA impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

1654. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent

defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Defendant breached the implied warranty of merchantability.

1655. FCA cannot disclaim its implied warranty as it knowingly sold or leased a defective product.

1656. FCA was provided notice of the Inflator Defect by numerous consumer complaints made to FCA's authorized dealers nationwide, complaints to NHTSA and through its own testing. Affording FCA a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because FCA has known of and concealed the Inflator Defect and, on information and belief, has refused to repair or replace the Inflator Defect free of charge within a reasonable time.

1657. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff Gaydos and members of the Virginia Sub-Class have been damaged in an amount to be proven at trial.

1658. Any attempt by FCA to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, FCA's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in FCA's warranty periods were also unconscionable and

inadequate to protect Plaintiff Gaydos and members of the Virginia Sub-Class. Among other things, Plaintiff Gaydos and members of the Virginia Sub-Class did not determine these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power existed between FCA and members of the Virginia Sub-Class, and FCA knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

1659. Plaintiff Gaydos and members of the Virginia Sub-Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

1660. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

## XXIII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs and the Classes, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class, and Plaintiffs' counsel as counsel for the Classes;

B.      An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

C.      Injunctive and equitable relief in the form of a comprehensive program to repair or replace the Defective Airbags in all Class Vehicles, and/or buyback all Class Vehicles, and to fully reimburse and make whole all members of the Classes for all costs and economic losses;

D.      Appropriate injunctive and equitable relief;

E.      A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

F.      An order awarding costs, restitution, disgorgement, punitive damages, treble damages and exemplary damages under applicable law, and compensatory damages for economic loss, overpayment damages, and out-of-pocket costs in an amount to be determined at trial;

G.      An order awarding any applicable statutory and civil penalties;

H.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.      An award of costs, expenses and attorneys' fees as permitted by law; and

J.      Such other or further relief as the Court may deem appropriate, just, and

equitable.

## XXIV.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all issues so triable.

DATED: November 8, 2021                    Respectfully submitted,

Christopher A. Seeger                       */s/ Joseph H. Meltzer*
Christopher L. Ayers                        Joseph H. Meltzer
**SEEGER WEISS LLP**                        Melissa L. Troutner
55 Challenger Road, 6th Floor               **KESSLER TOPAZ MELTZER**
Ridgefield Park, NJ 07660                   **& CHECK, LLP**
Telephone: (973) 639-9100                   280 King of Prussia Road
Facsimile: (973) 679-8656                   Radnor, PA 19087
cseeger@seegerweiss.com                     Telephone: (610) 667-7706
cayers@seegerweiss.com                      Facsimile: (610) 667-7756
                                            jmeltzer@ktmc.com
                                            mtroutner@ktmc.com


                                            James E. Cecchi
W. Daniel "Dee" Miles, III                  Caroline F. Bartlett
H. Clay Barnett, III                        Jordan M. Steele
J. Mitch Williams                           **CARELLA, BYRNE, CECCHI,**
**BEASLEY, ALLEN,**                         **OLSTEIN, BRODY & AGNELLO, P.C.**
**CROW, METHVIN,**                          5 Becker Farm Road
**PORTIS & MILES, P.C.**                    Roseland, New Jersey 07068
272 Commerce Street                         Telephone: (973) 994-1700
Montgomery, AL 36104                        Facsimile: (973) 994-1744
Telephone: (334) 269-2343                   jcecchi@carellabyrne.com
dee.miles@beasleyallen.com                  cbartlett@carellabyrne.com
clay.barnett@beasleyallen.com               jsteele@carellabyrne.com
mitch.williams@beasleyallen.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2021 a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court, is available for viewing and downloading from the ECF system, and will be served by operation of the Court's electronic filing system (CM/ECF) upon all counsel of record.

/s/ *Joseph H. Meltzer*
Joseph H. Meltzer
