James E. Cecchi, Esq.
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

[Additional Attorneys on Signature Page]

*Attorneys for Plaintiffs and Interim Class Counsel*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLENN SAGER, ANTHONY BOCCHINO, and OSCAR JONES, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>KEY SAFETY SYSTEMS, INC., GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS LLC, GENERAL MOTORS LLC, and FCA US LLC,<br><br>Defendants. | Case No.: 1:21-cv-15867 (KMW) (SAK)<br><br>SECOND AMENDED CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

Section                                                                                              Page

I.      INTRODUCTION ................................................................................................1

II.     PARTIES ...........................................................................................................4

        A.      Plaintiffs .................................................................................................4

        B.      Defendants ..............................................................................................5

III.    JURISDICTION AND VENUE ..........................................................................6

IV.     SUBSTANTIVE ALLEGATIONS .....................................................................8

        A.      Definitions ..............................................................................................8

        B.      The Inflator Defect Turns a System Intended to Safeguard Occupants into a Safety Hazard ....................................................................................10

        C.      Defendants Knew the Defective Airbags in the Class Vehicles Contained the Defect ................................................................................................11

                1.      Defendants Begin Receiving Failed Inflators In The Field, Culminating In Three Explosions In One Week. ...........................11

                2.      NTHSA Receives Mounting Reports of Injuries. .....................13

                3.      The Recall Remains Incomplete, Fails To Recall All Airbags Containing The Inflator Defect, And Does Not Compensate Plaintiffs For The Overpayment of Their Vehicles At the Point-of-Purchase .....................18

        D.      Despite Their Knowledge, Defendants Concealed The Inflator Defect And Continued To Sell Class Vehicles with the Defective Airbags As "Safe" And "Reliable." ...........................................................................................19

                1.      Labels and window stickers on the Class Vehicles stated that they were equipped with working airbags and seatbelts and failed to disclose the Inflator Defect. ...................................................20

                2.      Joyson, General Motors, and FCA marketed the Airbags and Class Vehicles as safe and reliable, but failed to disclose and concealed the Inflator Defect. .........................................................................25

V.      CLASS ACTION ALLEGATIONS ...................................................................39

        A.      Numerosity: Federal Rule of Civil Procedure 23(a)(1) ....................................40

B.     Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)...............................................................................................................41

C.     Typicality: Federal Rule of Civil Procedure 23(a)(3) ........................................43

D.     Adequacy: Federal Rule of Civil Procedure 23(a)(4) ........................................43

E.     Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)...43

F.     Superiority: Federal Rule of Civil Procedure 23(b)(3) .....................................44

VI.     ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED.......................44

VII.     CAUSES OF ACTION .................................................................................45

VIII.     PRAYER FOR RELIEF.................................................................................62

IX.     DEMAND FOR JURY TRIAL.......................................................................64

Plaintiffs Glenn Sager, Anthony Bocchino, and Oscar Jones, individually and on behalf of all others similarly situated, allege the following against General Motors Company, General Motors Holdings LLC, General Motors LLC (collectively "General Motors"), FCA US LLC ("FCA" with General Motors, the "Truck Manufacturers"), and Key Safety Systems, Inc. d/b/a Joyson Safety Systems ("Joyson") (collectively "Defendants") based upon personal knowledge as to allegations specifically pertaining to Plaintiffs and, as to all other matters, upon the investigation of counsel.[1]

## I.    INTRODUCTION

1.    This action concerns defective airbags manufactured by Joyson Safety Systems, which suffer from a defective design that permits moisture to corrode the inflator vessel, eventually resulting in a spontaneous rupture that endangers the safety of passengers and other vehicles on the road (the "Inflator Defect" or "Defect" with airbags containing the Defect referred to as "Defective Airbags").[2] Joyson first detected the Defect in early-to-mid 2015, upon discovering the presence of moisture in airbags containing the Inflator Defect. Defendants were aware of the Inflator Defect and the mounting reports of spontaneous inflator ruptures, yet nevertheless continued to install the airbags in trucks that Defendants FCA and General Motors manufactured, sold, or leased. The Truck Manufacturers misrepresented the Class Vehicles (defined below) as

---

[1] Counsel's investigation includes an analysis of publicly available information, including Defendants' Technical Service Bulletins, National Highway Traffic Safety Administration documents, and consumer complaints. Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

[2] An airbag is a critical safety feature of any motor vehicle. Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield. An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact. In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.

safe and deceptively concealed the fact that inflators in these vehicles are prone to rupture which presents an obvious safety risk.

2.      Testing confirmed that the Joyson airbags at issue in this litigation share a common, uniform Defect: corrosion inside the inflator vessel of the airbags, resulting from a defect in their design. It is known that airbags containing the Inflator Defect are located in the roof-rails of certain trucks manufactured by General Motors ("roof-rail airbags" or "RRAB") and the side-curtains of certain trucks manufactured by FCA ("side airbag inflatable curtain airbag" or "SABIC"). However, the Inflator Defect may also be present in other airbags manufactured and distributed by Joyson and Plaintiffs call for Defendants to recall any Defective Airbag containing the Inflator Defect, and reserve their right to amend the Class definition accordingly.

3.      Because of the common, uniform Inflator Defect, Joyson airbags fail to perform as they should. Instead of protecting vehicle occupants from bodily injury during accidents, the defective Joyson airbags may spontaneously rupture. As of November 2022, the Defective Airbags have been involved in multiple recalls, and dozens of ruptures have been reported to the National Traffic Highway Safety Association ("NHTSA") with injuries reported as early as August 2015. Despite nearly **two years** having passed since the initial November 25, 2020 recall by General Motors, the recall still remains uncompleted. *See* Exhibits A, C (documenting 74 complaints to NHTSA that the recall has not been repaired in the Class Vehicles and that: "the parts were not available"; "the recall repair was unavailable"; and "the manufacturer had exceeded a reasonable amount of time for the recall repair".). More than **three years** have passed since Joyson began to discover corroded, embrittled inflators in the field yet the Defective Airbags still remain on the road today.

4.      Defendants have long known of the Defect. Since rolling out of Defendants' manufacturing facilities, Class Vehicles containing the Inflator Defect have suffered from spontaneous ruptures, causing injury and property damage to owners and passengers. There have been ***dozens of these incidents*** reported to the National Highway Traffic Safety Association ("NHTSA") with the earliest reported on August 12, 2015. Manufacturers are required to monitor reports submitted to NHTSA and report information regarding internal customer complaints and warranty claims. By way of example, these complaints state: "…passenger sustained injuries. The contact required medical attention…The Manufacturer was notified of the failure. The vehicle was not repaired." (Reported Aug. 13, 2015, NHTSA ID 10748531); "…front side air bags deployed without warning or an impact…The Manufacturer [FCA] was contacted and stated that the vehicle was not included in a Takata air bag recall" (Reported Feb. 5, 2019, NHTSA ID 11174495); and "[m]y insurance adjuster and the service facility both expressed they are familiar of such accidental side air deployments on [a Class Vehicle]" (Reported on Mar. 22, 2017, NHTSA ID 10967669). *See* Exhibits. B, D.

5.      As a result of this misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages in the form of overpayment for their Class Vehicles at the time of purchase. The recalls fail to remedy the harm Plaintiffs sustained, because purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed. Plaintiffs and the Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as it avoids incurring the costs associated with recalls and installing replacement parts.

6.     Plaintiffs and the Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and paying for childcare. Also, as a direct result of misconduct by the Truck Manufacturers, each Plaintiff and Class member has out-of-pocket economic damage by virtue of having incurred the expense of taking the time to bring vehicles in for repair. Plaintiffs and the Classes also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of the Class Vehicles. Defendants' false representations and omissions concerning the safety and reliability of those vehicles and their concealment of the known safety defects plaguing those vehicles caused Plaintiffs and Class members to purchase, lease, or retain their vehicles with diminished value.

## II.    PARTIES

### A.    Plaintiffs

7.     Plaintiff Sager resides in Atco, New Jersey. Plaintiff Sager owns a 2016 Chevrolet Silverado, which was purchased used on or around April 1, 2020, from Mall Chevrolet in Cherry Hill, New Jersey. Plaintiff Sager purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Sager would not have purchased his Class Vehicle, or would have paid less for his Class Vehicle, had Defendants disclosed the Inflator Defect. The value of Plaintiff Sager's 2016 Chevrolet Silverado has diminished as a result of Defendants' deceptive acts and practices.

8.     Plaintiff Bocchino resides in Bellville, New Jersey. Plaintiff Bocchino owns a 2016 Dodge Ram 2500, which was purchased used on or around July 1, 2019, from Platinum Motors in Toms River, New Jersey. Plaintiff Bocchino purchased his Class Vehicle for personal, family and/or household use. Plaintiff Bocchino would not have purchased his 2016 Dodge Ram 2500,

or would have paid less for it, had Defendants disclosed the Inflator Defect. The value of Plaintiff Bocchino's 2016 Dodge Ram 2500 has diminished as a result of Defendants' deceptive acts and practices.

9.    Plaintiff Jones resides in Hillside, New Jersey. Plaintiff Jones owns a 2016 GMC Sierra Denali 1500, which was purchased new on or around April 1, 2016, from Maxon Auto Group in Union, New Jersey. Plaintiff Jones purchased his Class Vehicle for personal, family, and/or household use. Plaintiff Jones would not have purchased his 2016 GMC Sierra Denali 1500, or would have paid less for it, had Defendants disclosed the Inflator Defect. The value of Plaintiff Jones' 2016 GMC Sierra Denali 1500 has diminished as a result of Defendants' deceptive acts and practices.

**B.    <u>Defendants</u>**

10.    Key Safety Systems, Inc. d/b/a Joyson Safety Systems ("Joyson"), is incorporated in Delaware with its principal place of business located at 2025 Harmon Road, Auburn Hills, Michigan, 48326. Joyson is owned jointly by Joyson Group (China) and PAG Capital (Hong Kong), and the company is the result of Key Safety Systems, Inc. purchasing troubled Japanese airbag company Takata Corporation.

11.    General Motors LLC ("General Motors LLC") is organized in Delaware and maintains its executive offices at 300 Renaissance Center, Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings LLC.

12.    General Motors Holdings LLC ("General Motors Holdings") is organized in Delaware and maintains its principal executive offices in Detroit, Michigan. The sole member of General Motors LLC is General Motors Company.

13.    General Motors Company ("General Motors Parent") is a Delaware corporation with its principal executive offices in Detroit, Michigan, and is a citizen of the States of Delaware

and Michigan. General Motors Parent's only asset is its 100% ownership interest in General Motors Holdings. General Motors Parent is also responsible for making reports to NHTSA related to vehicle safety and deciding on vehicle recalls.

14.    FCA US LLC ("FCA"), formerly known as Chrysler Group LLC, is a Delaware limited liability company with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan, and FCA is a citizen of the States of Delaware and Michigan. The sole owner of FCA is Stellantis N.V., a Dutch-domiciled, multinational automotive manufacturing corporation formed in 2021.

## III.    **JURISDICTION AND VENUE**

15.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Classes are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

16.    This Court has specific personal jurisdiction over Defendants because they committed and are committing a tortious act in New Jersey, caused injury to Plaintiffs and the Class in New Jersey arising out of the sale and/or lease of Class Vehicles in New Jersey, or by permitting the resale of Class Vehicles in New Jersey while fraudulently concealing the Defect. In other words, Defendants' contacts with New Jersey gave rise to Plaintiffs' claims.

17.    Moreover, each Defendant maintains extensive, continuous and systematic, contacts with New Jersey, with the Ports of New York and New Jersey being critical to their continued, global operations. Defendants FCA US LLC and General Motors LLC, consented to personal jurisdiction in the State of New Jersey by registering to do business in New Jersey: each

of these Defendants files Annual Reports within the State of New Jersey; each assigned a third-party to be its registered agent in the State of New Jersey; as part of its registration to do business in this State, each consented to and deputized the registered to accept service of all valid process for all claims, all writs, and all causes of action, which is a very clear indication they consented to do business in this State. Moreover, each Defendant maintains an extensive network of importer/exporter subsidiaries, manufacturing facilities, repair centers and/or dealerships. More specifically:

    a.    General Motors LLC maintains the Corporation Service Company as its registered agent in New Jersey to accept service for all claims, all writs, and all causes of action in New Jersey. General Motors maintains subsidiaries for the purpose of importing and exporting Class Vehicles and other automotive vehicles, parts, and supplies at the Ports of New Jersey. General Motors also maintains 87 primary suppliers in New Jersey (direct and indirect) with a purchase order current within the last 365 days, 79 active dealers in New Jersey and delivered 58,177 vehicles in New Jersey just in 2020 alone.[3] General Motors also maintains a network of repair centers in New Jersey. General Motors also has a long relationship with the State of New Jersey, and operated the Linden Assembly in this District from 1937 to 2005, prior to its reorganization.

    b.    FCA US LLC maintains the C T CORPORATION SYSTEM as its registered agent in New Jersey to accept service for all claims, all writs, and all causes of action in

---

[3] General Motors in New Jersey, GENERAL MOTORS, https://www.gm.com/our-company/us/nj.html (last visited Oct. 5, 2021)

New Jersey. FCA has approximately 50 Dodge-affiliated dealerships in the State of New Jersey.[4] FCA also maintains a network of repair centers in New Jersey.

c.    Defendant Key Safety Systems, Inc. is the part supplier for the incomplete and inadequate recall being conducted throughout the State of New Jersey. It conducts substantial business in this District as many OEM's maintain their headquarters in this District including: BMW Group, Ferrari, Jaguar Land Rover, Subaru and Volvo. Defendant Key Safety Systems, Inc. also purposefully avails itself through importing / exporting at the Ports of New Jersey.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in New Jersey and Plaintiffs and the Class Vehicles at issue are located in New Jersey. Defendants caused harm to Plaintiffs, as well as hundreds of members of the Classes, in New Jersey.

## IV.   **SUBSTANTIVE ALLEGATIONS**

### A.   **Definitions**

19.    Plaintiffs bring this action on behalf of themselves, and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually, and on behalf of those similarly situated, for economic losses stemming from Defendants' manufacture, sale or lease, and false representations or omissions concerning the Inflator Defect in the Class Vehicles, including but not limited to: benefit of the bargain damages, overpayment damages, damages for diagnosis, repair, and/or replacement of the airbags; damages for diminished value of their vehicles; compensatory, statutory and punitive damages; attorneys' fees; costs; restitution; and/or injunctive relief.

---

[4] *Dodge Dealerships in New Jersey*, DealerRater, https://www.dealerrater.com /directory/New-Jersey/Dodge/ (last visited Oct. 13, 2021).

20.    "Class Vehicles" refers to all vehicles in the United States that: (a) were equipped with Defective Airbags (defined below) as original equipment; and (b) were manufactured, distributed, sold, or leased by Defendants.

21.    "Defective Airbags" refers to all airbag modules manufactured by Joyson, including: (a) all airbags containing the Inflator Defect; (b) all airbags subject to the recalls identified in paragraph 23 below; and (c) all airbags manufactured by Joyson subject to any subsequent expansion of pre-existing recalls, subject to new recalls, announced prior to the date of an order granting class certification, or relating to the tendency of such airbags to spontaneously deploy or rupture.

22.    All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, all Defective Airbags have an unreasonably dangerous tendency to spontaneously deploy, endangering the passengers and other drivers on the road.

23.    The following tables identify, to the best of Plaintiffs' understanding and without the benefit of discovery, the General Motors and FCA vehicles equipped with the Defective Airbags, along with their respective recall status:

| Recall | Make | Model | Model Years |
|---|---|---|---|
| 20V-736; 21V-504 | GMC | Sierra 1500 | 2015-2016 |
| 20V-736; 21V-504 | GMC | Sierra 2500/3500 | 2015-2016 |
| 20V-736; 21V-504 | Chevrolet | Silverado 1500 | 2015-2016 |
| 20V-736; 21V-504 | Chevrolet | Silverado 2500/3500 | 2015-2016 |
| 21V-632 | Dodge | Ram 1500 | 2015-2019 |
| 21V-632 | Dodge | Ram 2500 | 2015-2020 |
| 21V-632 | Dodge | Ram 3500 | 2015-2020 |
| 21V-632 | Dodge | Ram 3500 Cab Chassis (10,000 lbs.) | 2016 |
| 21V-632 | Dodge | Ram Classic | 2015-2020 |

**B.**    **The Inflator Defect Turns a System Intended to Safeguard Occupants into a Safety Hazard**

24.     Airbags are designed to take advantage of the physics of a crash. In the case of a head-on collision, a car usually completes its impact progression in a few instants. For example, when traveling at 40 miles per hour, a car will decelerate at a rate of 3,997 meters per second, taking just 4.5 milliseconds to stop completely, the blink of an eye. Following Newton's second law, the bodies of the occupants will continue to move until an outside force, such as the steering wheel, dashboard, or windshield bring the occupants to a stop.

25.     In general, there are five main parts of an airbag system: crash sensors; a control module; initiator; an explosive charge; and the airbag itself. Some airbag designs have added stored gas to this design, either in conjunction with or in place of the explosive charge.

26.     The airbag control module initiates airbag deployment by input from crash sensors located throughout the vehicle. Crash sensors are electronic devices designed to tell when an impact has occurred and only deploy when a collision occurs. The sensors respond to several different sets of stimuli, such as sudden stopping or increased pressure as pieces of the car move due to the force of the collision. Different sensors measure wheel speed, seat occupant status, brake pressure, impact, and more. The airbag control module measures these vehicle status indicators during operation.

27.     If an airbag deploys in the event of no collision, occupants are unexpectedly assaulted with an airbag inflating at 200 mph in 1/25th of a second and potentially bombarded with shrapnel.  For this reason, the Inflator Defect is tremendously, even fatally, dangerous to occupants.

**C.**    **Defendants Knew the Defective Airbags in the Class Vehicles Contained the Defect**

28.    Defendants knew or had reason to know of the Inflator Defect and the risks it entails well before General Motors and FCA issued their recalls, from field reports, consumer complaints, internal investigations, and communications from their networks of dealerships. Defendants have continued to acquire knowledge of the Defect and General Motors delayed nearly nine months before issuing a secondary recall. Defendants have continued to conceal this problem and the pattern of accidents, injuries, and premature deployments that. Defendants have failed to share this information with the consumers who paid for and drive their Class Vehicles every day.

**1.    Defendants Begin Receiving Failed Inflators In The Field, Culminating In Three Explosions In One Week.**

29.    On June 2, 2020, General Motors' Technical Assistance Center received a report from a General Motors dealer regarding an unwanted/uncommanded deployment of a roof-rail airbag in a 2015 model year Chevrolet Silverado. An inspection was conducted on June 22, 2020, and based on the photos obtained in that inspection, the issue was submitted to General Motors' safety program on June 25, 2020. On June 26, 2020, General Motors opened a formal product investigation.

30.    Joyson received the inflator from the field on July 17, 2020, and began engineering analyses on the returned part, including metallurgical and scanning electron microscopy analyses. Joyson found evidence of corrosion and material embrittlement at the inflator end cap.

31.    Joyson observed similar corrosion and embrittlement in a roof-rail airbag inflator returned from the field from a prior incident in 2019.

32.    On October 20, 2020, Joyson informed General Motors that it identified a production period during which moist air might have been introduced into the inflator manufacturing process. This supplier production window aligns with the manufacturing dates of

inflators from both field cap-separation incidents. On November 18, 2020, General Motors' Safety and Field Action Decision Authority decided to conduct a safety recall on roof-rail airbag inflators produced during this production window.

33.    On November 25, 2020, General Motors issued the first recall, in which less than 10,000 vehicles were recalled.

34.    On January 15, 2021, according to NHTSA ID 11416553, at least one consumer indicated that they attempted to have their Class Vehicle repaired but that the parts were not yet available and the infrastructure for repair was not in place.  Over two months after issuing the recall, General Motors was not in a position to repair the Class Vehicles.

35.    In mid-June 2021, roof-rail airbags in three separate 2015 model year Silverado vehicles—one in Florida and two in Texas—ruptured while the vehicles were unoccupied and not in use. In all three inflators, the steel inflator-body sidewall split open, suddenly releasing the gas stored inside the chamber.

36.    General Motors became aware of these three incidents on June 15, June 21, and June 22. On June 24, 2021, General Motors' Safety and Field Action Decision Authority decided to conduct a safety recall.

37.    On July 1, 2021, General Motors issued their second recall, increasing the number of Class Vehicles' affected from under 10,000 vehicles to over 400,000 vehicles.

38.    Similarly, FCA and Joyson had multiple discussions regarding the Defect between December 9, 2020 and July 8, 2021. It was found that moisture introduced into the inflator during supplier manufacturing may cause internal corrosion over time and potentially leading to Stress Corrosion Cracking ("SCC") in the inflator.

39.    On August 15, 2021, FCA also issued a recall for 212,373 Ram pick-ups in the United States, and another 49,334 in Canada and Mexico. Nearly two years passed after Joyson became aware of the Defect in 2019 before these recalls. Accordingly, Defendants knew or should have known that the Joyson airbags installed in millions of Class Vehicles were defective and potentially deadly.

40.    Though it is important to note that, upon information and belief, the Defect is not limited to those Class Vehicles subject to the recall. Testing conducted on multiple inflators, for with NTHSA indicated have no open recalls, revealed the same internal corrosion as reported by Joyson.

### 2.    NTHSA Receives Mounting Reports of Injuries.

41.    Defendants' dealerships provide Defendants with early knowledge of defects, including the Inflator Defect, through the reporting of customer complaints and warranty claims. Defendants' employees closely monitor internal databases containing customer complaints and warranty claims to identify, track, and address emerging problems from design and engineering standpoints, among others.

42.    Defendants have and continue to be under a legal obligation under federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them. Defendants therefore assiduously monitor the NHTSA–ODI website and the complaints filed therein to comply with their reporting obligations under federal law. Since the Class Vehicles left the Truck Manufacturer's facilities, there have been dozens of incidents of reported ruptures submitted to NHTSA. *See* Exs. B, D.

43.    Notwithstanding Defendants' exclusive and superior knowledge of the Inflator Defect and the associated risks to safety, Defendants failed to disclose the Inflator Defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and

13

continued to sell Class Vehicles containing the Inflator Defect. Defendants have intentionally concealed the Inflator Defect its safety risk from consumers, including Plaintiffs, members of the Class, and the public.

44.    As set forth above, Defendants know about the Inflator Defect due to consumer complaints such as those made to the NHTSA, which Defendants monitor as part of a continuous obligation to identify potential defects in their vehicles. Defendants knew about the Inflator Defect through monitoring NHTSA complaints identifying the Inflator Defect, a sampling of which is below that concern those individuals that have been injured:[5]

Reported Date:        August 13, 2015
Incident Date:        June 22, 2015
Consumer Location:    PHILIPSBURG, PA

Summary of Complaint
TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 14 MPH ON A GRAVEL ROAD, **BOTH THE DRIVER AND PASSENGER SIDE AIR BAGS DEPLOYED. THE CONTACT AND THE PASSENGER SUSTAINED INJURIES**. THE CONTACT REQUIRED MEDICAL ATTENTION. THE **VEHICLE WAS TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE FAILURE WAS CAUSED BY THE ROUGH ROAD AND THAT THE VEHICLE FUNCTIONED AS DESIGNED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED**. THE FAILURE MILEAGE WAS 9,300.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Reported Date:        August 1, 2016
Incident Date:        July 25, 2016
Consumer Location:    Unknown

Summary of Complaint:
THE TRUCK WAS TRAVELING ON THE INTERSTATE AND THE DRIVER HAD TO BRAKE FOR HEAVY TRAFFIC AHEAD. **WITHOUT REASON BOTH SIDE AIRBAGS DEPLOYED. THE AIRBAG DEPLOYMENT CAUSED THE DRIVER TO VEER OFF THE INTERSTATE AND ONTO**

---

[5] Below is a sampling of relevant ruptures involving injuries to vehicle occupants, for additional complaints and the full submission of those below, *see* Exs. B, D. Unless otherwise stated, all emphasis has been added.

**THE FRONTAGE RD.THERE WAS NO IMPACT WITH ANYTHING PRIOR TO AIRBAG DEPLOYMENT**. LUCKILY THERE WAS NO IMPACT AFTER DEPLOYMENT EITHER. THE DRIVER STATED THAT HE WAS HURT BY THE AIRBAGS. I RENDERED AID TO THIS DRIVER AND COMPLETED A INCIDENT REPORT. COLORADO STATE PATROL CASE # 3C161461

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Reported Date:       July 23, 2018
Incident Date:       June 27, 2018
Consumer Location:   ARLINGTON, VA

Summary of Complaint:
TL* THE CONTACT OWNS A 2016 GMC SIERRA 1500. WHILE DRIVING APPROXIMATELY 25 MPH, THE FRONT DRIVER'S SIDE AIR BAG ERRONEOUSLY DEPLOYED AND CAUSED THE CONTACT'S VEHICLE TO CRASH INTO THE REAR OF ANOTHER VEHICLE. **THE DRIVER SUSTAINED INJURIES TO THE HEAD, CHEST, AND LEFT ARM THAT REQUIRED MEDICAL ATTENTION.** THE VEHICLE WAS TOWED TO AN UNDISCLOSED LOCATION. A POLICE REPORT WAS NOT FILED. THE CAUSE OF THE FAILURE WAS NOT DETERMINED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE, BUT THE LOCAL DEALER WAS NOT. THE FAILURE MILEAGE WAS 17,000. THE VIN WAS NOT AVAILABLE.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Reported Date:       March 6, 2019
Incident Date:       December 5, 2018
Consumer Location:   JARVISBURG, NC

Summary of Complaint:
TL* TAKATA RECALL. THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 2500. **UPON ENTERING A RESIDENTIAL DRIVEWAY, ALL OF THE SIDE CURTAIN AIR BAGS DEPLOYED WITH FORCE AND A WHITE SUBSTANCE EMITTED INTO THE VEHICLE. THE CONTACT SUSTAINED HEAD TRAUMA, NECK, AND BACK PAINS THAT REQUIRED MEDICAL ATTENTION. THE CONTACT HAD TO BE TRANSPORTED TO THE HOSPITAL. THE INSURANCE COMPANY WAS NOTIFIED. THE VEHICLE WAS TAKEN TO OBX CHEVROLET (6166 N CROATAN HWY, KITTY HAWK, NC 27949, 252-261-5900), BUT WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS CONTACTED.** THE APPROXIMATE FAILURE MILEAGE WAS 62,000.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Reported Date:       February 10, 2021
Incident Date:       February 6, 2021

Consumer Location:   ALBUQUERQUE, NM

Summary of Complaint:
I WAS DRIVING AT A SPEED OF 40 MPH ON A DIRT ROAD WHEN I HIT **A LITTLE BUMP AN DRIVER AN PASSENGER CURTAIN AIR BAGS DEPLOY FOR NO REASON AT ALL, CAUSING MYSELF AN WIFE TO RUN OFF THE ROAD INTO AN EMBANKMENT. MY WIFE IS OK I SUFFER A LACERATION TO MY NOSE AN A SPRANG ANKLE.** THIS HAD HAPPEN WILL DELIVERING FOOD AN WATER TO GRANDPARENTS ON THE RESERVATION, THEY HAVE NO RUNNING WATER. THERE WAS NO POLICE REPORT FILED DUE TO COVID 19 AN UNAVAILABLE POLICE ON RESERVATION.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Reported Date:        August 6, 2021
Incident Date:        July 9, 2021
Consumer Location:   DAYTONA BEACH, FL

Summary of Complaint:
**Side rail airbag deployed knock me out and total my vehicle.**

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Reported Date:        March 3, 2022
Incident Date:        February 27, 2022
Consumer Location:   TERRELL, TX

Summary of Complaint:
I was driving on the highway and was rear ended by another vehicle which lifted the back end of my truck from the ground. Both side air bags deployed. I was wearing a hoodie at the time and the airbag deployment caused my hoodie to catch on fire. There was not an open flame for me to know it was burning. Instead, it smoldered and burnt my hoodie material. I could feel the underside of my arm stinging and the holes in my sleeve, but believed that it was a result of the airbag hitting my arm and causing essentially a bad carpet burn. However, this caused second degree burns to the bottom side of my arm near my arm pit. I discovered after the incident that airbag deployment is assisted by gunpowder. I am not sure if this is what caused my hoodie to catch fire. I also discovered that 2021-2022 Rams recently had a recall on Side Airbags due to improperly compressed air. My truck is a 2019 however, so I'm not sure if that recall should be expanded to include additional years.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Reported Date:        September 13, 2022
Incident Date:        March 18, 2022
Consumer Location:   SANFORD, NC

Summary of Complaint:
Air bags deployed while vehicle was parked and engine not running….vehicle was not hit or tampered with ..**I was inside vehicle vacuuming when air bags went off without any warning**..insurance gave me points for incident when there was no reason for air bags to deploy and I had to pay deductible…I should be reimbursed

45.    The above consumer complaints represent a sampling of complaints filed with the

NHTSA. Defendants monitored and saw the above quoted consumer complaints for three reasons:

a)    First, pursuant to the Transportation Recall Enhancement, Accountability, and

Documentation Act (the "TREAD Act"), 49 U.S.C. § 30118, manufacturers are

required to monitor reports submitted to NHTSA and report information regarding

internal customer complaints and warranty claims to NHTSA, and federal law

imposes criminal penalties against manufacturers who fail to disclose known safety

defects.

b)    Second, car manufacturers like Defendants know that NHTSA is a repository for

complaints, and as such can provide an early warning mechanism for responding to

design or manufacturing defects that pose a safety hazard. Hence, as courts have

found, it is entirely reasonable to assume that car manufacturers closely monitor

and analyze complaints made to NHTSA—particularly when they entail a safety

hazard.

c)    Third, online reputation management (commonly called "ORM" for short), is now

a standard business practice among most major companies and entails monitoring

consumer forums, social media and other sources on the internet where consumers

can review or comment on products. "Specifically, [online] reputation management

involves the monitoring of the reputation of an individual or a brand on the internet,

addressing content which is potentially damaging to it, and using customer

17

feedback to try to solve problems before they damage the individual's or brand's reputation."[6] The growth of the internet and social media, along with the advent of reputation management companies, has led to ORM becoming an integral part of many companies' marketing efforts. Defendants regularly monitored NHTSA in connection with its ORM activities because candid comments from Defendants owners provide valuable data regarding quality control issues and customer satisfaction. Defendants therefore would have learned about the numerous complaints filed with NHTSA.

46.     Defendants have shown a disregard for public welfare and safety by concealing their knowledge of the nature and extent of the Inflator Defect from the public while continuing to advertise their products as safe and reliable. Moreover, General Motors and FCA have violated their affirmative duty, imposed under the TREAD Act, to promptly advise customers about known defects.

> **3.     The Recall Remains Incomplete, Fails To Recall All Airbags Containing The Inflator Defect, And Does Not Compensate Plaintiffs For The Overpayment of Their Vehicles At the Point-of-Purchase**

47.     Despite nearly ***two years*** having passed since the initial November 25, 2020 recall by General Motors, the recall still remains uncompleted. *See* Exs. A, C (documenting 74 complaints to NHTSA that the recall has not been repaired in the Class Vehicles and that: "the parts were not available"; "the recall repair was unavailable"; and "the manufacturer had exceeded a reasonable amount of time for the recall repair".). The NHTSA database, while an efficient tool to monitor safety defects, typically only represents a tiny fraction of a much vaster problem that is

---

[6] Moryt Milo, *Great Businesses Lean Forward, Respond Fast*, Silicon Valley Business Journal (May 17, 2013, 6:00 AM EDT), http://www.bizjournals.com /sanjose/print-edition/2013/05/17/great-businesses-lean-forward-respond.html.

more accurately recorded through aggregated dealership warranty and repair data. Unfortunately, Defendants control this information and Plaintiffs are unable to review this data without the benefit of discovery.

48.    It is clear, however, that the recalls fail to repair or replace all defective airbags that contain the Inflator Defect. That is because the recalls only account for those defective airbags that were found through inflator traceability records and vehicle production records to have been manufactured between March 27, 2015 and September 28, 2015. The Defective Airbags that have so far been identified only relate to this manufacturing window, but the Inflator Defect is one of a poor design which may also permit this corrosive effect to occur over time. As a result, corrosion and intergranular cracking may lead to the end cap weakening to the point of compromise in airbags containing the Inflator Defect.

49.    Even if the recalls completely repaired all defective airbags in a timely manner and parts were available for all owners, it would fail to make Plaintiffs and the Classes whole, because Plaintiffs and the Classes were injured in the form of overpayment for their Class Vehicle at the time of purchase. No reasonable consumer would agree to purchase a vehicle containing a defective and dangerous airbag. Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed.

    **D.**    **Despite Their Knowledge, Defendants Concealed The Inflator Defect And Continued To Sell Class Vehicles with the Defective Airbags As "Safe" And "Reliable."**

50.    For Plaintiffs and many consumers, safety is one of the most important factors when buying or leasing a vehicle.

51.    Defendants engaged in unfair and deceptive trade practices and made false representations and/or omissions regarding the Defect and, in advertising and other consumer-

facing representations about the Class Vehicles, the Truck Manufacturers touted the safety of the Class Vehicles in national marketing campaigns.

52.    General Motors and FCA maintained that the Class Vehicles were safe and reliable in advertisements and promotional materials, and did not correct representations about the Class Vehicles' safety and reliability made in the past. Instead, General Motors and FCA repeatedly touted the Class Vehicles' passenger safety systems and assured consumers, including Plaintiffs and members of the Classes that they could rely on their airbags and that the Defective Airbags were safe and defect-free.

53.    Defendants' representations were deceptive, false and misleading because of what they failed to say; Defendants uniformly failed to disclose that the Defective Airbags in the Class Vehicles are prone to explode, even without air-bag deployment, and seriously injure drivers and passengers.

54.    Plaintiffs, directly or indirectly, were exposed to these advertisements and promotional materials before purchasing or leasing their Class Vehicles. If General Motors and FCA had instead chosen to disclose the truth about the Inflator Defect—including at dealerships, on their websites, in brochures, press releases or in other promotional materials—Plaintiffs and Class members would have seen those disclosures and been capable of making an informed purchasing decision. The misleading statements about Class Vehicles' safety in FCA and General Motors' advertisements and promotional materials, as well as omissions of truth about the Inflator Defect, influenced Plaintiffs and Class members' decisions to purchase or lease Class Vehicles.

          **1.**    **Labels and window stickers on the Class Vehicles stated that they were equipped with working airbags and seatbelts and failed to disclose the Inflator Defect.**

55.    To distribute their vehicles in the United States, the Truck Manufacturers had to "certify to the distributor or dealer at delivery that the vehicle or equipment complies with

applicable motor vehicle safety standards prescribed" by NHTSA under Chapter 301 of Title 49 of the U.S. Code. Accordingly, General Motors and FCA "may not issue the certificate if, in exercising reasonable care," they have "reason to know the certificate is false or misleading in a material respect." 49 U.S.C. § 30115; *see also* 49 U.S.C. § 30112.

56. Further, since "[c]ertification of a vehicle must be shown by a label permanently fixed to the vehicle," all Class Vehicles have a permanent label certifying compliance with the safety regulations prescribed by NHTSA. Since all the Class Vehicles are passenger vehicles, the permanent label must state: "This vehicle conforms to all applicable Federal motor vehicle safety, bumper, and theft prevention standards in effect on the date of manufacture shown above." 49 C.F.R. § 567.4(g)(5).

57. These labels were false and misleading because they failed to warn consumers about the risk that the inflators in the Class Vehicles are prone to explode, even without air-bag deployment, and instead indicated that the passenger safety system would function properly. *See* 49 C.F.R. § 571.208 (S4.1.5.4, S4.1.5.5) (Federal motor vehicle safety standards requiring Occupant Restraint Systems with airbags and seatbelts). Vehicle manufacturers have a duty to disclose known safety defects to the public and to NHTSA. When a vehicle manufacturer learns of a safety defect, federal law requires it to disclose the Defect to NHTSA and to the owners, purchasers, and dealers of the vehicle. 49 U.S.C. § 30118(c).

58. Indeed, General Motors acknowledges these obligations in its public SEC filings. In its Form 10-K for fiscal year 2019, General Motors Parent states: "If we or NHTSA determine that either a vehicle or vehicle equipment does not comply with a safety standard or if a vehicle Defect creates an unreasonable safety risk, the manufacturer [must] notify owners and provide a

remedy."[7] General Motors has since updated the "Vehicle Safety" section of its Form 10-K in fiscal year 2021 to say, "The Safety Act further requires that if we or NHTSA determine a vehicle or an item of vehicle equipment does not comply with a safety standard, or that vehicle or equipment contains a defect that poses an unreasonable safety risk, we must conduct a safety recall to remedy that condition in the affected vehicles."[8]

59.    Likewise, a prior publicly-traded parent of FCA, Fiat Chrysler Automobiles N.V., stated in an SEC filing that "Under U.S. federal law, all vehicles sold in the U.S. must comply with Federal Motor Vehicle Safety Standards ("FMVSS") promulgated by NHTSA, and must be certified by their manufacturer as being in compliance with all such standards at the time of the first purchase of the vehicle. In addition, if a vehicle contains a defect that is related to motor vehicle safety or does not comply with an applicable FMVSS, the manufacturer must notify NHTSA and vehicle owners and provide a remedy at no cost."[9]

60.    The interiors of the Class Vehicles also contain prominent labels that alert the driver and passengers to the vehicle's airbag system. For example, steering wheels and passenger dashboards typically have labels identifying the airbag and safety restraint system.

61.    General Motors and FCA were also specifically required to include in their vehicles warning labels that alerted consumers of the need to perform airbag maintenance. For example, S4.5.1 of 49 C.F.R. § 571.208 states:

> Air bag maintenance or replacement information. If the vehicle manufacturer recommends periodic maintenance or replacement of an inflatable restraint system, as that term is defined in S4.1.5.1(b) of this standard, installed in a vehicle, that vehicle shall be labeled with the recommended schedule for maintenance or replacement. The schedule shall be specified by month and year, or in terms of vehicle mileage, or by intervals measured from the date appearing on the vehicle certification label provided pursuant to 49 CFR Part 567. The label shall be

---

[7] General Motors, Co., Annual Report (Form 10-K) (Feb. 5, 2020).
[8] General Motors, Co., Annual Report (Form 10-K) (Feb. 10, 2021).
[9] Fiat Chrysler Automobiles N.V., Annual Report (Form 20-F) (Feb. 20, 2018).

permanently affixed to the vehicle within the passenger compartment and lettered in English in block capital and numerals not less than three thirty-seconds of an inch high. This label may be combined with the label required by S4.5.1(b) of this standard to appear on the sun visor.

62.    Plaintiffs are unaware of any label in any Class Vehicle that alerted consumers to the Inflator Defect or the need to perform maintenance to prevent airbag deployment.

63.    General Motors and FCA also distributed the Class Vehicles with so-called "Monroney" labels (also known as "window stickers") that described the equipment and safety features of the vehicles, including airbags. Dealers sell Class Vehicles to consumers with these labels visible. An image of a Monroney label for the 2015 Chevrolet Silverado 1500 is included below as an example. In the center of the image, it features a "Five Star" frontal crash rating for drivers. Under "Safety & Security" features, it touts the airbag system.[10]

---

[10] Monroney labels for many of the Class Vehicles are available at: https://monroneylabels.com.



64.    As shown in these examples, Monroney labels uniformly assured consumers that the Class Vehicles had working airbags. This information would have suggested to any reasonable consumer that the passenger safety system did not suffer from a Defect and would perform its intended function.

65.    Had General Motors and FCA disclosed the defective nature of airbags on the Monroney labels or other labels or marketing for the Class Vehicles, Plaintiffs and Class members would have seen that disclosure and been capable of making an informed decision when purchasing their Class Vehicle.

2. **Joyson, General Motors, and FCA marketed the Airbags and Class Vehicles as safe and reliable, but failed to disclose and concealed the Inflator Defect.**

66.    Joyson—then Key Safety Systems—advertised its airbags on its website. On its page detailing its airbag inflator offerings, Key Safety Systems (KSS) stated:

> KSS is known as an innovator in the design of key safety components such as lighter, smaller, environmentally friendly inflators . . . KSS Inflators are designed to meet the most stringent global customer requirements for design, performance, quality, and cost, and they reflect the company's commitment to providing the highest quality and most technologically advanced airbag systems.[11]

67.    Joyson misled consumers and represented that their airbags would perform as promised by failing to disclose and concealing the Inflator Defect—and instead touting its product's safety— despite knowledge that the airbags contained an undisclosed Defect.

68.    General Motors and FCA's advertisements for the Class Vehicles also left out a vital part of the story like their other consumer-facing representations. By uniformly omitting any information about the Inflator Defect, General Motors and FCA misled consumers into believing that their airbags would function properly in a crash, despite its knowledge to the contrary.

69.    Brochures and press releases for the Class Vehicles and Defendants' vehicles use similar language to send a misleading message of safety. Illustrative examples are described below.

a.    In the brochure for the 2015 GMC Sierra 1500, General Motors specifically touted the safety features of the Class Vehicle including its airbags.[12]

---

[11] *Inflators*, Key Safety Systems, https://web.archive.org/web/20150907201322 /http://keysafetyinc.com/inflators.asp (last visited Oct. 13, 2021).

[12] 2015 GMC Sierra 1500, Auto-Brochures https://www.autobrochures.com/makes/ GMC/Sierra/GMC_US%20Sierra_2015.pdf (last visited Aug. 20, 2021)



    b.  In the sales brochure for the 2016 GMC Sierra 1500, General Motors advertised the capability of the Class Vehicle's "safety alert system" and airbags.[13]

---

[13] 2016 GMC Sierra 1500, Auto-Brochures https://www.auto-brochures.com/makes /GMC/Sierra/GMC_US%20Sierra_2016.pdf (last visited Aug. 20, 2021).



   c.  In the sales brochure for the 2015 GMC Sierra HD, General Motors stated "[t]he new Sierra HD raises the bar for pickup truck safety."[14]

---

[14] 2015 GMC Sierra HD, Auto-Brochures https://www.auto brochures.com/makes/GMC/Sierra/GMC_US%20SierraHD_2015-1.pdf (last visited Aug. 20, 2021).



d.      In the sales brochure for the 2016 GMC Sierra HD, General Motors touted the Class Vehicle's ability to protect occupants of the vehicle through its various safety technologies.[15]



---

[15] 2016 GMC Sierra HD, Auto-Brochures https://www.auto-brochures.com/makes/ GMC/Sierra/GMC_US%20Sierra_2016.pdf?bcs-agent-scanner=1c332355-502b-3442-b9a3-1e615b037b4a (last visited Aug. 20, 2021).

e.      In the sales brochure for 2016 Chevrolet Silverado 1500, General Motors touted the Class Vehicle as "surrounded by safety". General Motors stated the Class Vehicle has features "that help protect you from the unexpected", including the vehicle's "six airbags and a 360-degree sensor system."[16]

# SURROUNDED BY SAFETY.



The available Enhanced Driver Alert Package has features that help protect you from the unexpected, including the Safety Alert Driver Seat, Lane Keep Assist, Forward Collision Alert, front and rear park assist and IntelliBeam™ headlamps.



**SAFETY ALERT DRIVER SEAT.** The available Safety Alert Driver Seat uses directional vibration pulses from the seat cushion instead of audible crash avoidance alerts to help indicate the direction of potential collision threats. The patented warning approach is tied into other onboard crash avoidance systems.

**LANE KEEP ASSIST.** At speeds above 60 km/h (37 mph), this available camera-based system monitors road lines and will gently turn the steering wheel if the vehicle begins changing lanes without the use of a turn signal. New for 2016.



**FORWARD COLLISION ALERT.** This available feature continually monitors how close your Silverado is to the vehicle in front of you. If the system determines that a front-end collision with a detected vehicle is imminent, it alerts the driver to a potential crash.

**REAR VISION CAMERA.** When the Silverado transmission is in Reverse, the available rear vision camera with dynamic guiding lines allows the driver to view objects directly behind the vehicle via the available screen in the centre stack. So it's easier to back up, park or hook up a trailer.



**INTELLIBEAM HEADLAMPS.** When oncoming headlamps are sensed or when tail lamps are detected in front of you, available IntelliBeam headlamps intuitively adjust between low and high beams.



**FRONT AND REAR PARK ASSIST.** Ideal when pulling into a parking spot at low speeds, this available system senses stationary objects and alerts you if an object is too close. If equipped, the rear vision camera automatically displays a live image of the area behind the vehicle on the available Chevrolet MyLink screen after you shift into Reverse.



**SIX AIRBAGS.** Silverado 1500 includes six airbags¹ and a 360-degree sensor system, including single-stage frontal airbags. There are also available head-curtain side-impact airbags with rollover protection and seat-mounted side-impact airbags.

**AVAILABLE ONSTAR® AUTOMATIC CRASH RESPONSE.²** In a crash, built-in sensors can alert a specially trained OnStar Advisor, who is connected into your Silverado to see if you need help — even if you can't ask for it. Advisors can use GPS technology to pinpoint your location and request emergency help.



**SAFETY STARTS WITH YOU.** Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic, surroundings and road conditions at all times. Read the Silverado Owner's Manual for more important safety information.

f.      In the sales brochure for the 2015 Chevrolet Silverado HD, General Motors stated "[a]t Chevrolet, we believe safety is as important to truck buyers as it is to car buyers. That is why the new Silverado HD sets the benchmark for pickup truck safety."[17]

---

[16] 2016 Chevrolet Silverado 1500, Auto-Brochures https://www.auto-brochures. com/makes/GMC/Sierra/GMC_US%20Sierra_2016.pdf?bcs-agent-scanner=1c3 32355-502b-3442-b9a3-1e615b037b4a (last visited Aug. 20, 2021).

[17] 2015 Chevrolet Silverado HD, Auto-Brochures https://www.auto-brochures.com /makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2015.pdf (last visited Aug. 20, 2021).



At Chevrolet, we believe safety is as important to truck buyers as it is to car buyers. That is why the new Silverado HD sets a benchmark for pickup truck safety. The package includes Forward Collision Alert (FCA) to warn you when you're rapidly approaching another vehicle and a collision is imminent, Lane Departure Warning (LDW) to alert you if you wander from your lane without using your turn signal, the Safety Alert Driver Seat that uses vibrations in the seat cushions to signal the direction of a potential hazard and Front and Rear Park Assist to help ease you into or out of tight spaces. Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic, surroundings and road conditions at all times. Read the vehicle Owner's Manual for more important safety information.

**SAFETY ALERT DRIVER SEAT** The available Safety Alert Driver Seat helps warn the driver of potential traffic danger using directional vibration pulses from the seat cushion. The patented warning approach is tied into other on-board crash avoidance systems.

**A / LANE DEPARTURE WARNING** This available technology alerts the driver when Silverado HD drifts over a lane line without signaling while traveling at least 35 mph.

**B / FORWARD COLLISION ALERT** To help prevent frontal crashes, this available technology alerts drivers when they are closing in too quickly on a vehicle ahead. The warning gives the driver critical additional time to react and potentially avoid a crash.

**ABS BRAKES** Four-wheel, four-channel, antilock disc brakes (ABS) help provide straight, more controlled stops by preventing wheel lock-up in most road conditions.

**REAR VISION CAMERA** When Silverado HD's transmission is in reverse, the available Rear Vision Camera with dynamic grid lines allows the driver to view objects directly behind the vehicle via the available 8" diagonal screen in the center stack. So it's easier to back up, park or hook up a trailer.

**SIX AVAILABLE AIR BAGS** Silverado HD offers up to six air bags† and a 360-degree sensor system, including single-stage frontal air bags, head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags.

**ONSTAR** The safety and security of OnStar† is available on Silverado HD. In the event of a crash, a vehicle sensor can automatically send an alert to a specially trained OnStar Advisor who can be immediately connected into your vehicle. Even if you can't respond, OnStar can send whatever help you need, based on GPS coordinates, crash data and a prediction of injury severity.

       g.     Similarly, in the sales brochure for the 2016 Chevrolet Silverado HD, General Motors touted the capability of the Class Vehicle's safety systems.[18]

---

[18] 2016 Chevrolet Silverado HD, Auto-Brochures https://www.auto-brochures.com /makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2016.pdf (last visited Aug. 20, 2021).

# SURROUNDED BY SAFETY.

With the available Driver Alert Package, you get features that help protect you from the unexpected, including the Safety Alert Driver Seat, Lane Departure Warning, Forward Collision Alert, and Front and Rear Park Assist.



**SAFETY ALERT DRIVER SEAT.** The available Safety Alert Driver Seat uses directional vibration pulses from the seat cushion instead of audible crash avoidance alerts to help indicate the direction of potential threats. The patented warning approach is tied into other onboard crash avoidance systems.



**FORWARD COLLISION ALERT.** This available feature continually monitors how close your vehicle is to the vehicle in front of you. If the system determines that a front-end collision with a detected vehicle is imminent, it alerts the driver to a potential crash.



**LANE DEPARTURE WARNING.** If you unintentionally change lanes (without a turn signal), this available camera-based system sends an alert. The camera, mounted near the inside rearview mirror, reads traffic lane markings when identifiable and provides audible and visual alerts.



**REAR VISION CAMERA.** When the Silverado HD transmission is in Reverse, the available rear vision camera with dynamic guiding lines allows the driver to view objects directly behind the vehicle via the screen in the center stack. So it's easier to back up, park or hook up a trailer.



**FRONT AND REAR PARK ASSIST.** Ideal when pulling into a parking spot at low speeds, this available system senses stationary objects and alerts you if an object is too close. The available rear vision camera automatically displays a live image of the area behind the vehicle on the screen in the center stack after you shift into Reverse.

**ABS BRAKES.** Four-wheel, four-channel, antilock disc brakes (ABS) help provide straight, more controlled stops by preventing wheel lockup in most road conditions.



**AIR BAGS.** Standard on 2500HD are six air bags, including frontal air bags, head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags, 3500HD has frontal air bags standard, and available are head-curtain side-impact air bags with rollover protection and seat-mounted side-impact air bags.

**AVAILABLE ONSTAR AUTOMATIC CRASH RESPONSE.** In a crash, built-in sensors can alert a specially trained OnStar Advisor, who can be connected into your Silverado HD to see if you need help — even if you can't ask for it. Advisors can use GPS technology to pinpoint your location and request emergency help. OnStar Guidance Plan is standard for the first six months (available on WT).

**SAFETY STARTS WITH YOU.** Safety features are no substitute for the driver's responsibility to operate the vehicle in a safe manner. The driver should remain attentive to traffic, surroundings and road conditions at all times. Read the Silverado HD Owner's Manual for more important safety information.

70.     FCA also touted the capabilities of their Class Vehicles in terms of performance, safety and reliability. As shown below:

a.      In the sales brochure for the 2015 Ram 1500, FCA touted the 2015 Ram 1500 as "Dependable [and] Sensible." FCA further stated, "When you deliver all the refinements of a Ram, comparisons to the wannabe competitors are welcome. The 2015 Ram 1500 stands up to all of them—and frequently stands above."[19]

---

[19] 2015 Dodge Ram 1500, Dealer eProcess, https://cdn.dealereprocess.org/cdn/brochures/ram/2015-1500.pdf?bcs-agent-scanner=03ba9dbd-d25c-764c-baff-98a2439c0943 (last visited Aug. 20, 2021).





**RAM 1500. THE PICKUP THAT BRINGS IT ALL TOGETHER.** These are the combinations that define leadership: one of the most extensive powertrain lineups in the industry, standing out with exceptional fuel efficiency, jaw-dropping towing and payload numbers for invaluable work capability—and priceless peace of mind for those demanding recreational needs. Nimble agility and responsive comfort for highways, off-roads and even at-rest loading. Class-exclusive[1]* suspensions. State-of-the-art technology. And people-centric interiors that give you seating, storage, communications and telematics at impressive levels of convenience and practicality. The 2015 Ram 1500 delivers a sleek aerodynamic exterior, legendary components and quality so good, it's backed by a 5-Year/100,000-Mile Powertrain Limited Warranty,[2] one of the best in the business. When you deliver all the refinements of a Ram, comparisons to the wannabe competitors are welcome. The 2015 Ram 1500 stands up to all of them—and frequently stands above. For a bigger picture that includes specs, videos, blogs and owner input, click over and bookmark **RAMTRUCKS.COM**

     b.     In the sales brochure for the 2016 Ram 1500, FCA states "Ram 1500 Does It All."[20]

     c.     In the sales brochure of the 2017 Ram 1500, FCA touted the safety features of the Class Vehicle stating that "Ram technology starts with safety and security."[21]

---

[20] 2016 Dodge Ram 1500, Auto-Brochures https://www.auto-brochures.com/ makes/ram/Ram_US%201500_2016.pdf?bcs-agent-scanner=14b821b3-9357-314c-8640-a207633d54c1 (last visited Aug. 20, 2021).

[21] 2017 Dodge Ram 1500, Auto-Brochures https://www.auto-brochures.com/ makes/ram/Ram_US%201500_2017.pdf?bcs-agent-scanner=d0687ab2-dbbb-2845-92dc-d6a505af78bf (last visited Aug. 20, 2021).



d.      In the sales brochure of the 2018 Ram 1500, touted the safety and security of the Class Vehicle, "Ram surrounds you with protection including advanced multistage front airbags, supplemental front side-mounted airbags, and side-curtain airbags." Further, FCA stated "Ram safety and security. It's all about you."[22]

---

[22] 2018 Dodge Ram 1500, Auto-Brochures https://www.auto-brochures.com/ makes/ram/Ram_US%201500_2018.pdf?bcs-agent-scanner=9a8104de-c6ac-eb45-8cf7-2e1c9fb5055c (last visited Aug. 20, 2021).



   e. In the sales brochure of the 2019 Ram 1500, FCA states "THE ALL-NEW

2019 RAM 1500: UNCOMPROMISING DURABILITY, CAPABILITY, LUXURY, SAFETY,

TECHNOLOGY AND EFFICIENCY."[23]

---

[23] 2019 Dodge Ram 1500, Auto-Brochures https://www.auto-brochures.com
/makes/ram/Ram_US%201500_2019.pdf?bcs-agent-scanner=428fce91-e821-2b40-a0fe-
550d3f1e3755 (last visited Aug. 20, 2021).



**THE ALL-NEW 2019 RAM 1500: UNCOMPROMISING DURABILITY, CAPABILITY, LUXURY, SAFETY, TECHNOLOGY AND EFFICIENCY. PERIOD.**

  f.  In the sales brochure of the 2019 Ram 1500 Classic, FCA states the Ram 1500 Classic "is engineered for all-around strength—and that includes jaw-dropping procedures to help ensure safety and stability. To achieve it, our engineers employed testing protocols that involved some of the most brutal conditions imaginable."[24]

---

[24] 2019 Dodge Ram Classic, Auto-Brochures https://www.auto-brochures.com/ makes/ram/Ram_US%201500_2019-cl.pdf (last visited Aug. 20, 2021).



g.      Similarly, in the sales brochure of the 2020 Ram 1500 Classis, FCA touted the same capabilities of the Class Vehicle. FCA stated the Ram 1500 Classic "is engineered for all-around strength—and that includes jaw-dropping procedures to help ensure safety and stability. To achieve it, our engineers employed testing protocols that involved some of the most brutal conditions imaginable."[25]

---

[25] 2020 Dodge Ram 1500, Auto-Brochures https://www.auto-brochures.com/ makes/ram/Ram_US%201500_2020-cl.pdf (last visited Aug. 20, 2021).



71.     Further, online and video advertisements further paint a misleading representation of safety, for example:

a.      In a 2020 video advertisement, General Motors highlighted the engineering teams that work on family vehicles, a voiceover stated: "The Chevy family of SUVs: we don't just take safety seriously, we take it personally."26

b.      In print advertisements, Chevrolet touted that its Silverado 1500 is the first ever pickup truck to receive a perfect 5 star rating for overall vehicle score safety.

---

26 Sam Mceachern, *New Chevrolet Ad Shines Spotlight on Brand's Vehicle Safety: Video*, GM AUTHORITY (Aug. 22, 2020) http://gmauthority.com/blog/2020/08/new-chevrolet-ad-shines-spotlight-on-brands-vehicle-safety-video/.

c.      For 2018, Chevrolet marketed the safety features of its vehicles on chevrolet.com by stating: "the safety of drivers and passengers is of high priority. That's why we offer a comprehensive and innovative approach to safety aimed at helping you make your drive safer before, during and after a collision. It's this "prevent, protect, respond" philosophy that drives Chevrolet in its efforts to deliver outstanding vehicle safety."[27]

d.      For 2019, Chevrolet marketed the safety features of its vehicles on chevrolet.com by stating: "Nothing is more important than feeling confident and secure when you're on the road. That's why your safety and well-being are at the core of everything we do. And with a wide range of available features and technologies, our vehicles are constantly working to help you drive as safely as possible."[28]

e.      Likewise, for the 2018 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "We design our trucks to last and to help keep you safe and secure. That's why every Ram 1500 is equipped with some of the most advanced safety and security technology available, including dynamic crumple zones, side-impact door beams and an advanced airbag system."[29]

f.      For the 2019 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "Your peace of mind is our top of mind. That's why the All-New 2019 Ram 1500 has been fully redesigned with a high-strength steel frame and more than 100 standard and available safety and security features."[30]

---

[27]     Chevrolet    Safety    (Mar.    12,    2018),    http://www.chevrolet.com/safety [https://web.archive.org/web/20180312123148/http://www.chevrolet.com/safety].
[28]     Chevrolet    Safety    (Aug.    12,    2019),    http://www.chevrolet.com/safety [https://web.archive.org/web/20190812225714mp_/https://www.chevrolet.com/safety].
[29]     Dodge    Trucks    (May    7,    2017),    http://www.ramtrucks.com/ram-1500.html [https://web.archive.org/web/20170507194019/http://www.ramtrucks.com/ram-1500.html].
[30]     Dodge    Trucks    (April    1,    2018),    https://www.ramtrucks.com/2019/ram-1500.html [https://web.archive.org/web/20180401023715mp_/https://www.ramtrucks.com/2019/ram-

g.    For the 2020 Ram 1500, FCA advertised its safety features on dodgetrucks.com by stating: "The 2020 Ram 1500 is designed for safety and security from the group up. So whether you're hauling big loads or transporting precious cargo, you can do it all with confidence."[31]

72.    The above represents a sampling of Defendants' advertisements.

73.    Based on information and belief, every single advertisement for a Class Vehicle omitted *any* mention that the vehicles' airbags and seatbelts could fail due to the Inflator Defect. General Motors and FCA's deceptive actions harmed Plaintiffs and the Classes. As a result of General Motors and FCA's unfair, deceptive, and/or fraudulent business practices and failure to disclose that the Class Vehicles carried a dangerous safety Defect, owners and lessees of the Class Vehicles have lost money and/or property.

## V.    CLASS ACTION ALLEGATIONS

74.    This case is about Defendants' legal responsibility for their knowledge, conduct, and defective products. The proposed Class members' claims all derive directly from a single course of conduct by Defendants. The objective facts are the same for all Class members. Within each Claim for Relief asserted by the respective proposed Classes, the same legal standards govern. Additionally, many states share the same legal standards and elements of proof, facilitating multistate or nationwide classes for some or all claims.

75.    Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated, as members of the proposed Classes under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or (c)(4) defined as follows:

---

1500.html].

[31]    Dodge Trucks (July 26, 2020), https://www.ramtrucks.com/ram-1500/safety-security.html [https://web.archive.org/web/20200726125527/https://www.ramtrucks.com/ram-1500/safety-security.html].

76.    **Nationwide Class:** All persons or entities in the United States that purchased or leased a Class Vehicle (the "Nationwide Class");

77.    **New Jersey Class:** All persons or entities that purchased or leased a Class Vehicle in the State of New Jersey and all persons or entities in the State of New Jersey that purchased, leased, or owns a Class Vehicle (the "New Jersey Sub-Class" and collectively with the Nationwide Class, the "Class" or "Classes");

78.    Excluded from the Classes are:

a.    Defendants' and their parents, subsidiaries and corporate affiliates, officers, directors, employees, assigns, and successors; and

b.    The Court, Court staff, Defendants' counsel, judicial officers and all respective immediate family members of the excluded entities described above.

79.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, reduced, divided into subclasses under Rule 23(c)(5), or otherwise modified. The Class and Sub-Classes are collectively referred to herein as the "Classes."

A.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

80.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are hundreds of thousands of Class Vehicles and Class members nationwide. The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

**B.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

81.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These include, without limitation, the following:

a.    Whether the Inflator Defect exists in the Class Vehicles;

b.    Whether Defendants knew, or should have known, about the Inflator Defect, and, if so, how long they have known or should have known about it;

c.    Whether the Inflator Defect presents a safety risk;

d.    Whether Defendants had a duty to disclose the Inflator Defect in the Class Vehicles and the associated safety risks to consumers including Plaintiffs and Class members;

e.    Whether Defendants breached their duty to disclose the Inflator Defect and/or that the Inflator Defect presents a safety risk;

f.    Whether Defendants' representations and certifications concerning vehicle safety were deceptive, false, and/or misleading given the Defect and the risk that the Defective Airbags may spontaneously rupture and seriously injure passengers;

g.    Whether Defendants fraudulently concealed the Inflator Defect;

h.    Whether Defendants negligently or falsely misrepresented or omitted material facts regarding the Defect and/or that the Defect presents a safety risk;

i.    Whether Defendants made material misrepresentations and/or omissions concerning the standard, quality, or grade of Class Vehicles and the Defect;

j.    Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices, in trade or commerce, by failing to disclose the Inflator Defect and/or that the Class Vehicles were designed, manufactured, and sold with Defective airbags components;

k.    Whether Defendants breached their express warranties in that Class Vehicles were defective with respect to design and manufacture, including workmanship and materials;

l.    Whether the Class Vehicles were unfit for the ordinary purposes for which they were used in violation of the implied warranty of merchantability;

m.    Whether Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* and/or any other statutory duties under state laws;

n.    Whether Defendants were unjustly enriched by the conduct alleged herein;

o.    Whether Defendants' unfair and deceptive acts, misrepresentations, and failure to disclose and/or concealment of the Defect caused Plaintiffs and Class members to overpay for their Class Vehicles;

p.    Whether members of the Classes would pay less for a Class Vehicle if Defendants, at the time of purchase, disclosed the Defect and/or that the Defect presents a safety risk;

q.    Whether members of the Classes would have purchased a Class Vehicle if Defendants, at the time of purchase, disclosed the Defect and/or that the Defect presents a safety risk;

r.    Whether members of the Classes would have had the Defect repaired if Defendants had disclosed, prior to the expiration of the warranty period, the Defect and/or that the Defect presents a safety risk;

s.    Whether Defendants violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2 *et seq.*;

t.      Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount.

### C.      Typicality: Federal Rule of Civil Procedure 23(a)(3)

82.      Plaintiffs' claims are typical of the Class members' claims whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and Class members purchased or leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based on the same legal theories as the claims of the other Class members.

### D.      Adequacy: Federal Rule of Civil Procedure 23(a)(4)

83.      Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automobile defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### E.      Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

84.      Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, for the Class as a whole.

**F.    Superiority: Federal Rule of Civil Procedure 23(b)(3)**

85.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims individually against Defendants such that it would be impracticable for members of the Classes to individually seek redress for Defendants' wrongful conduct.

86.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**VI.    ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED**

87.    Any applicable statute of limitations has been tolled by Defendants' knowing, willful, and active concealment of the Defect and the omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Class Vehicles and could not have reasonably discovered the Defect or Defendants' deception with respect to the Defect.

88.    Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a defect and/or that the Class Vehicles contained a Defect and corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitation, Plaintiffs and

members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the Defect or that Defendants were concealing the Defect.

89.     At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality, and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk.

90.     Defendants knowingly, actively, and affirmatively concealed the facts and underlying deceptive conduct alleged herein. Plaintiffs and members of the Classes reasonably relied on Defendants' knowing, active, and affirmative concealment. Plaintiffs could not have reasonably discovered the Defect through due diligence.

91.     For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CAUSES OF ACTION

### COUNT 1
### Violation of the Magnuson-Moss Warranty Act ("MMWA")
### 15 U.S.C. § 2301 *et seq.*
### (On Behalf Of Plaintiffs And The Nationwide Class, Or Alternatively, On Behalf Of Plaintiffs And The New Jersey Sub-Class Against The Truck Manufacturer Defendants)

92.     Plaintiffs re-allege and incorporate by reference all paragraphs as though full set forth herein.

93.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301, by virtue of 28 U.S.C. § 1332 (a)-(d).

94.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

95.    Plaintiffs are "consumer[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

96.    Each Truck Manufacturer Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 15 U.S.C. § 2301(4)-(5).

97.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

98.    The Truck Manufacturer Defendants provided Plaintiffs and members of the Classes with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, the Truck Manufacturer Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

99.    The Truck Manufacturer Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the members of the Classes pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect. The Truck Manufacturer Defendants have admitted that the Class Vehicles are defective in issuing their recalls, but the recalls are woefully insufficient to address the Inflator Defect.

100.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

101.     Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between the Truck Manufacturer Defendants on the one hand, and Plaintiffs and the other Class members, on the other.

102.     Any limitations on the warranties are substantively unconscionable. The Truck Manufacturer Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. The Truck Manufacturer Defendants failed to disclose the Inflator Defect to Plaintiffs and the members of the Classes. Thus, the Truck Manufacturer Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

103.     Plaintiffs and members of the Classes have had sufficient direct dealings with either the Truck Manufacturer Defendants or their agents (dealerships) to establish privity of contract.

104.     Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between the Truck Manufacturer Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the Inflator Defect.

105.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and is not required to give the Truck Manufacturer Defendants notice and an opportunity to cure until

such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

106.    Furthermore, affording the Truck Manufacturer Defendants an opportunity to cure their breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, the Truck Manufacturer Defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford the Truck Manufacturer Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

107.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because The Truck Manufacturer Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their defective Vehicles by retaining them.

108.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on

actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

109.    Plaintiffs and members of the Classes also requests, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

110.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for the Truck Manufacturer Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by the Truck Manufacturer Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT 2
### Fraud by Omission or Fraudulent Concealment
### (On Behalf Of Plaintiffs And The Nationwide Class, Or Alternatively, On Behalf Of Plaintiffs And The New Jersey Sub-Class Against All Defendants)

111.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

112.    Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the Defect installed in Class Vehicles is defective, exposing drivers and occupants to safety risk with the intent that Plaintiffs and members of the Classes rely on Defendants' misrepresentations and omissions. As a direct result of Defendants' fraudulent conduct, members of the Classes have suffered actual damages.

113.    Defendants intentionally and knowingly concealed and suppressed material facts from regulators and consumers regarding the Inflator Defect that causes the airbags to spontaneously deploy. Defendant Joyson was aware of the defective design in 2015 when it made modifications to its manufacturing assemblies—around the same time that the earliest complaints from NHTSA indicate injuries from ruptures began occurring in vehicles equipped with the Defective Airbags.

114.    A reasonable consumer would not have expected that the Class Vehicles contain inflators are prone to rupture, even without air-bag deployment, and seriously injure drivers and passengers. Defendants knew that reasonable consumers expect that their vehicles have working airbags, and would rely on those facts in deciding whether to purchase, lease, or retain a new or used motor vehicle. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

115.    Defendants ensured that Plaintiffs and the members of the Classes did not discover this information through actively concealing it and misrepresenting the Class Vehicles' safety systems without disclosing the truth. Defendants intended for Plaintiffs and members of the Classes to rely on their omissions—which they did by purchasing and leasing the Class Vehicles at the prices they paid.

116.    Defendants had a duty to disclose the Inflator Defect because:

a.    Defendants had exclusive and/or far superior knowledge and access to the facts about this hidden and complex safety Defect. Defendants also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs and members of the Nationwide Class and New Jersey Sub-Class;

50

b.    Defendants knew the Inflator Defect (and its safety risks) was a material fact that would affect Plaintiffs' and members of the Nationwide Class and New Jersey Sub-Class's decisions to buy or lease Class Vehicles;

c.    Defendants are subject to statutory duties to disclose known safety Defects to consumers and NHTSA; and

d.    Defendants made incomplete representations about the safety and reliability of the Class Vehicles and their passenger safety systems, while purposefully withholding material facts about a known safety defect. In uniform advertising and materials provided with each Class Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs and members of the Nationwide Class and New Jersey Sub-Class that the Class Vehicles contained the dangerous Inflator Defect. Because they volunteered to provide information about the Class Vehicles that they offered for sale to Plaintiffs and the Class, Defendants had the duty to disclose the whole truth. They did not.

117.    To this day, Defendants have not made full and adequate disclosure, continue to defraud Plaintiffs and members of the Nationwide Class and New Jersey Sub-Class, and continue to conceal material information regarding the Inflator Defect. The omitted and concealed facts were material because a reasonable person would find them important in purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and members of the Nationwide Class and New Jersey Sub-Class.

118.    Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect profits, and to avoid recalls that would hurt

the brand's image and cost money. They did so at the expense of Plaintiffs and members of the Classes. Had they been aware of the Inflator Defect in the Class Vehicles, and Defendants' callous disregard for safety, Plaintiffs and members of the Classes either would not have paid as much as they did for their Class Vehicles, or they would not have purchased or leased them.

119.    Accordingly, Defendants are liable to Plaintiffs and members of the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost overpayment for the Class Vehicles at the time of purchase or lease.

120.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of Plaintiffs' and members of the Classes's rights and well-being; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT 3
### Unjust Enrichment
### (On Behalf Of Plaintiffs And The Nationwide Class, Or Alternatively, On Behalf Of Plaintiffs And The New Jersey Sub-Class Against All Defendants)

121.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

122.    Because of their conduct, Defendants caused damages to Plaintiffs and members of the Classes.

123.    Plaintiffs and members of the Classes conferred a benefit on the Defendants by overpaying for Class Vehicles at prices that were artificially inflated by Defendants' concealment of the Inflator Defect and misrepresentations regarding the Class Vehicles' safety.

124.    As a result of Defendants' fraud and deception, Plaintiffs and members of the Classes were not aware of the facts concerning the Class Vehicles and did not benefit from the Defendants' misconduct.

125.    Defendants knowingly benefitted from their unjust conduct. They sold and leased Class Vehicles equipped with an Inflator Defect for more than what the vehicles were worth, at the expense of Plaintiffs and members of the Classes.

126.    Defendants readily accepted and retained these benefits from Plaintiffs and members of the Classes.

127.    It is inequitable and unconscionable for Defendants to retain these benefits because they misrepresented that the Class Vehicles were safe, and intentionally concealed, suppressed, and failed to disclose the Inflator Defect to consumers. Plaintiffs and members of the Classes would not have purchased or leased the Class Vehicles or paid less for them had Defendants not concealed the Inflator Defect.

128.    Plaintiffs and members of the Classes do not have an adequate remedy at law.

129.    Equity cannot in good conscience permit the Defendants to retain the benefits that they derived from Plaintiffs and members of the Classes through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of the Defendants' unjust enrichment is necessary.

**COUNT 4**
**Violation of the New Jersey Consumer Fraud Act ("NJCFA")**
**N.J. Stat. Ann. § 56:8-2, *et seq.***
**(On Behalf Of Plaintiffs And The Nationwide Class, Or Alternatively, On Behalf Of Plaintiffs And The New Jersey Sub-Class Against All Defendants)**

130.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

131.    The NJCFA prohibits:

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

N.J. Stat. Ann. § 56:8-2.

132.    Plaintiffs and members of the Classes are consumers who purchased or leased Class Vehicles for personal, family, or household use.

133.    In violation of the NJCFA, Defendants employed unconscionable commercial practices, deception, fraud, false pretense and/or false promise by providing Class Vehicles that contain the Inflator Defect and present an undisclosed safety risk to drivers and occupants of the Class Vehicles. Further, Defendants misrepresented the standard, quality or grade of the Class Vehicles which were sold or leased with the latent Defect and failed to disclose the Inflator Defect and corresponding safety risk in violation of the NJCFA.

134.    Defendants' misrepresentations and fraudulent omissions were material to Plaintiffs and members of the Classes. When Plaintiffs and members of the Classes purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Defective Airbags would not pose an unavoidable safety risk. Had Defendants disclosed that the Defective Airbags was prone to an unavoidable safety risk, Plaintiffs and members of the New Jersey State Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

135.    Further, had Defendants disclosed that about the Defective Airbags in the Class Vehicles, Plaintiffs and members of the Classes would have demanded repair or replacement

during the warranty periods at no cost to Plaintiffs and members of the Classes—as provided for in Defendants' warranties.

136.    Defendants knowingly concealed, suppressed and/or omitted the existence of the Inflator Defect and safety risk in the Class Vehicles at the time of sale or lease and at all relevant times thereafter.

137.    Defendants unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent Defect and corresponding safety risk.

138.    Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs and members of the Classes because Defendants possessed superior and exclusive knowledge regarding the Defect and the risks associated with the Defective Airbags' failure. Rather than disclose the Defect, Defendants intentionally concealed the Defect with the intent to mislead Plaintiffs and members of the Classes in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Defective Airbags to Plaintiffs and members of the Classes.

139.    Had Plaintiffs and members of the Classes known about the Inflator Defect at the time of purchase, including the safety hazard posed by the Defect, they would not have bought the Class Vehicles or would have paid much less for them.

140.    The repairs instituted by Defendants, if any, have not been adequate.

141.    As a direct and proximate result of Defendants' wrongful conduct in violation of the NJCFA, Plaintiffs and members of the Classes have suffered and continue to suffer harm by the threat of the unexpected failure of the Defective Airbags and/or actual damages in the amount of the cost to replace the Defective Airbags, and damages to be determined at trial. Plaintiffs and

members of the Classes have also suffered the ascertainable loss of the diminished value of their vehicles.

142.    As a result of Defendants' fraudulent and/or deceptive conduct, misrepresentations and/or knowing omissions, Plaintiffs and members of the Classes are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial.  See N.J. Stat. Ann. § 56:8-19.  Plaintiffs and members of the Classes also seek an order enjoining Defendants' unlawful, fraudulent and/or deceptive practices, and any other just and proper declaratory or equitable relief available under the NJCFA.  See N.J. Stat. Ann. § 56:8-19.

**COUNT 5**
**Breach of Express Warranty**
**N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-210**
**(On Behalf Of Plaintiffs And The Nationwide Class, Or Alternatively, On Behalf Of Plaintiffs And The New Jersey Sub-Class Against The Truck Manufacturer Defendants)**

143.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

144.    The Truck Manufacturer Defendants are and were at all relevant times "merchants" under N.J. Stat. Ann. § 12A:2-104(1), and "sellers" and "lessors" of motor vehicles and/or automotive parts under § 12A:2-103(1)(d) and § 12A:2A-103(1)(p).

145.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

146.    The Truck Manufacturer Defendants provided Plaintiffs and members of the Classes with one or more express warranties.

147.    The Truck Manufacturer Defendants marketed the Class Vehicles as high quality, reliable, and safe vehicles, and that the Truck Manufacturer Defendants would stand behind the

quality of their products and promptly repair any Defects. These statements helped conceal the existence of the Inflator Defect and its corresponding safety risk.

148.    Under the warranties provided to Plaintiffs and members of the Classes, the Truck Manufacturer Defendants promised to repair or replace covered components arising out of Defects in materials and/or workmanship, including the Inflator Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, the Truck Manufacturer Defendants breached these warranties.

149.    The Truck Manufacturer Defendants breached the express warranty promising to repair and correct a manufacturing Defect or Defect in materials or workmanship of any parts it supplied.

150.    On information and belief, the Truck Manufacturer Defendants have not suitably repaired or replaced the Defective Airbags for Plaintiffs and members of the Classes despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

151.    The Truck Manufacturer Defendants further breached their express warranties by selling Class Vehicles that were Defective with respect to materials, workmanship, design and manufacture.

152.    Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of materials, workmanship, design and/or manufacturing Defects which cause a failure to deploy the airbags as warranted.

153.    Plaintiffs and members of the Classes have had sufficient direct dealings with the Truck Manufacturer Defendants or their agents, their authorized dealerships, to establish privity of contract between the Truck Manufacturer Defendants, on the one hand, and Plaintiffs and members of the Classes, on the other hand.  Nonetheless, privity is not required here because

Plaintiffs and members of the Classes are intended third-party beneficiaries of contracts between the Truck Manufacturer Defendants and their dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

154.    The Truck Manufacturer Defendants were provided notice of the Inflator Defect by their engineers, numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing.   Affording the Truck Manufacturer Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because the Truck Manufacturer Defendants have known of and concealed the Inflator Defect and have failed to provide a suitable repair or replacement of the Defective Airbags within a reasonable time.

155.    Any attempt by the Truck Manufacturer Defendants to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here.  Specifically, the Truck Manufacturer Defendants' warranty limitation is unenforceable because they knowingly sold or leased a Defective product without informing consumers about the Defect.  The time limits contained in the Truck Manufacturer Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and members of the Classes.  Among other things, Plaintiffs and members of the Classes did not determine these time limitations, the terms of which unreasonably favored the Truck Manufacturer Defendants.   A gross disparity in bargaining power existed between the Truck Manufacturer Defendants and members of the Classes, and the Truck Manufacturer Defendants knew or should have known that the Class Vehicles were Defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

156.    Further, the limited warranty promising to repair and/or correct a manufacturing Defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and members of the Classes whole because, on information and belief, the Truck Manufacturer Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

157.    The Truck Manufacturer Defendants knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiffs and members of the Classes were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

158.    The Truck Manufacturer Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and members of the Classes purchased or leased their Class Vehicles.

159.    Plaintiffs and members of the Classes experienced the existence of the Inflator Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by the Truck Manufacturer Defendants.  Despite the existence of the warranties, the Truck Manufacturer Defendants failed to inform Plaintiffs and members of the Classes that the Class Vehicles contained the Inflator Defect during the warranty periods.

160.    Because of the Inflator Defect, the Class Vehicles are not reliable and owners of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation.

161.    As a direct and proximate result of the Truck Manufacturer Defendants' breach of express warranties, Plaintiffs and members of the Classes have been damaged in an amount to be determined at trial.

162.    Finally, because of the Truck Manufacturer Defendants' breach of express warranty as set forth herein, Plaintiff Sager and members of the Classes assert, as additional and/or

alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and members of the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT 6**
**Breach of Implied Warranty of Merchantability**
**N.J. Stat. Ann. §§ 12A:2-314, 12A:2A-103, and 12A:2A-212**
**(On Behalf Of Plaintiffs And The Nationwide Class, Or Alternatively, On Behalf Of Plaintiffs And The New Jersey Sub-Class Against Defendants General Motors And FCA)**

163.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

164.    The Truck Manufacturer Defendants are and were at all relevant times "merchants" with respect to motor vehicles and/or automotive parts under N.J. STAT. ANN.§ 12A:2-104(1), and "sellers" and "lessors" of motor vehicles and/or automotive parts under § 12A:2-103(1)(d) and § 12A:2A-103(1)(p).

165.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. STAT. ANN. §§ 12A:2-105(1) and 2A-103(1)(h).

166.    Plaintiffs and members of the Classes purchased or leased the Class Vehicles from the Truck Manufacturer Defendants by and through the Truck Manufacturer Defendants' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party.  At all relevant times, the Truck Manufacturer Defendants were the manufacturers, distributors, warrantors and/or sellers of Class Vehicles.  The Truck Manufacturer Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

167.     A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

168.     The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation.  The Class Vehicles contain an inherent Defect—the Inflator Defect—(at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants.   Thus, the Truck Manufacturer Defendants breached their implied warranty of merchantability.

169.     Plaintiffs and members of the Classes have had sufficient direct dealings with the Truck Manufacturer Defendants or their agents, their authorized dealerships, to establish privity of contract between the Truck Manufacturer Defendants, on the one hand, and Plaintiffs and members of the New Jersey State Class, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and members of the Classes are intended third-party beneficiaries of contracts between the Truck Manufacturer Defendants and their dealers, and specifically, of their implied warranties.  The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessees of the Class Vehicles only.

170.     The Truck Manufacturer Defendants were provided notice of the Inflator Defect by their engineers, numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA and through their own testing. Affording the Truck Manufacturer Defendants a reasonable opportunity to cure their breach of implied warranties would be

unnecessary and futile here because the Truck Manufacturer Defendants have known of and concealed the Inflator Defect and, on information and belief, have refused to repair or replace the Defective Airbags within a reasonable time.

171.   As a direct and proximate result of the Truck Manufacturer Defendants' breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

172.   Any attempt by the Truck Manufacturer Defendants to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, the Truck Manufacturer Defendants' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in the Truck Manufacturer Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and members of the Classes.  Among other things, Plaintiffs and members of the Classes did not determine these time limitations, the terms of which unreasonably favored the Truck Manufacturer Defendants.   A gross disparity in bargaining power existed between the Truck Manufacturer Defendants and members of the Classes, and the Truck Manufacturer Defendants knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Inflator Defect posed a safety risk.

## VIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs and the Classes, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class, and Plaintiffs' counsel as counsel for the Classes;

B.    An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

C.    Injunctive and equitable relief in the form of a comprehensive program to repair or replace the Defective Airbags in all Class Vehicles, and/or buyback all Class Vehicles, and to fully reimburse and make whole all members of the Classes for all costs and economic losses;

D.    Appropriate injunctive and equitable relief;

E.    A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

F.    An order awarding costs, restitution, disgorgement, punitive damages, treble damages and exemplary damages under applicable law, and compensatory damages for economic loss, overpayment damages, and out-of-pocket costs in an amount to be determined at trial;

G.    An order awarding any applicable statutory and civil penalties;

H.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.    An award of costs, expenses and attorneys' fees as permitted by law; and

J.    Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: January 6, 2023                    Respectfully submitted,

                                          /s/ James E. Cecchi
Christopher A. Seeger                     James E. Cecchi
Christopher L. Ayers                      Caroline F. Bartlett
**SEEGER WEISS LLP**                      Jordan M. Steele*
55 Challenger Road, 6th Floor             **CARELLA, BYRNE, CECCHI,**
Ridgefield Park, NJ 07660                 **BRODY & AGNELLO, P.C.**
Telephone: (973) 639-9100                 5 Becker Farm Road
Facsimile: (973) 679-8656                 Roseland, New Jersey 07068
cseeger@seegerweiss.com                   Telephone: (973) 994-1700
cayers@seegerweiss.com                    Facsimile: (973) 994-1744
                                          jcecchi@carellabyrne.com
                                          cbartlett@carellabyrne.com
                                          jsteele@carellabyrne.com


W. Daniel "Dee" Miles, III*               Joseph H. Meltzer
H. Clay Barnett, III*                     Melissa L. Troutner*
J. Mitch Williams*                        Jordan E. Jacobson*
**BEASLEY, ALLEN,**                       **KESSLER TOPAZ MELTZER**
**CROW, METHVIN,**                        **& CHECK, LLP**
**PORTIS & MILES, P.C.**                  280 King of Prussia Road
272 Commerce Street                       Radnor, PA 19087
Montgomery, AL 36104                      Telephone: (610) 667-7706
Telephone: (334) 269-2343                 Facsimile: (610) 667-7756
dee.miles@beasleyallen.com                jmeltzer@ktmc.com
clay.barnett@beasleyallen.com             mtroutner@ktmc.com
mitch.williams@beasleyallen.com

*Counsel for Plaintiffs and Interim Class Counsel*

***Admitted Pro Hac Vice**